# In The Matter Of:

*RICHARD BROOKS VS*
*CITY OF KANKAKEE, IL*

---

*RICHARD BROOKS*
*August 30, 2018*

---

*ADVANTAGE REPORTING SERVICE*
*110 S.W. JEFFERSON AVE., SUITE 430*
*PEORIA, IL    61602*
*PHONE: 309-673-1881   FAX: 309-673-0341*
*reportingservice@att.net*

Original File 8-30-18_BROOKS_BELINDA.TXT
Min-U-Script® with Word Index

Exhibit A, Part 1

**Page 1**

```
 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE CENTRAL DISTRICT OF ILLINOIS
 2                       URBANA DIVISION

 3

 4
    RICHARD BROOKS,              )
 5                              )
                    Plaintiff, )
 6                              )
       v.                       )   No. 17-CV-2265
 7                              )
    CITY OF KANKAKEE, ILLINOIS,  )
 8                              )
                    Defendant. )
 9

10

11

12           Deposition of RICHARD BROOKS, called

13   as a witness herein, pursuant to the applicable

14   provisions of the Federal Rules of Civil Procedure,

15   before Belinda A. Harr, CSR No. 84-003215, taken on

16   August 30, 2018, at 9:30 a.m. at 305 East Oak Street,

17   Kankakee, Illinois.

18

19

20

21

22

23
```

**Page 2**

```
 1                     APPEARANCES

 2
    LAW OFFICE OF KENNETH N. FLAXMAN, PC, by
 3  MR. JOEL A. FLAXMAN
    200 South Michigan Avenue, Suite 201
 4  Chicago, IL 60604
    (312) 427-3200
 5  knf@kenlaw.com

 6           Appeared on behalf of the Plaintiff;

 7
       and
 8
    HERVAS, CONDON & BERSANI, PC,
 9  MR. G. DAVID MATHUES
    333 Pierce Road, Suite 195
10  Itasca, IL 60143-3156
    (630) 773-4774
11  dmathues@hcbattorneys.com

12           Appeared on behalf of the Defendant.

13

14

15

16

17

18

19

20

21

22

23
```

**Page 3**

```
 1                     I N D E X

 2  WITNESS:
    Richard Brooks
 3
    EXAMINATION BY:                          PAGE
 4  Mr. Mathues                                4

 5  EXHIBITS:
    Exhibit No. 1.........................10
 6  Exhibit No. 2.........................13
    Exhibit No. 3.........................18
 7  Exhibit No. 4.........................19
    Exhibit No. 5.........................19
 8  Exhibit No. 6.........................19
    Exhibit No. 7.........................22
 9  Exhibit No. 8.........................24
    Exhibit No. 9.........................26
10  Exhibit No. 10........................27
    Exhibit No. 11........................27
11  Exhibit No. 12........................65
    Exhibit No. 13........................65
12  Exhibit No. 14........................65
    Exhibit No. 15.......................107
13  Exhibit No. 16.......................109
    Exhibit No. 17.......................111
14  Exhibit No. 18.......................121
    Exhibit No. 19.......................123
15  Exhibit No. 20.......................127
    Exhibit No. 21.......................128
16  Exhibit No. 22.......................133
    (Exhibits attached.)
17
18
19
20
21
22
23
```

**Page 4**

```
 1              (Witness sworn.)

 2       MR. MATHUES: This is the deposition of

 3   plaintiff Patrolman Richard Brooks in the case of

 4   Brooks versus the City of Kankakee.  It's Case Number

 5   17-CV-2265 in the Central District of Illinois.  The

 6   deposition will be taken under the Federal Rules of

 7   Civil Procedure and the local rules of the Central

 8   District of Illinois.  For the purposes of the record,

 9   my name is David Mathues and I'm an attorney for the

10   defendant.  Will the other two parties please identify

11   themselves?

12       MR. FLAXMAN: Joel Flaxman, attorney for the

13   plaintiff.

14       THE WITNESS: Richard Brooks, patrolman for the

15   City of Kankakee.

16              RICHARD BROOKS,

17   called as a plaintiff herein, having been first duly

18   sworn, was examined and testified as follows:

19              EXAMINATION

20   BY MR. MATHUES:

21       Q.   Mr. Brooks, have you given a deposition

22   in a civil case before?

23       A.   Yes, I have.
```

Page 5

1    Q.    Approximately, how many times?
2    A.    That I can remember, once.
3    Q.    Was that in the Baptist case?
4    A.    Yes.  And, also, I did one for the City.
5  So one or two.
6    Q.    You're probably familiar with the ground
7  rules or procedures of a deposition, which will help it
8  run smoothly, but I'll go over it anyhow.  Do you
9  understand that you're under oath?
10   A.    Yes.
11   Q.    Do you understand that we have a court
12  reporter taking down everything that you, I, or your
13  attorney say so you'll have to answer out loud, yes,
14  no, and not with a body language or an uh-huh so we
15  have a clear record and nothing is confused?
16   A.    Yes.
17   Q.    In the course of this deposition I might
18  ask a question that confuses you, either because I'm a
19  bad questioner or you're a veteran police officer and
20  I'm a civilian.  So if I ask a confusing question, will
21  you agree to ask me to clarify or explain what I mean?
22   A.    Yes, I will.
23   Q.    We'll be here a few hours.  You

Page 6

1  understand that if you need a break to use the bathroom
2  or any other reason, just ask but I would only ask that
3  you answer the question that's pending before taking
4  that break.  Is that fair?
5    A.    Yes.
6    Q.    In the course of the deposition attorneys
7  may make objections.  Listen to the objection and then
8  you can go ahead and answer the question unless your
9  attorney specifically says I'm instructing you not to
10  answer.  Do you understand that?
11   A.    Yes.
12   Q.    Is there any possible reason you couldn't
13  testify fairly and accurately this morning?
14   A.    No.
15   Q.    Do you have any problems with your
16  memory?
17   A.    Not problems, but I do have a human
18  memory so...
19   Q.    Okay.  I understand.  But you've never
20  been -- had any medical professional tell you you have
21  any problems with your memory?
22   A.    No.
23   Q.    It hasn't prevented you from testifying

Page 7

1  in court before in criminal cases, correct?
2    A.    No.
3    Q.    It has not?
4    A.    It has not, yeah.
5    Q.    Okay.  And if I refer to this case, will
6  you understand what I'm talking about, the case that
7  we're taking this deposition in today of Brooks versus
8  the City of Kankakee?
9    A.    Yes.
10   Q.    This case is not the first time you've
11  sued the Kankakee Police Department alleging they have
12  discriminated against you because you are
13  African-American?
14   A.    No.
15   Q.    And you were a party to the Baptist case
16  with four other officers beginning around 2003; is that
17  correct?
18   A.    Yes.
19   Q.    And some of your claims in that case went
20  before a jury; is that correct?
21   A.    Yes.
22   Q.    And the jury found against you as to the
23  claims that it heard; is that correct?

Page 8

1    A.    Part -- one part of it.
2    Q.    One part of the claims.
3    A.    Yes.
4    Q.    Yeah.  And then some of the other claims
5  ultimately they were settled; there was a settlement
6  agreement entered in the Baptist case.  Is that
7  correct?
8    A.    Yes.
9    Q.    And as part of those claims and part of
10  that settlement agreement there were some changes made
11  to the hiring and promotional process of the Kankakee
12  Police Department; is that correct?
13   A.    That's kind of hard for me to say.
14   Q.    What do you mean by that?
15   A.    Well, I didn't benefit from any of them.
16   Q.    Let me ask the question this way.  The
17  settlement agreement required certain changes in the
18  practice of hiring and/or promotions regarding the
19  Kankakee Police Department; is that correct?
20   A.    Yes.
21   Q.    And you're not alleging in this case that
22  the City of Kankakee is violating the agreement that
23  they entered into in the -- in the Baptist case,

Page 9

1  correct?
2      A.    Whether they're violating or not, I was
3  -- part of what my memory remembers is that I was told
4  that no city employee would be a part of a testing
5  process.
6      Q.    When you say you were told, who -- who
7  told you that?
8      A.    My attorney at that time.
9      Q.    And as I -- let me make sure I get -- the
10  initial attorney that you had in the Baptist case,
11  yourself, and possibly some of the other plaintiffs
12  ended up firing that attorney and hiring a different
13  attorney; is that correct?
14      A.    Yes, we felt he sold out to the City.
15      Q.    And that -- your dispute with him went up
16  on appeal to the Seventh Circuit; is that correct?
17      A.    Yes, it did.
18      Q.    And your memory is that this former
19  attorney is the one who said that no city employee
20  would be involved in the testing process, correct?
21      A.    That is how he got us to settle the
22  second part.
23          MR. MATHUES: I'm going to give you a document

Page 10

1  I'm going to mark as Exhibit No. 1 and I'm going to
2  give a copy to your attorney.
3          (Exhibit No. 1 marked.)
4  BY MR. MATHUES:
5      Q.    Okay.  Now, do you recognize Exhibit No.
6  1, Mr. Brooks?
7      A.    Exhibit No. 1?
8      Q.    What I'm handing you right now is going
9  to be Exhibit No. 1.
10          MR. FLAXMAN: He marked it as Exhibit 1.
11          THE WITNESS: Oh, okay.
12          MR. MATHUES: Can we go off the record?
13          (Off the record.)
14  BY MR. MATHUES:
15      Q.    Do you recognize what's been marked for
16  you as Exhibit No. 1?
17      A.    Yes, I do.
18      Q.    What is Exhibit No. 1?
19      A.    The interrogatory answers to questions.
20      Q.    And that's for this case, correct?
21      A.    Yes.
22      Q.    And if you go to the last page at the
23  very bottom of page 6, there's a signature; is that

Page 11

1  correct?
2      A.    Yes.
3      Q.    Whose signature is that?
4      A.    Mine.
5      Q.    And did you sign Exhibit No. 1?
6      A.    Yes, I did.
7      Q.    Is everything you signed in Exhibit No. 1
8  accurate?
9      A.    Based on my memory at that time, yes.
10      Q.    Since you've signed it, is there any
11  changes you believe need to be made to Exhibit No. 1?
12      A.    Basically, what I just shared with you
13  about what was shared with me through my first
14  attorney.
15      Q.    Other than what your first attorney told
16  you, that as I understand you're contending turned out
17  not to be the case, is there any other changes you
18  believe need to be made to your interrogatory answers
19  in Exhibit No. 1?
20      A.    Not that I can remember at this time.
21      Q.    Can you take a moment and look at Exhibit
22  No. 1 and see if that refreshes your recollection?
23      A.    Can I ask you my recollection of what?

Page 12

1  Of the exhibit itself, my answers?  Is that what you're
2  asking?
3          MR. MATHUES: Would you read back the question?
4          (Record read as requested.)
5  BY THE WITNESS:
6      A.    Not that I can think of at this time.
7  BY MR. MATHUES:
8      Q.    Is there anything that would help refresh
9  your recollection?
10      A.    Not at this time.
11      Q.    Take a look at Exhibit -- page 6 of
12  Exhibit No. 1, the very top line.  I'm going to start
13  reading for number 19.  "Do you contend that the City
14  of Kankakee is in any way in violation of the Baptist
15  settlement?"  Did I read that accurately?
16      A.    Yes.
17      Q.    And then the answer is no; is that
18  correct?
19      A.    Yes.  At that time, yes.
20      Q.    And that was an answer that you put down?
21      A.    At that time, yes.
22      Q.    And is it your testimony that that answer
23  is inaccurate now?

Page 13

1   A.   Based on -- if what I -- what I share
2   with you today is in any way different than what I
3   answered that question, I would have to say yes.
4   MR. MATHUES: Do you know -- strike that. I
5   have another exhibit. I will mark it Exhibit No. 2. I
6   will also give a copy to your attorney, Mr. Flaxman.
7   (Exhibit No. 2 marked.)
8   BY MR. MATHUES:
9   Q.   Take a look at Exhibit No. 2, and
10  whenever I give you an exhibit, Mr. Brooks, take as
11  much time as you need. I'm not trying to trick you
12  with a document. Whenever you're confident that you
13  know what you're looking at, you can just look up at me
14  or say I'm ready. Do you recognize Exhibit No. 2?
15  A.   Kind of. Kind of, yeah.
16  Q.   What is Exhibit No. 2?
17  A.   It's an Agreed Judgment Order.
18  Q.   Do you recognize the case caption as the
19  Baptist litigation that you were part of?
20  A.   Yes.
21  Q.   Do you see up at the top it says filed
22  and then there's a date of September 22, 2015 (sic)?
23  A.   Yes.

Page 14

1   Q.   2005. I apologize.
2   A.   Yes.
3   Q.   Then the very last page toward the bottom
4   it says entered this 22nd day of September 2005 and
5   it's the signature of Federal Judge Michael McCuskey?
6   A.   Yes.
7   Q.   Do you agree that what you're looking at
8   in Exhibit No. 2 is the settlement agreement that was
9   entered into in the Baptist case?
10  A.   There -- it was one, but as I was sharing
11  with my attorney, I definitely remember a Consent
12  Decree being advised to us by my past attorney.
13  Q.   Did you ever see a copy of that Consent
14  Decree?
15  A.   I remember reading it, and there's one
16  part -- and I even wrote it -- I wrote it down. It
17  talked about the testing procedure. It was talking
18  about how long it would cover, and it said five years
19  or two testing periods or whichever came last. That
20  stuck in my craw and it stuck in my memory.
21  Q.   The Consent Decree that you're referring
22  to, do you still have a copy?
23  A.   I don't have a copy. I've really looked

Page 15

1   and I cannot find it, but my memory -- I remember
2   reading how long it would cover. And that's how we
3   were sold on the second settlement.
4   Q.   When you're saying you sold on the second
5   settlement, are you referring to conversations between
6   yourself and your former attorney?
7   A.   And also Deputy Chief Hunt remembers it.
8   He shared with me he does remember it.
9   Q.   We'll get to Deputy Chief -- although
10  he's now the acting chief; is that correct?
11  A.   Yes.
12  Q.   As of, what, a month ago? Two weeks ago?
13  A.   Whenever Price Dumas resigned.
14  Q.   And Mr. Dumas was actually party to the
15  case as well, the Baptist case?
16  A.   Yes, but he found out things hadn't
17  changed when he came back.
18  Q.   And the Consent Decree that you're
19  referring to, do you know if it was ever filed with the
20  Federal Court?
21  A.   After severing with our attorney, we had
22  no way of finding out, but we were told it would be.
23  Q.   I -- I understand you were told it would

Page 16

1   be. Do you know as you sit here today, Mr. Brooks,
2   whether it actually was?
3   A.   Apparently not.
4   Q.   Do you know who, if anyone, in the world
5   might have a copy of that Consent Decree?
6   A.   My past attorney. The one we fired
7   because he sold us out for money.
8   Q.   And your dispute with your past attorney,
9   that went up to the Seventh Circuit as well, correct?
10  A.   Yes.
11  Q.   And the Seventh Circuit ruled against
12  you; is that correct?
13  A.   Based on his testimony. He was supposed
14  to represent us. He was our attorney.
15  Q.   I understand you're not happy with him,
16  Mr. Brooks.
17  A.   Yes.
18  Q.   My question was at least at the Seventh
19  Circuit took -- ruled against you; is that correct?
20  A.   They did.
21  Q.   And you have also since 2014 filed four
22  complaints with the Illinois Department of Human Rights
23  alleging racial discrimination on the job; is that

Page 17

1  correct?
2      A.   Yes, I have.
3      Q.   And three of those complaints were
4  dismissed that the Illinois Department of Human Rights
5  found no substantial evidence; is that correct?
6      A.   Three.  And one was found.
7      Q.   And one you voluntarily dismissed; is
8  that correct?
9      A.   Exactly.
10     Q.   And at the time you voluntarily dismissed
11 that fourth one you were represented by Mr. Flaxman; is
12 that correct?
13     A.   Exact -- well, I sought representation.
14     Q.   You had just said that one was found.
15 What do you mean by that?
16     A.   It was vacated.  The dismissed one was
17 vacated.
18     Q.   And after it was vacated was it dismissed
19 again?
20     A.   I can't remember.  I thought I -- I kind
21 of released myself from it.
22     Q.   Let's go through that.
23     A.   And just so you understand, they never

Page 18

1  ruled against it.  They only said that it wasn't
2  substantial enough, that there was some there, but just
3  not at that time.  And I had to credit that to my
4  layperson's knowledge of being my own representation.
5              (Exhibit No. 3 marked.)
6      Q.   I'm going to hand you a document marked
7  as Exhibit No. 3.  I'm, also, going to give a copy to
8  your attorney, Mr. Flaxman.  Do you see at the top
9  right-hand corner of Exhibit No. 3 it says charge
10 number 2014CA2471?
11     A.   Yes.
12     Q.   And would you agree that Exhibit No. 3 is
13 the first of the four complaints that you made with the
14 Illinois Department of Human Rights regarding racial
15 discrimination on the job?
16     A.   Yes.  It appears to be, yes.
17     Q.   And that's your signature down at the
18 bottom right-hand corner of page one of Exhibit 3,
19 Richard Brooks, 3/25/14?
20     A.   Yes.
21     Q.   And in summary what Complaint 2014CA2471
22 was over was when Jeff Martin was promoted to sergeant
23 instead of yourself; is that correct?

Page 19

1      A.   Yes.
2      Q.   And Jeff Martin was promoted to sergeant
3  in October of 2013; is that correct?
4      A.   I don't know when exactly he was
5  promoted.  I only --
6      Q.   Does that sound --
7      A.   I only documented when I found out.
8      Q.   In October 2013 would have been when you
9  found out that Jeff Martin was made sergeant?
10     A.   Whenever I noted it, yes.
11         MR. MATHUES: I'm going to mark another
12 document.  I'm going to mark three more documents in
13 quick succession, 4, 5, and 6.
14              (Exhibit Nos. 4, 5, and
15                6 marked.)
16 BY MR. MATHUES:
17     Q.   The first of three documents I've handed
18 you in quick succession, Mr. Brooks, has a Bates stamp
19 of Kankakee 224 marked as Exhibit 4.  Do you see --
20 would you agree that this is the initial dismissal for
21 lack of substantial evidence of the first claim you
22 made with the Illinois Department of Human Rights?
23     A.   Lack of substantial evidence is the way I

Page 20

1  would like to look at it.
2      Q.   That's --
3      A.   That's what it was based on.
4      Q.   That's what it was based on.
5      A.   Yes.
6      Q.   And then I handed you another document
7  that we've marked as Exhibit 5 -- and to go back, the
8  date of the dismissal for lack of substantial evidence
9  on Exhibit 4 was January 7th of 2015; is that right?
10 If you'd look at the middle of the first page.
11     A.   Yes.
12     Q.   And then Exhibit 5, which I had given you
13 and is marked Kankakee 236, that was your request for
14 review or reopening the petition with the Illinois
15 Department of Human Rights, the first one you had filed
16 that was captioned 2014CA2471?
17     A.   Exhibit 5?
18     Q.   Exhibit 5, with the Bates stamp at the
19 bottom of Kankakee 236.
20     A.   Yes.
21     Q.   And the date that you requested review or
22 re-opening of the Illinois Department of Human Rights
23 finding in Case Number 2014CA2471 was March 24, 2015?

**Page 21**

1   A.   Yes.

2   Q.   And, finally, the document that will be

3   marked as Exhibit 6 that begins with the Bates stamp of

4   Kankakee 250.

5   A.   Exhibit 6?  This one?

6   MR. FLAXMAN: Yeah, that's right.

7   BY MR. MATHUES:

8   Q.   It's also part of the same Illinois

9   Department of Human Rights Complaint CA 2014 -- strike

10  that -- 2014CA2471, correct?

11  A.   Yes.

12  Q.   And this is -- Exhibit 6 is also a notice

13  of dismissal for lack of substantial evidence and the

14  date is December 29, 2015?

15  A.   Yes.

16  Q.   So the Illinois Department of Human

17  Rights did, in fact, reopen your complaint after you

18  asked for review and then they again dismissed it for

19  lack of substantial evidence; is that correct?

20  A.   Yes.  But what I realized is that --

21  MR. FLAXMAN: Just --

22  MR. MATHUES: There's no question pending,

23  Mr. Brooks.

**Page 22**

1   MR. FLAXMAN: He wants yes or no.  Give him yes

2   or no.

3   MR. MATHUES: I'll mark another document as

4   Exhibit No. 7.  I will give a copy also to your

5   attorney, Mr. Flaxman.

6   (Exhibit No. 7 marked.)

7   BY MR. MATHUES:

8   Q.   Do you recognize Exhibit No. 7?

9   A.   Yes, I do.

10  Q.   What's Exhibit No. 7?

11  A.   It's a request for review that I wrote.

12  Q.   And Exhibit No. 7 was a request that you

13  had sent to the Illinois Department of Human Rights in

14  the Charge Number 2014CA2471 that we've just been

15  discussing, correct?

16  A.   Yes.

17  Q.   And would it be fair to say that it's a

18  letter laying out your side of the story as far as how

19  you've been treated?

20  A.   Yeah.  And it covers the part where I

21  stated where I was told that -- you know, that an

22  employee would not be a part of the testing process in

23  the Consent Decree.

**Page 23**

1   Q.   And as part of communicating what -- what

2   you believe you were told, Exhibit 7 tells the Illinois

3   Department of Human Rights it's your -- your side of

4   the story as far as how you have been treated, correct?

5   A.   Yes.

6   Q.   Meaning that when the Illinois Department

7   of Human Rights -- strike that.  And the date on

8   Exhibit No. 7 is March the 1st of 2015, correct?

9   A.   Yes.

10  Q.   Meaning that when the Illinois Department

11  of Human Rights ultimately dismissed your grievance for

12  lack of substantial evidence in December of 2015, they

13  did have in their possession the letter you had sent

14  them, correct?

15  MR. FLAXMAN: Object to the foundation.  He

16  doesn't know what the DHR has in their possession.

17  BY THE WITNESS:

18  A.   I'll agree with my attorney.

19  BY MR. MATHUES:

20  Q.   It's your testimony you don't know?  Is

21  that --

22  A.   No, I don't know what they had.

23  Q.   The next complaint you filed with the

**Page 24**

1   Illinois Department of Human Rights was in -- alleging

2   racial discrimination was in 2016, correct?

3   A.   Is there an exhibit I should be look at?

4   Q.   I'll give you one.  This will be Exhibit

5   No. 8.  Exhibit 8 begins with a Bates stamp of Kankakee

6   61.  This second complaint is captioned 2016CA1966; is

7   that correct?

8   (Exhibit No. 8 marked.)

9   A.   Yes.

10  MR. FLAXMAN: In the number right up here,--

11  THE WITNESS: Yes.

12  MR. FLAXMAN: -- yes.

13  BY MR. MATHUES:

14  Q.   And on April 3rd of 2017 the Illinois

15  Department of Human Rights again dismissed this

16  complaint for lack of substantial evidence; is that

17  correct?

18  A.   Yes.

19  Q.   If you go to what I believe is page 3,

20  it's Kankakee 63 Bates stamped.

21  A.   Page 3?

22  MR. MATHUES: I believe it's page 3 of the

23  document.  It's Kankakee 63.

Page 25

1      MR. FLAXMAN: It says 63 at the bottom.
2  BY MR. MATHUES:
3      Q.   Towards the middle of the page under
4  jurisdiction it says charge filed March 8, 2016.  Do
5  you see what I'm talking about?
6      A.   March 8?
7      MR. FLAXMAN: Under jurisdiction, charge filed.
8      THE WITNESS: Yeah.  Yes, I see that.
9  BY MR. MATHUES:
10     Q.   March 8, 2016, would have been the day
11  you filed your second complaint with the Illinois
12  Department of Human Rights, the one we're looking at
13  now captioned 2016CA1966?
14     A.   That's what's noted, yes.
15     Q.   And without getting too far into the
16  weeds of the subject of this complaint, in short your
17  allegation of discrimination here dealt with a
18  suspension that you received for getting involved in a
19  high-speed chase that you believed was unfair and
20  discriminatory; is that correct?
21     A.   Retaliation, yes.
22          (Exhibit No. 9 marked.)
23     Q.   I'll give you another.  We are at Exhibit

Page 26

1  9. I'll give a copy to your attorney.  Exhibit 9 is
2  Bates stamped Kankakee 294.  Do you see a caption on
3  Exhibit 9 of 2016CA2470 towards the top right-hand
4  corner?
5      A.   Yes.
6      Q.   And would you agree that Exhibit 9 Bates
7  stamp Kankakee 294 is the third of four complaints you
8  had filed with the Illinois Department of Human Rights
9  alleging racial discrimination?
10     A.   Based on memory, yes.
11     Q.   Without going too far into the weeds of
12  the subject matter of your third complaint, 2016CA2470,
13  this was over a disciplinary reprimand that former
14  Chief Larry Regnier wrote and put in your file that you
15  believed was retaliatory; is that correct?
16     A.   Yes.
17     Q.   And you filed Exhibit No. 9, your third
18  of four complaints, with the Illinois Department of
19  Human Rights on May the 2nd of 2016?  If you look at
20  the bottom --
21     MR. FLAXMAN: Is your signature there?
22     MR. MATHUES: -- right-hand corner where your
23  signature is, Mr. Brooks.

Page 27

1  BY THE WITNESS:
2      A.   Yes.
3          (Exhibit No. 10 marked.)
4  BY MR. MATHUES:
5      Q.   I have another one that I will mark as
6  Exhibit No. 10.  I have a copy for your attorney.
7  Exhibit 10 is Bates stamp Kankakee 297.
8          Would you agree that Exhibit No. 10
9  that we're looking at with Bates stamp Kankakee 297 and
10  also having the caption of 2016CA2470 is the third
11  dismissal -- is the Illinois Department of Human Rights
12  dismissal of your third complaint for lack of
13  substantial evidence?
14     A.   Yes.
15     Q.   And that dismissal was on April the 10th
16  of 2017; is that correct?
17     A.   Yes.
18          (Exhibit No. 11 marked.)
19     Q.   One more.  This will be Exhibit No. 11.
20  I'll give a copy to your attorney.  Exhibit No. 11, if
21  you look at the top right-hand corner, has a charge
22  number of 2017CA0559; is that correct?
23     A.   Yes.

Page 28

1      Q.   Would you agree Exhibit No. 11 is the
2  fourth of the complaints that you filed with the
3  Illinois Department of Human Rights alleging racial
4  discrimination?
5      A.   Yes.
6      Q.   And if you look down at the bottom
7  right-hand corner, there is a -- it's your signature
8  and a date of September 19, 2016, which is the date
9  that you filed the fourth complaint?
10     A.   Yes.
11     Q.   And the Bates stamp by the way of Exhibit
12  No. 11 is Kankakee 378, and this fourth complaint
13  2017CA0559, again, without getting into the weeds of
14  the subject matter, the basis of the complaint was when
15  Paul Berge was promoted to sergeant instead of
16  yourself; is that correct?
17     A.   Yes.
18     Q.   And this fourth complaint with the
19  caption of 2017CA0559 is the one that you dismissed
20  from the Illinois Department of Human Resources --
21  excuse me -- Department of Human Rights; is that
22  correct?
23     A.   I sought legal counsel, yes.

Page 29

1    Q.    And, obviously, Mr. Brooks, in the course
2  of the deposition certainly regardless of what I say I
3  am not asking for any statement that you made to your
4  attorney or that your attorney made to you. I'm not
5  trying to get into privileged information. I want to
6  put that -- put that out there.
7    A.    That's what you say.
8    Q.    What, if anything, did you do to get
9  ready for this morning's deposition?
10    A.    I went through my normal ritual dealing
11  with the stress that I have been dealing with with the
12  department. I come in every morning. I work out for
13  at least two hours. So I've been here since like 7:00,
14  6:30'ish. I worked out, took a shower, and came up.
15    Q.    Either on your own or in the accompany of
16  anyone else, did you review any documents to get ready
17  for this morning's deposition?
18    A.    Did I review any documents?
19    Q.    Did you review -- did you look at any
20  documents to get ready for this morning's deposition?
21    A.    I didn't have time this morning.
22    Q.    Other than -- other than this morning at
23  any time since this case has been filed, have you

Page 30

1  looked at any -- strike that. Since your deposition
2  has been scheduled in this case, Mr. Brooks, have you
3  looked at any documents to get ready for the
4  deposition?
5    A.    I did read interrogatories I answered.
6  That's the only documents that I can remember. And my
7  complaint. I did look over that.
8    Q.    So you didn't look at any other documents
9  to get ready for the deposition?
10    A.    No.
11    Q.    This is a yes-or-no question. I'm not
12  asking for anything that was said. Did you meet with
13  and talk to your attorney?
14    A.    Well, I came -- I was -- we came to this
15  location if you call that a meeting. We didn't set up
16  a scheduled meeting, no, but we -- we're here.
17    Q.    Okay. Let me ask -- let me ask the
18  question again. Did you talk -- without telling me a
19  word that was said, did you have a face-to-face
20  conversation with your -- with your attorney?
21    A.    Hi, how are you doing? We met each
22  other, yeah, introduced each other.
23    MR. FLAXMAN: You can tell him we spoke this

Page 31

1  morning without telling him what we spoke about.
2    THE WITNESS: I mean, yeah.
3  BY MR. MATHUES:
4    Q.    Okay. Did you talk to anyone else about
5  this morning's deposition?
6    A.    No.
7    Q.    Since the day you filed this case, Brooks
8  versus the City of Kankakee, in Federal Court, have you
9  talked to any other member of the Kankakee Police
10  Department about this lawsuit?
11    A.    I'm kind of getting lost. You mean this
12  deposition or --
13    Q.    This suit in general. This suit at all,
14  whether it's the deposition, whether it's the
15  allegations that you make, whether -- anything
16  regarding this suit.
17    A.    I'm going to say -- based on memory, I'm
18  going to say no that I can remember right now.
19    Q.    Since the day you filed this case, have
20  you talked to any member of the Kankakee Police
21  Department regarding your being promoted to sergeant?
22    A.    I've had citizens asking me why I haven't
23  been promoted. I mean, basically, it's people have

Page 32

1  asked me why and, you know, but --
2    Q.    My question was a little bit different.
3  I can -- have you talked to any member of the Kankakee
4  Police Department regarding your being promoted to
5  sergeant?
6    A.    I actually try not to. I even shared
7  that -- just real briefly, I have to share this, when I
8  get ride-alongs, I request not to have ride-alongs
9  because most inquire about why I haven't been promoted,
10  and I don't really want to go through all of that.
11    Q.    Before he left the department, did you
12  ever talk to Chief Dumas about the fact that you filed
13  this suit or you being promoted to sergeant?
14    A.    The only thing I can remember talking to
15  him about he was telling me to take the next test and I
16  was telling him because of the stress that I was going
17  through that I just couldn't do it.
18    Q.    Approximately, when did the Chief tell
19  you that -- strike that. Approximately, when did
20  former Chief Dumas tell you to take the sergeant's
21  test?
22    A.    I'm not saying he told me. He just kind
23  of encouraged me. He understood. He said he

Page 33

1  understood my reasoning.
2      Q.    Approximately, when did former Chief
3  Dumas encourage you to take the sergeant's test?
4      A.    I remember in passing we were at a
5  funeral. I can't recall -- I think it was a funeral of
6  another officer's mother.
7      Q.    Do you know what year this was?
8      A.    That's hard to say. I can't remember
9  unless I saw the obituary.
10     Q.    Was Mr. Dumas the acting Chief at the
11 time this conversation took place?
12     A.    Yes, he was.
13     Q.    Since you filed this case, have you had
14 any conversations with now -- former Deputy Chief, now
15 acting Chief, Mr. Hunt regarding you being promoted to
16 sergeant?
17     A.    Yeah, and it was pretty much the same
18 conversation, the stress that I was going through. He
19 understood.
20     Q.    So at some point did Mr. Hunt encourage
21 you to take the sergeant's test?
22     A.    He was being encouraging. You know, you
23 should go ahead and take it, and then I shared with him

Page 34

1  that, you know, it was too much.
2      Q.    Approximately, when did Mr. Hunt, now
3  acting Chief Hunt, encourage you to take the sergeant's
4  test?
5      A.    It was actually the same setting.
6      Q.    At the same funeral?
7      A.    Yeah. Yeah, the same. And they didn't
8  bother me after -- again after I shared with them the
9  stress that I was having, dealing with.
10     Q.    Have you had any conversations with Mr.
11 -- former Chief Dumas or acting Chief Mr. Hunt about
12 the status of this lawsuit?
13     A.    I didn't know the status. I don't know
14 what you're asking.
15     Q.    Have you talked to former Chief Dumas or
16 acting Chief Mr. Hunt in any way about this lawsuit?
17     A.    Other than what I shared with you.
18     Q.    What did you share with them?
19     A.    What I shared with you about the stress.
20     Q.    Did you tell them that this case is
21 pending?
22     A.    Did I tell them? No, I didn't talk to
23 them about this. That's the only thing we really

Page 35

1  talked about was the testing. We never got into this.
2      Q.    Let's take a step back. About how many
3  police officers are -- sworn officers are members of
4  the Kankakee Police Department?
5      A.    Based on my memory, I think the last I
6  heard was 67.
7      Q.    About how many of those were in patrol?
8      A.    I'm not exact, but somewhere around about
9  40 something.
10     Q.    About how many are in investigations?
11     A.    I couldn't really tell you that.
12     Q.    I'm not asking for an exact count but an
13 estimate. Approximately, what percentage of the
14 manpower of the Kankakee Police Department is
15 African-American?
16     A.    I'm not sure, but it's small.
17     Q.    Would you say more than 20 percent or
18 less than 20 percent?
19     A.    If I ventured a guess, I would say less.
20     Q.    More than ten percent or less than ten
21 percent?
22     A.    I would think right about there.
23     Q.    Do you know what -- approximately what

Page 36

1  percentage of the Kankakee Police Department would be
2  Hispanic or Latino?
3      A.    I couldn't tell you. It's probably not
4  even measurable.
5      Q.    Do you know if there are any Hispanic or
6  Latino police officers?
7      A.    When I say measurable, I mean like it's
8  probably point one, point something, or something like
9  that.
10     Q.    My question was a little bit different,
11 Mr. Brooks. Do you know as you sit here whether any of
12 the officers of the Kankakee Police Department are
13 Hispanic or Latino?
14     A.    I would say -- that I know of?
15     Q.    That you --
16     A.    I know they just hired one.
17     Q.    You know they hired one. Other than the
18 individual they just hired, do you know?
19     A.    I know two.
20     Q.    Two. About how many sergeants are there
21 total with the Kankakee Police Department?
22     A.    If I ventured a guess, it's probably
23 about 12 because they did eliminate some positions.

Page 37

1   Q.   About how many lieutenants are there?
2   A.   I'm going to guess five.
3   Q.   And above the lieutenants you've got a
4   patrol commander, an investigations commander, a deputy
5   chief, and a chief; is that correct?
6   A.   Yes.
7   Q.   Of the current sergeants, how many are
8   African-American?
9   A.   Since Price Dumas came about?
10   Q.   Today.  Today.  We'll go back in time,
11   but we'll say as of today.
12   A.   Since Price Dumas has come he's promoted
13   one.
14   Q.   And that would be Mr. Hunter?
15   A.   Yes.
16   Q.   And before Price Dumas came, who was --
17   were there any African-American sergeants?
18   A.   There would have been Austin, Miller, and
19   Hunt.  No, wait a minute.  You said sergeants?
20   Q.   Sergeants.
21   A.   I'm sorry.  You mean the ranking of
22   present sergeant or had been sergeant?  Because Hunt is
23   a lieutenant or the deputy chief.

Page 38

1   Q.   Let me ask the question a little bit
2   differently to make it more clear.  During the time --
3   during the time starting from 2010 forward from the
4   time that Mr. Regnier was chief, who during that time
5   at any point during that time was African-American and
6   was a sergeant?
7   A.   Donnell Austin and Mike Sneed.
8   Q.   And what about Mr. Hunt?
9   A.   Well, he was a lieutenant.
10   Q.   He was a lieutenant at that time?
11   A.   Yes.
12   Q.   Okay.
13   A.   Well, that I can remember.  It might -- I
14   might be off a little bit.
15   Q.   I understand.  In the course of this
16   deposition if you remember an answer to a question that
17   I asked 20 minutes ago or an hour ago and forgot but
18   then it comes to your mind, will you -- can you agree
19   to interrupt me and say I now remember such and such?
20   A.   Yes.
21   Q.   And Mr. Austin was later promoted to
22   lieutenant by former Chief Regnier; is that correct?
23   A.   Yes.  That was after he -- hold on -- he

Page 39

1   came to me to file a complaint because they did not
2   promote him before that.
3   Q.   Okay.  So we're clear, when you say he,
4   who's he?
5   A.   Sergeant Austin.
6   Q.   Mr. Austin came?
7   A.   Uh-huh.
8   Q.   Sergeant Austin came?
9   A.   Yes.
10   Q.   And Mr. Sneed was promoted to sergeant in
11   approximately 2011, correct?
12   A.   And that was after he came to me and was
13   ready to file a complaint that they did reach out to
14   him.
15   Q.   Do you know whether Mr. Sneed ever did
16   file a complaint?
17   A.   They reached out to him before he did,
18   yes.
19   Q.   So the answer is, no, he did not?
20   A.   No, he did not.  He didn't have to.
21   Q.   Do you know if Mr. Austin ever filed any
22   sort of racial discrimination complaint?
23   A.   They ended up promoting him to lieutenant

Page 40

1   before he did it.
2   Q.   So the answer is, no, he did not?
3   A.   No, he did not.  He did not have to.
4   Q.   Obviously, Mr. Hunt was a party to the
5   Baptist litigation.  Other than -- so I'm not asking
6   about that.  Other than the Baptist litigation, do you
7   know whether Mr. Hunt ever filed a complaint of racial
8   discrimination?
9   A.   He was about to, but then they promoted
10   him.
11   Q.   And he did not?
12   A.   Yes.
13   Q.   Other than the individuals we have
14   mentioned, Mr. Hunt, Mr. Austin, Mr. Hunter, Mr. Sneed,
15   and Price Dumas or -- can we go off the record?
16        (Off the record.)
17   BY MR. MATHUES:
18   Q.   Back on the record.  Other than those
19   individuals, are there any other African-Americans, who
20   are at the rank of sergeant and above since 2010?
21   A.   Not that I know of.
22   Q.   Has anyone been promoted to sergeant in
23   the Kankakee Police Department since Mr. Hunter was

Page 41

1  promoted earlier this year?
2      A.   Not that I know of.
3      Q.   Do you know when the next sergeant's test
4  will be?
5      A.   That's hard to say, but it's supposed to
6  be in three years.
7      Q.   The most recent test was in 2017,
8  correct?
9      A.   Yes.
10     Q.   And that resulted in a list that came out
11 in January of 2018, correct?
12     A.   Yes.
13     Q.   And that's the list that Mr. Hunter was
14 promoted off of, correct?
15     A.   Yes.
16     Q.   And as I understand it, once a sergeant's
17 list is issued, that list stays the list until there's
18 a new test and a new list; is that correct?
19     A.   Correct.
20     Q.   And then if someone gets promoted off the
21 list -- let's say person number one gets promoted off
22 the list.  Now the person who was previously --
23     A.   Person number one, two, or three.

Page 42

1      Q.   I'll get to that in a just second, but--
2          MR. FLAXMAN: Let him finish.
3          MR. MATHUES: -- if someone -- if someone gets
4  promoted from the top three, the person who was number
5  four now becomes part of the top three on the list; is
6  that correct?
7  BY THE WITNESS:
8      A.   Yes.
9  BY MR. MATHUES:
10     Q.   And by law the person who is promoted has
11 to be in the top three; is that correct?
12     A.   If there's a pending lawsuit, they can
13 reach, yeah.
14     Q.   Let me -- let me ask -- my question was a
15 little bit different.  Would you agree that by law a
16 sergeant promotion has to be someone from the top three
17 on the sergeant's list?
18     A.   Not by law.  I can't agree with that
19 because there are extenuating circumstances.
20     Q.   What circumstances are those?
21     A.   A lawsuit.
22     Q.   What's your basis for that testimony,
23 Mr. Brooks?  Who told you that?

Page 43

1      A.   Well, it's common knowledge that the
2  mayor has a right to make whoever has been injured or,
3  you know, not promoted or treated improperly -- she
4  does have the right to appoint, yeah.
5      Q.   And you have been a patrolman for how
6  many years?
7      A.   Twenty-two.
8      Q.   In your 22 years with the Kankakee Police
9  Department are you aware of anyone who has been
10 promoted to sergeant who was not in the top three on
11 the sergeant's list?
12     A.   Not to my knowledge.  Except for, I
13 think, Greg Foster.  I think he filed a suit.  He --
14 well, he tells me about that.
15     Q.   Greg Foster, is he currently employed by
16 the Kankakee Police Department?
17     A.   Retired sergeant.
18     Q.   Is he an African-American?
19     A.   No, he's white.
20     Q.   Do you know when -- approximately, when
21 did Greg Foster tell you that he filed a suit?
22     A.   Yeah, he filed a lawsuit.
23     Q.   Yeah.  Do you know what his allegations

Page 44

1  were?
2      A.   They kept passing over him.
3      Q.   Do you know was it a discrimination
4  lawsuit?
5      A.   I don't know what the basis.  He just
6  told me he won, so.
7      Q.   Approximately what year did he tell you
8  that he won?
9      A.   Many years.  He talks about it quite
10 often.
11     Q.   Approximately what year did he become a
12 sergeant?
13     A.   I think he was one when I came on board.
14     Q.   So this would have been like two decades
15 ago; is that correct?
16     A.   I would have to say, yeah, at least two
17 decades.  I got 22 years, yes.
18     Q.   When you say it's common knowledge that
19 the mayor can appoint someone to be sergeant, is that
20 something that the mayor has told you?
21     A.   No.  It's just the authority that she's
22 given.
23     Q.   When you say the authority that she's

Page 45

1  given, is this the result of your own -- is this belief
2  based on your own research?
3      A.   I would have to say at this time, yes.
4      Q.   What sources have you looked at that led
5  you to believe that the mayor has the authority to
6  appoint someone as sergeant who isn't on the top three
7  on the sergeant's list?
8      A.   Actually, I think it was through my first
9  counsel, Bent.
10     Q.   That -- that he told you the mayor had
11 that authority?
12     A.   Yeah.  That's why we were suing.
13     Q.   Other than Mr. Bent who, obviously, you
14 had a falling out with, has anyone else told you that
15 someone can be promoted to sergeant who is not in the
16 top three on the sergeant's list?
17     A.   Not that I can recall.
18     Q.   Is there anything that would refresh your
19 recollection as to who might have told you that?
20     A.   Not at this time.
21     Q.   As far as your background, you graduated
22 from Kankakee Community College with an associate's in
23 business and law enforcement back in 1984?

Page 46

1      A.   Yes.
2      Q.   And then you did some additional
3  education at Governor State; is that correct?
4      A.   I graduated with honors, yes.
5      Q.   Congratulations.  What year did you
6  graduate?
7      A.   It would have been '04.
8      Q.   And what did you get your degree in?
9      A.   Criminal justice.
10     Q.   Would that be a Bachelor of Science?
11     A.   Yes.
12     Q.   Do you have any other additional college
13 or above education?
14     A.   I did study at DeVry for a couple of
15 years in electronic engineering.
16     Q.   When you studied at DeVry, about how many
17 classes did you take?
18     A.   I think I went at least two years.  Maybe
19 about eight or twelve courses before dropping out.  It
20 was a long drive.
21     Q.   And were those courses criminal justice
22 related?
23     A.   No, it would be electronics.

Page 47

1      Q.   Electronics.  And what degree were you
2  working towards?
3      A.   That was in '86 so it was a long time
4  ago.
5      Q.   Fair.
6      A.   Engineering, electronic engineering.
7      Q.   Let me ask it differently.  Was it a
8  bachelor's or a master's?
9      A.   It would have been a bachelor's, yes.
10     Q.   You started working with the Kankakee
11 Police Department back in 1996; is that correct?
12     A.   Once I left the nuclear plant as a
13 sergeant, yes.
14     Q.   How old do you have to be to be eligible
15 to retire from the Kankakee Police Department?
16     A.   How old?
17     Q.   Yes.
18     A.   Oh, I couldn't tell you that.  I don't
19 know.
20     Q.   Do you know when you will be eligible for
21 retirement?
22     A.   I'm eligible now.  Twenty years.
23     Q.   Is there a mandatory retirement age for

Page 48

1  the Kankakee Police Department?
2      A.   I'm not sure.
3      Q.   Do you know if you have to retire at any
4  time in the future?
5      A.   Not that I know of, no.
6      Q.   Do you have any plans to retire before
7  age 60?
8      A.   I'm planning to go in 30 years so I would
9  be past 60.
10     Q.   Approximately, how long before a
11 sergeant's list comes out does the testing take place?
12     A.   It's hard for me to say, but it's
13 supposed to be boom-boom-boom, you know, steps, so.
14     Q.   Would it be fair to say less than six
15 months?
16     A.   I would agree to that, yeah.
17     Q.   And the announcement that there is going
18 to be sergeant testing that's a public announcement in
19 the police department?
20     A.   Yeah, I would say yes.
21     Q.   Posted on the bulletin board or sent out
22 by email?
23     A.   Yes, by the Commission.

Page 49

1  Q.  And when the list is published after the
2  testing, is that list also publicly -- or available to
3  all members of the Kankakee Police Department?
4  A.  Yes.
5  Q.  So you know where you rank on the list
6  and everyone else knows where you rank on the list?
7  A.  Not in the beginning.  There was a fight
8  to get that, yeah.
9  Q.  Now that's -- that's true?
10  A.  Yeah.
11  Q.  The 2014 list -- when the 2014 list came
12  out, was it public within -- within the Kankakee Police
13  Department?
14  A.  Yes.
15  Q.  When the 2011 sergeant's list came out,
16  was that list public within the Kankakee Police
17  Department?
18  A.  Yes.
19  Q.  Did you take the sergeant's exams when
20  the 2017 list came out?
21  A.  I shared that with you earlier.
22  Q.  And you did not, correct?
23  A.  Due to stress, no.

Page 50

1  Q.  Any other reason you did not take the
2  sergeant's exam in 2017?
3  A.  The knowledge I received that the same
4  two will be giving the oral interview.  That would be
5  the now Lieutenant Passwater and Lieutenant Kidwell.
6  Q.  When the testing for the 2017 sergeant's
7  exam took place, was Larry Regnier still chief or was
8  Mr. Dumas the acting chief?
9  A.  He had just recently taken over.
10  Q.  And by he we mean Mr. Dumas had just
11  recently taken over?
12  A.  Yes. And I must say even he didn't know
13  they were still a part of the process.  Why he didn't
14  know, he would have to tell you that.
15  Q.  And when you said he, you're talking
16  about Mr. Kidwell and Mr. Passwater?
17  A.  Yes.
18  MR. FLAXMAN: And when you said he, --
19  BY MR. MATHUES:
20  Q.  You mean Mr. Dumas -- strike that.  I
21  understand your testimony.
22  A.  Acting Chief at the time --
23  Q.  Acting Chief Dumas --

Page 51

1  A.  -- Price Dumas --
2  Q.  -- did not know --
3  A.  He stated --
4  THE REPORTER: Hold on second.  You guys are
5  talking at the same time.
6  BY MR. MATHUES:
7  Q.  So we're clear, what you were told is
8  that acting Chief Dumas did not know that Mr. Kidwell
9  and Mr. Passwater were still on the panel for the oral
10  exam?
11  A.  That is exactly what I'm stating.
12  Q.  When Mr. Dumas told you that, where did
13  that conversation take place?
14  A.  I think I was in -- in his office at --
15  we were in the office.  I was -- it was for -- I was
16  filing a grievance.  I was filing a grievance at the
17  time, and that's what it was based on, the grievance,
18  and that's when it came out.
19  Q.  When Mr. Dumas told you that, was there
20  anyone else besides you and he in his office?
21  A.  At the time Deputy Chief Hunt.
22  Q.  Anyone besides Mr. Dumas and Deputy Chief
23  Hunt and yourself?

Page 52

1  A.  No.
2  Q.  This conversation, was this before or
3  after the conversation at the funeral that you had
4  mentioned earlier where former acting Chief Dumas and
5  current acting Chief Hunt encouraged you to take the
6  sergeant's test?
7  A.  This was after.  It was during the
8  grievance.
9  Q.  The grievance that we're discussing, who
10  was the grievance directed at?
11  A.  It would have been at Sergeant Klopp.
12  Q.  What was the nature of the grievance?
13  A.  It was based on working hours.
14  Q.  Did you ultimately file the grievance?
15  A.  No.  They were going to settle it because
16  it was found that he was being biased towards me and he
17  had allowed another employee Marcella Gearhart -- I had
18  it documented where he had allowed her on the board --
19  there was a time with the Christmas party he allowed
20  her to work over -- or not allowed but he didn't say
21  anything at that time.  So they did offer, but I didn't
22  take it.  I just said I'm good as long as they were
23  willing to, you know, rectify and make sure it didn't

Page 53

1 happen again.

2     Q.   Would it be fair to say that you didn't

3 file a grievance because what you were upset about was

4 settled informally? Resolved informally?

5     A.   I would say it was still formal. It was

6 just through conversation. You know, they -- they said

7 based on that they would settle it and then I told

8 them, no, there's no need. I just wanted to make sure

9 that they knew about it.

10     Q.   When did Sergeant Klopp become a

11 sergeant?

12     A.   I don't know. I couldn't tell you the

13 exact date.

14     Q.   Would that be before 2010?

15     A.   I'm not sure.

16     Q.   Let's talk about the written exam for the

17 sergeant's test in 2011 and 2014. That made up 40

18 percent of your score; is that correct?

19     A.   Yes.

20     Q.   And how many questions are on the written

21 exam?

22     A.   If I were to venture a guess, the

23 written, I would say, maybe a hundred.

Page 54

1     Q.   Are they all multiple choice or short

2 answer or what kind of questions are they?

3     A.   Based on my memory, multiple choice.

4     Q.   Did you have the opportunity to study for

5 those questions?

6     A.   Four months.

7     Q.   How much time do you have to take it?

8     A.   I can't really remember. It's normally

9 -- I've gotten done with it.

10     Q.   Are you contending in this case that the

11 written exam is in any way biased?

12     A.   Based on the knowledge I've got I

13 received that at some point in time some white officers

14 did receive points, extra points.

15     Q.   What's the source of that knowledge?

16     A.   It would be acting Chief Hunt.

17     Q.   What did acting Chief Hunt tell you and

18 when did he tell you that?

19     A.   I can't remember exactly when, but they

20 stated to me that they discovered that -- I think it

21 was Benoit who was given points and he shared that with

22 me. From the past administration.

23     Q.   As I understand your testimony, at some

Page 55

1 point acting Chief Hunt told you that during the time

2 Larry Regnier was chief Officer Benoit got extra points

3 on the written exam?

4     A.   At least one they knew of. That's the

5 one they knew of.

6     Q.   When acting Chief Hunt told you this, was

7 this after Mr. Regnier resigned?

8     A.   Yes.

9     Q.   Was it during the time Mr. Hunt was

10 acting chief or was it during the time Mr. Dumas was

11 acting chief?

12     A.   Dumas.

13     Q.   When Mr. Hunt told you this, was anyone

14 else present?

15     A.   No.

16     Q.   Do you know that when Mr. Hunt said that

17 they discovered this, who the they is in that

18 statement?

19     A.   No.

20     Q.   Do you know how many points -- extra

21 points were given to Officer Benoit?

22     A.   No.

23     Q.   Did Officer Benoit ever make sergeant?

Page 56

1     A.   No.

2     Q.   Did Officer Benoit ever even score in the

3 top three on either the 2011, 2014, or 2017 sergeant's

4 list?

5     A.   No, but he was placed above me.

6     Q.   But he didn't -- he didn't get in the top

7 three, correct?

8     A.   He got close.

9     Q.   But the answer to my question is, no, he

10 did not get in the top three?

11     A.   No, he did not.

12     Q.   Is he still with the Kankakee Police

13 Department?

14     A.   Yes, he is.

15     Q.   Other than the conversation that we have

16 been discussing between yourself and now acting Chief

17 Hunt, has anyone else told you at any time that any

18 white officers got additional points on the written

19 exam?

20     A.   No.

21     Q.   Are you contending that the actual

22 questions themselves on the written exam are in any way

23 racially discriminatory?

Page 57

1    A.   Yes, based on that the people that are
2 giving the test with this department they're sought out
3 -- the questions -- the area of the questions are
4 shared with leadership or was shared with leadership of
5 the department.
6    Q.   I didn't really understand your answer.
7 Can you explain what you mean, Mr. Brooks?
8    A.   Where the questions would be exactly
9 coming from, they would be sought -- the department was
10 -- it was sought from the department exactly what they
11 wanted and where they wanted the questions to come
12 from, what area of questioning.
13    Q.   As I -- so during the time Mr. Regnier
14 was chief, Mr. Regnier or other top individuals could
15 say what kind of questions they wanted on the test.  Is
16 that -- is that what you're telling me?
17    A.   The area of questioning, yes.
18    Q.   What is the source for that, that
19 information that you have?
20    A.   It's just based on police conversation.
21 We all knew that.
22    Q.   Who specifically would have told you
23 that?

Page 58

1    A.   As far as -- I can't really pinpoint
2 exactly who said it, but, I mean, it was known.
3    Q.   Did Mr. Hunt ever tell you that?
4    A.   It could -- he could have discussed it
5 with me, but I don't recollect exactly it being him.
6 Just through conversation with other officers.
7    Q.   Did former Chief Dumas tell you that?
8    A.   I didn't talk to him about that, no.
9    Q.   Other than your claim that former Chief
10 Regnier and his lieutenant sought out what -- the
11 subject matter of the questions, do you have any other
12 claims that the written portion of the exam is racially
13 biased?
14    A.   Not at this time.
15    Q.   During any of your complaints with the
16 Illinois Department of Human Resources (sic) regarding
17 racial discrimination within the sergeant's test, did
18 you say anything about the written portion of the exam?
19    A.   Yes, I did, and I think that's what I
20 mentioned about the points and the answers to the
21 questions or the questions themselves, I should say.
22    Q.   When you say the points and the answers
23 to the questions, are --

Page 59

1    A.   No.  The questions themselves.
2    Q.   The questions themselves.  The questions
3 on the written exam.
4    A.   Yes.  The area of questioning, yes.
5    Q.   And then there is the oral exam which in
6 2011 and 2014 made up 30 percent of your score; is that
7 correct?
8    A.   Yes.
9    Q.   Describe the oral exam to me.
10    A.   It's a panel of five, and at least two
11 commanders from our department is on that panel, at
12 least for me there was, and the only two I ever and
13 always got from, I would say, '15 or maybe even '11 was
14 -- if my memory serves me correct, was Lieutenant
15 Passwater or it's Commander Passwater and Commander
16 Kidwell.
17    Q.   There's -- so there's five individuals on
18 the panel, correct?
19    A.   That -- yeah, five that's led by those
20 two.
21    Q.   And --
22    A.   Commander Kidwell and Lieutenant
23 Passwater.

Page 60

1    Q.   Do you know who the other three were for
2 the 2011 sergeant's list?
3    A.   I couldn't tell you.
4    Q.   Do you know who the other three were for
5 the 2014 sergeant's list?
6    A.   I couldn't tell you.
7    Q.   And, obviously, since you didn't take the
8 2017 exam, you don't know who they would be for the
9 2017 exam, correct?
10    A.   I was told that they were there.  They
11 did implement it.  Passwater and Kidwell.
12    Q.   Do you know who the other three members
13 would have been besides Passwater and --
14    A.   No.
15    Q.   -- Kidwell for the 2017 exam?
16    A.   No, I couldn't tell you.
17    Q.   Would you agree that the other three
18 members in 2011 were not members of the Kankakee Police
19 Department?
20    A.   Yes, I would agree to that.
21    Q.   Would you agree that in 2014 the other
22 three members were not members of the Kankakee Police
23 Department?

---

Page 61

1    A.   Not that I know of. I didn't know if
2  they were friends or whatever.
3    Q.   But they were not sworn officers--
4    A.   No.
5    Q.   -- of the Kankakee Police Department,
6  correct?
7    A.   Not sworn, but I didn't know if they were
8  friends.
9    Q.   My question was a little different. They
10 were not sworn. They were not members of the Kankakee
11 Police Department, correct?
12   A.   Not that I know of, no.
13   Q.   And that's actually by part of the
14 testing procedure, is it not, that a majority of the
15 board -- the majority of the panel for the oral exam
16 are to be people outside the Kankakee Police
17 Department, correct?
18   A.   My understanding from my lawsuit was that
19 none were supposed to be part supposed -- to be a part
20 of the testing process.
21   Q.   And when you say your understanding,
22 that's what we talked about earlier, your conversations
23 with your former lawyer?

---

Page 62

1    A.   Yes.
2    Q.   Any other source of information for that
3  understanding?
4    A.   Just the other parties that were part of
5  the lawsuit.
6    Q.   What do you mean by that?
7    A.   They were present when we were discussing
8  that Consent Decree.
9    Q.   And when you say the other parties, you
10 mean the other plaintiffs, Mr. Hunt, Mr. Baptist,
11 Mr. Moore, Mr. Upton; is that correct?
12   A.   Not Moore.
13   Q.   Not Moore. I apologize. Who did -- who
14 did I leave out?
15   A.   I think you left out Dumas.
16   Q.   Mr. Dumas.
17   A.   Or Dumas.
18   Q.   I apologize. Would you agree that a
19 majority -- in both 2011 and 2014 a majority of the
20 panelists for the oral exam were not members -- that
21 you sat for were not members of the Kankakee Police
22 Department?
23   A.   About 60 percent, yes.

---

Page 63

1    Q.   Do you know whether in 2011 all of the
2  individuals who took the oral exam had the exact same
3  panel and whether the panel was different?
4    A.   I'm not sure because I was only there for
5  mine.
6    Q.   So you -- you don't know?
7    A.   No, I couldn't say definitively.
8    Q.   Has anyone ever told you whether or not
9  in 2011 the panel for the oral exam was the same for
10 everybody or different for different officers?
11   A.   I can't remember exactly who told me, but
12 someone did say there were different -- there were
13 different selections as far as our department, and I
14 think the questioning was why did I always get those
15 two. I think that was what we were discussing.
16   Q.   Do you remember when this conversation
17 took place that you just told me about?
18   A.   After the testing. I think it was with
19 Sergeant Sneed because I think he had different -- he
20 had a different panel based on our department. I don't
21 know about the other three.
22   Q.   Do you know for the 2014 sergeant's list
23 whether everybody who took the test had the same panel

---

Page 64

1  for the oral exam or not?
2    A.   And that's what I'm stating here. I
3  don't know if it was '11 or '14 that we discussed that.
4  It would have had to have been '11. So for '14 --
5  because he got promoted off there. So it wouldn't be
6  -- the '14 I would have to say, no, I didn't discuss.
7    Q.   And do you know one -- one way or the
8  other for 2014?
9    A.   I didn't inquire.
10   Q.   As I understand it, for the 2017
11 sergeant's list the oral exam's percentage was
12 increased -- well, strike that. The written exam's
13 percentage was increased to 50 percent and the oral
14 exam was decreased to 20 percent. Do you know if
15 that's correct?
16   A.   I didn't have that knowledge, and I don't
17 recollect.
18   Q.   If that's correct, do you know why that
19 would have happened?
20   A.   I couldn't say.
21   Q.   The written exam is actually administered
22 by Standard & Associates; is that correct?
23   A.   You mean for this last test? Because I

---

Page 65

1  wasn't there.
2      Q.   For the 2011 and 2014?
3      A.   Yes, for those I was there, yes.
4      Q.   And Standard & Associates is an outside
5  organization that does testing; is that correct?
6      A.   Outside but they do listen to the
7  administration. They just don't come in.
8      MR. MATHUES: Let me give you, since we're
9  talking about it, three documents. One is going to be
10  Kankakee 19 and I will mark that as -- it will be
11  marked as Exhibit No. 12. One is going to No. 14.
12      THE REPORTER: Do you mean 13?
13      MR. MATHUES: No. 13. I apologize. Thank you.
14  That's Bates stamped Kankakee 699. I believe we are
15  now at 14, and that would be -- it has a Bates stamp of
16  Kankakee 698. And I will also give a copy of these to
17  your counsel.
18          (Exhibit Nos. 12, 13 and
19              14 marked.)
20  BY MR. MATHUES:
21      Q.   Exhibit No. 12, Kankakee 19, can we agree
22  that's the 2011 sergeant's list we've been discussing?
23      A.   Yes.

Page 66

1      Q.   Exhibit No. 13, Bates stamped Kankakee
2  699, can we agree that's the 2014 sergeant's list we've
3  been discussing?
4      A.   Yes.
5      Q.   And Exhibit No. 14, with the Bates stamp
6  Kankakee 698, can we agree that's the 2017 sergeant's
7  list we have been discussing?
8      A.   Yes.
9      MR. MATHUES: We have been going about an hour
10  and a half. Do you want to take a break to use the
11  bathroom?
12      THE WITNESS: Yeah, we could.
13      MR. MATHUES: Let's go off the record please.
14          (Brief break.)
15  BY MR. MATHUES:
16      Q.   Can we go back on the record, please?
17  Before the break we were talking about the written and
18  the oral exam. The next item on the list for the 2011
19  and 2014 sergeant's list are the Chief's merit points
20  and that's 15 percent of the score, correct?
21      A.   Yes.
22      Q.   Do you know how the Chief's merits points
23  for purposes of the sergeant's list are scored?

Page 67

1      A.   I don't know if anyone knows.
2      Q.   If, hypothetically speaking, the Chief
3  were to testify that the Chief's merit points resulted
4  from scores given to everyone from asking every person
5  in the department with the rank of sergeant and above
6  to rank the applicants and then throwing out the high
7  score and the low score and putting an average, would
8  you have any reason to dispute that?
9      A.   Definitely.
10      Q.   And what would you base that dispute on?
11      A.   Based on just the events that surrounded
12  certain officers' criminal activity, drug usage. Paul
13  Berge, I'm speaking of, who got a 15. There's no way I
14  know one officer that would give him a 15. If they
15  did, it would be a friend.
16      Q.   Has anyone ever told you how the Chief's
17  merit points are awarded?
18      A.   No.
19      Q.   Has anyone ever told you what they did or
20  did not give Paul Berge?
21      A.   The score?
22      Q.   Yes.
23      A.   It's right in front of me. It's on the

Page 68

1  sheet.
2      Q.   Have you ever had any conversations with
3  a member of the Kankakee Police Department regarding
4  what -- what merit award they did or didn't give Paul
5  Berge?
6      A.   I don't understand what you're asking me.
7  The Chief? Have I discussed -- no, I didn't discuss
8  with him what he gave him, no.
9      Q.   Did you discuss with anybody else?
10      A.   If I was just to say just in conversation
11  -- I can't pinpoint who -- just guys talking in
12  general, they couldn't believe it either, the other
13  officers just discussing in discussion when the list
14  came out. It would almost be a joke. If Berge got a
15  15, even black and white would laugh at it.
16      Q.   Other than the conversations regarding
17  people laughing at what Paul Berge received, have you
18  had any other conversations about how the Chief's merit
19  points are awarded?
20      A.   No.
21      Q.   Next is the community service points
22  that's only five percent. Do you know how that's
23  awarded?

Page 69

1     A.   I would say the officer would have to
2 share what they have done in the community.
3     Q.   Do you have any personal knowledge as to
4 how that -- how that score from zero to five actually
5 gets awarded on the sergeant's list?
6     A.   Well, I discussed my part where -- what I
7 did over the summer. I worked with -- I donated my
8 time to young football players.
9     Q.   My question was a little bit different,
10 Mr. Brooks. Do you have any knowledge as to how that
11 -- how that number on the community service actually
12 gets awarded between zero and five?
13     A.   I answered it. I said I shared -- I
14 wrote it up and I turned it in to the Chief, and that's
15 how I was awarded my points.
16     Q.   Do you have -- other than what you've
17 told me, do you have any other knowledge as to how
18 those five points are awarded?
19     A.   Yeah, the Chief can just give them to you
20 when you don't deserve them. That's the only other
21 way.
22     Q.   Taking a step back to the Chief's merit
23 points, do you have any personal knowledge as to

Page 70

1 whether the Chief himself votes on that merit -- on the
2 merit points to award?
3     A.   You know, to be honest with you, all I
4 know is that I write it up and I give it to the
5 secretary. That's my knowledge of it.
6     Q.   The education points that are also five
7 percent, do you know how those are awarded?
8     A.   Based on your education.
9     Q.   Do you know if it's X number of points
10 for a bachelor's and X number of points for a high
11 school diploma?
12     A.   Yeah, I think that's how it's awarded,
13 yeah.
14     Q.   The longevity points, do you know how
15 those are awarded?
16     A.   Not exactly how it's awarded, but I guess
17 it's based on your tenure with the department.
18     Q.   And then there's veteran's preference
19 points, correct?
20     A.   Yes. It's on the Exhibit 13. I just
21 noticed that, yeah.
22     Q.   I don't see it on Exhibit No. 12.
23     A.   Right. That's what I was saying.

Page 71

1     Q.   But I do see it on Exhibit No. 13. Do
2 you know whether veteran's points were awarded for the
3 2011 sergeant's list or not?
4     A.   I don't know.
5     Q.   Other than Jose Martinez, Gary Tison, and
6 Michael Coash who are given veteran's points on the
7 2014 promotional list, do you know whether any of the
8 individuals on the 2011 sergeant's list are military
9 veterans?
10     A.   Not that I know of. And I -- I wanted to
11 say one thing about those -- that community service.
12 On that 2014 I think through my 22 years and five
13 testing the first time ever the list was posted and
14 taken down and Berge was given five extra points. That
15 was on that 2014, and no one understood why.
16     Q.   And when you say five extra points, is
17 that five extra points on the community service or is
18 that five extra points on something else?
19     A.   No. The community service.
20     Q.   So is it your testimony that initially
21 Berge got zero and then he had five?
22     A.   Yes.
23     Q.   I know I had asked you similar questions

Page 72

1 at the beginning regarding the ethnicity of individuals
2 within the Kankakee County Police Department --
3 Kankakee City Police Department, and you gave me some
4 estimations. Looking at the 2014 sergeant's list,
5 other than yourself and Mr. Hunter, is there anyone on
6 that list who you look at and say that person is not
7 white?
8     A.   Scott Halper and Jose Martinez.
9     Q.   What is Mr. Halper's ethnicity?
10     A.   Asian descent.
11     Q.   And Mr. Martinez is he Hispanic?
12     A.   Yes.
13     Q.   Anyone else?
14     A.   No, that's it.
15     Q.   And by the way, when you said
16 Mr. Martinez, do you mean Jose Martinez or Joseph
17 Martinez or both?
18     A.   Okay. It would be both.
19     Q.   Are they related?
20     A.   No. Not that I know. It could be. I
21 don't know. Not that -- they don't claim to be.
22     MR. MATHUES: Off the record.
23         (Off the record.)

Page 73

1      MR. MATHUES: Back on the record.
2  BY MR. MATHUES:
3      Q.   The same question with respect to the
4  2011 sergeant's list, Mr. Brooks.  So Mr. Halper is of
5  Asian descent.
6      A.   And Michael Sneed, myself, Jose, and Joe,
7  and Charles Johnson.
8      Q.   Charles Johnson, what is his ethnicity?
9      A.   Black.
10      Q.   As far as the 2014 sergeant's list, we've
11  covered that Paul Berge has been promoted to sergeant,
12  correct?
13      A.   '14, yes.
14      Q.   Gary Tison was promoted to sergeant?
15      A.   Yes.
16      Q.   What year was he promoted to sergeant?
17      A.   Tison?
18      Q.   Yes, sir.
19      A.   Last year, '17.
20      Q.   And Steven Hunter was promoted to
21  sergeant in 2018?
22      A.   Yes.
23      Q.   Anyone else promoted off of the 2014

Page 74

1  sergeant's list?
2      A.   No, no, no.  Steven Hunter was off --
3      Q.   The '17 list.
4      A.   Yeah.
5      Q.   I apologize.  You are correct.
6      A.   Yeah.
7      Q.   I am not correct.
8      A.   Just those two, Tison and Berge, '14.
9      Q.   As I mentioned, Mr. Hunter -- we can look
10  at Exhibit 14, that's the 2017 sergeant's list, and the
11  only person promoted off that list to date is
12  Mr. Hunter?
13      A.   Yes.  I can say Scott Halper has since
14  left the department, so -- because of the testing
15  process.
16      Q.   Do you know where Mr. Halper went?
17      A.   Manteno.
18      Q.   Did Mr. Halper tell you that he left
19  because of the testing process or did you hear that
20  from somebody else?
21      A.   No, he -- he shared that with me.
22      Q.   Approximately when did Mr. Halper leave
23  the department?

Page 75

1      A.   Shortly after the test itself.  Shortly,
2  no -- he -- he left this year.
3      Q.   He left this year.  Do you know if he
4  left before or after Mr. Hunter was made sergeant?
5      A.   After.
6      Q.   When Mr. Halper told you he left because
7  of the testing process, was there anyone besides
8  yourself present?
9      A.   I'm not sure.  There might have been.
10      Q.   Do you remember specifically what
11  Mr. Halper told you?
12      A.   I think we were talking about stress,
13  related stress as far as taking the test, and how it
14  affects you during the test.  And he was sharing with
15  me how it affected him on this testing process and how
16  he was upset about being passed over and Paul Berge
17  being given five extra points, which catapulted him
18  over Halper.
19      Q.   Do you remember if Mr. Halper asked you
20  anything about your decision to take or not take the
21  sergeant's test in 2017?
22      A.   Well, we were discussing it and I shared
23  with him that I just couldn't do it again because of

Page 76

1  the stress that is -- the four years of studying and
2  the stress that you go through once you find out that,
3  you know, you didn't do as well as, you know, you
4  should have.  And based on that I just told him I
5  couldn't do it anymore.  After I shared with him why I
6  didn't take it because of the stress that I had been
7  feeling from previous testing and that's when he shared
8  with me that he felt that's what affected his scoring
9  this last time.
10      Q.   We mentioned the -- we've covered the
11  2017 and '14 sergeant's list in terms of who got
12  promoted off of it.  Other than Jeff Martin did anyone
13  get promoted off the 2011 sergeant's list?
14      A.   I remember Michael Sneed right before he
15  came to me about wanting to go file a complaint-- or
16  right after that.  That's when I filed, I think, number
17  -- one of those, if you check the numbers, I filed
18  over Berge then.  The complaint was all the criminal
19  activity he was involved with.  And Sneed was going to
20  be filing because at that time they weren't even
21  allowing him to apply for, I think, stolen auto.
22  That's when he came to me and wanted to file a
23  complaint.  And I guess when word got out, they reached

Page 77

1  out for him.
2      Q.  Michael Lindgren, I did not -- did he
3  leave the department?
4      A.  He passed away.
5      Q.  I'm sorry to hear that.
6      A.  From cancer, yeah.
7      Q.  Do you know when that happened?
8      A.  Man, that was -- it's kind of hard to
9  say.  It was kind of like maybe, oh, '12ish or
10 something.  Don't quote me on that.
11     Q.  But not long after the 2011 list came
12 out?
13     A.  It's -- it's hard for me.  I don't really
14 -- I can't tell you, but it was close.
15     Q.  Now, looking more closely at the 2014
16 sergeant's testing list, on the written exam you scored
17 a 71, correct?
18     A.  Yes.
19     Q.  And that's a little by lower than you
20 scored in 2011 when you scored a 77, correct?
21     A.  Yes.
22     Q.  And on 2014, for example, Mr. Berge,
23 Mr. Halper, Mr. Martinez, Mr. Tison, Mr. Hunter,

Page 78

1  Mr. Latham, and Mr. Benoit, so everybody who was ranked
2  above you on the 2014 sergeant's list also scored
3  higher than you on the written exam, correct?
4      A.  No.
5      Q.  Everyone except for Mr. Coash.  I stand
6  corrected.  Is that correct?
7      A.  On the '14, --
8      Q.  On the '14.
9      A.  -- but not the '11, yeah.  Not the '11
10 testing.  And I attribute that to the stress that I was
11 dealing with, which kind of led me to do what I did on
12 '17.
13     Q.  That said, everyone who is below you on
14 the 2014 list, you scored better than they did on the
15 written exam with the exception of Mr. Herscher who you
16 tied with; is that correct?
17     A.  Yes.  Well, they don't have everybody
18 listed.
19     Q.  They don't have everyone listed.
20     A.  Yeah.  So I couldn't say yes or no.
21     Q.  Do you know who should be listed on the
22 2014 sergeant's list that isn't listed there?
23     A.  I couldn't tell you.

Page 79

1      Q.  Do you know approximately how many people
2  should be listed on the list that aren't listed there?
3      A.  I know it's more than what's listed, but
4  I couldn't tell you how many should be.
5      Q.  Could you say more than five or less than
6  five?  More than ten or less than ten?
7      A.  Only -- as far as taking the test?
8      Q.  As far as taking the test.
9      A.  That could have been, I would say, more
10 than five.  It could have been.  I'm not saying I know
11 there should have been.
12     Q.  As to the oral exam in 2014 you scored a
13 57, correct?
14     A.  Yes.
15     Q.  And, again, that is lower than all of the
16 individuals who ranked above you on the 2014 exam,
17 correct?
18     A.  Yes.
19     Q.  And that would include Mr. Hunter,
20 Mr. Martinez, and Mr. Halper and all three of those
21 individuals who are not white, correct?
22     A.  Yes.  Based on the subjective scoring,
23 yes.

Page 80

1      Q.  And your -- just like your written exam
2  went down between 2011 to 2014, your oral exam also
3  went down from 2011 to 2014 from 62.3 on the 2011 to 57
4  on 2014, correct?
5      A.  Yes.
6      Q.  On the other hand, your Chief's merit
7  points between 2011 and 2014 went up from 10 to 12.
8      A.  Yes.
9      Q.  And you've mentioned Paul Berge a number
10 of times in this deposition.  Mr. Berge's merit points
11 went down from 15 to 13 between 2011 and 2014; is that
12 correct?
13     A.  But still higher than mine.
14     Q.  Now, Mr. Hunter, he had a 15 on the merit
15 points, higher than both you or Paul Berge, correct?
16     A.  Which test?
17     Q.  2014.
18     A.  Yes.  Well, he -- well, let me see.
19 2014?  Yes.
20     Q.  Your community service points also went
21 up between 2011 and 2014 from two in 2011 to five in
22 2014; is that correct?
23     A.  Yes.

Page 81

1   Q.   Your education points stayed the same
2   from four to four; is that correct?
3   A.   Yes.
4   Q.   Now, in 2014 everybody who was ranked
5   above you and yourself all got five out of five on the
6   community service points, correct?
7   A.   Not at the beginning.  Initially, Berge
8   -- when the list was initially posted, he was second
9   under Scott Halper with zero.
10   Q.   Other than Berge, did anybody else --
11   everyone else got five out of five, correct?
12   A.   Yes.
13   Q.   Looking at the overall score on the 2014
14   list, your overall score was a 71.5?
15   A.   Yes.
16   Q.   And the person listed third was
17   Mr. Martinez with 80.05, correct?
18   A.   With the addition of his veteran points,
19   yes.
20   Q.   And would you agree that just as a matter
21   of mathematics you need 8.6 more points on the 2014
22   list to get yourself into the top three than if you
23   could -- if you gained -- if your score increased by

Page 82

1   8.6 points, you would then be in the top three?
2   A.   Yes, if I would have got 8 more points in
3   that subjective or assessment -- oral assessment, yes.
4   Q.   Likewise, if you would have gotten 8.6
5   more points on the written exam, you also would have
6   been in the top three?
7   A.   Based on a percentage, no.  I don't think
8   I could have gotten any -- up to 8 because it's only 40
9   percent.  Those are actual points.  Some are actual and
10   some are -- even though it's like a percentage of the
11   test, but those are actual points, if you understand
12   what I'm saying.
13   Q.   I don't understand what you're saying.
14   Can you explain what you mean, Mr. Brooks?
15   A.   If -- the written is multiplied by
16   whatever percentage, 40 percent, but over here even
17   though it's 15 percent of a testing, the Chief's points
18   are points that are just given.  They're not -- you
19   know.
20   Q.   The most points -- additional points you
21   could have gotten on the Chief's would have been three,
22   correct?
23   A.   I'm trying to explain to you the

Page 83

1   difference.  Like, if you multiply my 71 times, what,
2   40 percent, if that was 40 percent of the testing, I
3   would only be like four points from -- if you look at
4   Paul Berge's and multiplied his 86, I would be only
5   four points.  It would be like a four-point difference
6   because I would have a 28 and he would be at 32.
7   Q.   Let me take a step back and ask it this
8   way.  If you would have gotten what Scott Halper or
9   Paul Berge got on the written exam in 2014, would you
10   have been in the top three?
11   MR. FLAXMAN: I mean, it's a math problem.
12   We're not going to disagree with the calculations that
13   we would come up with, but I think putting him on the
14   spot to ask him to compute it is not a good use of
15   anyone's time.  I mean, to do it he's got to figure out
16   -- he's got to reduce by 30 percent because these
17   aren't real points.
18   THE WITNESS: Right.  That's what I'm trying to
19   explain.
20   MR. FLAXMAN: You've got to add them up to all
21   the other numbers.
22   BY MR. MATHUES:
23   Q.   When you say points at the question you

Page 84

1   just went through --
2   A.   Five points on the community service is
3   five solid points.  It's -- to me it's more weight than
4   the written because it's based on a percentage.
5   Q.   So as I understand your testimony is the
6   community service counts for more than the written?
7   A.   If I had five and he had zero, I would
8   have had five more points.  If you multiply 40 percent
9   times the scores on the written, they would come up to
10   like 28 and 32 if you got 80.
11   Q.   But as we've already discussed, with the
12   exception of Paul Berge, everybody else above you got
13   the same score you did on the community service points
14   in 2014, correct?
15   A.   I would have to agree, yes, but he's the
16   one that got promoted.
17   Q.   Do you know whether Paul Berge would have
18   scored in the top three before the community service
19   points?
20   A.   Based on the subjective scoring in the
21   oral interview, yeah, I think he still would have been
22   where he needed to be, yeah.  But not the top, but he
23   ended up second.

Page 85

1   Q.   Looking at the 2017 list, when the list
2   came out, there was one African-American in the top
3   three, and that would be Mr. Hunter, correct?
4   A.   That I know of, yes.
5   Q.   And the first person promoted off of the
6   2017 list was, in fact, Mr. Hunter?
7   A.   I would say yes.  Now, you're not saying
8   that's under Regnier?
9   MR. FLAXMAN: Just -- he just -- he just wants
10  yes or no.  We don't need to -- we don't need to have a
11  debate about it.
12  THE WITNESS: Okay.
13  BY MR. MATHUES:
14  Q.   2014 there were not any African-Americans
15  in the top three, correct?
16  A.   Which one again?
17  Q.   2014, Mr. Brooks.
18  A.   No.
19  Q.   It was an Asian, Mr. Halper, and a
20  Hispanic Latino, Mr. Martinez, correct?
21  A.   Yes.
22  Q.   And even after Gary Tison and Paul Berge
23  were promoted, there would still not have been any

Page 86

1   African-Americans in the top three on the 2014 list,
2   correct?  Because then the top three would have been
3   Mr. Halper, Mr. Martinez, and Mr. Coash?
4   A.   Yes.
5   Q.   As to the 2011 sergeant's list initially
6   there would have been no African-Americans within the
7   top three, correct?  Mr. Martin, Mr. Lindgren, and
8   Mr. Berge are all white?
9   A.   By the time it was done, I was fourth
10  and--
11  MR. FLAXMAN: He's just asking you the question
12  about are those three men white.  That's all.  That's
13  the only thing you need to answer.
14  BY THE WITNESS:
15  A.   Yeah, they're white.
16  BY MR. MATHUES:
17  Q.   So there were no African-Americans in the
18  top three initially on 2011?
19  A.   No.
20  Q.   But then Jeff Martin was off the list
21  because he was promoted?
22  A.   Yes.
23  Q.   And Mr. Lindgren was off the list because

Page 87

1   unfortunately he passed away?
2   A.   Yes.
3   Q.   And that would have made -- that would
4   have bumped--
5   A.   Clay Wolfe left.
6   Q.   And Mr. Wolfe left.  That would have left
7   the top three as Mr. Sneed, Mr. Halper, and Mr. Berge?
8   A.   Yes.
9   Q.   And the third person would have been
10  Mr. Sneed?
11  A.   Yes.
12  Q.   And Mr. Sneed was African-American and he
13  was the next person promoted --
14  A.   Yes.
15  Q.   -- off the 2011 list?  In fact, Mr. Sneed
16  would have been promoted even though he had higher
17  scores than Paul Berge and Scott Halper?  Strike that.
18  That was a bad question.  That was a terrible question.
19  A.   I was going to say, you screwed that up.
20  Q.   That was the exact opposite -- that was
21  the exact opposite of what I meant.  Mr. Sneed was
22  promoted ahead of --
23  A.   And he had a worse score than I had, so.

Page 88

1   Q.   Say that again?
2   A.   His score -- his written was lower than
3   mine.
4   Q.   His oral was higher?
5   A.   Well, actually, my written was higher
6   than all of theirs, but, yeah.
7   Q.   When you say all of theirs, you mean all
8   of theirs except Mr. Martin?
9   A.   Yes.
10  Q.   Mr. Sneed's oral in 2011 was higher than
11  yours?
12  A.   Yes.
13  Q.   And his merit points were higher, 15 as
14  opposed to 10?
15  A.   Yes.
16  Q.   Community service was higher, four as
17  opposed to two?
18  A.   Yes.
19  Q.   Do you think you're more qualified to be
20  a sergeant than Mr. Sneed?
21  A.   Based on the written.
22  Q.   Is that a yes?
23  A.   Based on the written, yes.

Page 89

1    Q.    Okay.  Do you think you're more qualified
2  to be a sergeant than Mr. Martin?
3    A.    Oh, yeah, I trained him.  I was his
4  trainer.
5    Q.    Do you think you're more qualified to be
6  a sergeant than Mr. Hunter?
7    A.    I would say yes.
8    Q.    Based on?  Based on what?
9    A.    Just based on my service to the
10  department.
11    Q.    Do you think you're more qualified to be
12  a sergeant than Mr. Tison?
13    A.    Definitely.
14    Q.    Why so?
15    A.    Because of his racial slurs he uses.
16    Q.    Anything else?
17    A.    And he had -- well, based on the fact
18  that I have been there longer and just the merits and
19  deeds that I should have gotten which is commendations
20  I didn't receive from Chief Regnier.
21    Q.    Fair to say you believe you're more
22  qualified to be a sergeant than Mr. Berge?
23    A.    Definitely.  He should not be on the

Page 90

1  list.
2    Q.    Do you think -- is it your opinion he
3  should be fired?
4    A.    Based on his activity, yes.
5    Q.    Is there anyone on any of the three
6  sergeant lists, 2011, 2014, or 2017, you would look at
7  and say that person is more qualified than me to be a
8  sergeant?
9    A.    Absolutely not.
10    Q.    When did it come out about Paul Berge
11  using steroids?
12    A.    The day that his girlfriend reported him.
13  I don't know the exact date but...
14    Q.    How did his girlfriend rat him out for
15  using steroids?
16    A.    You've got to talk to Regnier.
17    Q.    Do you know was that before or after the
18  2011 sergeant's list came out?
19    A.    I'm not sure.
20    Q.    Do you know if it was before or after the
21  2014 sergeant's list came out?
22    A.    Definitely before.
23    Q.    Do you know if it was before or after --

Page 91

1  so it would be before he made sergeant?
2    A.    Yes.
3    Q.    And throughout your complaints to the
4  Illinois Department of Human Rights or the letter that
5  you wrote to Mayor -- former Mayor Epstein when you
6  refer to Mr. Berge's drug use, are we talking about
7  steroids?
8    A.    I don't remember the letter.
9    Q.    Let me put it to you this way.  Do you
10  have any information that Mr. Berge ever used cocaine?
11    A.    We weren't told what his drug usage was.
12  We just knew it was illegal.
13    Q.    What drugs do you believe Mr. Berge used?
14    A.    I really don't care.  It was illegal.  He
15  shouldn't have used it.
16    Q.    That wasn't quite my question, Mr.
17  Brooks.
18    A.    Like I said, I don't know.
19    Q.    Any reason to dispute that the illegal
20  drugs he used were steroids and only steroids?
21    A.    It could have been, but it's still
22  illegal.
23    Q.    That wasn't quite my question, Mr.

Page 92

1  Brooks.  Do you have any reason to believe -- any
2  information that would lead you to believe that the
3  drugs that Mr. Berge used were anything besides
4  steroids?
5    A.    No.
6    Q.    The incident when Mr. Berge crashed his
7  car, when did that happen?
8    A.    I don't know exactly when.  I wasn't the
9  responding officer.
10    Q.    Do you know was that before or after
11  Mr. Berge made sergeant?
12    A.    Before.
13    Q.    Before or after the 2014 sergeant's list
14  came out?
15    A.    Before.
16    Q.    Before or after the 2011 sergeant's list
17  came out?
18    A.    After.
19    Q.    Do you know who the responding officer
20  was?
21    A.    Rod Wagner.
22    Q.    To the best of your knowledge, tell me
23  what happened when Mr. Berge crashed his car.

Page 93

1    A.    From what I heard from witnesses was that
2  he left the bar, the Kankakee City Tavern, in a rush
3  and he crashed into a neighboring building, Jewel
4  foods.  He drove the vehicle to another officer's home,
5  Officer English, and then call the following day and
6  reported it as a hit-and-run.
7    Q.    Do you know when former Chief Regnier
8  found out what Mr. Berge had done with respect to
9  misreporting this car crash?
10    A.    Based on-Commander Matthew Adamson -- he
11  met me at a store, Mario's Market, and he was actually
12  sharing with me about the commendation he wrote for me
13  and the Chief didn't give, and he mentioned that he
14  told me that day that he found out of the crash that it
15  should be investigated and the Chief blew him off.
16    Q.    I'm going to break this down a little bit
17  because I -- the conversation you had with Mr. Adamson,
18  when did that conversation happen?
19    A.    I can't give you the exact date and time,
20  but I can tell you the exact location was Mario's
21  Market.
22    Q.    Was it before -- that conversation before
23  or after the 2014 sergeant's list came out?

Page 94

1    A.    I would say it was before.
2    Q.    Before or after the 2011 sergeant's list
3  came out?
4    A.    It would have been after.  It was after
5  he left.
6    Q.    After Mr. Adamson left?
7    A.    Yes.
8    Q.    What was Mr. Adamson's rank?
9    A.    He was a commander.
10    Q.    Where did Mr. Adamson go?
11    A.    I don't know.
12    Q.    Mr. Adamson -- as I understand it,
13  Mr. Adamson told you that the very day Paul Berge
14  reported an alleged hit-and-run that Mr. Adamson had
15  told former Chief Regnier to investigate this alleged
16  hit-and-run and former Chief Regnier blew him off?
17    A.    When he got knowledge of it, yes.
18    Q.    Do you know when the circumstances of
19  Mr. Berge's auto accident were reported to anyone else
20  who was a ranked lieutenant or above?
21    A.    Based on speaking with Rod Wagner, he
22  said he told Sergeant Foster.  It went through the
23  ranks, I'm assuming.

Page 95

1    Q.    Eventually, Mr. Berge got suspended for
2  his steroid use, correct?
3    A.    I -- I couldn't really tell you.  I
4  couldn't tell you if he served a day of suspension for
5  any punishment.  I -- I can't tell you.
6    Q.    As you're sitting here right now, you
7  can't say whether Mr. Berge was ever suspended from the
8  Kankakee Police Department?
9    A.    Right now, yes, I cannot tell you that.
10    Q.    If someone walked into this room and said
11  Mr. Berge was suspended without pay for 30 days, would
12  that person be lying?
13    A.    I couldn't tell you.  Because you can
14  exchange days for a vacation.  So he never -- we never
15  missed him.  So I don't know what happened.
16    Q.    For any of the individuals that we have
17  discussed who were promoted to sergeant from 2011 up
18  until the present day, do you have any information
19  about their disciplinary files?
20    A.    I would have to say no.
21    Q.    You can't say what they were or were not
22  disciplined for?
23    A.    No, I couldn't.  Unless they told me.

Page 96

1    Q.    To the best of your knowledge, has any of
2  them told you?
3    A.    I couldn't definitively say yes or no.
4    Q.    Is there anything that would help your
5  memory in saying yes or no?
6    A.    I would have to say no at this time.
7    Q.    Earlier in the deposition you mentioned
8  some racially offensive comments that Mr. Tison had
9  made.  What did Mr. Tison say and when did he say it?
10    A.    No, I said -- what I said is that my --
11  is that Officer Lacie Zingre came to me and stated to
12  me that she witnessed him saying racial slurs and she
13  was not going to lie on his behalf during the trial or
14  the suit, civil suit.
15    Q.    Which suit are we talking about?
16    A.    You would have to ask her.  She came to
17  me.
18    Q.    This officer is she African-American,
19  Hispanic, white?
20    A.    A white female.
21    Q.    How long has she been a police officer?
22    A.    I'm thinking about five years.
23    Q.    When did this conversation between you

Page 97

1 and her take place?
2   A.   I can't give an exact date, but it was
3 before the settlement because the conversation was that
4 she was not going to lie on his behalf, but I think
5 there was video of it anyway, so...
6   Q.   What settlement are you talking about?
7   A.   That she discussed. I don't know what
8 she was discussing about. She was -- you have to talk
9 to her, sir. I mean, this was what she came to me and
10 discussed.
11   Q.   Let me ask it to you this way. Have you
12 with your own ears ever heard Mr. Tison use racial
13 slurs?
14   A.   No. I haven't, no.
15   Q.   Other than -- have you ever watched on
16 video -- ever see any video where Mr. Tison used racial
17 slurs?
18   A.   I don't have access to that.
19   Q.   Does that mean no?
20   A.   It means that I don't have access. For
21 me to say it never happened I'm not saying that.
22     MR. MATHUES: Can you go back and read the
23 question where I asked Mr. Brooks about whether he has

Page 98

1 seen a video?
2     (Record read as requested.)
3 BY THE WITNESS:
4   A.   No, I haven't.
5 BY MR. MATHUES:
6   Q.   Other than this female officer, has
7 anyone else ever told you that Mr. Tison used racial
8 slurs?
9   A.   I don't want to say her name because
10 they're friends so I'm going to -- I don't know how to
11 get around that question, but I would say, yes, but I'm
12 not going to reveal her name.
13   Q.   This other individual -- strike that.
14 Other than the female officer we discussed, how many
15 people have told you that they have heard with their
16 own ears Mr. Tison use racial slurs?
17   A.   I'll venture to say none other than that.
18   Q.   Have you ever heard former Chief Regnier
19 use racial slurs?
20   A.   He called me a name. I'm trying to
21 remember exactly what the female officer told me the
22 name was. For me to relate it --
23   Q.   My question was a little bit different.

Page 99

1 Have you ever heard with your own ears Mr. --
2 Mr. Regnier use racial slurs directed to anybody?
3   A.   No, I haven't.
4   Q.   Have you ever heard with your own ears
5 Mr. Kidwell use racial slurs?
6   A.   No.
7   Q.   Have your ever heard with your own ears
8 Mr. Passwater use racial slurs?
9   A.   No.
10   Q.   Has anyone ever come to you and told you
11 I heard former Chief Regnier use racial slurs?
12   A.   Is tattoos and that included, like on his
13 body, or whatever, of swastikas?
14   Q.   Is it your testimony that Mr. Regnier has
15 a swastika tattoo?
16   A.   That's what the officer told me. I'm
17 going to leave it right there.
18   Q.   Your testimony as you sit here is that a
19 current or former member of the Kankakee Police
20 Department told you that former Chief Regnier has a
21 swastika tattoo?
22   A.   Yeah.
23   Q.   When did that conversation take place?

Page 100

1   A.   It was with Officer B.J. Moore so it had
2 to be before he was terminated, yes.
3   Q.   When was Officer Moore terminated?
4   A.   2013.
5   Q.   So it would have been before 2013 that an
6 officer told you that Mr. -- former Chief Regnier has a
7 swastika tattoo?
8   A.   Yeah.
9   Q.   Did this person tell you where on the
10 former Chief's body this swastika tattoo was?
11   A.   No, I wasn't interested at that time.
12   Q.   So the answer to the question is no?
13   A.   No, but if I ask him, I'm sure he'll tell
14 me.
15   Q.   Are you willing to say the name of that
16 person who gave you this information?
17   A.   I did.
18   Q.   Who was that?
19   A.   B.J. Moore, Officer Moore.
20   Q.   It was Officer Moore -- Officer Moore is
21 the one who told you that former Chief Regnier has a
22 swastika tattoo?
23   A.   Yeah. They were down in the locker room.

Page 101

1    Q.    What is Officer Moore's ethnicity?
2    A.    He's black.
3    Q.    Has anyone ever told you that they had
4    heard Mr. Kidwell use racial slurs?
5    A.    No.
6    Q.    Has anyone ever told you that they had
7    heard Mr. Passwater use racial slurs?
8    A.    No.
9    Q.    As to Mr. Tison, other than the incident
10   we've talked about where the female officer came to you
11   and referenced the settlement and his lawsuit, are
12   there any other incidents where anyone has told you
13   about Mr. Tison using racial slurs?
14   A.    No.
15   Q.    And I saw in one of your Department of
16   Human Resources (sic) complaint you have a reference to
17   some racially insensitive language or cartoons that
18   were put up by Mr. Passwater.
19   A.    Now, see that's what I was thinking
20   about, but I couldn't -- you said I had to say yes or
21   no, so...
22   Q.    What is -- what was that about?
23   A.    You will have to speak to Officer Joe

Page 102

1    Baptist on that.
2    Q.    So that's something that he would have
3    seen but you didn't see?
4    A.    Exactly.
5    Q.    What did Mr. Baptist tell you about what
6    he saw or heard with respect to Mr. Passwater?
7    A.    You will have to ask him.
8    Q.    Do you -- you don't have a memory of that
9    as you sit here this morning?
10   A.    Well, I'm not -- I don't have a memory.
11   He just -- I think he even -- I'm just trying to
12   remember because I think he might have even showed me
13   the picture, actually showed me the picture, if my
14   memory serves me correct. That's why I'm wanting to,
15   you know, --
16   Q.    As best as you can recall, when did
17   former Officer Baptist have this conversation with you
18   where he possibly showed you a picture?
19   A.    I'm going to say within the last two
20   years.
21   Q.    When did Mr. Baptist retire?
22   A.    I'm not exactly sure, but it's been at
23   least six, seven years ago.

Page 103

1    Q.    This conversation was after Mr. Baptist
2    had retired?
3    A.    It's been over a period of time, even
4    prior to the last lawsuit. So, yeah. He's mentioned
5    it.
6    Q.    When you say prior to the last lawsuit,
7    does that mean prior to the Baptist litigation that you
8    and Mr. Baptist and Mr. Upton and Mr. Hunt were part
9    of?
10   A.    If my memory serves me correct, I'm going
11   to say --
12   Q.    So this would have been at least ten
13   years ago?
14   A.    No, no. He's mentioned it over time.
15   Q.    He mentioned it over time?
16   A.    Yeah.
17   Q.    When did he say it happened?
18   A.    He didn't give me an exact time.
19   Q.    Did he say whether it happened before the
20   Baptist litigation was filed?
21   A.    I would think so, yes.
22   Q.    Do you have any personal knowledge of
23   whether the female officer who discussed the racial

Page 104

1    slurs that Mr. Tison used ever told anyone else about
2    what she heard?
3    A.    I didn't ask her, no.
4    Q.    So the answer to that question is, no,
5    you don't have any personal knowledge?
6    A.    No.
7    Q.    In your Department of Human Resources
8    (sic) complaints there's a reference to Chief Regnier
9    not giving you a commendation that someone put in for.
10   A.    Yes.
11   Q.    What's that about?
12   A.    In 2013 there was a murder suspect that
13   we were pursuing. I captured him, put him down --
14   Q.    Like a foot chase?
15   A.    Yeah, foot chase. I put him down,
16   arrested him, handed him over to Lieutenant Passwater
17   at the time of the investigation. I was sitting down
18   in my squad getting ready to do my report and before I
19   could type the first letter there he goes again running
20   out of the station in front of me. I gave pursuit
21   again --
22   Q.    A foot chase?
23   A.    First in my vehicle and then I jumped

Page 105

1   out.  I tackled him again, arrested him, and brought
2   him back up.  Based on those two events, Commander
3   Passwater was giving me, this is what he told me, a
4   letter of commendation.  He went back to the Chief and
5   inquired why he -- if he had gotten it and if he was
6   going to sign off from it, and -- well, and then I
7   guess he said if he didn't he would do another one and
8   the Chief just ignored it so after that he left it
9   alone.
10       Q.   Now, you had just said Commander
11   Passwater.  I want to make sure that's right who we're
12   talking about.
13       A.   No, Commander Adamson.
14       Q.   I thought that might have been the case,
15   but I wanted to make sure.
16       A.   No, I said Passwater is who I handed the
17   criminal to.
18       Q.   You handed the criminal to Passwater --
19       A.   Yes.
20       Q.   -- the first time you captured the
21   scumbag or the second time?
22       A.   After the first time I captured, --
23       Q.   After the first time.

Page 106

1       A.   -- yeah.
2       Q.   You caught the guy the second time --
3       A.   Yes.
4       Q.   -- and Mr. Adamson said --
5       A.   No, no.  I handed him to Passwater --
6       Q.   The second time?
7       A.   Then a short time later he was -- he
8   shared with me he was giving me a letter of
9   commendation for that.
10       Q.   Adamson shared with you?
11       A.   Yes.  He wrote it and handed it to the
12   Chief and didn't get it back.  He went in inquired and
13   even -- this is what he told me.  He mentioned to the
14   Chief he would write another one.  Not only did he tell
15   me that, but he told Officer Suprenant the same story.
16       Q.   And how do you know that he told Officer
17   Suprenant the same story?
18       A.   Officer Suprenant told me.  And he didn't
19   respond or anything so he left it alone after that.
20       Q.   Do you know whether since Mr. Regnier
21   became the chief in 2010 he put any letters of
22   commendation in your file?
23       A.   When I looked at it a few months ago, I

Page 107

1   didn't see it.
2       Q.   When you say you didn't see it, do you
3   mean you didn't see any letters of commendation or you
4   didn't see the one we have been talking about regarding
5   capturing this murder suspect?
6       A.   No, I didn't see any letters.
7            (Exhibit No. 15 marked.)
8       Q.   I'm going to give you a one-page document
9   I'm going to mark as Exhibit No. 15.  I'll give a copy
10   to your attorney.  It's Bates stamped Kankakee 0624.
11   What's Exhibit No. 15, Mr. Brooks?
12       A.   It looks like a praise from a citizen.
13       Q.   Who signed Exhibit No. 15?
14       A.   It's blacked out.
15       Q.   Whose name is typed underneath that
16   signature?
17       A.   Chief of Police.
18       Q.   And that Chief would be Larry Regnier?
19       A.   Yes.
20       Q.   Do you see the date of 11/6/2013?
21       A.   Yes.
22       Q.   There is a name above the typed letter
23   portion.  Is that your name?

Page 108

1       A.   Yes.
2       Q.   And the second paragraph begins "I want
3   to commend you for your actions and patience in dealing
4   with the situation.  I have read the report referenced
5   in his e-mail and you did an excellent job.  Keep up
6   keep up the good work."  Did I read that accurately?
7       A.   Yes.
8       Q.   Any reason to dispute that Exhibit 15 is
9   in your personnel file?
10       A.   I don't recall seeing it.
11       Q.   My question was a little bit different,
12   Mr. Brooks.
13       A.   Uh-huh.
14       Q.   As you sit here this morning do you have
15   any evidence to dispute that Exhibit 15, the letter of
16   commendation, was, in fact, in your file?
17       A.   As I stated, I didn't see it.  I can't
18   dispute it, but I didn't see it.
19       Q.   During the date 11/6/2013 Larry Regnier
20   was the Chief at the time?
21       A.   Yes.
22       Q.   Mr. Brooks, do you recall an incident
23   back in 2007 when you were assigned to be a school

Page 109

1  resource officer in Kankakee High School that you got
2  into a dispute with a supervisor?
3      A.   No, not that I can recall.  Not a
4  supervisor, no.
5      Q.   Did you get into a dispute with anyone
6  regarding an assignment as a school resource officer
7  back in 2007?
8      A.   I'm going to have to say, no, not a
9  dispute.
10      MR. MATHUES: What happened with -- strike all
11  of that. I'm going to show you another document. I'll
12  mark it as Exhibit No. 16. It's Bates stamped is
13  Kankakee 628. I'll give a copy also to your attorney.
14          (Exhibit No. 16 marked.)
15  BY MR. MATHUES:
16      Q.   Do you see Exhibit 16 is a Notice of
17  Suspension for the City of Kankakee Police Department
18  addressed to you.  Would you agree with that?
19      A.   Yes.
20      Q.   And lower down on the first page it says
21  "Such suspension is based on your conduct on 3/9/2007
22  at or about 8:10 o'clock a.m." and then goes on to
23  describe an incident. Is that correct?

Page 110

1      A.   Yes, but I don't see the grievance
2  results because it was reduced.
3      Q.   Before getting into the grievance and
4  results and whether or not it was -- what happened?
5      A.   Actually, when it boiled down to it and
6  we got to discuss it, it was a misunderstanding.  One
7  sergeant had told me one thing and another sergeant had
8  told me another thing. But I guess the misunderstanding
9  was that one if one sergeant tells you something and
10  then another one comes mind, the confusion was which
11  one do you follow.
12      Q.   Who were the two sergeants in the case?
13      A.   The senior sergeant was Wayne Trudeau,
14  and I think one, if my memory serves me correct, it
15  might have been Lieutenant Hunt. I think that might be
16  the case, Deputy Chief Hunt.
17      Q.   At that time he would have been
18  lieutenant?
19      A.   Sergeant.
20      Q.   Sergeant?
21      A.   Sergeant Hunt, yeah.
22      Q.   As you sit here, what did former Sergeant
23  Trudeau tell you and what did at that time Sergeant

Page 111

1  Hunt tell you?
2      A.   Sergeant Trudeau told me to go and work
3  the -- work the school, the high school, and then
4  Sergeant Hunt came and told me -- he and I have since
5  discussed it and agreed that it was a misunderstanding
6  -- to go to the junior high.  And one thing led to
7  another and it ended up going to arbitration, and as I
8  stated it was reduced.
9      Q.   It was reduced from three days to what?
10      A.   I think one.
11      Q.   During this what you described as a
12  misunderstanding did you get into anything that could
13  be called a verbal altercation with former Sergeant
14  Trudeau?
15      A.   I don't think it got that serious.  I
16  think it was just based on me not going, and I did
17  speak to the commander, Commander Gerard at that time,
18  and that's what he said to me, Rich, it's just a
19  misunderstanding is what it appears to be.
20          (Exhibit No. 17 marked.)
21      Q.   I'm going to show you another document.
22  It's going to be Exhibit No. 17.  I'll also give a copy
23  to your attorney.  It's Bates stamped Kankakee 000627.

Page 112

1  Would you agree it's a disciplinary letter of reprimand
2  from former Chief Larry Regnier issued to you back on
3  6/29/2010?
4      A.   Yeah, but there was a problem with what
5  he was --
6      MR. FLAXMAN: He'll ask you questions about it
7  after --
8      THE WITNESS: Well, he wrote it, but I'm just
9  saying it was --
10  BY MR. MATHUES:
11      Q.   Did he write it as a letter of reprimand?
12      A.   But it didn't happen under his auspices
13  is what I'm saying.
14      Q.   I understand that, exactly.
15      A.   Yeah.
16      Q.   In fact, the first paragraph of Exhibit
17  No. 17 mentions that, correct, that the Chief said he
18  was made aware of an outstanding disciplinary
19  situation?
20      A.   And it was resolved under Chief Kincaid.
21      Q.   Did you ever file a grievance or
22  challenge the letter of reprimand that's in front of
23  you in Exhibit No. 17?

Page 113

1   A.   I never got it?
2   Q.   You never -- is it your testimony that--
3   A.   I never got it.
4   Q.   This letter of reprimand --
5   A.   Absolutely not.
6   Q.   You never saw it?
7   A.   I never got it.
8   Q.   As you're looking at it this morning is
9  this the first time you've ever laid eyes on it?
10   A.   Yes.  That's why I'm trying to read it.
11  And this evidence was later discovered --
12   MR. FLAXMAN: Well, --
13   THE WITNESS: I need to tell him.  This was
14  later discovered.  I didn't -- it was a
15  misunderstanding on the sergeant's part.  It was later
16  discovered.  So it should -- I shouldn't have never
17  gotten it.
18  BY MR. MATHUES:
19   Q.   And, in fact, you didn't know about it
20  until today, right?
21   A.   Yes.
22   Q.   Back in 2015 you were initially given a
23  three-day suspension over a high-speed chase, correct?

Page 114

1   A.   Yes.
2   Q.   And eventually that suspension was cut in
3  arbitration as well?
4   A.   Yes.
5   Q.   What was it reduced to?
6   A.   To a one-day because radio traffic wasn't
7  clear.
8   Q.   Without going into the -- at this time
9  without going into the fairness of whether the
10  suspension was or wasn't fair, the pursuit itself,
11  would you agree, happened on August the 5th of 2015?
12   A.   The alleged pursuit, I would say.
13   Q.   The incident -- can we call it the
14  incident?
15   A.   Yes.
16   Q.   It happened on August 5th of 2015?
17   A.   Yes.
18   Q.   And it happened about 6 o'clock in the
19  evening; is that correct?
20   A.   Yes.
21   Q.   And it started here in downtown Kankakee;
22  is that correct?
23   A.   It happened.

Page 115

1   Q.   It happened here in downtown Kankakee.
2  And it started when you saw a -- what sometimes gets
3  referred to as a crotch rocket motorcycle at a high
4  rate of speed, correct?
5   A.   The investigatory process started, yes.
6   Q.   And what did you -- what happened next?
7   A.   You mean as far as what I did?
8   Q.   What did you do?  Yeah.  What did you do?
9   A.   The report states that I went out and
10  just tried to see what was going on.
11   Q.   Don't tell me what the report states,
12  Mr. Brooks.
13   A.   Well, I'm just -- that's what happened,
14  sir.
15   Q.   What did you do?
16   A.   Okay.  I'm going to start over again
17  before I was interrupted.  I went out onto the street.
18  I turned right and didn't see it.  I went up to the
19  corner here.  I was told by a citizen it went that way.
20  When I approached the bike, the bike rode off.  I then
21  ex- -- no, before that I had executed my lights and the
22  person looked back and then he rode off.
23   Q.   When you say executed your lights, is

Page 116

1  that the same thing as you turned your lights and
2  sirens on?
3   A.   Yes.
4   Q.   You're in your marked police car?
5   A.   Yes.
6   Q.   Just so we're clear, what intersection
7  when you turned your lights and sirens on?
8   A.   Schuyler and Court.
9   Q.   When you saw -- the moment you turned the
10  lights and sirens on, the bike was still or in motion?
11   A.   The suspect or the subject looked back at
12  me.  No, we were stopped.
13   Q.   He was stopped as well?
14   A.   Yeah.
15   Q.   What prompted you to take your car out to
16  go to investigate the situation?  Was it that you seen
17  the suspect -- the subject on a bike at a high rate of
18  speed or did you hear about it over the radio?
19   A.   No, I witnessed it.
20   Q.   When you witnessed it, tell me what you
21  saw.
22   A.   A blur.
23   Q.   Fair to say a guy on a bike driving way

Page 117

1    over the speed limit --
2        A.   Yes.
3        Q.   -- in downtown Kankakee?
4        A.   Indiana right here, 100 block.
5        Q.   The suspect -- after you turned your
6    lights and siren on, the suspect took off, correct?
7        A.   He proceeded to turn left, yes.
8        Q.   He turned left and then he took off at a
9    high rate of speed?
10       A.   He was moving pretty good.
11       Q.   What did you do?
12       A.   Well, at that time I was still following
13   him. I went through a green light like at 50 miles an
14   hour, 30, somewhere within -- it wasn't fast.  And it
15   was like within a 40-second time limit, and once he got
16   out of sight I discontinued the chase, the
17   investigation.
18       Q.   Before beginning the investigation, did
19   you ask any sergeant over the radio for permission to
20   follow this bike?
21       A.   Well, I mean, when you're executing a
22   traffic stop I've never went over and asked unless I
23   knew I was about to be in a chase so -- I wasn't going

Page 118

1    to chase him so I didn't.
2        Q.   Is it your testimony that this -- this
3    incident did not involve a chase?
4        A.   No, because he was, like I said, a blur.
5    He was gone.
6        Q.   What's the fastest you got your police
7    car to during this incident?
8        A.   I really wasn't paying attention to the
9    speedometer, but I think it was probably at about 80,
10   and I would say he was way over that.
11       Q.   What's the actual speed limit in downtown
12   Kankakee?
13       A.   Well, this was over the bridge.  We were
14   in -- at that time the speed limit, I think, going over
15   Schuyler onto the curve it was actually about either
16   45, 50 or 45.
17       Q.   For approximately -- as best you can
18   recollect, approximately, how long was your speed at
19   80?
20       A.   Probably about three seconds.
21       Q.   About how long was your speed over the
22   speed limit?
23       A.   With my lights and sirens on, I would say

Page 119

1    probably through the whole chase, 40 seconds.
2        Q.   It was 6 o'clock in the evening we had
3    said, correct?
4        A.   (Nods.)  Saturday downtown Kankakee.  It
5    was empty, yeah.
6        Q.   It's your testimony there were no other
7    cars on the road?
8        A.   Not that I saw at the time, no.
9        Q.   During this incident did you go through
10   any red lights?
11       A.   Based on the arbitration when we watched
12   the video together, absolutely not.
13       Q.   So there is a video of this incident,
14   correct?
15       A.   Yes, and we watched it together.  I
16   approached one with my lights and siren and let traffic
17   go through and then that -- that would be at Schuyler
18   and River.
19       Q.   This video we're talking about is it your
20   squad car video?
21       A.   Yes.
22       Q.   And your testimony is you didn't go
23   through any red lights during this incident?

Page 120

1        A.   Not without stopping first, yes.
2        Q.   After you stopped did you then go through
3    a red light?
4        A.   Once it was cleared, yes.
5        Q.   Did you go through any stop signs during
6    this incident without stopping?
7        A.   Absolutely not.
8        Q.   Did you hear over the radio anyone
9    telling you to terminate the pursuit or break off the
10   chase or words to that effect?
11       A.   No.
12       Q.   By the way, we've mentioned arbitration a
13   couple of times in terms of challenging a suspension.
14   How does that process work?
15       A.   Well, you have to go to the union rep or
16   the union itself and you file the paperwork and submit
17   it to the department.  The union -- I can't tell
18   exactly how they go about doing it, but they do submit
19   paperwork, and a date is set up where we all meet, the
20   arbitrator, the City, myself, and representation.
21       Q.   Who is the arbitrator?
22       A.   I don't know.  I couldn't remember.  I
23   mean, it's independent.  I mean, we don't know who.

Page 121

1  I'm sure they don't know either.
2     Q.   One arbitrator or a panel?
3     A.   One person.
4        MR. MATHUES: I'm getting close to being done
5  but I would like to take a short break to use the
6  bathroom. Can we go off the record?
7           (Brief break.)
8           (Exhibit No. 18 marked.)
9  BY MR. MATHUES:
10    Q.   I'll give you a document I've had marked
11 as Exhibit 18. Exhibit 18 has a Bates stamp of Kankakee
12 93. Would you agree Exhibit 18 is your written
13 statement tp the police department about the --
14    A.   Totality --
15    Q.   -- chase --
16    A.   Totality of the circumstances, yes.
17    Q.   What happened, correct?
18    A.   Yes.
19    Q.   Your signature at the bottom?
20    A.   Yes.
21    Q.   Your words?
22    A.   Yes.
23    Q.   Is it fair to say that in Exhibit No. 18

Page 122

1  you expressed some confusion or frustration that you
2  weren't entirely clear what the pursuit policy was?
3     A.   I think it was my interpretation of the
4  policy, yeah.
5     Q.   What your interpretation was?
6     A.   Yes.
7     Q.   In fact, in the next to the last
8  paragraph, it begins "the reason I wanted to write this
9  short statement was due to the confusion and
10 frustration I felt while meeting with Commander Kidwell
11 and Lieutenant Lowman reference this chase and because
12 of my understanding of the pursuit policy."  Did I
13 read that accurately?
14    A.   Yes. Can I read on?  It says because of
15 my understanding of the policy.
16    Q.   Yeah.
17    A.   That's the whole sentence.
18    Q.   Fair enough. This incident -- I think
19 earlier in this deposition you had said it wasn't a
20 chase. Did I hear you correctly?  Did you use those
21 words earlier in this deposition?
22    A.   I said I pursued.
23    Q.   Pursued.

Page 123

1     A.   Yeah.  I mean, I don't know if you
2  understand...
3     Q.   Now, on Exhibit 18 you are describing the
4  situation. It's the third paragraph from the bottom,
5  the shortest paragraph. Your words are "With lights
6  and siren activated, I then determined during the short
7  chase that after observing the rate of the speed and
8  the recklessness of the driver I terminated the chase
9  on my own." Did I read that accurately?
10    A.   Yes.
11           (Exhibit No. 19 marked.)
12    Q.   I'm showing you another document. I'll
13 give a copy to your attorney. It's marked Kankakee
14 100. I ask that it be marked as Exhibit No. 19. If
15 you turn to the third page, which is Bates stamped
16 Kankakee 102, the third page Kankakee 102 is a Kankakee
17 Police Department memo of 10/28/2014, correct?
18    A.   Yes.
19    Q.   And there are two signatures on it, yours
20 and a Lieutenant Lowman's, correct?
21    A.   Yes.
22    Q.   And the subject of the memo is that on
23 10/28/14, approximately one year before the pursuit

Page 124

1  incident we have been discussing, "On 10/28/14
2  Patrolman Brooks and I discussed the chase that he was
3  involved in on 10/24/14. We reviewed the pursuit
4  policy and we are up to date on the Kankakee Police
5  Department's pursuit policy." Did I read that
6  accurately?
7     A.   Yes.
8     Q.   Is it, in fact, correct that on 10/28/14
9  you and Lieutenant Lowman discussed what the Kankakee
10 Police Department's pursuit policy was?
11    A.   The way that I understood it?
12       MR. MATHUES: Can you please read the question
13 back?
14           (Record read as requested.)
15 BY THE WITNESS:
16    A.   The same as the way I understood it.  It
17 was an agreement between us, and that's why I signed
18 it.
19       MR. MATHUES: Will you please read the
20 question?
21       THE REPORTER: The one I just read?
22       MR. MATHUES: Yes.
23           (Record read as requested.)

Page 125

1  BY THE WITNESS:
2     A.   Yes.
3  BY MR. MATHUES:
4     Q.   Also, as part of your -- one of your
5  Illinois Department of Human Rights complaints you
6  reference an instance where an Officer Shreffler also
7  violated the Kankakee Police Department's pursuit
8  policy; is that correct?
9     A.   Yes.
10    Q.   Now, Officer Shreffler is actually no
11 longer a member of the Kankakee Police Department; is
12 that correct?
13    A.   For using racial slurs, yes.
14    Q.   He's been -- he's been fired?
15    A.   Yes.
16    Q.   When was he fired?
17    A.   The exact day I couldn't say, but it's
18 been recent.
19    Q.   In 2018?
20    A.   Yes.
21    Q.   Was that when Mr. Dumas was Chief?
22    A.   Yes.
23    Q.   Other than being fired for being racial

Page 126

1  slurs --
2     A.   I think it was a little more than that,
3  but that's -- it was a part of it, yeah.
4     Q.   What else -- that's -- that's where I was
5  going with it. It's correct that in addition to the
6  racial slurs and in addition to the pursuit chase that
7  you -- that you mentioned that he was involved in,
8  Officer Shreffler has had other disciplinary issues; is
9  that correct?
10    A.   No, I mean, along with the racial slurs,
11 I think he also was threatening to kill the individual
12 and he commented such as that based on what the witness
13 told me.
14    Q.   Who was -- who did Officer Shreffler
15 threaten to kill?
16    A.   Chief Dumas.
17    Q.   When did that happen?
18    A.   Recently. It's on file. You can ask and
19 you can check the investigation.
20    Q.   Do you know if other -- do you know if
21 apart from the incident of making threats against then
22 Chief Dumas if Officer Shreffler had any other
23 disciplinary violations against him?

Page 127

1     A.   Well, yeah, based on just the guys
2  talking there were other issues with Facebook and all
3  that crazy stuff, yeah.
4     Q.   More limited, the high-speed pursuit
5  chase that Officer Shreffler was involved in that led
6  to him getting suspended, would you agree that that
7  happened on 2/21/2015?
8     A.   I really don't know to be honest.
9            (Exhibit No. 20 marked.)
10    Q.   I'm going to show you another document
11 we'll mark as Exhibit 20. I'll give a copy to your
12 attorney. Exhibit 20 has a Bates stamp, even though
13 it's difficult to see, of Kankakee 205.
14           Exhibit 20 that you're looking at is
15 a Kankakee Police Department memo, correct, to D/C --
16 Deputy Chief Gerard from Commander Kidwell?
17    A.   Yes.
18    Q.   There's some handwriting at the top that
19 says Re: Shreffler case.
20    A.   Yes.
21    Q.   The very first line it begins on
22 2/21/2014, correct?
23      MR. FLAXMAN: '15.

Page 128

1       MR. MATHUES: 2015. Thank you for the
2  correction, Counsel.
3       MR. FLAXMAN; we'll stipulate that's what it
4  says.
5  BY MR. MATHUES:
6     Q.   Would you agree with me that
7  Mr. Shreffler's high-speed pursuit happened back on
8  2/21/2015?
9     A.   That's what it states.
10    Q.   Any reason to dispute that as you sit
11 here, Mr. Brooks?
12    A.   Other than I'm not sure. So I would say
13 no.
14    Q.   And would you agree that the incident
15 that Mr. Shreffler got involved in happened about 3:30
16 in the morning?
17    A.   Where is that at?
18           (Exhibit No. 21 marked.)
19    Q.   I'll give you another document. We'll
20 mark this as Exhibit No. 21. I'll give a copy to your
21 attorney. It's Bates stamped Kankakee 209. You also
22 see Exhibit 21 is a Kankakee Police Department memo to
23 Commander Kidwell from Lieutenant Hunt dated February

Page 129

1  23, 2015?
2      A.  Yes, I see that.
3      Q.  It's an incident -- it gives two incident
4  numbers and Michael Shreffler, which is the individual
5  we have been talking about, correct?
6      A.  Yes.
7      Q.  It begins, "Sir, on 2/21/2015 at
8  approximately 3:11 a.m. Officers Berge, Coash, and
9  Shreffler were involved in a vehicle pursuant of a
10 suspicious vehicle that originated at the Salvation
11 Army on East Court Street."  Did I read that
12 accurately?
13     A.  Yes.
14     Q.  Based on what you're looking at as
15 Exhibit 21, would you agree that Officer Shreffler's
16 pursuit happened at about 3:30 in the morning?
17     A.  Office Berge, Coash, and Shreffler's
18 pursuit, yes.
19     Q.  That's all part of the same incident,
20 correct?
21     A.  That's what the letter says, yes.
22     Q.  As you sit here today, any reason to
23 dispute that?

Page 130

1      A.  Not based on the letter.
2      Q.  Based on anything else?
3      A.  I don't have any knowledge about this.
4      Q.  Were you working that night that this
5  incident happened?
6      A.  No.  The night that I was working the
7  incident happened at 10 o'clock.  I denoted it in my
8  statement.
9      Q.  Which statement would that be?
10     A.  The one I gave to the City.
11     Q.  Would that be --
12     MR. FLAXMAN: Not of Mr. Shreffler.
13 BY THE WITNESS:
14     A.  It was Mr. Berge.  That's the statement,
15 I think it was, if that's what you're asking.
16 BY MR. MATHUES:
17     Q.  I'm not asking about Mr. Berge crashing
18 his car or using steroids at the moment.
19     A.  I'm not talking about that either, but--
20     MR. FLAXMAN: Why don't you let --
21     THE WITNESS: Yeah, I'm just kind of confused.
22     MR. FLAXMAN: Let him start over with a new
23 question.

Page 131

1      THE WITNESS: Okay.  He asked me was I working
2  and I -- no, I wasn't.
3      MR. MATHUES: Okay.
4      THE WITNESS: That's where the question came
5  from.
6  BY MR. MATHUES:
7      Q.  The night the incident with Officer
8  Shreffler's high-speed pursuit 2/21/2015 do you know if
9  you were working that night?
10     A.  No, not that I recall.
11     Q.  As you sit here this afternoon, do you
12 have any reason to dispute that initially -- strike
13 that.
14         As you sit here this afternoon, would
15 you agree that Sergeant Martin was the sergeant on duty
16 when this incident with Mr. Shreffler happened?
17     A.  Based on the first paragraph, I would
18 agree.
19     Q.  As you sit here this afternoon, would you
20 agree that Sergeant Martin initially authorized the
21 pursuit that Mr. Shreffler and the other officers were
22 involved in?  I'll direct your attention to the first
23 page of Exhibit No. 20 towards the bottom of the second

Page 132

1  paragraph.
2      MR. FLAXMAN: I mean, I object to the
3  foundation of asking him other things that happened
4  when he wasn't on duty.
5      MR. MATHUES: Off the record.
6         (Off-the-record conversation.)
7  BY MR. MATHUES:
8      Q.  Let's go back on the record and I'll try
9  again.  As you sit here today, do you have any reason
10 to dispute or disagree that Sergeant Martin initially
11 authorized the pursuit that Officer Shreffler was
12 involved in?
13     A.  I disagree.  I don't see it.
14     Q.  That was not my question, Mr. Brooks.  As
15 you sit here today, do you have any reason or any
16 information to disagree with the fact that Sergeant
17 Martin initially authorized the pursuit that Officer
18 Shreffler got involved in?
19     A.  Not to my knowledge.
20     Q.  As you sit here today, do you have any
21 reason to dispute or disagree with that after initially
22 authorizing the pursuit Sergeant Martin ordered Officer
23 Shreffler to stop the pursuit?

Page 133

1    A.    Not to my knowledge.
2    Q.    Officer Shreffler was, in fact, suspended
3  based on this high-speed pursuit for one day?
4    A.    Not to my knowledge.
5    Q.    Rounded to the nearest thousand dollars,
6  what's your current salary?
7    A.    For a patrolman -- man, it's hard to say.
8  Somewhere around 70'ish, 75.
9    Q.    Rounded to the nearest thousand dollars,
10 what is the current salary for a sergeant?
11   A.    It's probably about 89, 90.
12   Q.    Rounded to the nearest thousand dollars,
13 what is the current salary for a lieutenant?
14   A.    Probably 110, something in that area.
15         (Exhibit No. 22 marked.)
16   Q.    I'll give you one more document, and
17 we'll mark it as Exhibit 22. I'll give a copy to your
18 attorney. It is not Bates stamped because it is
19 Plaintiff's Initial Disclosures in this matter. Do
20 you recognize Exhibit 22, Mr. Brooks?
21         (Attorney/Client consultation.)
22   MR. FLAXMAN: Just let him know if you
23 recognize it and then you can ask me a question.

Page 134

1  BY THE WITNESS:
2    A.    I have to say, no, I don't.
3    MR. FLAXMAN: Can we take a really quick break?
4         (Off the record.)
5  BY MR. MATHUES:
6    Q.    Is your recollection refreshed at all,
7  Mr. Brooks, as to whether you've seen Exhibit 22
8  before?
9    A.    I'm not going to say no but I was trying
10 to look at some of the names that are on there. Like
11 Joe Bassett. I don't know who that is. I don't know
12 who that person is.
13   Q.    Number one is a Billy Jerome Moore. Is
14 that the same individual that we referred to as B.J.
15 Moore during this deposition?
16   A.    Yes.
17   Q.    And what -- is there any other
18 information that you have not told me -- not mentioned
19 in today's deposition that you believe Mr. Moore has
20 regarding your lawsuit, this lawsuit?
21   A.    I couldn't say yes or no to that.
22   Q.    Have you had any conversations with
23 Mr. Moore that we have not already discussed regarding

Page 135

1  racial discrimination against you?
2    A.    Not that I can recall at this time.
3    Q.    Anything that would refresh your
4  recollection?
5    A.    Not at this time.
6    Q.    What about at any other time?
7    A.    Yeah, if he was here.
8    Q.    And you had said a few seconds ago you
9  don't know who Joe Bassett is; is that correct?
10   A.    Exactly, yes.
11   Q.    Who's Michael Suprenant?
12   A.    A co-worker.
13   Q.    Does he currently work for the police
14 department.
15   A.    He's a patrol officer, yes.
16   Q.    How long has he been a patrol officer?
17   A.    I'm not sure, but I would guess
18 approximately 15 years.
19   Q.    Have you had any conversations with
20 Mr. Suprenant that we haven't already talked about
21 today regarding racial discrimination against you and
22 the Kankakee Police Department?
23   A.    Only that he said to me at one time --

Page 136

1  and he's white. He felt that he experienced racial
2  discrimination because he was friends with blacks while
3  working at this department.
4    Q.    Approximately, when did Mr. Suprenant say
5  that?
6    A.    It's hard to pinpoint, but within the
7  last few years, yeah.
8    Q.    Would you say it's before or after the
9  2014 sergeant list came out?
10   A.    I would have to put it right -- it was
11 either before or after, right in that time.
12   Q.    Other than this statement -- when
13 Mr. Stuprenant (phonetic) made this statement to you --
14   A.    Suprenant.
15   Q.    Suprenant. Were anyone else besides
16 yourself and him present?
17   A.    No. I would say me and him was present,
18 yeah.
19   Q.    Would you call him a friend?
20   A.    We don't hang out together, no.
21   Q.    So you wouldn't say he's a friend of
22 yours?
23   A.    He's a co-worker.

Page 137

1   Q.   Mr. Moore, would you call him a friend?
2   A.   Closer than Suprenant.
3   Q.   Of all the people who are current and
4   former Kankakee police officers who would you say are
5   your three closest friends?
6   A.   I really don't -- the closest thing that
7   I would say to a friend would probably be Moore,
8   Officer B.J. Moore, the closest.  I don't hang out with
9   him, but, you know.
10  Q.   After Officer Moore who is the closest?
11  Who is the next closest you would have to a friend?
12  A.   That would be family members.
13  Q.   Within the Kankakee -- it might have been
14  a bad question.  After Officer Moore who within the
15  Kankakee Police Department, current or former, would be
16  the next closest to being a friend?
17  A.   I'm not trying to delay, but I don't have
18  any real friends to be honest with you.  It's not a
19  negative thing.  I just don't hang out with anyone.
20  Q.   Before he retired would you have
21  considered Officer Baptist a friend?
22  A.   More of an acquaintance.
23  Q.   What about Mr. Hunt?

Page 138

1   A.   I would say me and him really would be
2   more of an acquaintance, that we don't hang out
3   together or anything, no.
4   Q.   The fourth person on the list is Scott
5   Koerner.  Who is he?
6   A.   Internal Affairs.
7   Q.   What's his rank?
8   A.   He's no longer with us.
9   Q.   What was his rank before he left?
10  A.   Internal Affairs.
11  Q.   Did he retire?  Is he deceased?  What
12  happened?
13  A.   He's a police chief up north from what I
14  understand.
15  Q.   When did he leave?
16  A.   I can't pinpoint.
17  Q.   Approximately.
18  A.   About last year.  Middle of last year.
19  Q.   What's his ethnicity?
20  A.   White.
21  Q.   What information do you believe
22  Mr. Koerner has that's relevant to this lawsuit?
23  A.   When I requested the investigation of

Page 139

1   Berge's crash, he and -- well, the Mayor ordered him to
2   do the investigation.
3   Q.   Anything -- any other information that
4   you believe Scott Koerner has?
5   A.   Not that I can think of.
6   Q.   Have you had any conversations with
7   Mr. Koerner either before or after he left the Kankakee
8   Police Department regarding racial discrimination that
9   you believe he suffered as a police officer?
10  A.   Only the investigation.
11  Q.   Of Mr. Berge?
12  A.   Yeah.  Well, not -- yeah, he -- I was
13  part of the investigation, yeah.
14  Q.   Do you think Paul Berge gets special
15  treatment?
16  A.   I think it's beyond that.
17  Q.   Why do you think Mr. Berge gets such
18  special treatment?
19  A.   I just think it's hypocritical that the
20  same crimes he commits he doesn't even get charged and
21  yet he's out there charging suspects with those crimes
22  and they're going to jail.
23  Q.   I get that.  My question was a little bit

Page 140

1   different.  Can we agree that even among the white
2   officers of the Kankakee Police Department Paul Berge
3   gets special treatment?
4   A.   There was a letter out there from white
5   officers, yes.  It noted that, yeah.
6   Q.   So can we -- can we agree on that that
7   you think that even among the white officers Paul Berge
8   gets treated special?
9   A.   As far as special I think they were more
10  scrutinizing the criminal activity.  So I wouldn't say
11  special treatment.  I think their concern was getting
12  away with, you know, -- not quote/unquote of like
13  murder, not saying he committed murder, but that's what
14  their complaint was.
15  Q.   So I'm going to go back and ask the
16  question I asked initially.  Why do you think so many
17  allowances or excuses are made for Paul Berge as
18  opposed to anybody else?
19  A.   Disparate treatment.
20  MR. MATHUES: Can we go off the record?
21       (Off-the-record conversation.)
22  MR. FLAXMAN: Let's go back on the record.
23  THE WITNESS: Do you wants your answer or what

Page 141

1  do you want me to say?
2  BY MR. MATHUES:
3      Q.   Why do you think Paul Berge gets such
4  special treatment as opposed to anybody else in the
5  whole police department?
6      A.   Disparate treatment of minorities.
7  Because if he was white -- if he wasn't white, I don't
8  think he would have gotten it.  There's no way based on
9  my belief.
10     Q.   Do you think that Paul Berge gets treated
11 the same as every other white officer on the Kankakee
12 Police Department?
13     A.   I think he has the opportunity to be
14 treated.
15         MR. MATHUES: Can you read that question again?
16            (Record read as requested.)
17 BY MR. MATHUES:
18     Q.   So I'll ask the question.  Mr. Brooks, do
19 you believe that Paul Berge gets treated the same as
20 every other white police officer on the Kankakee Police
21 Department?
22     A.   Yes.
23     Q.   The fifth person on the list of Exhibit

Page 142

1  22 is Matt Adamson.  Is there any conversations you've
2  had with Mr. Adamson regarding your allegations of
3  racial discrimination that we haven't already talked
4  about?
5      A.   No.
6      Q.   Any other information you believe
7  Mr. Adamson has regarding the lawsuit we haven't
8  already talked about?
9      A.   Not that I know of.
10     Q.   Person number six is Willie Hunt, who is
11 no acting Chief Hunt, correct?
12     A.   Yes.
13     Q.   Any conversation that you've had with
14 acting Chief Hunt regarding racial discrimination
15 against you as a police officer that we haven't already
16 talked about?
17     A.   Not that I can recollect.
18     Q.   Anything that would refresh your
19 recollection?
20     A.   Him being here.
21     Q.   Anything else?
22     A.   No.
23     Q.   Any other information you believe that

Page 143

1  Officer Hunt has -- excuse me -- acting Chief Hunt has
2  regarding your lawsuit that we haven't already talked
3  about?
4      A.   Not that I know of.
5      Q.   The seventh person on the list is Larry
6  Osenca.  Who is that person?
7      A.   I'm assuming Larry Osenga.
8      Q.   Osenga.  Who --
9      A.   That's what I'm assuming.
10     Q.   -- is that person?
11     A.   Well, he used to be a commander with the
12 department now serving as an alderman.
13     Q.   Have you had any conversations with Larry
14 Osenga regarding racial discrimination against you as a
15 police officer?
16     A.   He definitely was a part of the first
17 suit.  He was the one that was on that -- he was part
18 of the first suit.
19     Q.   When you say the first suit, are you
20 talking about the Baptist litigation?
21     A.   Yes.
22     Q.   When did Mr. Osenga leave the police
23 department?

Page 144

1      A.   I'm not sure.
2      Q.   Before or after the 2011 sergeant's list
3  came out?
4      A.   I would say before.  I'm assuming now.
5  Don't quote me on it.
6      Q.   The eighth person on the list is Deanne
7  Regas.  Who is that?
8      A.   She's the one that actually told me about
9  Berge.
10     Q.   Is that Berge's ex-girlfriend?
11     A.   No.  She's a co-worker.  She works with
12 the department.
13     Q.   Is she a sworn police officer or a
14 civilian?
15     A.   Sworn police officer.
16     Q.   What's her rank?
17     A.   Officer.  Patrolman.  Same thing.
18     Q.   What's her ethnicity?
19     A.   White.
20     Q.   Is she the same person who told you about
21 what -- Mr. Tison's racial slurs?
22     A.   I'm not going to say that.
23     Q.   Have you --

Page 145

1   A.   That was Lacie Zingre.
2   Q.   Lacie.  What information do you believe
3   Ms. Regas has regarding your lawsuit?
4   A.   Other than informing me about the
5   accident of Berge, that would be it.
6      MR. FLAXMAN: Before you move on from this,
7   number two should be Baptist.  He was the plaintiff in
8   the earlier case, and Mr. Koerner's last name, I think,
9   is misspelled.  I think it should be K-O-E-R-N-E-R.
10     MR. MATHUES: Thank you.
11     MR. FLAXMAN: You're welcome.
12  BY MR. MATHUES:
13  Q.   Going back -- so thanks to your counsel's
14  clarification, Mr. Baptist.  Other than what we've
15  already talked about, do you believe Mr. Baptist has
16  any other information regarding this lawsuit?
17  A.   I couldn't say to be honest.
18  Q.   When did Mr. Baptist leave the
19  department?
20  A.   Man, if I was to venture a guess, around
21  '07, '08.
22  Q.   Where did he go?
23  A.   He retired.

Page 146

1   Q.   We talked about the salary difference
2   between patrolman and sergeant.  Is there any
3   difference in the benefits package?
4   A.   Oh, I'm sure.
5   Q.   What would that difference be?
6   A.   I -- I would have to look at the
7   contract.
8   Q.   As you sit here, do you know?
9   A.   No, I don't know, but I'm sure it is.
10  Q.   In this case you're claiming damages for
11  emotional distress, correct?
12  A.   Yes.
13  Q.   What emotional distress have you
14  suffered?
15  A.   Oh, man.  Hopelessness, helplessness,
16  anger.  Not being able to just get justice of what is
17  going on in my career at this time.
18  Q.   Has any mental health professional given
19  you a diagnosis?
20  A.   Not as of yet, no.
21  Q.   Have you sought any professional mental
22  health assistance for your emotional distress damages
23  related to this case?

Page 147

1   A.   Not as of yet, no.
2   Q.   Do you plan to do that?
3   A.   Oh, man.  I couldn't answer that right
4   now.
5   Q.   Is there any activity that you have had
6   to stop doing as a result of the mental distress that
7   you're seeking damages for in this case?
8   A.   Seeking promotion.
9   Q.   Anything else?
10  A.   Not necessarily -- I'm not seeking
11  promotion, but testing under the auspices of this
12  department.
13  Q.   Other than -- other than testing is there
14  any other activity you had to stop doing as a result of
15  the emotional distress --
16  A.   No.
17  Q.   -- you're claiming in this case?
18  A.   No.
19  Q.   Is there any activity that you do less of
20  as a result of the emotional distress damages you're
21  claiming in this case?
22  A.   Based on my health I think I do do less
23  of certain things.  I will have to say yes as stress

Page 148

1   was involved.
2   Q.   What things do you do less of a result of
3   this emotional distress?
4   A.   Well, actually, I do more of.  I work out
5   to relieve the stress.  So I wouldn't say that I do
6   less.  I do more of.
7   Q.   Is there anything else you do more of
8   besides working out?
9   A.   I eat plenty of beets.
10  Q.   Anything else?
11  A.   No.
12  Q.   Anything that you can say that you do
13  less of?
14  A.   I can't recall at this time.
15  Q.   Anything that would refresh your
16  recollection?
17  A.   I would say not at this time.
18  Q.   Does it bother you that other
19  African-American officers have been promoted to
20  sergeant or above but not yourself?
21  A.   No, we -- they thank me all the time.
22  They say -- they saw what I've gone through and they
23  felt that's why they were reached for.  Michael Sneed

Page 149

1   even told me that himself.
2       Q.   Is Mr. Sneed still a sergeant?
3       A.   Yes. And Sergeant Hunter also. They --
4   they definitely commend me and thank me based on what
5   I've gone through. That -- they definitely feel that's
6   why -- not so much as Sergeant Hunter, but Officer
7   Sneed and also what we went through with Lieutenant
8   Hunt. That's how he got promoted, based on what we
9   went through at the time when he -- he sued earlier.
10      Q.   We're talking about the Baptist
11  litigation back in --
12      A.   Baptist, yeah.
13      Q.   How many times have you had this -- a
14  conversation of this nature with Mr. Sneed?
15      A.   We were just talking about it just the
16  other day.
17      Q.   Does he ever encourage you to take the
18  test again?
19      A.   We didn't discuss that, no, but I did
20  share with him the stress that I have been feeling,
21  yeah. I told him that, yes.
22      Q.   Have you decided whether you will or will
23  not take the sergeant's test the next time it's

Page 150

1   offered?
2       A.   If it's under the auspices of what it's
3   been the last four years with Passwater and Kidwell on
4   there, I will have to say definitely no. It's just
5   that way. I do not trust them as far as subjective
6   scoring. If things are changed, I would say yes.
7       Q.   And when you're talking about subjective
8   scoring and Passwater and Kidwell, we're talking about
9   the oral exam portion, correct?
10      A.   The whole test.
11      Q.   Do you know if Passwater and Kidwell have
12  any input on the answers to the written test?
13      A.   Like I said, the exact answers or the
14  areas of study, I mean, you know --
15      Q.   My question was about the answers.
16      A.   I would have to say no.
17      Q.   Who grades the written test?
18      A.   That's a good question.
19      Q.   Do you know?
20      A.   I can only assume.
21      Q.   What's your assumption?
22      A.   Standard & Associates.
23      Q.   Is it a -- do you fill out the bubbles

Page 151

1   for the multiple choice question just like back in,
2   say, a SAT test?
3       A.   Yeah. You color them out, yeah.
4       MR. MATHUES: I don't have any more questions.
5   Do you want a break before you -- I assume you want
6   some redirect?
7       MR. FLAXMAN: Maybe. I'll just talk to him for
8   a minute.
9           (Brief break.)
10      MR. FLAXMAN: I don't have any questions.
11      MR. MATHUES: Mr. Brooks, would you like to--
12      MR. FLAXMAN: We'll reserve signature.
13          (Signature reserved.)
14          (Whereupon, the deposition
15          Concluded at 12:45 p.m.)
16
17
18
19
20
21
22
23

Page 152

1                    Reporter:   Belinda Harr
2           IN THE UNITED STATES DISTRICT COURT
          FOR THE CENTRAL DISTRICT OF ILLINOIS
3
          Richard Brooks v. City of Kankakee
4                    No. 17-CV-2265
5           I have read the foregoing transcript of my
    deposition taken on August 30, 2018, and
6
    _____It is a true and correct transcript of my
7   deposition given on the day and date aforesaid.
8   [or]
    _____I wish to make the following changes to my
9   deposition:
10  PAGE_____LINE_____CHANGE_____
11  PAGE_____LINE_____CHANGE_____
12  PAGE_____LINE_____CHANGE_____
13  PAGE_____LINE_____CHANGE_____
14  PAGE_____LINE_____CHANGE_____
15  PAGE_____LINE_____CHANGE_____
16  PAGE_____LINE_____CHANGE_____
17  PAGE_____LINE_____CHANGE_____
18  PAGE_____LINE_____CHANGE_____
19  PAGE_____LINE_____CHANGE_____
20  PAGE_____LINE_____CHANGE_____
21
22                   _____
23                        RICHARD BROOKS

Page 153

```
 1   STATE OF ILLINOIS)
                     )
 2   COUNTY  OF GRUNDY)

 3            I, Belinda A. Harr, CSR No. 84-003215, do

 4   hereby certify that RICHARD BROOKS, was first duly

 5   sworn by me to testify the truth; that the above

 6   deposition was recorded stenographically by me and

 7   reduced to typewriting under my personal direction; and

 8   that the foregoing is a true and correct transcript of

 9   the testimony given by the said witness at the time and

10   place previously specified.

11               I further certify that I am not

12   counsel for nor in any way related to any of the

13   parties to this suit, nor am I in any way interested in

14   the outcome thereof.

15               IN WITNESS WHEREOF I have hereunto

16   set my hand this 14th day of September, 2018.

17

18

19

20                   s/Belinda A. Harr
21

22                Certified Shorthand Reporter

23
```

## A

**able (1)**
146:16
**above (12)**
37:3;40:20;46:13;
56:5;67:5;78:2;79:16;
81:5;84:12;94:20;
107:22;148:20
**Absolutely (4)**
90:9;113:5;119:12;
120:7
**access (2)**
97:18,20
**accident (2)**
94:19;145:5
**accompany (1)**
29:15
**accurate (1)**
11:8
**accurately (7)**
6:13;12:15;108:6;
122:13;123:9;124:6;
129:12
**acquaintance (2)**
137:22;138:2
**acting (22)**
15:10;33:10,15;34:3,
11,16;50:8,22,23;51:8;
52:4,5;54:16,17;55:1,6,
10,11;56:16;142:11,
14;143:1
**actions (1)**
108:3
**activated (1)**
123:6
**activity (7)**
67:12;76:19;90:4;
140:10;147:5,14,19
**actual (5)**
56:21;82:9,9,11;
118:11
**actually (17)**
15:14;16:2;32:6;
34:5;45:8;61:13;64:21;
69:4,11;88:5;93:11;
102:13;110:5;118:15;
125:10;144:8;148:4
**Adamson (13)**
93:10,17;94:6,10,12,
13,14;105:13;106:4,
10;142:1,2,7
**Adamson's (1)**
94:8
**add (1)**
83:20
**addition (3)**
81:18;126:5,6
**additional (4)**
46:2,12;56:18;82:20
**addressed (1)**
109:18

**administered (1)**
64:21
**administration (2)**
54:22;65:7
**advised (1)**
14:12
**Affairs (2)**
138:6,10
**affected (2)**
75:15;76:8
**affects (1)**
75:14
**African-American (10)**
7:13;35:15;37:8,17;
38:5;43:18;85:2;87:12;
96:18;148:19
**African-Americans (5)**
40:19;85:14;86:1,6,
17
**afternoon (3)**
131:11,14,19
**again (18)**
17:19;21:18;24:15;
28:13;30:18;34:8;53:1;
75:23;79:15;85:16;
88:1;104:19,21;105:1;
115:16;132:9;141:15;
149:18
**against (34)**
7:12,22;16:11,19;
18:1;126:21,23;135:1,
21;142:15;143:14
**age (2)**
47:23;48:7
**ago (10)**
15:12,12;38:17,17;
44:15;47:4;102:23;
103:13;106:23;135:8
**agree (34)**
5:21;14:7;18:12;
19:20;23:18;26:6;27:8;
28:1;38:18;42:15,18;
48:16;60:17,20,21;
62:18;65:21;66:2,6;
81:20;84:15;109:18;
112:1;114:11;121:12;
127:6;128:6,14;
129:15;131:15,18,20;
140:1,6
**Agreed (2)**
13:17;111:5
**agreement (6)**
8:6,10,17,22;14:8;
124:17
**ahead (3)**
6:8;33:23;87:22
**alderman (1)**
143:12
**allegation (1)**
25:17
**allegations (3)**
31:15;43:23;142:2
**alleged (3)**

94:14,15;114:12
**alleging (6)**
7:11;8:21;16:23;
24:1;26:9;28:3
**allowances (1)**
140:17
**allowed (4)**
52:17,18,19,20
**allowing (1)**
76:21
**almost (1)**
68:14
**alone (2)**
105:9;106:19
**along (1)**
126:10
**altercation (1)**
111:13
**although (1)**
15:9
**always (2)**
59:13;63:14
**among (2)**
140:1,7
**and- (1)**
86:10
**and/or (1)**
8:18
**anger (1)**
146:16
**announcement (2)**
48:17,18
**answered (3)**
13:3;30:5;69:13
**anymore (1)**
76:5
**apart (1)**
126:21
**apologize (5)**
14:1;62:13,18;65:13;
74:5
**Apparently (1)**
16:3
**appeal (1)**
9:16
**appears (2)**
18:16;111:19
**applicants (1)**
67:6
**apply (1)**
76:21
**appoint (3)**
43:4;44:19;45:6
**approached (2)**
115:20;119:16
**Approximately (21)**
5:1;32:18,19;33:2;
34:2;35:13,23;39:11;
43:20;44:7,11;48:10;
74:22;79:1;118:17,18;
123:23;129:8;135:18;
136:4;138:17
**April (2)**

24:14;27:15
**arbitration (4)**
111:7;114:3;119:11;
120:12
**arbitrator (3)**
120:20,21;121:2
**area (5)**
57:3,12,17;59:4;
133:14
**areas (1)**
150:14
**Army (1)**
129:11
**around (5)**
7:16;35:8;98:11;
133:8;145:20
**arrested (2)**
104:16;105:1
**Asian (3)**
72:10;73:5;85:19
**assessment (2)**
82:3,3
**assigned (1)**
108:23
**assignment (1)**
109:6
**assistance (1)**
146:22
**Associates (3)**
64:22;65:4;150:22
**associate's (1)**
45:22
**assume (2)**
150:20;151:5
**assuming (4)**
94:23;143:7,9;144:4
**assumption (1)**
150:21
**attention (2)**
118:8;131:22
**attorney (37)**
4:9,12;5:13;6:9;9:8,
10,12,13,19;10:2;
11:14,15;13:6;14:11,
12;15:6,21;16:6,8,14;
18:8;22:5;23:18;26:1;
27:6,20;29:4,4;30:13,
20;107:10;109:13;
111:23;123:13;127:12;
128:21;133:18
**Attorney/Client (1)**
133:21
**attorneys (1)**
6:6
**attribute (1)**
78:10
**August (2)**
114:11,16
**auspices (3)**
112:12;147:11;150:2
**Austin (3)**
37:18;38:7,21;39:5,
6,8,21;40:14

**authority (4)**
44:21,23;45:5,11
**authorized (2)**
131:20;132:11,17
**authorizing (1)**
132:22
**auto (2)**
76:21;94:19
**available (1)**
49:2
**average (1)**
67:7
**award (2)**
68:4;70:2
**awarded (12)**
67:17;68:19,23;69:5,
12,15,18;70:7,12,15,
16;71:2
**aware (2)**
43:9;112:18
**away (3)**
77:4;87:1;140:12

## B

**Bachelor (1)**
46:10
**bachelor's (3)**
47:8,9;70:10
**back (30)**
12:3;15:17;20:7;
35:2;37:10;40:18;
45:23;47:11;66:16;
69:22;73:1;83:7;97:22;
105:2,4;106:12;
108:23;109:7;112:2;
113:22;115:22;116:11;
124:13;128:7;132:8;
140:15,22;145:13;
149:11;151:1
**background (1)**
45:21
**bad (3)**
5:19;87:18;137:14
**Baptist (28)**
5:3;7:15;8:6,23;
9:10;12:14;13:19;14:9;
15:15;40:5,6;62:10;
102:1,5,17,21;57:1,20;
63:20;67:11;70:8,17;
76:4;79:22;82:7;84:4,
**bar (1)**
93:2
**base (1)**
67:10
**Based (49)**
11:9;13:1;16:13;
20:3,4;26:10;31:17;
35:5;45:2;51:17;52:13;
53:7;54:3,12;57:1,20;
63:20;67:11;70:8,17;
76:4;79:22;82:7;84:4,

RICHARD BROOKS VS
CITY OF KANKAKEE, IL

RICHARD BROOKS
August 30, 2018

20;88:21,23;89:8,8,9,
17;90:4;93:10;94:21;
105:2;109:21;111:16;
119:11;126:12;127:1;
129:14;130:1,2;
131:17;133:3;141:8;
147:22;149:4,8
**Basically (2)**
11:12;31:23
**basis (3)**
28:14;42:22;44:5
**Bassett (2)**
134:11;135:9
**Bates (22)**
19:18;20:18;21:3;
24:5,20;26:2,6;27:7,9;
28:11;65:14,15;66:1,5;
107:10;109:12;111:23;
121:11;123:15;127:12;
128:21;133:18
**bathroom (3)**
6:1;66:11;121:6
**became (1)**
106:21
**become (2)**
44:11;53:10
**becomes (1)**
42:5
**beets (1)**
148:9
**beginning (5)**
7:16;49:7;72:1;81:7;
117:18
**begins (6)**
21:3;24:5;108:2;
122:8;127:21;129:7
**behalf (2)**
96:13;97:4
**belief (2)**
45:1;141:9
**below (1)**
78:13
**benefit (1)**
8:15
**benefits (1)**
146:3
**Benoit (6)**
54:21;55:2,21,23;
56:2;78:1
**Bent (2)**
45:9,13
**Berge (52)**
28:15;67:13,20;68:5,
14,17;71:14,21;73:11;
74:8;75:16;76:18;
77:22;80:9,15;81:7,10;
83:9;84:12,17;85:22;
86:8;87:7,17;89:22;
90:10;91:10,13;92:3,6,
11,23;93:8;94:13;95:1,
7,11;129:8,17;130:14,
17;139:11,14,17;140:2,
7,17;141:3,10,19;

**Berge's (6)**
80:10;83:4;91:6;
94:19;139:1;144:10
**besides (7)**
51:20,22;60:13;75:7;
92:3;136:15;148:8
**best (4)**
92:22;96:1;102:16;
118:17
**better (1)**
78:14
**beyond (1)**
139:16
**biased (3)**
52:16;54:11;58:13
**bike (6)**
115:20,20;116:10,
17,23;117:20
**Billy (1)**
134:13
**bit (10)**
32:2;36:10;38:1,14;
42:15;69:9;93:16;
98:23;108:11;139:23
**BJ (4)**
100:1,19;134:14;
137:8
**black (3)**
68:15;73:9;101:2
**blacked (1)**
107:14
**blacks (1)**
136:2
**blew (2)**
93:15;94:16
**block (1)**
117:4
**blur (2)**
116:22;118:4
**board (4)**
44:13;48:21;52:18;
61:15
**body (3)**
5:14;99:13;100:10
**boiled (1)**
110:5
**boom-boom-boom (1)**
48:13
**both (4)**
62:19;72:17,18;
80:15
**bother (2)**
34:8;148:18
**bottom (10)**
10:23;14:3;18:18;
20:19;25:1;26:20;28:6;
121:19;123:4;131:23
**break (12)**
6:1,4;66:10,14,17;
93:16;120:9;121:5,7;
134:3;151:5,9
**bridge (1)**

144:9;145:5

118:13
**Brief (3)**
66:14;121:7;151:9
**briefly (1)**
32:7
**Brooks (38)**
4:3,4,14,16,21;7:7;
10:6;13:10;16:1,16;
18:19;19:18;21:23;
26:23;29:1;30:2;31:7;
36:11;42:23;57:7;
69:10;73:4;82:14;
85:17;91:17;92:1;
97:23;107:11;108:12,
22;115:12;124:2;
128:11;132:14;133:20;
134:7;141:18;151:11
**brought (1)**
105:1
**bubbles (1)**
150:23
**building (1)**
93:3
**bulletin (1)**
48:21
**bumped- (1)**
87:4
**business (1)**
45:23
**but- (2)**
42:1;130:19

## C

**CA (1)**
21:9
**calculations (1)**
83:12
**call (5)**
30:15;93:5;114:13;
136:19;137:1
**called (3)**
4:17;98:20;111:13
**came (36)**
14:19;15:17;29:14;
30:14,14;37:9,16;39:1,
6,8,12;41:10;44:13;
49:11,15,20;51:18;
68:14;76:15,22;77:11;
85:2;90:18,21;92:14,
17;93:23;94:3;96:11,
16;97:9;101:10;111:4;
131:4;136:9;144:3
**can (53)**
5:2;6:8;10:12;11:20,
21,23;12:6;13:13;30:6,
23;31:18;32:3,14;
38:13,18;40:15;42:12;
44:19;45:15;57:7;
65:21;66:2,6,16;69:19;
74:9,13;82:14;93:20;
95:13;97:22;102:16;
109:3;114:13;118:17;

121:6;122:14;124:12;
126:18,19;133:23;
134:3;135:2;139:5;
140:1,6,6,20;141:15;
142:17;148:12;150:20
**cancer (1)**
77:6
**caption (4)**
13:18;26:2;27:10;
28:19
**captioned (2)**
20:16;24:6;25:13
**captured (3)**
104:13;105:20,22
**capturing (1)**
107:5
**car (8)**
92:7,23;93:9;116:4,
15;118:7;119:20;
130:18
**care (1)**
91:14
**career (1)**
146:17
**cars (1)**
119:7
**cartoons (1)**
101:17
**case (37)**
4:3,4,22;5:3;7:5,6,
10,15,19;8:6,21,23;
9:10;10:20;11:17;
13:18;14:9;15:15,15;
20:23;29:23;30:2;31:7,
19;33:13;34:20;54:10;
105:14;110:12,16;
127:19;145:8;146:10,
23;147:7,17,21
**cases (1)**
7:1
**catapulted (1)**
75:17
**caught (1)**
106:2
**Central (2)**
4:5,7
**certain (3)**
8:17;67:12;147:23
**certainly (1)**
29:2
**challenge (1)**
112:22
**challenging (1)**
120:13
**changed (2)**
15:17;150:6
**changes (4)**
8:10,17;11:11,17
**charge (5)**
18:9;22:14;25:4,7;
27:21
**charged (1)**
139:20

**charging (1)**
139:21
**Charles (2)**
73:7,8
**chase (19)**
25:19;104:14,15,22;
113:23;117:16,23;
118:1,3;119:1;120:10;
121:15;122:11,20;
123:7,8;124:2;126:6;
127:5
**check (2)**
76:17;126:19
**Chief (78)**
15:7,9,10;26:14;
32:12,18,20;33:2,10,
14,15;34:3,11,11,15,
16;37:5,5,23;38:4,22;
50:7,8,22,23;51:8,21,
22;52:4,5;54:16,17;
55:1,2,6,10,11;56:16;
57:14;58:7,9;67:2;
68:7;69:14,19;70:1;
89:20;93:7,13,15;
94:15,16;98:18;99:11,
20;100:6,21;104:8;
105:4,8;106:12,14,21;
107:17,18;108:20;
110:16;112:2,17,20;
125:21;126:16,22;
127:16;138:13;142:11,
14;143:1
**Chief's (10)**
66:19,22;67:3,16;
68:18;69:22;80:6;
82:17,21;100:10
**choice (3)**
54:1,3;151:1
**Christmas (1)**
52:19
**Circuit (4)**
9:16;16:9,11,19
**circumstances (4)**
42:19,20;94:18;
121:16
**citizen (2)**
107:12;115:19
**citizens (1)**
31:22
**City (15)**
4:4,15;5:4;7:8;8:22;
9:4,14,19;12:13;31:8;
72:3;93:2;109:17;
120:20;130:10
**Civil (3)**
4:7,22;96:14
**civilian (1)**
5:20;144:14
**claim (3)**
19:21;58:9;72:21
**claiming (3)**
146:10;147:17,21
**claims (6)**

7:19,23;8:2,4,9;
58:12
**clarification (1)**
145:14
**clarify (1)**
5:21
**classes (1)**
46:17
**Clay (1)**
87:5
**clear (7)**
5:15;38:2;39:3;51:7;
114:7;116:6;122:2
**cleared (1)**
120:4
**close (3)**
56:8;77:14;121:4
**closely (1)**
77:15
**Closer (1)**
137:2
**closest (6)**
137:5,6,8,10,11,16
**Coach (5)**
71:6;78:5;86:3;
129:8,17
**cocaine (1)**
91:10
**College (2)**
45:22;46:12
**color (1)**
151:3
**coming (1)**
57:9
**commander (15)**
37:4,4;59:15,15,22;
94:9;105:2,10,13;
111:17,17;122:10;
127:16;128:23;143:11
**commanders (1)**
59:11
**commend (2)**
108:3;149:4
**commendation (7)**
93:12;104:9;105:4;
106:9,22;107:3;108:16
**commendations (1)**
89:19
**commented (1)**
126:12
**comments (1)**
96:8
**Commission (1)**
48:23
**commits (1)**
139:20
**committed (1)**
140:13
**common (2)**
43:1;44:18
**communicating (1)**
23:1
**Community (14)**

45:22;68:21;69:2,11;
71:11,17,19;80:20;
81:6;84:2,6,13,18;
88:16
**Complaint (24)**
18:21;21:9,17;23:23;
24:6,16;25:11,16;
26:12;27:12;28:9,12,
14,18;30:7;39:1,13,16,
22;40:7;76:18,23;
101:16;140:14
**complaint- (1)**
76:15
**complaints (10)**
16:22;17:3;18:13;
26:7,18;28:2;58:15;
91:3;104:8;125:5
**compute (1)**
83:14
**concern (1)**
140:11
**Concluded (1)**
151:15
**conduct (1)**
109:21
**confident (1)**
13:12
**confused (2)**
5:15;130:21
**confuses (1)**
5:18
**confusing (1)**
5:20
**confusion (3)**
110:10;122:1,9
**Congratulations (1)**
46:5
**Consent (7)**
14:11,13,21;15:18;
16:5;22:23;62:8
**considered (1)**
137:21
**consultation (1)**
133:21
**contend (1)**
12:13
**contending (3)**
11:16;54:10;56:21
**contract (1)**
146:7
**conversation (24)**
30:20;33:11,18;
51:13;52:2,3;53:6;
56:15;57:20;58:6;
63:16;68:10;93:17,18,
22;96:23;97:3;99:23;
102:17;103:1;132:6;
140:21;142:13;149:14
**conversations (12)**
15:5;33:14;34:10;
61:22;68:2,16,18;
134:22;135:19;139:6;
142:1;143:13

**copy (19)**
10:2;13:6;14:13,22,
23;16:5;18:7;22:4;
26:1;27:6,20;65:16;
107:9;109:13;111:22;
123:13;127:11;128:20;
133:17
**corner (7)**
18:9,18;26:4,22;
27:21;28:7;115:19
**corrected (1)**
78:6
**correction (1)**
128:2
**correctly (1)**
122:20
**counsel (4)**
28:23;45:9;65:17;
128:2
**counsel's (1)**
145:13
**count (1)**
35:12
**counts (1)**
84:6
**County (1)**
72:2
**couple (2)**
46:14;120:13
**course (4)**
5:17;6:6;29:1;38:15
**courses (2)**
46:19,21
**court (6)**
5:11;7:1;15:20;31:8;
116:8;129:11
**cover (2)**
14:18;15:2
**covered (2)**
73:11;76:10
**covers (1)**
22:20
**co-worker (3)**
135:12;136:23;
144:11
**crash (3)**
93:9,14;139:1
**crashed (3)**
92:6,23;93:3
**crashing (1)**
130:17
**craw (1)**
14:20
**crazy (1)**
127:3
**credit (1)**
18:3
**crimes (2)**
139:20,21
**criminal (8)**
7:1;46:9,21;67:12;
76:18;105:17,18;
140:10

**crotch (1)**
115:3
**current (8)**
37:7;52:5;99:19;
133:6,10,13;137:3,15
**currently (2)**
43:15;135:13
**curve (1)**
118:15
**cut (1)**
114:2

**D**

**D/C (1)**
127:15
**damages (4)**
146:10,22;147:7,20
**date (16)**
13:22;20:8,21;21:14;
23:7;28:8,8;53:13;
74:11;90:13;93:19;
97:2;107:20;108:19;
120:19;124:4
**dated (1)**
128:23
**David (1)**
4:9
**day (13)**
14:4;25:10;31:7,19;
90:12;93:5,14;94:13;
95:4,18;125:17;133:3;
149:16
**days (3)**
95:11,14;111:9
**dealing (5)**
29:10,11;34:9;78:11;
108:3
**dealt (1)**
25:17
**Deanne (1)**
144:6
**debate (1)**
85:11
**decades (2)**
44:14,17
**deceased (1)**
138:11
**December (2)**
21:14;23:12
**decided (1)**
149:22
**decision (1)**
75:20
**decreased (1)**
64:14
**Decree (7)**
14:12,14,21;15:18;
16:5;22:23;62:8
**deeds (1)**
89:19
**defendant (1)**
4:10

**definitely (9)**
14:11;67:9;89:13,23;
90:22;143:16;149:4,5;
150:4
**definitively (2)**
63:7;96:3
**degree (2)**
46:8;47:1
**delay (1)**
137:17
**denoted (1)**
130:7
**Department (95)**
7:11;8:12,19;16:22;
17:4;18:14;19:22;
20:15,22;21:9,16;
22:13;23:3,6,10;24:1,
15;25:12;26:8,18;
27:11;28:3,20,21;
29:12;31:10,21;32:4,
11;35:4,14;36:1,12,21;
40:23;43:9,16;47:11,
15;48:1,19;49:3,13,17;
56:13;57:2,5,9,10;
58:16;59:11;60:19,23;
61:5,11,17;62:22;
63:13,20;67:5;68:3;
70:17;72:2,3;74:14,23;
77:3;89:10;91:4;95:8;
99:20;101:15;104:7;
109:17;120:17;121:13;
123:17;125:5,11;
127:15;128:22;135:14,
22;136:3;137:15;
139:8;140:2;141:5,12,
21;143:12,23;144:12;
145:19;147:12
**Department's (3)**
124:5,10;125:7
**deposition (25)**
4:2,6,21;5:7,17;6:6;
7:7;29:2,9,17,20;30:1,
4,9;31:5,12,14;38:16;
80:10;96:7;122:19,21;
134:15,19;151:14
**Deputy (9)**
15:7,9;33:14;37:4,
23;51:21,22;110:16;
127:16
**descent (2)**
72:10;73:5
**Describe (2)**
59:9;109:23
**described (1)**
111:11
**describing (1)**
123:3
**deserve (1)**
69:20
**determined (1)**
123:6
**DeVry (2)**
46:14,16

**DHR (1)**
23:16
**diagnosis (1)**
146:19
**difference (5)**
83:1,5;146:1,3,5
**different (17)**
9:12;13:2;32:2;
36:10;42:15;61:9;63:3,
10,10,12,13,19,20;
69:9;98:23;108:11;
140:1
**differently (2)**
38:2;47:7
**difficult (1)**
127:13
**diploma (1)**
70:11
**direct (1)**
131:22
**directed (2)**
52:10;99:2
**disagree (5)**
83:12;132:10,13,16,
21
**disciplinary (6)**
26:13;95:19;112:1,
18;126:8,23
**disciplined (1)**
95:22
**Disclosures (1)**
133:19
**discontinued (1)**
117:16
**discovered (5)**
54:20;55:17;113:11,
14,16
**discriminated (1)**
7:12
**discrimination (17)**
16:23;18:15;24:2;
25:17;26:9;28:4;39:22;
40:8;44:3;58:17;135:1,
21;136:2;139:8;142:3,
14;143:14
**discriminatory (2)**
25:20;56:23
**discuss (5)**
64:6;68:7,9;110:6;
149:19
**discussed (14)**
58:4;64:3;68:7;69:6;
84:11;95:17;97:7,10;
98:14;103:23;111:5;
124:2,9;134:23
**discussing (12)**
22:15;52:9;56:16;
62:7;63:15;65:22;66:3,
7;68:13;75:22;97:8;
124:1
**discussion (1)**
68:13
**dismissal (6)**

19:20;20:8;21:13;
27:11,12,15
**dismissed (9)**
17:4,7,10,16,18;
21:18;23:11;24:15;
28:19
**Disparate (2)**
140:19;141:6
**dispute (16)**
9:15;16:8;67:8,10;
91:19;108:8,15,18;
109:2,5,9;128:10;
129:23;131:12;132:10,
21
**distress (7)**
146:11,13,22;147:6,
15,20;148:3
**District (2)**
4:5,8
**document (16)**
9:23;13:12;18:6;
19:12;20:6;21:2;22:3;
24:23;107:8;109:11;
111:21;121:10;123:12;
127:10;128:19;133:16
**documented (2)**
19:7;52:18
**documents (9)**
19:12,17;29:16,18,
20;30:3,6,8;65:9
**dollars (3)**
133:5,9,12
**donated (1)**
69:7
**done (5)**
54:9;69:2;86:9;93:8;
121:4
**Donnell (1)**
38:7
**down (16)**
5:12;12:20;14:16;
18:17;28:6;71:14;80:2,
3,11;93:16;100:23;
104:13,15,17;109:20;
110:5
**downtown (5)**
114:21;115:1;117:3;
118:11;119:4
**drive (1)**
46:20
**driver (1)**
123:8
**driving (1)**
116:23
**dropping (1)**
46:19
**drove (3)**
93:4
**drug (3)**
67:12;91:6,11
**drugs (3)**
91:13,20;92:3
**Due (2)**

49:23;122:9
**duly (1)**
4:17
**Dumas (31)**
15:13,14;32:12,20;
33:3,10;34:11,15;37:9,
12,16;40:15;50:8,10,
20,23;51:1,8,12,19,22;
52:4;55:10,12;58:7;
62:15,16,17;125:21;
126:16,22
**During (20)**
38:2,3,4,5;52:7;55:1,
9,10;57:13;58:15;
75:14;96:13;108:19;
111:11;118:7;119:9,
23;120:5;123:6;134:15
**duty (2)**
131:15;132:4

### E

**earlier (9)**
41:1;49:21;52:4;
61:22;96:7;122:19,21;
145:8;149:9
**ears (5)**
97:12;98:16;99:1,4,7
**East (1)**
129:11
**eat (1)**
148:9
**education (5)**
46:3,13;70:6,8;81:1
**effect (1)**
120:10
**eight (1)**
46:19
**eighth (1)**
144:6
**either (9)**
5:18;29:15;56:3;
68:12;118:15;121:1;
130:19;136:11;139:7
**electronic (2)**
46:15;47:6
**electronics (2)**
46:23;47:1
**eligible (3)**
47:14,20,22
**eliminate (1)**
36:23
**else (28)**
29:16;31:4;45:14;
49:6;51:20;55:14;
56:17;68:9;71:18;
72:13;73:23;74:20;
81:10,11;84:12;89:16;
94:19;98:7;104:1;
126:4;130:2;136:15;
140:18;141:4;142:21;
147:9;148:7,10
**email (1)**

48:22
**e-mail (1)**
108:5
**emotional (6)**
146:11,13,22;
147:15,20;148:3
**employed (1)**
43:15
**employee (4)**
9:4,19;22:22;52:17
**empty (1)**
119:5
**encourage (4)**
33:3,20;34:3;149:17
**encouraged (2)**
32:23;52:5
**encouraging (1)**
33:22
**ended (4)**
9:12;39:23;84:23;
111:7
**enforcement (1)**
45:23
**engineering (3)**
46:15;47:6,6
**English (1)**
93:5
**enough (2)**
18:2;122:18
**entered (4)**
8:6,23;14:4,9
**entirely (1)**
122:2
**Epstein (1)**
91:5
**estimate (1)**
35:13
**estimations (1)**
72:4
**ethnicity (6)**
72:1,9;73:8;101:1;
138:19;144:18
**even (21)**
14:16;32:6;36:4;
50:12;56:2;59:13;
68:15;76:20;82:10,16;
85:22;87:16;102:11,
12;103:3;106:13;
127:12;139:20;140:1,
7;149:1
**evening (2)**
114:19;119:2
**events (2)**
67:11;105:2
**Eventually (2)**
95:1;114:2
**everybody (6)**
63:10,23;78:1,17;
81:4;84:12
**everyone (6)**
49:6;67:4;78:5,13,
19;81:11
**evidence (11)**

17:5;19:21,23;20:8;
21:13,19;23:12;24:16;
27:13;108:15;113:11
**ex- (1)**
115:21
**Exact (14)**
17:13;35:8,12;53:13;
63:2;87:20,21;90:13;
93:19,20;97:2;103:18;
125:17;150:13
**Exactly (17)**
17:9;19:4;51:11;
54:19;57:8,10;58:2,5;
63:11;70:16;92:8;
98:21;102:4,22;
112:14;120:18;135:10
**exam (35)**
50:2,7;51:10;53:16,
21;54:11;55:3;56:19,
22;58:12,18;59:3,5,9;
60:8,9,15;61:15;62:20;
63:2,9;64:1,14,21;
66:18;77:16;78:3,15;
79:12,16;80:1,2;82:5;
83:9;150:9
**EXAMINATION (1)**
4:19
**examined (1)**
4:18
**example (1)**
77:22
**exams (1)**
49:19
**exam's (2)**
64:11,12
**excellent (1)**
108:5
**Except (3)**
43:12;78:5;88:8
**exception (2)**
78:15;84:12
**exchange (1)**
95:14
**excuse (2)**
28:21;143:1
**excuses (1)**
140:17
**executed (2)**
115:21,23
**executing (1)**
117:21
**ex-girlfriend (1)**
144:10
**Exhibit (109)**
10:1,3,5,7,9,10,16,
18;11:5,7,11,19,21;
12:1,11,12;13:5,5,7,9,
10,14,16;14:8;18:5,7,9,
12,18;19:14,19;20:7,9,
12,17,18;21:3,5,12;
22:4,6,8,10,12;23:2,8;
24:3,4,5,8;25:22,23;
26:1,3,6,17;27:3,6,7,8,

18,19,20;28:1,11;
65:11,18,21;66:1,5;
70:20,22;71:1;74:10;
107:7,9,11,13;108:8,
15;109:12,14,16;
111:20,22;112:16,23;
121:8,11,11,12,23;
123:3,11,14;127:9,11,
12,14;128:18,20,22;
129:15;131:23;133:15,
17,20;134:7;141:23
**experienced (1)**
136:1
**explain (5)**
5:21;57:7;82:14,23;
83:19
**expressed (1)**
122:1
**extenuating (1)**
42:19
**extra (8)**
54:14;55:2,20;71:14,
16,17,18;75:17
**eyes (1)**
113:9

**F**

**Facebook (1)**
127:2
**face-to-face (1)**
30:19
**fact (12)**
21:17;32:12;85:6;
87:15;89:17;108:16;
112:16;113:19;122:7;
124:8;132:16;133:2
**fair (10)**
6:4;22:17;47:5;
48:14;53:2;89:21;
114:10;116:23;121:23;
122:18
**fairly (1)**
6:13
**fairness (1)**
114:9
**falling (1)**
45:14
**familiar (1)**
5:6
**family (1)**
137:12
**far (14)**
22:18;23:4;25:15;
26:11;45:21;58:1;
63:13;73:10;75:13;
79:7,8;115:7;140:9;
150:5
**fast (1)**
117:14
**fastest (1)**
118:6
**February (1)**

128:23
**Federal (4)**
4:6;14:5;15:20;31:8
**feel (1)**
149:5
**feeling (2)**
76:7;149:20
**felt (5)**
9:14;76:8;122:10;
136:1;148:23
**female (6)**
96:20;98:6,14,21;
101:10;103:23
**few (4)**
5:23;106:23;135:8;
136:7
**fifth (1)**
141:23
**fight (1)**
49:7
**figure (1)**
83:15
**file (14)**
26:14;39:1,13,16;
52:14;53:3;76:15,22;
106:22;108:9,16;
112:21;120:16;126:18
**filed (25)**
13:21;15:19;16:21;
20:15;23:23;25:4,7,11;
26:8,17;28:2,9;29:23;
31:7,19;32:12;33:13;
39:21;40:7;43:13,21,
22;76:16,17;103:20
**files (1)**
95:19
**filing (3)**
51:16,16;76:20
**fill (1)**
150:23
**finally (1)**
21:2
**find (2)**
15:1;76:2
**finding (2)**
15:22;20:23
**finish (1)**
42:2
**fired (5)**
16:6;90:3;125:14,16,
23
**firing (1)**
9:12
**first (27)**
4:17;7:10;11:13,15;
18:13;19:17,21;20:10,
15;45:8;71:13;85:5;
104:19,23;105:20,22,
23;109:20;112:16;
113:9;120:1;127:21;
131:17,22;143:16,18,
19
**five (30)**

14:18;37:2;59:10,17,
19;68:22;69:4,12,18;
70:6;71:12,14,16,17,
18,21;75:17;79:5,6,10;
80:21;81:5,5,11,11;
84:2,3,7,8;96:22
**Flaxman (39)**
4:12,12;10:10,13:6;
17:11;18:8;21:6,21;
22:1,5;23:15;24:10,12;
25:1,7;26:21;30:23;
42:2;50:18;83:11,20;
85:9;86:11;112:6;
113:12;127:23;128:3;
130:12,20,22;132:2;
133:22;134:3;140:22;
145:6,11;151:7,10,12
**follow (2)**
110:11;117:20
**following (2)**
93:5;117:12
**follows (1)**
4:18
**foods (1)**
93:4
**foot (3)**
104:14,15,22
**football (1)**
69:8
**forgot (1)**
38:17
**formal (1)**
53:5
**former (30)**
9:18;15:6;26:13;
32:20;33:2,14;34:11,
15;38:22;52:4;58:7,9;
61:23;91:5;93:7;94:15,
16;98:18;99:11,19,20;
100:6,10,21;102:17;
110:22;111:13;112:2;
137:4,15
**forward (1)**
38:3
**Foster (4)**
43:13,15,21;94:22
**found (10)**
7:22;15:16;17:5,6,
14;19:7,9;52:16;93:8,
14
**foundation (2)**
23:15;132:3
**four (14)**
7:16;16:21;18:13;
26:7,18;42:5;54:6;
76:1;81:2,2;83:3,5;
88:16;150:3
**four-point (1)**
83:5
**fourth (7)**
17:11;28:2,9,12,18;
86:9;138:4
**friend (8)**

67:15;136:19,21;
137:1,7,11,16,21
**friends (6)**
61:2,8;98:10;136:2;
137:5,18
**front (3)**
67:23;104:20;112:22
**frustration (2)**
122:1,10
**funeral (4)**
33:5,5;34:6;52:3
**future (1)**
48:4

**G**

**gained (1)**
81:23
**Gary (3)**
71:5;73:14;85:22
**gave (5)**
68:8;72:3;100:16;
104:20;130:10
**Gearhart (1)**
52:17
**general (2)**
31:13;68:12
**Gerard (2)**
111:17;127:16
**gets (13)**
41:20,21;42:3;69:5,
12;115:2;139:14,17;
140:3,8;141:3,10,19
**girlfriend (2)**
90:12,14
**given (13)**
4:21;20:12;44:22;
45:1;54:21;55:21;67:4;
71:6,14;75:17;82:18;
113:22;146:18
**gives (1)**
129:3
**giving (5)**
50:4;57:2;104:9;
105:3;106:8
**goes (2)**
104:19;109:22
**good (5)**
52:22;83:14;108:6;
117:10;150:18
**Governor (1)**
46:3
**grades (1)**
150:17
**graduate (1)**
46:6
**graduated (2)**
45:21;46:4
**green (1)**
117:13
**Greg (3)**
43:13,15,21
**grievance (13)**

23:11;51:16,16,17;
52:8,9,10,12,14;53:3;
110:1,3;112:21
**ground (1)**
5:6
**guess (10)**
35:19;36:22;37:2;
53:22;70:16;76:23;
105:7;110:8;135:17;
145:20
**guy (2)**
106:2;116:23
**guys (3)**
51:4;68:11;127:1

**H**

**half (1)**
66:10
**Halper (18)**
72:8;73:4;74:13,16,
18,22;75:6,11,18,19;
77:23;79:20;81:9;83:8;
85:19;86:3;87:7,17
**Halper's (1)**
72:9
**hand (2)**
18:6;80:6
**handed (7)**
19:17;20:6;104:16;
105:16,18;106:5,11
**handing (1)**
10:8
**handwriting (1)**
127:18
**hang (4)**
136:20;137:8,19;
138:2
**happen (5)**
53:1;92:7;93:18;
112:12;126:17
**happened (26)**
64:19;77:7;92:23;
95:15;97:21;103:17,
19;109:10;110:4;
114:11,16,18,23;115:1,
6,13;121:17;127:7;
128:7,15;129:16;
130:5,7;131:16;132:3;
138:12
**happy (1)**
16:15
**hard (8)**
8:13;33:8;41:5;
48:12;77:8,13;133:7;
136:6
**health (3)**
146:18,22;147:22
**hear (5)**
74:19;77:5;116:18;
120:8;122:20
**heard (14)**
7:23;35:6;93:1;

97:12;98:15,18;99:1,4,
7,11;101:4,7;102:6;
104:2
**help (3)**
5:7;12:8;96:4
**helplessness (1)**
146:15
**here- (1)**
24:10
**herein (1)**
4:17
**Herscher (1)**
78:15
**Hi (1)**
30:21
**high (8)**
67:6;70:10;109:1;
111:3,6;115:3;116:17;
117:9
**higher (9)**
78:3;80:13,15;87:16;
88:4,5,10,13,16
**high-speed (6)**
25:19;113:23;127:4;
128:7;131:8;133:3
**himself (2)**
70:1;149:1
**hired (3)**
36:16,17,18
**hiring (3)**
8:11,18;9:12
**Hispanic (6)**
36:2,5,13;72:11;
85:20;96:19
**hit-and-run (3)**
93:6;94:14,16
**hold (2)**
38:23;51:4
**home (1)**
93:4
**honest (4)**
70:3;127:8;137:18;
145:17
**honors (1)**
46:4
**Hopelessness (1)**
146:15
**hour (2)**
38:17;66:9;117:14
**hours (3)**
5:23;29:13;52:13
**human (27)**
6:17;16:22;17:4;
18:14;19:22;20:15,22;
21:9,16;22:13;23:3,7,
11;24:1,15;25:12;26:8,
19;27:11;28:3,20,21;
58:16;91:4;101:16;
104:7;125:5
**hundred (1)**
53:23
**Hunt (40)**
15:7;33:15,20;34:2,

3,11,16;37:19,22;38:8;
40:4,7,14;51:21,23;
52:5;54:16,17;55:1,6,9,
13,16;56:17;58:3;
62:10;103:8;110:15,
16,21;111:1,4;128:23;
137:23;142:10,11,14;
143:1,1;149:8
**Hunter (18)**
37:14;40:14,23;
41:13;72:5;73:20;74:2,
9,12;75:4;77:23;79:19;
80:14;85:3,6;89:6;
149:3,6
**hypocritical (1)**
139:19
**hypothetically (1)**
67:2

**I**

**identify (1)**
4:10
**ignored (1)**
105:8
**illegal (4)**
91:12,14,19,22
**Illinois (25)**
4:5,8;16:22;17:4;
18:14;19:22;20:14,22;
21:8,16;22:13;23:2,6,
10;24:1,14;25:11;26:8,
18;27:11;28:3,20;
58:16;91:4;125:5
**implement (1)**
60:11
**improperly (1)**
43:3
**inaccurate (1)**
12:23
**incident (23)**
92:6;101:9;108:22;
109:23;114:13,14;
118:3,7;119:9,13,23;
120:6;122:18;124:1;
126:21;128:14;129:3,
3,19;130:5,7;131:7,16
**incidents (1)**
101:12
**include (1)**
79:19
**included (1)**
99:12
**increased (3)**
64:12,13;81:23
**independent (1)**
120:23
**Indiana (1)**
117:4
**individual (5)**
36:18;98:13;126:11;
129:4;134:14
**individuals (10)**

40:13,19;57:14;
59:17;63:2;71:8;72:1;
79:16,21;95:16
**informally (2)**
53:4,4
**information (15)**
29:5;57:19;62:2;
91:10;92:2;95:18;
100:16;132:16;134:18;
138:21;139:3;142:6,
23;145:2,16
**informing (1)**
145:4
**initial (3)**
9:10;19:20;133:19
**initially (12)**
71:20;81:7,8;86:5,
18;113:22;131:12,20;
132:10,17,21;140:16
**injured (1)**
43:2
**input (1)**
150:12
**inquire (2)**
32:9;64:9
**inquired (2)**
105:5;106:12
**insensitive (1)**
101:17
**instance (1)**
125:6
**instead (2)**
18:23;28:15
**instructing (1)**
6:9
**interested (1)**
100:11
**Internal (2)**
138:6,10
**interpretation (2)**
122:3,5
**interrogatories (1)**
30:5
**interrogatory (2)**
10:19;11:18
**interrupt (1)**
38:19
**interrupted (1)**
115:17
**intersection (1)**
116:6
**interview (2)**
50:4;84:21
**into (16)**
8:23;14:9;25:15;
26:11;28:13;29:5;35:1;
81:22;93:3;95:10;
109:2,5;110:3;111:12;
114:8,9
**introduced (1)**
30:22
**investigate (2)**
94:15;116:16

**investigated (1)**
93:15
**investigation (8)**
104:17;117:17,18;
126:19;138:23;139:2,
10,13
**investigations (2)**
35:10;37:4
**investigatory (1)**
115:5
**involve (1)**
118:3
**involved (12)**
9:20;25:18;76:19;
124:3;126:7;127:5;
128:15;129:9;131:22;
132:12,18;148:1
**issued (2)**
41:17;112:2
**issues (2)**
126:8;127:2
**item (1)**
66:18

**J**

**jail (1)**
139:22
**January (2)**
20:9;41:11
**Jeff (5)**
18:22;19:2,9;76:12;
86:20
**Jerome (1)**
134:13
**Jewel (1)**
93:3
**job (3)**
16:23;18:15;108:5
**Joe (4)**
73:6;101:23;134:11;
135:9
**Joel (1)**
4:12
**Johnson (2)**
73:7,8
**joke (1)**
68:14
**Jose (4)**
71:5;72:8,16;73:6
**Joseph (1)**
72:16
**Judge (1)**
14:5
**Judgment (1)**
13:17
**jumped (1)**
104:23
**junior (1)**
111:6
**jurisdiction (2)**
25:4,7
**jury (2)**

7:20,22
**justice (3)**
46:9;21;146:16

**K**

**Kankakee (89)**
4:4,15;7:8,11;8:11,
19,22;12:14;19:19;
20:13,19;21:4;24:5,20,
23;26:2,7;27:7,9;
28:12;31:8,9;32:3;
35:4,14;36:1,12,21;
40:23;43:8,16;45:22;
47:10,15;48:1;49:3,12,
16;56:12;60:18;62:2;
61:5,10,16;62:21;
65:10,14,16,21;66:1,6;
68:3;72:2,3;93:2;95:8;
99:19;107:10;109:1,
13,17;111:23;114:21;
115:1;117:3;118:12;
119:4;121:11;123:13,
16,16,16;124:4,9;
125:7,11;127:13,15;
128:21,22;135:22;
137:4,13,15;139:7;
140:2;141:11,20
**Keep (2)**
108:5,6
**kept (1)**
44:2
**Kidwell (15)**
50:5,16;51:8;59:16,
22;60:11,15;99:5;
101:4;122:10;127:16;
128:23;150:3,8,11
**kill (2)**
126:11,15
**Kincaid (1)**
112:20
**kind (12)**
8:13;13:15,15;17:20;
31:11;32:22;54:2;
57:15;77:8,9;78:11;
130:21
**Klopp (2)**
52:11;53:10
**knew (6)**
53:9;55:4,5;57:21;
91:12;117:23
**knowledge (22)**
18:4;43:1,12;44:18;
50:3;54:12,15;64:16;
69:3,10,17,23;70:5;
92:22;94:17;96:1;
103:22;104:5;130:3;
132:19;133:1,4
**known (1)**
58:2
**knows (2)**
49:6;67:1
**Koerner (4)**

RICHARD BROOKS VS
CITY OF KANKAKEE, IL

138:5,22;139:4,7
**K-O-E-R-N-E-R (1)**
145:9
**Koerner's (1)**
145:8

## L

**Lacie (3)**
96:11;145:1,2
**lack (6)**
19:21,23;20:8;21:13,
19;23:12;24:16;27:12
**laid (1)**
113:9
**language (2)**
5:14;101:17
**Larry (9)**
26:14;50:7;55:2;
107:18;108:19;112:2;
143:5,7,13
**last (16)**
10:22;14:3,19;35:5;
64:23;73:19;76:9;
102:19;103:4,6;122:7;
136:7;138:18,18;
145:8;150:3
**later (5)**
38:21;106:7;113:11,
14,15
**Latham (1)**
78:1
**Latino (4)**
36:2,6,13;85:20
**laugh (1)**
68:15
**laughing (1)**
68:17
**law (4)**
42:10,15,18;45:23
**lawsuit (19)**
31:10;34:12,16;
42:12,21;43:22;44:4;
61:18;62:5;101:11;
103:4,6;134:20,20;
138:22;142:7;143:2;
145:3,16
**lawyer (1)**
61:23
**laying (1)**
22:18
**layperson's (1)**
18:4
**lead (1)**
92:2
**leadership (2)**
57:4,4
**least (9)**
16:18;29:13;44:16;
46:18;55:4;59:10,12;
102:23;103:12
**leave (7)**
62:14;74:22;77:3;

99:17;138:15;143:22;
145:18
**led (5)**
45:4;59:19;78:11;
111:6;127:5
**left (21)**
32:11;47:12;62:15;
74:14,18;75:2,3,4,6;
87:5,6,6;93:2;94:5,6;
105:8;106:19;117:7,8;
138:9;139:7
**legal (1)**
28:23
**less (11)**
35:18,19,20;48:14;
79:5,6;147:19,22;
148:2,6,13
**letter (16)**
22:18;23:13;91:4,8;
104:19;105:4;106:8;
107:22;108:15;112:1,
11,22;113:4;129:21;
130:1;140:4
**letters (3)**
106:21;107:3,6
**lie (2)**
96:13;97:4
**lieutenant (20)**
37:23;38:9,10,22;
39:23;50:5,5;58:10;
59:14,22;94:20;
104:16;110:15,18;
122:11;123:20;124:9;
128:23;133:13;149:7
**lieutenants (2)**
37:1,3
**light (2)**
117:13;120:3
**lights (11)**
115:21,23;116:1,7,
10;117:6;118:23;
119:10,16,23;123:5
**Likewise (1)**
82:4
**limit (5)**
117:1,15;118:11,14,
22
**limited (1)**
127:4
**Lindgren (3)**
77:2;86:7,23
**line (2)**
12:12;127:21
**list (80)**
41:10,13,17,17,17,
18,21,22;42:5,17;
43:11;45:7,16;48:11;
49:1,2,5,6,11,11,15,16,
20;56:4;60:2,5;63:22;
64:11;65:22;66:2,7,18,
19,23;68:13;69:5;71:3,
7,8,13;72:4,6;73:4,10;
74:1,3,10,11;76:11,13;

77:11,16;78:2,14,22;
79:2;81:8,14,22;85:1,1,
6;86:1,5,20,23;87:15;
90:1,18,21;92:13,16;
93:23;94:2;136:9;
138:4;141:23;143:5;
144:2,6
**listed (8)**
78:18,19,21,22;79:2,
2,3;81:16
**Listen (2)**
6:7;65:6
**lists (1)**
90:6
**litigation (7)**
13:19;40:5,6;103:7,
20;143:20;149:11
**little (13)**
32:2;36:10;38:1,14;
42:15;61:9;69:9;77:19;
93:16;98:23;108:11;
126:2;139:23
**local (1)**
4:7
**location (2)**
30:15;93:20
**locker (1)**
100:23
**long (11)**
14:18;15:2;46:20;
47:3;48:10;52:22;
77:11;96:21;118:18,
21;135:16
**longer (3)**
89:18;125:11;138:8
**longevity (1)**
70:14
**look (19)**
11:21;12:11;13:9,13;
20:1,10;24:3;26:19;
27:21;28:6;29:19;30:7,
8;72:6;74:9;83:3;90:6;
134:10;146:6
**looked (7)**
14:23;30:1,3;45:4;
106:23;115:22;116:11
**looking (11)**
13:13;14:7;25:12;
27:9;72:4;77:15;81:13;
85:1;113:8;127:14;
129:14
**looks (1)**
107:12
**lost (1)**
31:11
**loud (1)**
5:13
**low (1)**
67:7
**lower (4)**
77:19;79:15;88:2;
109:20
**Lowman (2)**

122:11;124:9
**Lowman's (1)**
123:20
**lying (1)**
95:12

## M

**majority (4)**
61:14,15;62:19,19
**making (1)**
126:21
**Man (5)**
77:8;133:7;145:20;
146:15;147:3
**mandatory (1)**
47:23
**manpower (1)**
35:14
**Manteno (1)**
74:17
**many (17)**
5:1;35:2,7,10;36:20;
37:1,7;43:6;44:9;
46:16;53:20;55:20;
79:1,4;98:14;140:16;
149:13
**Marcella (1)**
52:17
**March (5)**
20:23;23:8;25:4,6,10
**Mario's (2)**
93:11,20
**mark (12)**
10:1;13:5;19:11,12;
22:3;27:5;65:10;107:9;
109:12;127:11;128:20;
133:17
**marked (30)**
10:3,10,15;13:7;
18:5,6;19:15,19;20:5;
13:21:3;22:6;24:8;
25:22;27:3,18;65:11,
19;107:7;109:14;
111:20;116:4;121:8,
10;123:11,13,14;
127:9;128:18;133:15
**Market (2)**
93:11,21
**Martin (13)**
18:22;19:2,9;76:12;
86:7,20;88:8;89:2;
131:15,20;132:10,17,
22
**Martinez (11)**
71:5;72:8,11,16,16,
17;77:23;79:20;81:17;
85:20;86:3
**master's (1)**
47:8
**math (1)**
83:11
**mathematics (1)**

81:21
**MATHUES (70)**
4:2,9,20;9:23;10:4,
12,14;12:3,7;13:4,8;
19:11,16;21:7,22;22:3,
7;23:19;24:13,22;25:2,
9;26:22;27:4;31:3;
40:17;42:3,9;50:19;
51:6;65:8,13,20;66:9,
13,15;72:22;73:1,2;
83:22;85:13;86:16;
97:22;98:5;109:10,15;
112:10;113:18;121:4,
9;124:12,19,22;125:3;
128:1,5;130:16;131:3,
6;132:5,7;134:5;
140:20;141:2,15,17;
145:10,12;151:4,11
**Matt (1)**
142:1
**matter (5)**
26:12;28:14;58:11;
81:20;133:19
**Matthew (1)**
93:10
**may (2)**
6:7;26:19
**Maybe (5)**
46:18;53:23;59:13;
77:9;151:7
**mayor (8)**
43:2;44:19,20;45:5,
10;91:5,5;139:1
**McCuskey (1)**
14:5
**mean (33)**
5:21;8:14;17:15;
31:2,11,23;36:7;37:21;
50:10,20;57:7;58:2;
62:6,10;64:23;65:12;
72:16;82:14;83:11,15;
88:7;97:9,19;103:7;
107:3;115:7;117:21;
120:23,23;123:1;
126:10;132:2;150:14
**Meaning (2)**
23:6,10
**means (1)**
97:20
**meant (1)**
87:21
**measurable (2)**
36:4,7
**medical (1)**
6:20
**meet (2)**
30:12;120:19
**meeting (3)**
30:15,16;122:10
**member (6)**
31:9,20;32:3;68:3;
99:19;125:11
**members (11)**

35:3;49:3;60:12,18,
18,22,22;61:10;62:20,
21;137:12
**memo (4)**
123:17,22;127:15;
128:22
**memory (19)**
6:16,18,21;9:3,18;
11:9;14:20;15:1;26:10;
31:17;35:5;54:3;59:14;
96:5;102:8,10,14;
103:10;110:14
**men (1)**
86:12
**mental (3)**
146:18,21;147:6
**mentioned (15)**
40:14;52:4;58:20;
74:9;76:10;80:9;93:13;
96:7;103:4,14,15;
106:13;120:12;126:7;
134:18
**mentions (1)**
112:17
**merit (12)**
66:19;67:3,17;68:4,
18;69:22;70:1,2;80:6,
10,14;88:13
**merits (2)**
66:22;89:18
**met (2)**
30:21;93:11
**Michael (8)**
14:5;71:6;73:6;
76:14;77:2;129:4;
135:11;148:23
**middle (3)**
20:10;25:3;138:18
**might (11)**
5:17;16:5;38:13,14;
45:19;75:9;102:12;
105:14;110:15,15;
137:13
**Mike (1)**
38:7
**miles (1)**
117:13
**military (1)**
71:8
**Miller (1)**
37:18
**mind (2)**
38:18;110:10
**Mine (4)**
11:4;63:5;80:13;
88:3
**minorities (1)**
141:6
**minute (2)**
37:19;151:8
**minutes (1)**
38:17
**misreporting (1)**

93:9
**missed (1)**
95:15
**misspelled (1)**
145:9
**misunderstanding (6)**
110:6,8;111:5,12,19;
113:15
**moment (3)**
11:21;116:9;130:18
**money (1)**
16:7
**month (1)**
15:12
**months (3)**
48:15;54:6;106:23
**Moore (18)**
62:11,12,13;100:1,3,
19,19,20,20;134:13,15,
19,23;137:1,7,8,10,14
**Moore's (1)**
101:1
**more (32)**
19:12;27:19;35:17,
20;38:2;77:15;79:3,5,
6,9;81:21;82:2,5;84:3,
6,8;88:19;89:1,5,11,21;
90:7;126:2;127:4;
133:16;137:22;138:2;
140:9;148:4,6,7;151:4
**morning (10)**
6:13;29:12,21,22;
31:1;102:9;108:14;
113:8;128:16;129:16
**morning's (4)**
29:9,17,20;31:5
**most (3)**
32:9;41:7;82:20
**mother (1)**
33:6
**motion (1)**
116:10
**motorcycle (1)**
115:3
**move (1)**
145:6
**moving (1)**
117:10
**much (5)**
13:11;33:17;34:1;
54:7;149:6
**multiple (3)**
54:1,3;151:1
**multiplied (2)**
82:15;83:4
**multiply (2)**
83:1;84:8
**murder (4)**
104:12;107:5;
140:13,13
**must (1)**
50:12
**myself (3)**

17:21;73:6;120:20

| N |
| --- |

**name (10)**
4:9;98:9,12,20,22;
100:15;107:15,22,23;
145:8
**names (1)**
134:10
**nature (2)**
52:12;149:14
**nearest (3)**
133:5,9,12
**necessarily (1)**
147:10
**need (10)**
6:1;11:11,18;13:11;
53:8;81:21;85:10,10;
86:13;113:13
**needed (1)**
84:22
**negative (1)**
137:19
**neighboring (1)**
93:3
**new (3)**
41:18,18;130:22
**next (11)**
23:23;32:15;41:3;
66:18;68:21;87:13;
115:6;122:7;137:11,
16;149:23
**night (4)**
130:4,6;131:7,9
**Nods (1)**
119:4
**none (2)**
61:19;98:17
**normal (1)**
29:10
**normally (1)**
54:8
**north (1)**
138:13
**Nos (2)**
19:14;65:18
**noted (3)**
19:10;25:14;140:5
**notice (2)**
21:12;109:16
**noticed (1)**
70:21
**nuclear (1)**
47:12
**Number (18)**
4:4;12:13;18:10;
20:23;22:14;24:10;
27:22;41:21,23;42:4;
69:11;70:9,10;76:16;
80:9;134:13;142:10;
145:7
**numbers (3)**

76:17;83:21;129:4

| O |
| --- |

**oath (1)**
5:9
**obituary (1)**
33:9
**Object (2)**
23:15;132:2
**objection (1)**
6:7
**objections (1)**
6:7
**observing (1)**
123:7
**obviously (4)**
29:1;40:4;45:13;
60:7
**o'clock (4)**
109:22;114:18;
119:2;130:7
**October (2)**
19:3,8
**off (33)**
10:12,13;38:14;
40:15,16;41:14,20,21;
64:5;66:13;72:22,23;
73:23;74:2,11;76:12,
13;85:5;86:20,23;
87:15;93:15;94:16;
105:6;115:20,22;
117:6,8;120:9;121:6;
132:5;134:4;140:20
**offensive (1)**
96:8
**offer (1)**
52:21
**offered (1)**
150:1
**office (4)**
51:14,15,20;129:17
**officer (61)**
5:19;55:2,21,23;
56:2;67:14;69:1;92:9,
19;93:5;96:11,18,21;
98:6,14,21;99:16;
100:1,3,6,19,20,20;
101:1,10,23;102:17;
103:23;106:15,16,18;
109:1,6;125:6,10;
126:8,14,22;127:5;
129:15;131:7;132:11,
17,22;133:2;135:15,
16;137:8,10,14,21;
139:9;141:11,20;
142:15;143:1,15;
144:13,15,17;149:6
**officers (17)**
7:16;35:3,3;36:6,12;
54:13;56:18;58:6;
63:10;68:13;129:8;
131:21;137:4;140:2,5,

7;148:19
**officers' (1)**
67:12
**officers- (1)**
61:3
**officer's (2)**
33:6;93:4
**Off-the-record (2)**
132:6;140:21
**often (1)**
44:10
**old (2)**
47:14,16
**once (6)**
5:2;41:16;47:12;
76:2;117:15;120:4
**on-Commander (1)**
93:10
**one (68)**
5:4,5;8:1,2;9:19;
14:10,15;16:6;17:6,7,
11,14,16;18:18;20:15;
21:5;24:4;25:12;27:5,
19;28:19;36:8,16,17;
37:13;41:21,23;44:13;
55:4,5;64:7,7;65:9,11;
67:14;71:11,15;76:17;
84:16;85:2,16;100:21;
101:15;105:7;106:14;
107:4;110:6,7,9,9,10,
11,14;111:6,10;
119:16;121:2,3;
123:23;124:21;125:4;
130:10;133:3,16;
134:13;135:23;143:17;
144:8
**one-day (1)**
114:6
**one-page (1)**
107:8
**only (22)**
6:2;18:1;19:5,7;
30:6;32:14;34:23;
59:12;63:4;68:22;
69:20;74:11;79:7;82:8;
83:3,4;86:13;91:20;
106:14;135:23;139:10;
150:20
**onto (2)**
115:17;118:15
**opinion (1)**
90:2
**opportunity (2)**
54:4;141:13
**opposed (4)**
88:14,17;140:18;
141:4
**opposite (2)**
87:20,21
**oral (19)**
50:4;51:9;59:5,9;
61:15;62:20;63:2,9;
64:1,11,13;66:18;

79:12;80:2;82:3;84:21;
88:4,10;150:9
**Order (1)**
13:17
**ordered (2)**
132:22;139:1
**organization (1)**
65:5
**originated (1)**
129:10
**Osenca (1)**
143:6
**Osenga (4)**
143:7,8,14,22
**out (66)**
5:13;9:14;11:16;
15:16,22;16:7;19:7,9;
22:18;29:6,12,14;
39:13,17;41:10;45:14;
46:19;48:11,21;49:12,
15,20;51:18;57:2;
58:10;62:14,15;67:6;
68:14;76:2,23;77:1,12;
81:5,11;83:15;85:2;
90:10,14,18,21;92:14,
17;93:8,14,23;94:3;
104:20;105:1;107:14;
115:9,17;116:15;
117:16;136:9,20;
137:8,19;138:2;
139:21;140:4;144:3;
148:4,8;150:23;151:3
**outside (3)**
61:16;65:4,6
**outstanding (1)**
112:18
**over (28)**
5:8;18:22;26:13;
30:7;44:2;50:9,11;
52:20;69:7;75:16,18;
82:16;103:3,14,15;
104:16;113:23;115:16;
116:18;117:1,19,22;
118:10,13,14,21;120:8;
130:22
**overall (2)**
81:13,14
**own (10)**
18:4;29:15;45:1,2;
97:12;98:16;99:1,4,7;
123:9

## P

**package (1)**
146:3
**page (14)**
10:22,23;12:11;14:3;
18:18;20:10;24:19,21,
22;25:3;109:20;
123:15,16;131:23
**panel (11)**
51:9;59:10,11,18;

61:15;63:3,3,9,20,23;
121:2
**panelists (1)**
62:20
**paperwork (2)**
120:16,19
**paragraph (7)**
108:2;112:16;122:8;
123:4,5;131:17;132:1
**Part (29)**
8:1,1,2,9,9;9:3,4,22;
13:19;14:16;21:8;
22:20,22;23:1;42:5;
50:13;61:13,19,19;
62:4;69:6;103:8;
113:15;125:4;126:3;
129:19;139:13;143:16,
17
**parties (3)**
4:10;62:4,9
**party (4)**
7:15;15:14;40:4;
52:19
**passed (3)**
75:16;77:4;87:1
**passing (2)**
33:4;44:2
**Passwater (21)**
50:5,16;51:9;59:15,
15,23;60:11,13;99:8;
101:7,18;102:6;
104:16;105:3,11,16,18;
106:5;150:3,8,11
**past (5)**
14:12;16:6,8;48:9;
54:22
**patience (1)**
108:3
**patrol (4)**
35:7;37:4;135:15,16
**Patrolman (7)**
4:3,14;43:5;124:2;
133:7;144:17;146:2
**Paul (24)**
28:15;67:12,20;68:4,
17;73:11;75:16;80:9,
15;83:4,9;84:12,17;
85:22;87:17;90:10;
94:13;139:14;140:2,7,
17;141:3,10,19
**pay (1)**
95:11
**paying (1)**
118:8
**pending (4)**
6:3;21:22;34:21;
42:12
**people (7)**
31:23;57:1;61:16;
68:17;79:1;98:15;
137:3
**percent (19)**
35:17,18,20,21;

53:18;59:6;62:23;
64:13,14;66:20;68:22;
70:7;82:9,16,17;83:2,2,
16;84:8
**percentage (8)**
35:13;36:1;64:11,13;
82:7,10,16;84:4
**period (1)**
103:3
**periods (1)**
14:19
**permission (1)**
117:19
**person (27)**
41:21,22,23;42:4,10;
67:4;72:6;74:11;81:16;
85:5;87:9,13;90:7;
95:12;100:9,16;
115:22;121:3;134:12;
138:4;141:23;142:10;
143:5,6,10;144:6,20
**personal (4)**
69:3,23;103:22;
104:5
**personnel (1)**
108:9
**petition (1)**
20:14
**phonetic (1)**
136:13
**picture (3)**
102:13,13,18
**pinpoint (4)**
58:1;68:11;136:6;
138:16
**place (7)**
33:11;48:11;50:7;
51:13;63:17;97:1;
99:23
**placed (1)**
56:5
**plaintiff (4)**
4:3,13,17;145:7
**plaintiffs (2)**
9:11;62:10
**Plaintiff's (1)**
133:19
**plan (1)**
147:2
**planning (1)**
48:8
**plans (1)**
48:6
**plant (1)**
47:12
**players (1)**
69:8
**please (5)**
4:10;66:13,16;
124:12,19
**plenty (1)**
148:9
**pm (1)**

151:15
**point (6)**
33:20;36:8,8;38:5;
54:13;55:1
**points (58)**
54:14,14,21;55:2,20,
21;56:18;58:20,22;
66:19,22;67:3,17;
68:19,21;69:15,18,23;
70:2,6,9,10,14,19;71:2,
6,14,16,17,18;75:17;
80:7,10,15,20;81:1,6,
18,21;82:1,2,5,9,11,17,
18,20,20;83:3,5,17,23;
84:2,3,8,13,19;88:13
**police (67)**
5:19;7:11;8:12,19;
31:9,20;32:4;35:3,4,
14;36:1,6,12,21;40:23;
43:8,16;47:11,15;48:1,
19;49:3,12,16;56:12;
57:20;60:18,22;61:5,
11,16;62:21;68:3;72:2,
3;95:8;96:21;99:19;
107:17;109:17;116:4;
118:6;121:13;123:17;
124:4,10;125:7,11;
127:15;128:22;135:13,
22;137:4,15;138:13;
139:8,9;140:2;141:5,
12,20,20;142:15;
143:15,22;144:13,15
**policy (8)**
122:2,4,12,15;124:4,
5,10;125:8
**portion (4)**
58:12,18;107:23;
150:9
**positions (1)**
36:23
**possession (2)**
23:13,16
**possible (1)**
6:12
**possibly (2)**
9:11;102:18
**Posted (3)**
48:21;71:13;81:8
**practice (1)**
8:18
**praise (1)**
107:12
**preference (1)**
70:18
**present (7)**
37:22;55:14;62:7;
75:8;95:18;136:16,17
**pretty (2)**
33:17;117:10
**prevented (1)**
6:23
**previous (1)**
76:7

**previously (1)**
41:22
**Price (6)**
15:13;37:9,12,16;
40:15;51:1
**prior (1)**
103:4,6,7
**privileged (1)**
29:5
**probably (10)**
5:6;36:3,8,22;118:9,
20;119:1;133:11,14;
137:7
**problem (2)**
83:11;112:4
**problems (3)**
6:15,17,21
**Procedure (3)**
4:7;14:17;61:14
**procedures (1)**
5:7
**proceeded (1)**
117:7
**process (12)**
8:11;9:5,20;22:22;
50:13;61:20;74:15,19;
75:7,15;115:5;120:14
**professional (3)**
6:20;146:18,21
**promote (1)**
39:2
**promoted (43)**
18:22;19:2,5;28:15;
31:21,23;32:4;9,13;
33:15;37:12;38:21;
39:10;40:9,22;41:1,14,
20,21;42:4,10;43:3,10;
45:15;64:5;73:11,14,
16,20,23;74:11;76:12,
13;84:16;85:5,23;
86:21;87:13,16,22;
95:17;148:19;149:8
**promoting (1)**
39:23
**promotion (3)**
42:16;147:8,11
**promotional (2)**
8:11;71:7
**promotions (1)**
8:18
**prompted (1)**
116:15
**public (3)**
48:18;49:12,16
**publicly (1)**
49:2
**published (1)**
49:1
**punishment (1)**
95:5
**purposes (2)**
4:8;66:23
**pursuant (1)**

129:9
**pursued (2)**
122:22,23
**pursuing (1)**
104:13
**pursuit (23)**
104:20;114:10,12;
120:9;122:2,12;
123:23;124:3,5,10;
125:7;126:6;127:4;
128:7;129:16,18;
131:8,21;132:11,17,22,
23;133:3
**put (11)**
12:20;26:14;29:6,6;
91:9;101:18;104:9,13,
15;106:21;136:10
**putting (2)**
67:7;83:13

**Q**

**qualified (6)**
88:19;89:1,5,11,22;
90:7
**questioner (1)**
5:19
**quick (3)**
19:13,18;134:3
**quite (3)**
44:9;91:16,23
**quote (2)**
77:10;144:5
**quote/unquote (1)**
140:12

**R**

**racial (35)**
16:23;18:14;24:2;
26:9;28:3;39:22;40:7;
58:17;89:15;96:12;
97:12,16;98:7,16,19;
99:2,5,8,11;101:4,7,13;
103:23;125:13,23;
126:6,10;135:1,21;
136:1;139:8;142:3,14;
143:14;144:21
**racially (4)**
56:23;58:12;96:8;
101:17
**radio (4)**
114:6;116:18;
117:19;120:8
**rank (9)**
40:20;49:5,6;67:5,6;
94:8;138:7,9;144:16
**ranked (4)**
78:1;79:16;81:4;
94:20
**ranking (1)**
37:21
**ranks (1)**

94:23
**rat (1)**
90:14
**rate (4)**
115:4;116:17;117:9;
123:7
**Re (1)**
127:19
**reach (2)**
39:13;42:13
**reached (3)**
39:17;76:23;148:23
**read (21)**
12:3,4,15;30:5;
97:22;98:2;108:4,6;
113:10;122:13,14;
123:9;124:5,12,14,19,
21,23;129:11;141:15,
16
**reading (3)**
12:13;14:15;15:2
**ready (8)**
13:14;29:9,16,20;
30:3,9;39:13;104:18
**real (3)**
32:7;83:17;137:18
**realized (1)**
21:20
**really (15)**
14:23;32:10;34:23;
35:11;54:8;57:6;58:1;
77:13;91:14;95:3;
118:8;127:8;134:3;
137:6;138:1
**reason (14)**
6:2,12;50:1;67:8;
91:19;92:1;108:8;
122:8;128:10;129:22;
131:12;132:9,15,21
**reasoning (1)**
33:1
**recall (9)**
33:5;45:17;102:16;
108:10,22;109:3;
131:10;135:2;148:14
**receive (2)**
54:14;89:20
**received (4)**
25:18;50:3;54:13;
68:17
**recent (2)**
41:7;125:18
**recently (3)**
50:9,11;126:18
**recklessness (1)**
123:8
**recognize (7)**
10:5,15;13:14,18;
22:8;133:20,23
**recollect (4)**
58:5;64:17;118:18;
142:17
**recollection (8)**

11:22,23;12:9;45:19;
134:6;135:4;142:19;
148:16
**record (23)**
4:8;5:15;10:12,13;
12:4;40:15,16,18;
66:13,16;72:22,23;
73:1;98:2;121:6;
124:14,23;132:5,8;
134:4;140:20,22;
141:16
**rectify (1)**
52:23
**red (3)**
119:10,23;120:3
**redirect (1)**
151:6
**reduce (1)**
83:16
**reduced (4)**
110:2;111:8,9;114:5
**refer (2)**
7:5;91:6
**reference (4)**
101:16;104:8;
122:11;125:6
**referenced (2)**
101:11;108:4
**referred (2)**
115:3;134:14
**referring (3)**
14:21;15:5,19
**refresh (5)**
12:8;45:18;135:3;
142:18;148:15
**refreshed (1)**
134:6
**refreshes (1)**
11:22
**regarding (23)**
8:18;18:14;31:16,21;
32:4;33:15;58:16;68:3,
16;72:1;107:4;109:6;
134:20,23;135:21;
139:8;142:2,7,14;
143:2,14;145:3,16
**regardless (1)**
29:2
**Regas (2)**
144:7;145:3
**Regnier (27)**
26:14;38:4,22;50:7;
55:2,7;57:13,14;58:10;
85:8;89:20;90:16;93:7;
94:15,16;98:18;99:2,
11,14,20;100:6,21;
104:8;106:20;107:18;
108:19;112:2
**relate (1)**
98:22
**related (4)**
46:22;72:19;75:13;
146:23

**released (1)**
17:21
**relevant (1)**
138:22
**relieve (1)**
148:5
**remember (26)**
5:2;11:20;14:11,15;
15:1,8;17:20;30:6;
31:18;32:14;33:4,8;
38:13,16,19;54:8,19;
63:11,16;75:10,19;
76:14;91:8;98:21;
102:12;120:22
**remembers (2)**
9:3;15:7
**reopen (1)**
21:17
**reopening (1)**
20:14
**re-opening (1)**
20:22
**rep (1)**
120:15
**report (4)**
104:18;108:4;115:9,
11
**reported (4)**
90:12;93:6;94:14,19
**reporter (4)**
5:12;51:4;65:12;
124:21
**represent (1)**
16:14
**representation (3)**
17:13;18:4;120:20
**represented (1)**
17:11
**reprimand (5)**
26:13;112:1,11,22;
113:4
**request (4)**
20:13;22:11,12;32:8
**requested (7)**
12:4;20:21;98:2;
124:14,23;138:23;
141:16
**required (1)**
8:17
**research (1)**
45:2
**reserve (1)**
151:12
**reserved (1)**
151:13
**resigned (2)**
15:13;55:7
**Resolved (2)**
53:4;112:20
**resource (2)**
109:1,6
**Resources (4)**
28:20;58:16;101:16;

104:7
**respect (3)**
73:3;93:8;102:6
**respond (1)**
106:19
**responding (2)**
92:9,19
**result (5)**
45:1;147:6,14,20;
148:2
**resulted (2)**
41:10;67:3
**results (2)**
110:2,4
**Retaliation (1)**
25:21
**retaliatory (1)**
26:15
**retire (5)**
47:15;48:3,6;102:21;
138:11
**Retired (4)**
43:17;103:2;137:20;
145:23
**retirement (2)**
47:21,23
**reveal (1)**
98:12
**review (7)**
20:14,21;21:18;
22:11;29:16,18,19
**reviewed (1)**
124:3
**Rich (1)**
111:18
**Richard (4)**
4:3,14,16;18:19
**ride-alongs (2)**
32:8,8
**right (23)**
10:8;20:9;21:6;
24:10;31:18;35:22;
43:2,4;67:23;70:23;
76:14,16;83:18;95:6,9;
99:17;105:11;113:20;
115:18;117:4;136:10,
11;147:3
**right-hand (6)**
18:9,18;26:3,22;
27:21;28:7
**Rights (22)**
16:22;17:4;18:14;
19:22;20:15,22;21:9,
17;22:13;23:3,7,11;
24:1,15;25:12;26:8,19;
27:11;28:3,21;91:4;
125:5
**ritual (1)**
29:10
**River (1)**
119:18
**road (1)**
119:7

**rocket (1)**
115:3
**Rod (2)**
92:21;94:21
**rode (2)**
115:20,22
**room (2)**
95:10;100:23
**Rounded (3)**
133:5,9,12
**ruled (3)**
16:11,19;18:1
**Rules (3)**
4:6,7;5:7
**run (1)**
5:8
**running (1)**
104:19
**rush (1)**
93:2

**S**

**salary (4)**
133:6,10,13;146:1
**Salvation (1)**
129:10
**same (24)**
21:8;33:17;34:5,6,7;
50:3;51:5;63:2,9,23;
73:3;81:1;84:13;
106:15,17;116:1;
124:16;129:19;134:14;
139:20;141:11,19;
144:17,20
**sat (2)**
62:21;151:2
**Saturday (1)**
119:4
**saw (9)**
33:9;101:15;102:6;
113:6;115:2;116:9,21;
119:8;148:22
**saying (13)**
15:4;32:22;70:23;
79:10;82:12,13;85:7;
96:5,12;97:21;112:9,
13;140:13
**scheduled (2)**
30:2,16
**school (6)**
70:11;108:23;109:1,
6;111:3,3
**Schuyler (3)**
116:8;118:15;119:17
**Science (1)**
46:10
**score (14)**
53:18;56:2;59:6;
66:20;67:7,7,21;69:4;
81:13,14,23;84:13;
87:23;88:2
**scored (8)**

66:23;77:16,20,20;
78:2,14;79:12;84:18
**scores (3)**
67:4;84:9;87:17
**scoring (5)**
76:8;79:22;84:20;
150:6,8
**Scott (7)**
72:8;74:13;81:9;
83:8;87:17;138:4;
139:4
**screwed (1)**
87:19
**scrutinizing (1)**
140:10
**scumbag (1)**
105:21
**second (14)**
9:22;15:3,4;24:6;
25:11;42:1;51:4;81:8;
84:23;105:21;106:2,6;
108:2;131:23
**seconds (3)**
118:20;119:1;135:8
**secretary (1)**
70:5
**seeing (1)**
108:10
**seeking (3)**
147:7,8,10
**selections (1)**
63:13
**senior (1)**
110:13
**sent (3)**
22:13;23:13;48:21
**sentence (1)**
122:17
**September (3)**
13:22;14:4;28:8
**sergeant (73)**
18:22;19:2,9;28:15;
31:21;32:5,13;33:16;
37:22,22;38:6;39:5,8,
10;40:20,22;42:16;
43:10,17;44:12,19;
45:6,15;47:13;48:18;
52:11;53:10,11;55:23;
63:19;67:5;73:11,14,
16,21;75:4;88:20;89:2,
6,12,22;90:8,9;91:1;
92:11;94:22;95:17;
110:7,7,9,13,19,20,21,
22,23;111:2,4,13;
117:19;131:15,15,20;
132:10,16,22;133:10;
136:9;146:2;148:20;
149:2,3,6
**sergeants (6)**
36:20;37:7,17,19,20;
110:12
**sergeant's (52)**
32:20;33:3,21;34:3;

41:3,16;42:17;43:11;
45:7,16;48:11;49:15,
19;50:2,6;52:6;53:17;
56:3;58:17;60:2,5;
63:22;64:11;65:22;
66:2,6,19,23;69:5;71:3,
8;72:4;73:4,10;74:1,
10;75:21;76:11,13;
77:16;78:2,22;86:5;
90:18,21;92:13,16;
93:23;94:2;113:15;
144:2;149:23
**serious (1)**
111:15
**served (1)**
95:4
**serves (4)**
59:14;102:14;
103:10;110:14
**service (13)**
68:21;69:11;71:11,
17,19;80:20;81:6;84:2,
6,13,18;88:16;89:9
**serving (1)**
143:12
**set (2)**
30:15;120:19
**setting (1)**
34:5
**settle (3)**
9:21;52:15;53:7
**settled (2)**
8:5;53:4
**settlement (10)**
8:5,10,17;12:15;
14:8;15:3,5;97:3,6;
101:11
**seven (1)**
102:23
**Seventh (5)**
9:16;16:9,11,18;
143:5
**severing (1)**
15:21
**share (5)**
13:1;32:7;34:18;
69:2;149:20
**shared (19)**
11:12,13;15:8;32:6;
33:23;34:8,17,19;
49:21;54:21;57:4,4;
69:13;74:21;75:22;
76:5,7;106:8,10
**sharing (3)**
14:10;75:14;93:12
**sheet (1)**
68:1
**short (6)**
25:16;54:1;106:7;
121:5;122:9;123:6
**shortest (1)**
123:5
**Shortly (2)**

75:1,1
**show (3)**
109:11;111:21;
127:10
**showed (3)**
102:12,13,18
**shower (1)**
29:14
**showing (1)**
123:12
**Shreffler (17)**
125:6,10;126:8,14,
22;127:5,19;128:15;
129:4,9;130:12;
131:16,21;132:11,18,
23;133:2
**Shreffler's (4)**
128:7;129:15,17;
131:8
**sic (4)**
13:22;58:16;101:16;
104:8
**side (2)**
22:18;23:3
**sight (1)**
117:16
**sign (2)**
11:5;105:6
**signature (11)**
10:23;11:3;14:5;
18:17;26:21,23;28:7;
107:16;121:19;151:12,
13
**signatures (1)**
123:19
**signed (4)**
11:7,10;107:13;
124:17
**signs (1)**
120:5
**similar (1)**
71:23
**siren (3)**
117:6;119:16;123:6
**sirens (4)**
116:2,7,10;118:23
**sit (15)**
16:1;36:11;99:18;
102:9;108:14;110:22;
128:10;129:22;131:11,
14,19;132:9,15,20;
146:8
**sitting (2)**
95:6;104:17
**situation (4)**
108:4;112:19;
116:16;123:4
**six (3)**
48:14;102:23;142:10
**slurs (20)**
89:15;96:12;97:13,
17;98:8,16,19;99:2,5,8,
11;101:4,7,13;104:1;

125:13;126:1,6,10;
144:21
**small (1)**
35:16
**smoothly (1)**
5:8
**Sneed (18)**
38:7;39:10,15;40:14;
63:19;73:6;76:14,19;
87:7,10,12,15,21;
88:20;148:23;149:2,7,
14
**Sneed's (1)**
88:10
**sold (4)**
9:14;15:3,4;16:7
**solid (1)**
84:3
**somebody (1)**
74:20
**someone (10)**
41:20;42:3,3,16;
44:19;45:6,15;63:12;
95:10;104:9
**sometimes (1)**
115:2
**somewhere (3)**
35:8;117:14;133:8
**sorry (2)**
37:21;77:5
**sort (1)**
39:22
**sought (7)**
17:13;28:23;57:2,9,
10;58:10;146:21
**sound (1)**
19:6
**source (3)**
54:15;57:18;62:2
**sources (1)**
45:4
**speak (2)**
101:23;111:17
**speaking (3)**
67:2,13;94:21
**special (7)**
139:14,18;140:3,8,9,
11;141:4
**specifically (3)**
6:9;57:22;75:10
**speed (10)**
115:4;116:18;117:1,
9;118:11,14,18,21,22;
123:7
**speedometer (1)**
118:9
**spoke (2)**
30:23;31:1
**spot (1)**
83:14
**squad (2)**
104:18;119:20
**stamp (12)**

19:18;20:18;21:3;
24:5;26:7;27:7,9;
28:11;65:15;66:5;
121:11;127:12
**stamped (10)**
24:20;26:2;65:14;
66:1;107:10;109:12;
111:23;123:15;128:21;
133:18
**stand (1)**
78:5
**Standard (3)**
64:22;65:4;150:22
**start (3)**
12:12;115:16;130:22
**started (4)**
47:10;114:21;115:2,
5
**starting (1)**
38:3
**State (1)**
46:3
**stated (6)**
22:21;51:3;54:20;
96:11;108:17;111:8
**statement (9)**
29:3;55:18;121:13;
122:9;130:8,9,14;
136:12,13
**states (3)**
115:9,11;128:9
**stating (2)**
51:11;64:2
**station (1)**
104:20
**status (2)**
34:12,13
**stayed (1)**
81:1
**stays (1)**
41:17
**step (3)**
35:2;69:22;83:7
**steps (1)**
48:13
**steroid (1)**
95:2
**steroids (7)**
90:11,15;91:7,20,20;
92:4;130:18
**Steven (2)**
73:20;74:2
**still (13)**
14:22;50:7,13;51:9;
53:5;56:12;80:13;
84:21;85:23;91:21;
116:10;117:12;149:2
**stipulate (1)**
128:3
**stolen (1)**
76:21
**stop (5)**
117:22;120:5;

**132:23;147:6,14**
**stopped (3)**
116:12,13;120:2
**stopping (2)**
120:1,6
**store (1)**
93:11
**story (4)**
22:18;23:4;106:15,
17
**street (2)**
115:17;129:11
**stress (15)**
29:11;32:16;33:18;
34:9,19;49:23;75:12,
13;76:1,2,6;78:10;
147:23;148:5;149:20
**strike (11)**
13:4;21:9;23:7;30:1;
32:19;50:20;64:12;
87:17;98:13;109:10;
131:12
**stuck (2)**
14:20,20
**studied (1)**
46:16
**study (3)**
46:14;54:4;150:14
**studying (1)**
76:1
**stuff (1)**
127:3
**Stuprenant (1)**
136:13
**subject (7)**
25:16;26:12;28:14;
58:11;116:11,17;
123:22
**subjective (5)**
79:22;82:3;84:20;
150:5,7
**submit (2)**
120:16,18
**substantial (10)**
17:5;18:2;19:21,23;
20:8;21:13,19;23:12;
24:16;27:13
**succession (2)**
19:13,18
**sued (2)**
7:11;149:9
**suffered (2)**
139:9;146:14
**suing (1)**
45:12
**suit (12)**
31:13,13,16;32:13;
43:13,21;96:14,14,15;
143:17,18,19
**summary (1)**
18:21
**summer (1)**
69:7

**supervisor (2)**
109:2,4
**supposed (5)**
16:13;41:5;48:13;
61:19,19
**Suprenant (9)**
106:15,17,18;
135:11,20;136:4,14,15;
137:2
**sure (19)**
9:9;35:16;48:2;
52:23;53:8,15;63:4;
75:9;90:19;100:13;
102:22;105:11,15;
121:1;128:12;135:17;
144:1;146:4,9
**surrounded (1)**
67:11
**suspect (6)**
104:12;107:5;
116:11,17;117:5,6
**suspects (1)**
139:21
**suspended (5)**
95:1,7,11;127:6;
133:2
**suspension (8)**
25:18;95:4;109:17,
21;113:23;114:2,10;
120:13
**suspicious (1)**
129:10
**swastika (5)**
99:15,21;100:7,10,
22
**swastikas (1)**
99:13
**sworn (8)**
4:1,18;35:3;61:3,7,
10;144:13,15

---

**T**

**tackled (1)**
105:1
**talk (10)**
30:13,18;31:4;32:12;
34:22;53:16;58:8;
90:16;97:8;151:7
**talked (15)**
14:17;31:9,20;32:3;
34:15;35:1;61:22;
101:10;135:20;142:3,
8,16;143:2;145:15;
146:1
**talking (24)**
7:6;14:17;25:5;
32:14;50:15;51:5;65:9;
66:17;68:11;75:12;
91:6;96:15;97:6;
105:12;107:4;119:19;
127:2;129:5;130:19;
143:20;149:10,15;

**150:7,8**
**talks (1)**
44:9
**tattoo (5)**
99:15,21;100:7,10,
22
**tattoos (1)**
99:12
**Tavern (1)**
93:2
**telling (6)**
30:18;31:1;32:15,16;
57:16;120:9
**tells (3)**
23:2;43:14;110:9
**ten (5)**
35:20,20;79:6,6;
103:12
**tenure (1)**
70:17
**terminate (1)**
120:9
**terminated (3)**
100:2,3;123:8
**terms (2)**
76:11;120:13
**terrible (1)**
87:18
**test (29)**
32:15,21;33:3,21;
34:4;41:3,7,18;52:6;
53:17;57:2,15;58:17;
63:23;64:23;75:1,13,
14,21;79:7,8;80:16;
82:11;149:18,23;
150:10,12,17;151:2
**testified (1)**
4:18
**testify (2)**
6:13;67:3
**testifying (1)**
6:23
**testimony (14)**
12:22;16:13;23:20;
42:22;50:21;54:23;
71:20;84:5;99:14,18;
113:2;118:2;119:6,22
**testing (26)**
9:4,20;14:17,19;
22:22;35:1;48:11,18;
49:2;50:6;61:14,20;
63:18;65:5;71:13;
74:14,19;75:7,15;76:7;
77:16;78:10;82:17;
83:2;147:11,13
**thanks (1)**
145:13
**that- (1)**
113:2
**theirs (3)**
88:6,7,8
**thinking (2)**
96:22;101:19

**third (10)**
26:7,12,17;27:10,12;
81:16;87:9;123:4,15,
16
**though (4)**
82:10,17;87:16;
127:12
**thought (2)**
17:20;105:14
**thousand (3)**
133:5,9,12
**threaten (1)**
126:15
**threatening (1)**
126:11
**threats (1)**
126:21
**three (42)**
17:3,6;19:12,17;
41:6,23;42:4,5,11,16;
43:10;45:6,16;56:3,7,
10;60:1,4,12,17,22;
63:21;65:9;79:20;
81:22;82:1,6,21;83:10;
84:18;85:3,15;86:1,2,7,
12,18;87:7;90:5;111:9;
118:20;137:5
**three-day (1)**
113:23
**throughout (1)**
91:3
**throwing (1)**
67:6
**tied (1)**
78:16
**times (6)**
5:1;80:10;83:1;84:9;
120:13;149:13
**Tison (16)**
71:5;73:14,17;74:8;
77:23;85:22;89:12;
96:8,9;97:12,16;98:7,
16;101:9,13;104:1
**Tison's (1)**
144:21
**to- (1)**
151:11
**today (12)**
7:7;13:2;16:1;37:10,
10,11;113:20;129:22;
132:9,15,20;135:21
**today's (1)**
134:19
**together (4)**
119:12,15;136:20;
138:3
**told (69)**
9:3,6,7;11:15;15:22,
23;22:21;23:2;32:22;
42:23;44:6,20;45:10,
14,19;51:7,12,19;53:7;
55:1,6,13;56:17;57:22;
60:10;63:8,11,17;

67:16,19;69:17;75:6,
11;76:4;91:11;93:14;
94:13,15,22;95:23;
96:2;98:7,15,21;99:10,
16,20;100:6,21;101:3,
6,12;104:1;105:3;
106:13,15,16,18;110:7,
8;111:2,4;115:19;
126:13;134:18;144:8,
20;149:1,21

**took (9)**
16:19;29:14;33:11;
50:7;63:2,17,23;117:6,
8

**top (30)**
12:12;13:21;18:8;
26:3;27:21;42:4,5,11,
16;43:10;45:6,16;56:3,
6,10;57:14;81:22;82:1,
6,83:10;84:18,22;85:2,
15;86:1,2,7,18;87:7;
127:18

**total (1)**
36:21

**Totality (2)**
121:14,16

**toward (1)**
14:3

**Towards (5)**
25:3;26:3;47:2;
52:16;131:23

**tp (1)**
121:13

**traffic (3)**
114:6;117:22;119:16

**trained (1)**
89:3

**trainer (1)**
89:4

**treated (7)**
22:19;23:4;43:3;
140:8;141:10,14,19

**treatment (7)**
139:15,18;140:3,11,
19;141:4,6

**trial (1)**
96:13

**trick (1)**
13:11

**tried (1)**
115:10

**Trudeau (4)**
110:13,23;111:2,14

**true (1)**
49:9

**trust (1)**
150:5

**try (2)**
32:6;132:8

**trying (9)**
13:11;29:5;82:23;
83:18;98:20;102:11;
113:10;134:9;137:17

**turn (2)**
117:7;123:15

**turned (8)**
11:16;69:14;115:18;
116:1,7,9;117:5,8

**twelve (1)**
46:19

**Twenty (1)**
47:22

**Twenty-two (1)**
43:7

**two (25)**
4:10;5:5;14:19;
15:12;29:13;36:19,20;
41:23;44:14,16;46:18;
50:4;59:10,12,20;
63:15;74:8;80:21;
88:17;102:19;105:2;
110:12;123:19;129:3;
145:7

**type (1)**
104:19

**typed (2)**
107:15,22

**U**

**ultimately (3)**
8:5;23:11;52:14

**under (10)**
4:6;5:9;25:3,7;81:9;
85:8;112:12,20;
147:11;150:2

**underneath (1)**
107:15

**understood (6)**
32:23;33:1,19;71:15;
124:11,16

**unfair (1)**
25:19

**unfortunately (1)**
87:1

**union (3)**
120:15,16,17

**unless (4)**
6:8;33:9;95:23;
117:22

**up (31)**
9:12,15;13:13,21;
16:9;24:10;29:14;
30:15;39:23;53:17;
59:6;69:14;70:4;80:7,
21;82:8;83:13,20;84:9,
23;87:19;95:17;
101:18;105:2;108:5,6;
111:7;115:18;120:19;
124:4;138:13

**upset (2)**
53:3;75:16

**Upton (2)**
62:11;103:8

**usage (2)**
67:12;91:11

**use (16)**
6:1;66:10;83:14;
91:6;95:2;97:12;98:16,
19;99:2,5,8,11;101:4,7;
121:5;122:20

**used (6)**
91:10,13,15,20;92:3;
97:16;98:7;104:1;
143:11

**uses (1)**
89:15

**using (5)**
90:11,15;101:13;
125:13;130:18

**V**

**vacated (3)**
17:16,17,18

**vacation (1)**
95:14

**vehicle (4)**
93:4;104:23;129:9,
10

**venture (3)**
53:22;98:17;145:20

**ventured (2)**
35:19;36:22

**verbal (1)**
111:13

**versus (3)**
4:4;7:7;31:8

**veteran (2)**
5:19;81:18

**veterans (1)**
71:9

**veteran's (3)**
70:18;71:2,6

**video (8)**
97:5,16,16;98:1;
119:12,13,19,20

**violated (1)**
125:7

**violating (2)**
8:22;9:2

**violation (1)**
12:14

**violations (1)**
126:23

**voluntarily (2)**
17:7,10

**votes (1)**
70:1

**W**

**Wagner (2)**
92:21;94:21

**wait (1)**
37:19

**walked (1)**
95:10

**wants (3)**

22:1;85:9;140:23

**watched (3)**
97:15;119:11,15

**way (24)**
8:16;12:14;13:2;
15:22;19:23;28:11;
34:16;54:11;56:22;
64:7;67:13;69:21;
72:15;83:8;91:9;97:11;
115:19;116:23;118:10;
120:12;124:11,16;
141:8;150:5

**Wayne (1)**
110:13

**weeds (3)**
25:16;26:11;28:13

**weeks (1)**
15:12

**weight (1)**
84:3

**welcome (1)**
145:11

**weren't (3)**
76:20;91:11;122:2

**what's (16)**
10:15;22:10;25:14;
42:22;54:15;79:3;
104:11;107:11;118:6,
11;133:6;138:7,19;
144:16,18;150:21

**whenever (4)**
13:10,12;15:13;
19:10

**Whereupon (1)**
151:14

**whichever (1)**
14:19

**white (21)**
43:19;54:13;56:18;
68:15;72:7;79:21;86:8,
12,15;96:19,20;136:1;
138:20;140:1,4,7;
141:7,7,11,20;144:19

**whole (4)**
119:1;122:17;141:5;
150:10

**who's (2)**
39:4;135:11

**Whose (2)**
11:3;107:15

**Willie (1)**
142:10

**willing (2)**
52:23;100:15

**within (12)**
49:12,12,16;58:17;
72:2;86:6;102:19;
117:14,15;136:6;
137:13,14

**without (10)**
25:15;26:11;28:13;
30:18;31:1;95:11;
114:8,9;120:1,6

**Witness (26)**
4:1,14;10:11;12:5;
23:17;24:11;25:8;27:1;
31:2;42:7;66:12;83:18;
85:12;86:14;98:3;
112:8;113:13;124:15;
125:1;126:12;130:13,
21;131:1,4;134:1;
140:23

**witnessed (3)**
96:12;116:19,20

**witnesses (1)**
93:1

**Wolfe (2)**
87:5,6

**won (2)**
44:6,8

**word (2)**
30:19;76:23

**words (4)**
120:10;121:21;
122:21;123:5

**work (8)**
29:12;52:20;108:6;
111:2,3;120:14;
135:13;148:4

**worked (2)**
29:14;69:7

**working (9)**
47:2,10;52:13;130:4,
6;131:1,9;136:3;148:8

**works (1)**
144:11

**world (1)**
16:4

**worse (1)**
87:23

**write (4)**
70:4;106:14;112:11;
122:8

**written (30)**
53:16,20,23;54:11;
55:3;56:18,22;58:12,
18;59:3;64:12,21;
66:17;77:16;78:3,15;
80:1;82:5,15;83:9;
84:4,6,9;88:2,5,21,23;
121:12;150:12,17

**wrote (9)**
14:16,16;22:11;
26:14;69:14;91:5;
93:12;106:11;112:8

**Y**

**year (12)**
33:7;41:1;44:7,11;
46:5;73:16,19;75:2,3;
123:23;138:18,18

**years (19)**
14:18;41:6;43:6,8;
44:9,17;46:15,18;
47:22;48:8;71:12;76:1;

**RICHARD BROOKS VS**
**CITY OF KANKAKEE, IL**

96:22;102:20,23;
103:13;135:18;136:7;
150:3

**yes-or-no (1)**
30:11

**young (1)**
69:8

---

### Z

**zero (5)**
69:4,12;71:21;81:9;
84:7

**Zingre (2)**
96:11;145:1

---

### 0

**000627 (1)**
111:23

**04 (1)**
46:7

**0624 (1)**
107:10

**07 (1)**
145:21

**08 (1)**
145:21

---

### 1

**1 (14)**
10:1,3,6,7,9,10,16,
18;11:5,7,11,19,22;
12:12

**10 (7)**
27:3,6,7,8;80:7;
88:14;130:7

**10/24/14 (1)**
124:3

**10/28/14 (3)**
123:23;124:1,8

**10/28/2014 (1)**
123:17

**100 (2)**
117:4;123:14

**102 (2)**
123:16,16

**10th (1)**
27:15

**11 (10)**
27:18,19,20;28:1,12;
59:13;64:3,4;78:9,9

**11/6/2013 (2)**
107:20;108:19

**110 (1)**
133:14

**12 (6)**
36:23;65:11,18,21;
70:22;80:7

**12:45 (1)**
151:15

**12ish (1)**

77:9

**13 (7)**
65:12,13,18;66:1;
70:20;71:1;80:11

**14 (13)**
64:3,4,6;65:11,15,
19;66:5;73:13;74:8,10;
76:11;78:7,8

**15 (17)**
59:13;66:20;67:13,
14;68:15;80:11,14;
82:17;88:13;107:7,9,
11,13;108:8,15;
127:23;135:18

**16 (3)**
109:12,14,16

**17 (7)**
73:19;74:3;78:12;
111:20,22;112:17,23

**17-CV-2265 (1)**
4:5

**18 (6)**
121:8,11,11,12,23;
123:3

**19 (6)**
12:13;28:8;65:10,21;
123:11,14

**1984 (1)**
45:23

**1996 (1)**
47:11

**1st (1)**
23:8

---

### 2

**2 (6)**
13:5,7,9,14,16;14:8

**2/21/2014 (1)**
127:22

**2/21/2015 (4)**
127:7;128:8;129:7;
131:8

**20 (9)**
35:17,18;38:17;
64:14;127:9,11,12,14;
131:23

**2003 (1)**
7:16

**2005 (2)**
14:1,4

**2007 (2)**
108:23;109:7

**2010 (4)**
38:3;40:20;53:14;
106:21

**2011 (36)**
39:11;49:15;53:17;
56:3;59:6;60:2,18;
62:19;63:1,9;65:2,22;
66:18;71:3,8;73:4;
76:13;77:11,20;80:2,3,
3,7,11,21,21;86:5,18;

87:15;88:10;90:6,18;
92:16;94:2;95:17;
144:2

**2013 (5)**
19:3,8;100:4,5;
104:12

**2014 (50)**
16:21;21:9;49:11,11;
53:17;56:3;59:6;60:5,
21;62:19;63:22;64:8;
65:2;66:2,19;71:7,12,
15;72:4;73:10,23;
77:15,22;78:2,14,22;
79:12,16;80:2,3,4,7,11,
17,19,21,22;81:4,13,
21;83:9;84:14;85:14,
17;86:1;90:6,21;92:13;
93:23;136:9

**2014CA2471 (6)**
18:10,21;20:16,23;
21:10;22:14

**2015 (11)**
13:22;20:9,23;21:14;
23:8,12;113:22;
114:11,16;128:1;129:1

**2016 (5)**
24:2;25:4,10;26:19;
28:8

**2016CA1966 (2)**
24:6;25:13

**2016CA2470 (3)**
26:3,12;27:10

**2017 (18)**
24:14;27:16;41:7;
49:20;50:2,6;56:3;
60:8,9,15;64:10;66:6;
74:10;75:21;76:11;
85:1,6;90:6

**2017CA0559 (3)**
27:22;28:13,19

**2018 (3)**
41:11;73:21;125:19

**205 (1)**
127:13

**209 (1)**
128:21

**21 (4)**
128:18,20,22;129:15

**22 (9)**
13:22;43:8;44:17;
71:12;133:15,17,20;
134:7;142:1

**224 (1)**
19:19

**22nd (1)**
14:4

**23 (1)**
129:1

**236 (2)**
20:13,19

**24 (1)**
20:23

**250 (1)**

21:4

**28 (2)**
83:6;84:10

**29 (1)**
21:14

**294 (2)**
26:2,7

**297 (2)**
27:7,9

**2nd (1)**
26:19

---

### 3

**3 (8)**
18:5,7,9,12,18;24:19,
21,22

**3/25/14 (1)**
18:19

**3/9/2007 (1)**
109:21

**3:11 (1)**
129:8

**3:30 (2)**
128:15;129:16

**30 (5)**
48:8;59:6;83:16;
95:11;117:14

**32 (2)**
83:6;84:10

**378 (1)**
28:12

**3rd (1)**
24:14

---

### 4

**4 (4)**
19:13,14,19;20:9

**40 (8)**
35:9;53:17;82:8,16;
83:2,2;84:8;119:1

**40-second (1)**
117:15

**45 (2)**
118:16,16

---

### 5

**5 (6)**
19:13,14;20:7,12,17,
18

**50 (3)**
64:13;117:13;118:16

**57 (2)**
79:13;80:3

**5th (2)**
114:11,16

---

### 6

**6 (9)**
10:23;12:11;19:13,

15;21:3,5,12;114:18;
119:2

**6/29/2010 (1)**
112:3

**6:30'ish (1)**
29:14

**60 (3)**
48:7;9;62:23

**61 (1)**
24:6

**62.3 (1)**
80:3

**628 (1)**
109:13

**63 (3)**
24:20,23;25:1

**67 (1)**
35:6

**698 (2)**
65:16;66:6

**699 (2)**
65:14;66:2

---

### 7

**7 (7)**
22:4,6,8,10,12;23:2,8

**7:00 (1)**
29:13

**70'ish (1)**
133:8

**71 (2)**
77:17;83:1

**71.5 (1)**
81:14

**75 (1)**
133:8

**77 (1)**
77:20

**7th (1)**
20:9

---

### 8

**8 (8)**
24:5,5,8;25:4,6,10;
82:2,8

**8.6 (3)**
81:21;82:1,4

**8:10 (1)**
109:22

**80 (3)**
84:10;118:9,19

**80.05 (1)**
81:17

**86 (2)**
47:3;83:4

**89 (1)**
133:11

---

### 9

**9 (6)**

25:22;26:1,1,3,6,17
**90 (1)**
  133:11
**93 (1)**
  121:12