E-FILED
Friday, 12 April, 2019  01:11:03 PM
Clerk, U.S. District Court, ILCD

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
## URBANA DIVISION

| | | |
|---|---|---|
| **RICHARD BROOKS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 17-cv-2265** |
| | ) | |
| **CITY OF KANKAKEE, ILLINOIS,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## O R D E R

On November 21, 2018, Defendant filed a Motion for Summary Judgment (#16).
On December 12, 2018, Plaintiff filed a Response to Motion for Summary Judgment
(#19). On December 26, 2018, Defendant filed a Reply (#20). The court has reviewed the
parties' filings and the record. For the following reasons, Defendant's Motion for
Summary Judgment (#16) is GRANTED in part and DENIED in part.

### I. BACKGROUND

A. <u>Overview</u>

Plaintiff alleges that Defendant retaliated against him for engaging in protected
activity by threatening him with discipline and by passing him over for promotion.

B. <u>Background Facts</u>

As a preliminary matter, the court notes that Plaintiff lodged numerous
objections to Defendant's Undisputed Material Facts. Where necessary, the court

consulted the record and modified the stated fact so that it accurately reflects statements in the record, whether that be by deposition or declaration.

1. *The Parties*

Plaintiff Richard Brooks is an African-American male who has been a patrolman for the Kankakee Police Department ("KPD") for over 22 years. Defendant City of Kankakee is a duly-incorporated municipality and maintains a police force, the Kankakee Police Department ("KPD").

At all relevant times, KPD consisted of about 67 officers, including about 12 sergeants, 5 lieutenants, and a Patrol Commander, Investigations Commander, Deputy Chief, and Chief. Larry Regnier was the Deputy Chief from 2000 to 2010 and then Chief from 2010 until he retired on May 1, 2016. Robin Passwater is currently a lieutenant in the KPD and was the Commander of the Investigations Division from about 2009 to 2015, Deputy Chief in 2015 and early 2016, and Acting Chief for a few months in 2016. Christopher Kidwell is currently a lieutenant in the KPD assigned to the Kankakee Area Metro Enforcement Group ("KAMEG"). Kidwell was Commander of the Patrol Division from 2014 to until early 2018, when he returned to KAMEG.

2. *The* Baptist *Litigation*

In 2003, Plaintiff and four other African-American KPD officers—Joe Baptist, Price Dumas, Willie Hunt, and Lamar Upton—sued the City of Kankakee over alleged racial discrimination (the "*Baptist*" litigation). A jury rejected some of the plaintiffs' claims in the *Baptist* litigation. While the remaining claims, which alleged disparate

impact in promotional policy, were pending a bench trial, the parties settled. On September 12, 2005, at a hearing before the predecessor to this court, the terms of the settlement were read into the record.

The agreement provided for the creation of a "Blue Ribbon Committee" to review the Police Department's hiring and promotional testing, albeit only in an advisory role, and required certain other changes in KPD's policies, such as public notice of promotional testing. The settlement terms also included a two-testing-cycle or five-year time period for the agreement to be in effect. The *Baptist* plaintiffs, including Plaintiff, were all present in court, were asked if they agreed to the terms read into the record, and all nodded their heads. The court then entered a written settlement document on September 22, 2005, that reduced the terms read into the record to writing.

The written settlement document in *Baptist* was called an "Agreed Judgment Order." In Plaintiff's deposition, he testified that there was a second document, a "Consent Decree," that included terms that were different from those read into the record and later included in the Agreed Judgment Order. The "Consent Decree" is not in the record, and Plaintiff testified that the only person who he believes would have the document is his former attorney. Plaintiff is not on good terms with that former attorney, with Plaintiff stating in his deposition that that attorney "sold us [*Baptist* plaintiffs] out for money."

One of the *Baptist* plaintiffs, Willie Hunt, was promoted to lieutenant before 2010, and is currently the Acting Chief of KPD.

3

3. *Illinois Department of Human Rights/EEOC Complaints*

Since 2014, Plaintiff has filed four separate complaints against the KPD before the Illinois Department of Human Rights ("IDHR") alleging racial discrimination, and each one has been dismissed—three for lack of substantial evidence to support the allegations, and the fourth by Plaintiff voluntarily.

Plaintiff's first complaint, filed on March 25, 2015, under IDHR 2014-CA-2471, was based on the City's decision to promote Jeff Martin (white) instead of Plaintiff to sergeant in October 2013. The IDHR dismissed Plaintiff's complaint for lack of substantial evidence in December 2015.

Plaintiff's second complaint, filed on March 8, 2016, under IDHR 2016-CA-1966, was based on a three-day suspension Plaintiff received for violating KPD's pursuit policies and alleged that similarly-situated white officers did not receive such discipline. The IDHR dismissed this complaint for lack of substantial evidence on April 3, 2017.

Plaintiff's third complaint, filed on May 2, 2016, under IDHR 2016-CA-2470, was based on a written Reprimand Plaintiff received based on his comments at a KPD Police and Fire Commission meeting. The IDHR dismissed this complaint for lack of substantial evidence on April 10, 2017.

Plaintiff's fourth complaint, filed on September 19, 2016, under IDHR 17-CA-559, was based on the City's decision to promote Paul Berge (white) instead of Plaintiff to sergeant in March 2016. Plaintiff voluntarily dismissed that complaint on June 23, 2017.

Plaintiff filed a complaint with the EEOC, received a "right to sue" letter, and filed his complaint in this case within 90 days of receiving that letter.

4. *KPD's Testing and Promotional Procedures*

The KPD promotes officers to sergeant through a competitive examination process. Notice that testing will occur, and the candidates' subsequent scores, are publicly posted. The ranked results of such testing are colloquially called "the list." If a candidate is promoted off "the list," every other candidate moves up one spot. A list remains in effect until it is replaced by a new list. For the times relevant to this case, there is a 2011 list, issued November 14, 2011, a 2014 list, issued December 4, 2014, and a 2017 list, issued January 8, 2018.

State law requires the Police Chief to pick from among the top three candidates on the list when promoting an officer to sergeant. See 65 Ill. Comp. Stat. 5/10-2.1-15 (mandating that for police, "all examinations for promotion shall be competitive," and that "all promotions shall be made from the 3 having the highest ranking."). The Chief may only promote a person when there is an open position.

Between 2011 and the present day, the KPD promoted five patrolmen to sergeant, all of whom were among the top three on the relevant list, and of those five, two were African-American. Between 2011 and the present day, both times an African-American became one of the top three candidates, that African-American was the next person promoted to sergeant, "leapfrogging" ahead of higher-ranked non-African-American candidates. Plaintiff was never at any time one of the top three candidates,

5

was thus never eligible to be promoted to sergeant, and was in fact never promoted to sergeant.

Plaintiff testified in his deposition that no one in the KPD who took the sergeants' test between 2011 and the present day is more qualified than himself to be a sergeant (including the two other African-Americans who scored higher on the competitive exams and were promoted to sergeant).

Stanard & Associates[1] is an independent company that prepared and administered the written and oral exams for the KPD promotional process in 2011 and 2014. KPD Chief Regnier encouraged Stanard to cover certain topics (e.g., drug laws), but Stanard chose the questions and Regnier did not see the questions. Stanard "customized" its testing for KPD, which is a common practice in its industry, did so in a manner consistent with the governing union contract, and provided training to the individuals responsible for grading the oral exams that was designed to reduce subjectivity and bias. Stanard, after administering the written and oral exams, took those scores, along with scores from KPD regarding merit, education, seniority, and community service points, and created the ranked lists.

For the 2011 and 2014 Sergeant lists, 40% of a candidate's score was based on a written test of 100 multiple choice questions, and 30% of a candidate's score came from an oral exam. Each candidate's oral exam was graded by a panel of five, two KPD members and three members of other police departments. For the 2011 and 2014 lists,

---

[1] Often referred to in discovery as "Standard & Associates".

15% of a candidate's score came from "Merit Points," which were based on evaluations from every supervisor at KPD. For the 2011 and 2014 lists, the remaining 15% of a candidate's score came from education, community service, and seniority, worth 5% each. The KPD command staff encouraged study groups, but no member of the command staff taught any study group.

     5.  *Testing Results and Promotions from the 2011 Exam*

The top three candidates from the 2011 testing were Jeff Martin, Michael Lindgren, and Paul Berge, who were all white; Plaintiff ranked seven of seventeen candidates with a combined score of 70.49. Martin's top score was 80.92. Michael Sneed, who initially placed fifth, was the highest-ranked African-American candidate with a score of 73.37.

Plaintiff had the second-highest written score in 2011. His oral exam was lower than every candidate who ranked above him, including Sneed. Plaintiff received ten of a potential fifteen merit points on the 2011 exam. Martin (white), Sneed (African-American), and four other candidates received fifteen. (Even if Plaintiff had received fifteen points on the merit points section, he would not have made the top three). Plaintiff received two out of a potential five points for community service. Some white and some black officers received more points; other white and other black officers received fewer (e.g., Martin (white) received five, Sneed (black) received four, Schneider and Benoit (both white) received zero, and Johnson, (black) received zero). Jeff Martin, who earned the highest written score and highest overall score, was the first person

promoted off the 2011 list. Martin's promotion was the subject of Plaintiff's first unsuccessful IDHR petition. At some point between 2011 and 2014, Michael Lindgren, who placed second, died of cancer. After these departures, the top three candidates were Paul Berge (white), Scott Halper (white), and Michael Sneed (black). Chief Regnier passed over Berge and Halper (both white), and promoted Sneed (black), to sergeant.

6. *Testing Results and Promotions from the 2014 Exam*

The top three candidates on the 2014 list were Berge, Halper, and Jose Martinez (Hispanic); Plaintiff ranked ninth of sixteen candidates with a score of 71.5. Berge's top score was 85.25. The highest-ranked African-American candidate was Steven Hunter, who placed sixth with a combined score of 76.45. Plaintiff's written exam score declined from 77 in 2011 to 71 in 2014, and his oral exam score declined from 62.3 in 2011 to 57 in 2014. Of the fifteen police officers who completed all portions of the 2014 promotional test, ten were white, three were Hispanic, and two were African-American.

The scoring panel for the 2014 oral exam consisted of two KPD members, Passwater and Kidwell, and the three outsiders, Commander Allen Roechner of the Joliet Police Department (white), Chief Justin Meyer of the Minooka Police Department (white), and retired Chief Bill McHenry from the Cook County Sheriff's Department (black). Lory Newcomb of Stanard & Associates selected the three outside panelists herself, not because those names were requested by anyone from KPD. For the 2014 oral exam, one of the outside panelists was the Team Leader, and was responsible for

8

collecting the assessment materials and then turning them over to Lory Newcomb, and the materials did not leave her custody.

When rating Plaintiff's performance on the oral exam, Kidwell and Passwater never gave Plaintiff the lowest score he received. The lowest score Plaintiff received always came from an outside panelist. Score sheets for Plaintiff's 2014 oral exam show that no panelist ever gave Plaintiff a score on a specific question which differed by more than two points from another panelist's score on that same question.

Stanard required the five panelists to tell each other how they rated a candidate, and to discuss their ratings if one rating differed from another by more than two points. After discussing, the panelists may, but need not, adjust their scores. Plaintiff's scores in the subjective categories increased between 2011 and 2014. He received twelve of a possible fifteen merit points (up from ten in 2011) and five of a possible five community service points (up from two in 2011). Only five of the sixteen candidates received top potential merit scores of fifteen points in 2014. (Even if Plaintiff had been given a merit score of fifteen, he would not have placed in the top three). Berge, who earned the top overall score, and the top written score, was the first person promoted off the 2014 list. He was promoted in either January, February or March 2016.[2] At some point between the publication of the 2014 list and the publication of the 2017 list, Scott Halper left the KPD, so the top three candidates were Jose Martinez, Gary Tison, and Michael Coash. Later in

---

[2] Regnier testified Berge was promoted in 2016. In Plaintiff's IDHR Charge he wrote that he learned of Berge's promotion on March 25, 2016. The exact date Berge was promoted is not apparent in the record.

2016 after Regnier had retired, another sergeant position opened and Tison (white) was promoted, leaving the top three candidates Jose Martinez, Michael Coash, and Steven Hunter (black), and Plaintiff sixth.

Another round of testing occurred in 2017, which led to a new list that was issued on January 9, 2018. Plaintiff did not participate. The top three candidates on the 2017 list were Bradford Latham (white), Michael Coash (white), and Steven Hunter (black). Hunter, ranked third overall, was promoted at the next opening, ahead of the two non-African-American candidates above him. No one at KPD has been promoted to sergeant since Hunter.

7.   *Plaintiff's Disciplinary History and Comparably Disciplined White Officers*

a.   Pursuit Policy Violation

Plaintiff was served a Notice of Suspension on September 17, 2015, suspending him for three days. Plaintiff's suspension was upheld on appeal by the Mayor of Kankakee, then subsequently cut to one day in arbitration. Defendant's given reason for the suspension was that Plaintiff had violated KPD's policies regarding high-speed chases. Plaintiff testified in his deposition that the suspension was imposed in retaliation. The KPD policy prohibits officers from beginning such chases unless the occupants have committed a forcible felony, are trying to escape with a deadly weapon, or if a supervisor gives permission.

Plaintiff's pursuit, which he described after the incident as a "chase" and said "should not happen again," was never authorized by a supervisor. The incident

10

occurred at about 6:00 p.m. on Saturday, August 5, 2015, in downtown Kankakee.

Plaintiff accelerated his squad car to about 80 m.p.h. while chasing a speeding

motorcycle, maintained that speed for several seconds, and during the chase,

approached an intersection where the traffic light was red. After stopping and making

sure the intersection was clear, Plaintiff continued the chase through the red light.

Plaintiff had no reason to believe the motorcyclist was committing a "forcible felony"

that would have allowed Plaintiff to engage in a high-speed pursuit. Plaintiff's pursuit

was not prompted by anything other than the motorcyclist's speed.

Plaintiff states that the pursuit occurred because of confusing instructions.

Plaintiff had violated the KPD pursuit policy on October 24, 2014, and four days after

that earlier violation had discussed the pursuit policy with a superior officer. Plaintiff

and the superior officer reviewed and discussed the KPD pursuit policy and then

signed a document that stated Plaintiff and the superior officer were "up to date on" the

policy. From Plaintiff's deposition, it appears that although "they were up to date", they

both held different understandings of what that meant.

### b.  April 25, 2016, Reprimand

Plaintiff received a written Reprimand on April 25, 2016, from Regnier, based on

"disparaging remarks" Plaintiff made and finding Plaintiff in violation of three KPD

Policies and Procedures. The written Reprimand ordered him to "cease any further

public disparagement of the Kankakee Police Department or criticism of other public

officers, including the statement of inaccurate information, in public or private."

11

Regnier's stated reasons for issuing that Reprimand were that Plaintiff had commented in multiple public forums that KPD was operating under a "consent decree" based on the *Baptist* suit, and that Plaintiff made statements about a specific officer's drug use, an accident in which that officer was involved, and that officer's subsequent promotion. Regnier wrote, in the Reprimand, that Plaintiff's statements were "not true" and "damaging, to not only the Police Department, but your fellow officers and yourself."

The times and locations of statements that Regnier identified as problematic in the Reprimand are (1) April 12, 2016, statements at a Police and Fire Commission Meeting at the Public Safety Center; (2) February 19, 2016, comments in the Mayor's conference room at a discipline appeal hearing related to Plaintiff's discipline for violation of the KPD pursuit policy; and (3) 2014 statements at the EEOC in Chicago, during a hearing on an EEOC complaint.[3]

After identifying the times and places of Plaintiff's remarks, Regnier wrote, in the Reprimand, that:

> At the EEOC hearing you made reference numerous times about a Consent Decree the City was under from your law suit. No Consent Decree was ever entered. The only agreement coming from the law suit was an agreement to use a "Blue Ribbon Committee" for the purpose of providing advice on the next promotional process. The City did not lose the law suit and certainly no judgment was entered against the City. Your representations are factually false.

---

[3] Which EEOC complaint Plaintiff made statements about in Chicago in 2014 is not clear. The Reprimand refers to the statements being relevant to Plaintiff's own complaint, but elsewhere in the record it appears Plaintiff may have been testifying as a witness for another officer who made an EEOC complaint.

You also have made statements about a specific officer's drug use, his promotion and an accident in which he was involved. All of these incidents have been dealt with, and adjudicated by the Administration. The discipline administered by the Department to another officer is, quite frankly, none of your business or anyone else' [sic] for that matter, except for the officer involved. However, you may be assured that the matter was handled with proper discipline involved, contrary to your inappropriate public statements.

You have taken it upon yourself to profess these inaccurate facts and stories to which you have no factual basis except what you think or what someone else may have told you. The instances you have alleged took place a number of years ago and yet you make public statements as if the incidents have recently happened.

You make these inaccurate and false claims at times that are beneficial only to you and have no bearing on the reason for the hearing or public meeting you are attending. You also use ambush type tactics to make these claims as to ensure that your claims can not be rebutted. In essence you are waging a battle against your own peers and damaging the Police Department as a whole.

Regnier then wrote that Plaintiff was in gross violation of KPD Policy and

Procedures. Regnier specifically found Plaintiff had violated sections 340.3.2(f),

340.3.5(ac), and 340.3.5(af). Section 340.3.2(f) requires KPD employees to report any act

by him/herself or another that could result in criminal prosecution or discipline.

Section 340.3.5(ac) prohibits any off-duty conduct which any employee knows or

should reasonably know is unbecoming a member of the KPD, which is contrary to

good order, efficiency and morale, or which tends to reflect unfavorably on the

Department or its officers. Section 340.3.5(af) prohibits giving false or misleading

statements or misrepresenting or omitting material information to a supervisor, or any

other person in a position of authority, in connection with any investigation or any

reporting of department-related business. Regnier ordered Plaintiff to stop "further

public disparagement of the Kankakee Police Department or criticism of other police officers," and concluded the Reprimand thus:

> This order is hereby issued to you and any future violation of this policy will be grounds for your discipline up to and including termination of your appointment with the Kankakee Police Department.

Regnier testified in his deposition that he issued the Reprimand because Plaintiff "…just had made it sound like he [Berge, the white officer found to have been using illegal steroids] was a heroin addict or something like that. He was just saying just [sic] drug use. The way he said it was that it inferred [sic] that he was using, you know, like heroin or cocaine or something like that, not steroids."

Robin Passwater, a lieutenant with the KPD who attended the Police and Fire Commission meeting referenced in the Reprimand on behalf of Regnier, testified:

> There was [sic] things said in that meeting in the public comment section that were issues that had already been dealt with, whether it was discipline or promotional testing that had already been dealt with and that had already been passed, and those issues were brought up *in my opinion* to the Police and Fire Commission as if they were still ongoing and that we weren't following the rules on some of this other thing. (emphasis added).

### c. Discipline of Other Officers

Michael Shreffler (white) was suspended for one day in March, 2015, for violating KPD's pursuit policy on February 21, 2015. Shreffler's pursuit occurred at about 3:00 a.m. Shreffler's pursuit was initially permitted by KPD policy because it was authorized by a supervisor, but Shreffler violated policy by not terminating the pursuit when ordered.

Regnier issued Patrolman Michael Shreffler (white) a written Reprimand for public comments that "adversely affect the public perception" of KPD, based on Shreffler's Facebook postings regarding the 2016 Super Bowl halftime show. Shreffler's Reprimand contained the same "further violations will trigger progressive discipline up to and including termination" language that the letter to Plaintiff contained.

During his tenure as Chief, Regnier terminated two officers: Jeff Sais (white) for theft, a crime for which Sais was later convicted, and B.J. Moore (black) for abandoning his job.

The only KPD officer to receive a 30-day suspension, the most severe discipline possible short of termination, during Regnier's tenure was Berge (white), who received two such suspensions. Berge's first 30-day suspension was imposed for using illegal drugs, specifically steroids, in 2012 or 2013. Berge's illegal drug use became known before the 2014 list issued; Berge was suspended in 2012 or 2013. Because of his drug use, Berge was also subjected to 18 months of random drug testing (he passed, although he was promoted to sergeant in 2016 before the 18 months was complete), referred for treatment, and passed over for promotion in favor of Sneed (black) despite being ranked higher than Sneed on the 2011 list.

Berge was given a second 30-day suspension in 2016 based on an incident which had occurred in April 2012. Berge left a tavern, got into his police vehicle, struck a building, and then drove home and misreported the incident as a hit-and-run by an unknown driver. KPD command staff did not know Berge's initial report was false at

the time Berge made the report, only learning about the incident in 2016 when Plaintiff brought up the matter at his pursuit-policy-violation appeal hearing with the Mayor.

KPD command staff informed the Internal Affairs officer about the false report in February 2016, who then assisted command staff with investigating. The investigation discovered "a lot of people" in the department knew about the false report, but no one ever approached the command staff about the report being false. Berge was disciplined, but not fired or prosecuted, for misreporting as a "hit and run" his having crashed a police vehicle while leaving a tavern. He was not fired because the thirty-day suspension he was given was one of the highest forms of discipline an officer can receive short of being fired. Berge signed a "Last Chance Agreement" that provided that further violations of KPD policy would be grounds for immediate termination.[4]

C.  Use of Racial Slurs

Plaintiff never heard Regnier, Kidwell, or Passwater use racial slurs. No one else has told Plaintiff that they overheard Regnier, Kidwell, or Passwater use racial slurs.

D.  Procedural History

Plaintiff Richard Brooks filed his Complaint (#1) against Defendant City of Kankakee, Illinois, on November 14, 2017, pursuant to 42 U.S.C. § 2000e, alleging

---

[4] The Last Chance Agreement has a handwritten date of April 6, 2015, by the signatures, but this is clearly a scrivener's error and the actual date of signature is April 6, 2016. The Agreement sets Berge's suspension from April 1 to April 30, 2016, and it refers to Berge as a sergeant, which he was in 2016 but not in 2015.

Defendant violated his rights under Title VII of the Civil Rights Act of 1964 by retaliating against him for engaging in protected activity.

In his Complaint, Plaintiff alleges that after his participation in the *Baptist* litigation Defendant "undertook a variety of retaliatory acts" including repeatedly refusing to promote him to sergeant. Plaintiff specifically points to Defendant passing him over for promotion to sergeant on March 25, 2016. Plaintiff also alleges that "Some of these retaliatory acts are set out in an April 25, 2016," Reprimand.

In his Response to Motion for Summary Judgment (#19), Plaintiff writes that he "in this case challenges the oral interview" section of the 2014 promotional exam, and further argues that the April 25, 2016, Reprimand was issued as retaliation for engaging in protected activity. Thus, Plaintiff's Response narrows his claim for retaliation to these two matters.[5]

Plaintiff makes no argument to further pursue any other instances of retaliation that could be encompassed by the Complaint (the 2015 pursuit policy Reprimand, for example). He has thus abandoned and waived his claim insofar as it rests on those other events. See *Lacy v. Progressive Ins. Co.*, 2016 WL 25717, at *2 (N.D. Ill. Jan. 4, 2016) (citing *Alioto v. Town of Lisbon*, 651 F.3d 715, 721 (7th Cir. 2011) ("Longstanding under our caselaw is the rule that a person waives an argument by failing to make it before the district court. We apply that rule where a party fails to develop arguments related to a

---

[5] Plaintiff does attempt, in his Response, to bring forth a never-before-presented claim related to the 2014 promotional exam. More on that below.

discrete issue, and we also apply that rule where a litigant effectively abandons the litigation by not responding to alleged deficiencies …") (citations omitted)); *Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466-67 (7th Cir. 2010) ("Failure to respond to an argument – as the Bontes have done here – results in waiver…. This leaves us no choice but to accept U.S. Bank's assertions – supported as they are by pertinent legal authority – that the allegations in the Bontes' Complaint do not entitle them to relief.").

## II. ANALYSIS

### A. Summary Judgment Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). In ruling on a motion for summary judgment, a district court "has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). In making this determination, the court must construe the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in favor of that party. See *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Singer v. Raemisch*, 593 F.3d 529, 533 (7th Cir. 2010). However, a court's favor toward the nonmoving party does not extend to drawing inferences which are only supported by speculation or conjecture. See *Singer*, 593 F.3d at 533. In addition, this court "need not accept as true a plaintiff's *characterization* of the facts or a plaintiff's legal conclusion." *Nuzzi v. St. George*

*Cmty. Consol. Sch. Dist. No. 258*, 688 F. Supp. 2d 815, 835 (C.D. Ill. 2010) (emphasis in original).

Summary judgment is the "put up or shut up" moment in a lawsuit, when a party must show what evidence it has that would convince a factfinder to accept its version of events. *Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 901 (7th Cir. 2003). Therefore, to successfully oppose a motion for summary judgment, a plaintiff must do more than raise a metaphysical doubt as to the material facts. *Michael v. St. Joseph Cty.*, 259 F.3d 842, 845 (7th Cir. 2001). Instead, it must present definite, competent evidence to rebut the motion. *Id.* Where the plaintiff has the ultimate burden of proof at trial, the defendant may succeed on a motion for summary judgment simply by indicating the absence of evidence to support the plaintiff's claim. *Celotex Corp.*, 477 U.S. at 322.

B.  <u>Defendant's Motion for Summary Judgment</u>

Plaintiff's Complaint alleges Defendant retaliated against him for engaging in protected activities. Title VII prohibits an employer from retaliating against an employee "because he has opposed any practice made an unlawful employment practice by this subchapter" or "because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing" challenging racial discrimination. 42 U.S.C. § 2000e-3(a); see also *Lord v. High Voltage Software, Inc.*, 839 F.3d 556, 563 (7th Cir. 2016).

> Over the years, courts in this Circuit have discussed two methods through which a claimant may prove a *prima facie* retaliation claim: the "direct" method and the "indirect" method. The direct method requires the plaintiff to simply present

evidence satisfying the elements of the retaliation claim: (1) he engaged in a protected activity, (2) he suffered an adverse action, and (3) a causal connection exists between the activity and the adverse action. *Sitar v. Ind. Dep't. of Transp.*, 344 F.3d 720, 728 (7th Cir. 2003).

The indirect method, by contrast, refers to the burden-shifting framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). That method allows the plaintiff to establish a *prima facie* case without proving a direct causal link by showing that (1) he engaged in a protected activity, (2) he performed his job duties according to his employer's legitimate expectations, (3) he suffered an adverse action, and (4) he was treated less favorably than similarly situated employees who did not engage in protected activity. *Sitar*, 344 F.3d at 728. If the plaintiff can establish his *prima facie* case with this indirect method, the burden then shifts to the employer to provide a legitimate, non-discriminatory reason for the adverse action. *Adusumilli v. City of Chicago*, 164 F.3d 353, 362 (7th Cir. 1998). If the employer does so, the burden shifts back to the employee to prove that the employer's stated reason is mere pretext. *Sitar*, 344 F.3d at 728.

In *Ortiz v. Werner Enterprises*, 834 F.3d 760, 763 (7th Cir. 2016), we cautioned that these two methods are "just means to consider whether one fact ... caused another ... and therefore are not 'elements' of any claim." We warned district courts not to split evidence into categories of "direct evidence" and "indirect evidence," but to instead evaluate the evidence as a whole to determine if it "would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action." *Id.* at 764–65.[]

We did not reject or alter the *McDonnell Douglas* burden-shifting framework in *Ortiz*; we simply clarified that there are not separate classifications of evidence to be evaluated under different standards, and we eliminated unhelpful surplus tests. *Id.* at 766; *see also Ferrill v. Oak Creek-Franklin Joint Sch. Dist.*, 860 F.3d 494, 499 (7th Cir. 2017) ("Nothing in *Ortiz* ... displaced the burden-shifting analysis established in *McDonnell Douglas*."). In the wake of *Ortiz*, "[t]he *McDonnell Douglas* framework is just 'a formal way of analyzing a discrimination case when a certain kind of circumstantial evidence—evidence that similarly situated employees not in the plaintiff's protected class were treated better—would permit a jury to infer discriminatory intent." *Ferrill*, 860 F.3d at 499–500.

*Lewis v. Wilkie*, 909 F.3d 858, 866–67 (7th Cir. 2018).

Although *Ortiz* was an employment discrimination case, not a retaliation case, the Seventh Circuit has applied *Ortiz*'s holding in both kinds of cases. *Id.* at 667 n.2. "Title VII retaliation claims must be proved according to traditional principles of but-for causation …" *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013).

  1. *Retaliation by Failure to Promote*

Plaintiff alleges that Defendant retaliated against him for engaging in protected activities by passing him over for promotion.[6] Plaintiff does not point the court to any evidence that raises an inference of retaliation under the "direct" method. Plaintiff also makes no argument under that theory. Thus, the court will evaluate his retaliation by failure to promote claim under the *McDonnell Douglas* burden-shifting framework.

Regarding the first element, the court finds, and Defendant does not dispute, that Plaintiff has engaged in protected activities. Plaintiff's role as a plaintiff in the *Baptist* civil rights litigation against Defendant is a protected activity. See 42 U.S.C. § 2000e-3(a). Plaintiff's multiple subsequent IDHR complaints and EEOC charges are also protected activities. See *id.*; see also *Malin v. Hospira, Inc.*, 762 F.3d 552, 558 (7th Cir. 2014).

Regarding the third element, the court finds, and Defendant does not dispute, that being passed over for promotion is an adverse employment action. *Malin*, 762 F.3d

---

[6] Defendant treats Plaintiff's claim of retaliation by failure to promote as a claim of racial discrimination by failure to promote. Because the "meeting legitimate expectations" and "similarly situated" analyses are the same for either claim, the court's ruling would be the same either way. However, the court reiterates, Plaintiff has plead only retaliation claims. He has made no direct discrimination claims in this suit. He has not plead a discrimination claim, but, rather, solely a retaliation claim.

at 558 ("…failing to promote an employee is an adverse employment action that can give rise to liability under Title VII.").

Regarding the second element (whether Plaintiff performed his job duties according to his employer's expectations) and the fourth element (whether he was treated less favorably than similarly situated employees who did not engage in protected behavior), the court finds that because Plaintiff was never eligible for promotion, Plaintiff's claim of retaliation by failure to promote must fail as a matter of law. Also, Plaintiff does not respond to Defendant's arguments on his retaliation by failure to promote claim and has thus waived this claim. See *Lacy*, 2016 WL 25717, at *2; *Alioto*, 651 F.3d at 721; *Bonte*, 624 F.3d at 466-67.

Regarding the second element, the KPD expects all potential sergeants to place in the top three on the competitive examination process. While a police chief may pick anyone in the top three, he or she must pick one of the top three, and KPD can only promote someone to sergeant when there is an opening.

This promotion process is not a matter of judgment, rather it is the law in Illinois. See *Sundstrom v. Arlington Heights*, 826 F. Supp. 1143, 1148 (N.D. Ill. 1993) (recognizing that Illinois law limits promotion to sergeant to the top three). Competitive testing for promotion to sergeant at KPD is publicly announced, and the ranked results are publicly posted. The three rounds of testing relevant to this case resulted in a 2011 list, a 2014 list, and a 2017 list.

As described previously, the largest percentage of a candidate's score comes from a written exam which consists of 100 multiple-choice questions and accounts for 40% of a candidate's score. An oral examination accounts for 30%. Merit points make up 15%, and are based on scores assigned by every supervisor in KPD to each candidate (in other words, "merit" accounts for the views of all supervisors, so no one person controls the ranking). Community service, education, and seniority each account for 5%. The firm of Stanard & Associates creates the questions, administers the written and oral tests, selects the outsider police supervisors who make up a majority of the oral exam's grading panel, and then collects all scores and publishes the list, which stays in place until a new list is issued, and whenever one candidate either leaves the KPD or is promoted, everyone else moves up one spot.

All five of the people promoted to sergeant from 2011 forward were ranked in the top three. Indeed, two of them were ranked first at the time of promotion: Jeff Martin in 2013 and Paul Berge in 2016, and Gary Tison, promoted in 2016 or 2017, ranked second.

Plaintiff never scored within the top three, and thus was never even eligible to be promoted. As a result, there is no need to further parse how he compared to other candidates. Plaintiff initially ranked seventh of seventeen candidates on the 2011 list, and the highest he ever ranked on that list was fourth.

Plaintiff's performance got worse in the 2014 round of testing. While his subjective "merit" and "community service" scores increased, his written and oral

scores materially declined, so he initially ranked ninth of sixteen candidates on the 2014 list. The highest he ever ranked on that list was sixth.

He chose not to take the test for the 2017 list, making him flatly ineligible for promotion after that list was issued.

Because Plaintiff was never eligible for promotion, he was not meeting his employer's legitimate expectations *for promotion*.

Regarding the fourth element, Plaintiff would need to show that a similarly situated employee, who did not engage in protected activity, was treated better. "Similarly situated" means someone who is "directly comparable in all material respects." *Bio v. Fed. Express Corp.*, 424 F.3d 593, 597 (7th Cir. 2005). Courts consider "all relevant factors" in making this judgment, including whether the employee (1) held the same job description; (2) was subject to the same standards; (3) was subordinate to the same supervisor; and (4) had comparable experience, education, and other qualifications. *Id.*

The last factor is determinative. Plaintiff does not have similar "qualifications" to the five people (three white and two black) who were promoted to sergeant between 2011 and today. They were all ranked in the top three; he never was. As with the "legitimate expectations" element, there is no need for further analysis. That exercise could be useful if Plaintiff had consistently earned one of the top three spots and consistently been passed over, but that is not what happened here.

The "similar qualifications" element demands more than resume-reading; it accounts for an employee's scores on competitive promotional testing. In *Abuelyaman v. Ill. State Univ.*, 667 F.3d 800 (7th Cir. 2011) the Seventh Circuit considered a discrimination claim by an associate professor who, after years of poor reviews in the university's complex evaluation process, was not re-hired. *Id.* at 804-806. The Seventh Circuit affirmed the district court's grant of summary judgment for the defendant because the plaintiff could not show "that he was treated differently from those professors outside his protected class who were similarly situated to him with respect to performance." *Abuelyaman*, 667 F.3d at 811. The "performance" at issue was the university's evaluation process. *Id.*

Plaintiff's deposition testimony that *no one* who took the sergeants' exam from 2011 to the present day is more qualified than himself to be a sergeant is immaterial and irrelevant. Subjective, "uncorroborated personal opinions" about one's own performance compared to one's peers "are not sufficient" to dodge summary judgment. *Davis v. Harris*, 2006 WL 3321630, at *3 (C.D. Ill. Nov. 14, 2006) (citing *Oest v. Illinois Dep't of Corr.*, 240 F.3d 605, 615 (7th Cir. 2001), *overruled on other grounds by Ortiz*, 834 F.3d 760).

Plaintiff cannot make out a prima facie case for retaliation by failure to promote. He has failed to show any issue of material fact exists that could convince a reasonable factfinder that he was meeting his employer's legitimate expectations for promotion, or

25

that he was similarly situated to those who were promoted. Summary judgment is granted for Defendant on Plaintiff's claim of retaliation by failure to promote.

Further, under *Ortiz*'s direction that the court cut through the unnecessary "rats nest" of tests and simply determine "…whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action," the court rules that, even taking all the evidence in the light most favorable to Plaintiff, because Plaintiff was never eligible for promotion, no reasonable factfinder could conclude that he was passed over for promotion in retaliation for engaging in protected activities. See *Ortiz*, 834 F.3d at 765.

### 2. *Plaintiff's New Disparate Impact Claim*

For the first time in this litigation, in his Response to Plaintiff's Motion for Summary Judgment (#19), Plaintiff argues a new-to-this-case claim: that the oral portion of the 2014 promotional exam had a disparate impact on African-American test-takers.

Disparate impact claims involve employment practices that are facially neutral in their treatment of different groups, but that in fact fall more harshly on one group than another and cannot be justified by business necessity. Unlike in a disparate treatment case, disparate impact cases do not require evidence of the employer's subjective intent to discriminate (or, as in the case at bar, retaliate for engaging in protected activity). See *Raytheon Co. v. Hernandez*, 540 U.S. 44, 52-53 (2003); *Griggs v. Duke Power Co.*, 401 U.S.

424, 432 (1971). Claims of discrimination based on disparate treatment are not the same as claims of discrimination based on disparate impact. *Raytheon Co.*, 540 U.S. at 52. They are considered to be two separate, legally distinct claims. *Puffer v. Allstate Ins. Co.*, 675 F.3d 709, 719 (7th Cir. 2012).

To make a disparate impact claim, a plaintiff must plead that a specific, facially neutral employment practice caused a significantly disproportionate adverse impact based on a protected factor. *Bew v. City of Chi.*, 252 F.3d 891, 894 (7th Cir. 2001).

Plaintiff made no disparate impact claim in his Complaint (#1). The Complaint alleges solely retaliation. There is no allegation of a facially neutral practice by Defendant. There is no allegation that African-Americans fared poorer because of that practice, notwithstanding its facial neutrality.

There has been nothing in the filings to even hint that Plaintiff was harboring a disparate impact claim, until his Response to the summary judgment motion. There has been nothing to put Defendant on notice that Plaintiff was making a separate disparate impact claim, particularly when Plaintiff did not plead such a claim in his Complaint.

Thus, Plaintiff is attempting to amend the Complaint via his summary judgment response to add an entirely new cause of action against Defendant. A plaintiff may not amend his complaint through arguments in his brief in opposition to a motion for summary judgment. *Shanahan v. City of Chi.*, 82 F.3d 776, 781 (7th Cir. 1996); see also *Davis*, 2006 WL 3321630, at *2 (C.D. Ill. Nov. 14, 2006) (citing *Speer v. Rand McNally &*

*Co.*, 123 F.3d 658, 665 (7th Cir. 1997) ("[the plaintiff] cannot now attempt to use the Response to amend his claims to add this additional claim.")).

Plaintiff is not simply pursuing a new legal theory based on existing allegations. Rather, Plaintiff has attempted to add a new substantive claim of legal liability in his response to the summary judgment motion, which is improper. See *Whitaker v. Milwaukee Cty., Wisc.*, 772 F.3d 802, 809 (7th Cir. 2014). Plaintiff is not a *pro se* litigant, for whom the court construes pleadings liberally. Rather, Plaintiff is, and has been throughout this litigation, represented by competent counsel. If Plaintiff intended to advance a claim of disparate impact, it should have been clearly plead in his Complaint, to put Defendant and the court on notice of his claim. Therefore, the court will not consider this claim.

### 3. *Retaliation via April 25, 2016, Reprimand*

Plaintiff received a written Reprimand from Chief Regnier on April 25, 2016. In the Reprimand, Regnier cited Plaintiff's statements at a Police and Fire Commission meeting in 2016, Plaintiff's statements in the Mayor's office made during an appeal hearing for a Reprimand he received for violating the KPD pursuit policy, and Plaintiff's statements to the EEOC in Chicago in 2014.

Defendant argues that Plaintiff's statements were false, that judgment should be entered as a matter of law because Defendant was simply enforcing KPD policy in issuing the Reprimand, and that white officers were similarly disciplined for similar

conduct. Plaintiff counters that the Reprimand was issued in retaliation for protected activity.

As stated above, to prevail on a Title VII retaliation claim, the plaintiff must simply prove that (1) he engaged in an activity protected by the statute; (2) he suffered an adverse employment action; and (3) there is a causal link between the protected activity and the adverse action. *Lewis*, 909 F.3d at 866. *Ortiz* dispensed with the practice of sorting evidence into "direct" and "indirect" piles. *Ortiz*, 834 F.3d at 766. While the *McDonnel Douglas* burden-shifting framework is consistent with *Ortiz*, and is useful in analyzing cases where there is insufficient evidence standing on its own to raise an inference of causation, where there is enough "direct method" causation evidence the court need not engage in the burden-shifting analysis. The issue is whether a reasonable factfinder could conclude that the plaintiff's protected status or activities caused the adverse employment action. See *Ortiz*, 834 F.3d at 765.

Regarding the first element, and taking all the evidence in the light most favorable to Plaintiff, a genuine issue of material fact exists as to whether Plaintiff's statements were "activity protected by the statute."

Plaintiff's 2014 testimony at the EEOC appears to be, by definition, activity protected by Title VII. He was in the process of having "made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a).

Plaintiff's statements to the Police and Fire Commission also appear to be within the realm of "oppos[ing] any practice made an unlawful employment practice by this subchapter." *Id.*

Defendant argues that the Reprimand was not issued "for [Plaintiff's] complaints about discrimination, but [Plaintiff's] false statements in doing so." Defendant's conclusion that Plaintiff's statements were false is in dispute, and ultimately prevents entry of summary judgment for Defendant here.

Plaintiff's comments at the EEOC and Police and Fire Commission about a "Consent Decree" seemed to particularly rankle Regnier. An excerpt from Regnier's deposition touches on some comments Plaintiff made at that meeting:

> Q. And what was disparaging about his reference to a consent decree?
> A. That the promotional process was biased.
> Q. And did he -- did he say at the Police and Fire Commission meeting that the promotional process was biased?
> A. Pardon me, say that again?
> Q. Is that something he said at the Police and Fire Commission meeting, that the promotional process was biased?
> A. Yes, unfair.
> Q. And we're talking about the promotional process in the police department in the City of Kankakee; is that right?
> A. Yes.
> Q. And by biased, did you mean that he said it was discriminatory against African-American officers?
> A. Yes.

In the Reprimand, Regnier wrote that "The City did not lose the law suit and certainly no judgement [sic] was entered against the City." Regnier wrote that Plaintiff's representations in making these comments were "factually false." Although there was

not a "Consent Decree," there was an "Agreed Judgment Order," which was a
settlement instrument filed in the publicly accessible record in *Baptist*. That Order
included detailed terms about testing and promotion procedures that KPD promised to
implement. The Order settled a claim that KPD promotional practices had a disparate
impact on African-Americans. The court rules that a reasonable factfinder could
conclude that Plaintiff's comments about a "Consent Decree" were not "factually false"
and were protected activity.

The other comments Regnier specifically targeted in the Reprimand were
Plaintiff's statements about Paul Berge's illegal drug use, Berge's false report about
what happened when Berge crashed a police vehicle while leaving a tavern, and Berge's
subsequent promotion to sergeant. Not lost on the court is the fact that Berge is white,
and Plaintiff filed an EEOC complaint alleging that Berge was promoted to sergeant
because of his race. The exact content of each statement Plaintiff made in complaining
about Berge is not in the record, but it would be a reasonable inference that Plaintiff was
opposing what he believed was preferential treatment of Berge due to Berge's race.

There is no doubt in the court's mind that these comments made the KPD "look
bad," and that Regnier disliked the comments. However, Plaintiff was complaining
about awful behavior by Berge, and it is *that officer's behavior*, plus the KPD's decision to
keep him on the force and promote him to sergeant, that made the KPD look bad.

Defendant argues that Plaintiff's comments about Berge's illegal drug use were
misleading, "implying that the other officer in question was using cocaine or heroin,"

31

but there is no indication Plaintiff ever said anything about the specific substance Berge was using, other than that it was "drugs" or "illegal drugs," both of which, in fact, accurately describe the illegal steroids that Berge was using.

Plaintiff made statements about the severity, or lack of severity, of Berge's punishment for the illegal drug use. Defendant argues that Plaintiff knew about the discipline Berge had received, and provides a link to a February 5, 2014, news article bearing the headline "Drug enforcement cop suspended for illegal steroids" as proof that Plaintiff knew Berge was suspended.[7] Nevertheless, Plaintiff testified in his deposition that he did *not* know that Berge had received any discipline at all. He testified that officers were able to exchange vacation time to satisfy suspensions, and that if Berge served a suspension Plaintiff was not aware of it. The fact that a news article about Berge's suspension was published online does not conclusively refute Plaintiff's testimony.

Plaintiff also commented on the severity, or lack of severity, of Berge's punishment for making a false report after crashing a police vehicle. From the record it appears the KPD only seriously investigated, and disciplined Berge, for the false report sometime in 2016 *after* Plaintiff commented on the issue at the February 2016 appeal

---

[7] The article may be found at: https://www.daily-journal.com/news/local/drug-enforcement-cop-suspended-for-illegal-steroids/article_724f16aa-69bf-565a-98c9-7b21df268290.html (last visited April 12, 2019).

hearing in the Mayor's office.[8] Thus, Plaintiff's discussion of the issue at that meeting, and at the Police and Fire Commission Meeting a few months later, were comments a reasonable juror could find were about what Plaintiff reasonably believed was ongoing, current, preferential treatment of Berge.

Whether Plaintiff was intentionally lying about the extent of Berge's punishment to make the police department look bad or was making an honest public appeal in opposition to preferential treatment on the basis of race is a disputed material fact.

Regarding the second element, the court finds that Plaintiff suffered an adverse employment action when Regnier issued him the written Reprimand. A materially adverse action need not be one that affects the terms and conditions of employment, but it must be one that a reasonable employee would find to be materially adverse such that the employee would be dissuaded from engaging in the protected activity. *Lewis*, 909 F.3d at 867.

Chief Regnier deemed Plaintiff's activity as being "false public statements" that were violations of KPD policy. He stated that "this continuing conduct" caused him to issue the Reprimand. Chief Regnier concluded the Reprimand by writing that "any future violation of this policy will be grounds for your discipline up to and including termination of your employment with the Kankakee Police Department." A reasonable

---

[8] From Regnier's deposition: "It was not until I believe it was after [the appeal hearing in the Mayor's office] that we began to look because no one ever came forward to tell us even though it is now several years later." Those comments, too, by Plaintiff, *which actually lead to the discovery of Berge's false report*, are cited in the Reprimand as a basis for the discipline.

employee, having been informed in writing that he would face discipline "up to and including termination" if he continued making statements to the EEOC and to the Police and Fire Commission in opposition to perceived racial discrimination, would be dissuaded from continuing to make such protected statements. The Reprimand was thus "materially adverse." See *id.*

Regarding the third element, the court finds there was a clear, direct causal link between Plaintiff's activity and the adverse employment action. The written Reprimand specifically identifies the three activities that a reasonable factfinder could determine were protected activities. The adverse action – the Reprimand - by its own text, establishes the causal link.

Taking all the evidence in the light most favorable to Plaintiff, and drawing all reasonable inferences in his favor, the court finds that a reasonable factfinder could determine that Defendant retaliated against Plaintiff for engaging in protected activity when Chief Regnier issued the April 25, 2016, Reprimand. Thus, Defendant's Motion for Summary Judgment is DENIED as to Plaintiff's claim that the April 25, 2016, Reprimand was in retaliation for engaging in protected activity.

IT IS THEREFORE ORDERED THAT:

1.  Defendants' Motion for Summary Judgment (#16) is GRANTED in part and DENIED in part. Judgment is entered in favor of Defendant and against Plaintiff regarding Plaintiff's claim of retaliation by failure to promote.

34

Defendant's motion is DENIED regarding Plaintiff's claim of retaliation by

Reprimand.

2. This case remains scheduled for a final pretrial hearing on Monday, April 15,

2019, at 11:30 a.m. in Courtroom A in Urbana, and for a jury trial to

commence on Tuesday, April 30, 2019, at 9:00 a.m. in Courtroom A in Urbana.

ENTERED this 12th day of April, 2019.

s/ Colin Stirling Bruce
COLIN S. BRUCE
U.S. DISTRICT JUDGE