E-FILED
Tuesday, 28 May, 2019  08:14:43 AM
Clerk, U.S. District Court, ILCD

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

RICHARD BROOKS,

                              Docket No. 17-2265

          Plaintiff,

     vs.                      Urbana, Illinois
                              April 30, 2019
                              9:07 a.m.
CITY OF KANKAKEE, ILLINOIS,

          Defendant.


                  JURY TRIAL (Day 1 of 2)

          BEFORE THE HONORABLE COLIN S. BRUCE
             UNITED STATES DISTRICT JUDGE


A P P E A R A N C E S :

For the Plaintiff:    KENNETH N. FLAXMAN, ESQUIRE
                      Kenneth N. Flaxman, P.C.
                      200 South Michigan Avenue, Suite 201
                      Chicago, Illinois 60604
                      312-427-3200

For the Defendant:    G. DAVID MATHUES, ESQUIRE
                      CHARLES E. HERVAS, ESQUIRE
                      Hervas, Condon & Bersani, P.C.
                      333 Pierce Road, Suite 195
                      Itasca, Illinois 60143-3156
                      630-773-4774




Court Reporter:       LISA KNIGHT COSIMINI, RMR-CRR
                      U.S. District Court
                      201 South Vine, Suite 344
                      Urbana, Illinois 61802

Proceedings recorded by mechanical stenography; transcript
produced by computer.

I N D E X

Page

PRELIMINARY MATTERS ............................   3
     Voir Dire Procedures, Statement of the Case,
     Witnesses, Rule 615 Motion


PRELIMINARY INSTRUCTIONS
     By Judge Bruce ............................   11


OPENING STATEMENTS
     By Mr. Flaxman ............................   22
     By Mr. Mathues ............................   27


EVIDENCE ON BEHALF OF THE PLAINTIFF:

     LARRY REGNIER
     Direct Examination by Mr. Flaxman ............   36

     RICHARD BROOKS
     Direct Examination by Mr. Flaxman ............   84
     Cross-Examination by Mr. Mathues  ............ 103
     Redirect Examination by Mr. Flaxman .......... 139


DEFENDANT'S RULE 50 MOTION ...................... 152


EVIDENCE ON BEHALF OF THE DEFENDANT:

     LARRY REGNIER
     Direct Examination by Mr. Mathues ............ 154

```
 1                  (In open court, 9:07 a.m.)
 2          COURTROOM DEPUTY:  This is in Case Number
 3   17-2265, Richard Brooks versus the City of Kankakee,
 4   Illinois.
 5          THE COURT:  All right.  On behalf of Plaintiff,
 6   we have Ken Flaxman.  Plaintiff Richard Brooks is also
 7   present here in the courtroom.
 8          On behalf of the defendant, City of Kankakee,
 9   we have Mr. Mathues and Mr. Hervas both here.
10          Mr. Condon's not going to appear; correct?
11          MR. MATHUES:  That's correct, Your Honor.
12          THE COURT:  Housekeeping matters.  All right,
13   I'll give you my same cautionary instruction concerning
14   follow-up to any voir dire questions I ask.  Make sure
15   it's a true follow-up.  Based upon the nature of this
16   case and the information you're going to have in the jury
17   books, I don't anticipate -- plus, the standard questions
18   that I ask -- I don't anticipate any need for any
19   follow-up questions, but you never know.
20          As far as the defendant's proposed voir dire
21   questions, you proposed a question regarding military
22   service.  I will ask that question.  I've now
23   incorporated it into the Court's voir dire.
24          You had another three proposed questions for
25   the venire.  I will not ask those.  They use the term
```

1  "discipline."  They use the term "discrimination."  I

2  thought about it quite a while.  Those questions focus on

3  an extremely narrow area of inquiry.  This is not a

4  question of appropriate discipline, and it's not a

5  question of discrimination.  The issue here before us is

6  one of retaliation.  So exercising my discretion, I

7  believe those other three proposed questions are a subtle

8  form of indoctrination.  Perhaps more importantly, they

9  have a significant potential to confuse the jury pool as

10  to the issues in the case right at the outset.  So I'm

11  not going to ask those other three proposed questions,

12  but I will ask the question concerning military service.

13          Consistent with what we talked about at the

14  final pretrial conference, I made a simple revised

15  statement of the case.  It simply reads as follows:

16  "This is a civil action.  Plaintiff Brooks alleges that

17  Defendant City of Kankakee retaliated against him for

18  protected speech activities.  Defendant City of Kankakee

19  denies retaliating against Plaintiff Brooks."  I kept it

20  as simple and straightforward and neutral as possible as

21  I said I would do at the final pretrial conference.

22          Mr. Flaxman, do you have any objection to that

23  statement of the case?

24          MR. FLAXMAN:  I'm not sure if we have an

25  instruction defining "protected speech."

```
 1              THE COURT:  Oh, that's going to be later.  This
 2    is just what I tell the venire when they walk in, --
 3              MR. FLAXMAN:  All right.
 4              THE COURT:  -- just the broadest overview
 5    possible.  So any objection?
 6              MR. FLAXMAN:  No, Your Honor.
 7              THE COURT:  Mr. Mathues, any objection?
 8              MR. MATHUES:  No, Your Honor.
 9              THE COURT:  Okay.  I still have this trial
10    marked down for two or three days.
11              Witness list.  Let me know if -- I'll tell you
12    what.  I'm going to read off who I've got; and if there's
13    somebody I should add or somebody I should take off, let
14    me know when I'm done.
15              I have Plaintiff Richard Brooks.
16              Larry Regnier.  I hope I'm not pronouncing his
17    name too incorrectly.
18              Chris Kidwell, Robin Passwater, Lory Newcomb,
19    Dawn Landwehr, Willie Davis, Nickey Yates.
20              Mr. Flaxman, anybody else I need to add or take
21    off?
22              MR. FLAXMAN:  I think you need to take off, but
23    the defense will speak to that.
24              THE COURT:  Mr. Mathues.
25              MR. MATHUES:  Yes, Your Honor.  The last four
```

BROOKS v. CITY OF KANKAKEE, 17-2265 -- Jury Trial (4/30/19)

```
1   individuals, Lory Newcomb and then the last names that
2   you read, none of them will be appearing.
3           THE COURT:  All right.  So I can take off
4   Lory Newcomb, correct?
5           MR. MATHUES:  Yes, Your Honor.
6           THE COURT:  And then you said the last three:
7   Dawn Landwehr, Willie Davis, and Nickey Yates?
8           MR. MATHUES:  Yes, Your Honor.
9           THE COURT:  I can take all three of those
10  people off?
11          MR. MATHUES:  That's correct.
12          THE COURT:  I'm only asking this because I'm
13  going to ask the jury if they know any -- after I read
14  the witnesses off, I'll ask if they know any of them; and
15  it sounds like -- so now we're down to Mr. Brooks,
16  Mr. Regnier, Mr. Kidwell, and Mr. Passwater as the only
17  four witnesses; is that correct?
18          MR. FLAXMAN:  Yes, Your Honor.
19          MR. MATHUES:  Yes, Your Honor.
20          And the -- Larry Regnier, I believe --
21          THE COURT:  Regnier?
22          MR. MATHUES:  Regnier is how he's pronounced
23  it, to me at least.
24          THE COURT:  I'm glad you told me that.  So,
25  Regnier.
```

1          We'll see how bad it gets with some of the

2    potential jurors' names.  That sometimes can be an

3    adventure for me to guess how they pronounce their names.

4          All right.  At the final pretrial, both sides

5    told me that they did not believe I needed to read the

6    stipulations in the final pretrial order at any time

7    during the trial.  If you change your mind, let me know.

8    I have those available.  So if you want me to, just

9    direct me to which stipulation you'd like me to read.  I

10   read them over, and I agree with both of you gentlemen.

11   I don't think there's going to be a need to read those

12   stipulations.  There's not really anything about them

13   that struck me as in dispute.

14          I'll enter an order concerning the Rule 615

15   motion.  So any witnesses who want to stay for the

16   opening statements can stay for those.  If anybody is in

17   here during any testimony, they're going to be excluded

18   from testifying themselves.  So I obviously don't know

19   who these -- that's not true.  I know who some of these

20   people are, but I don't know who all these people are.

21   So if you see someone who's a potential witness, you

22   know, instruct them to leave very quickly, or else

23   they're not going to be a witness.

24          My only other instruction is my standard

25   instruction.  I will tell the venire, and the jury after

```
 1   we've picked them, to be rude to you.  Don't extend
 2   common courtesies.  Don't hold doors open.  Don't greet
 3   them.  Don't say "hello" to them.  I'm telling you to do
 4   the same thing.  When we take our break in the morning,
 5   if you need to use the restroom, I suggest you go out to
 6   the left, go down one floor, and then cut back underneath
 7   to the restrooms on the second floor.  That way, you
 8   don't run into anybody in the venire.
 9           Likewise, to the extent you can use the stairs
10   instead of the elevator, that's probably wise.  There's a
11   staircase at the north end of the building, the same
12   staircase you'd take to get down to the second floor to
13   cut underneath to go to the second floor restroom.  Just
14   don't be courteous.  Don't open doors.  Don't speak to
15   them.  It's only come up as an issue one time so far.
16   But, you know, I had to stop and hold a hearing to find
17   out that somebody just said "hello."  So just -- don't do
18   it.  Just avoid that.
19           All right.  Anything -- what's their status
20   downstairs?
21           COURTROOM DEPUTY:  They're ready for you.
22           THE COURT:  Gotcha.
23           Before I go downstairs and take the final
24   excuses for anybody who doesn't want to be in the venire,
25   anything else on behalf of the plaintiff?
```

BROOKS v. CITY OF KANKAKEE, 17-2265 -- Jury Trial (4/30/19)

```
 1              MR. FLAXMAN:  Nothing from Plaintiff,
 2   Your Honor.
 3              THE COURT:  Mr. Mathues?
 4              MR. MATHUES:  Judge, there's one thing.  One of
 5   the exhibits, the Department of Human Rights report, the
 6   one that Your Honor held was admissible, Mr. Flaxman and
 7   I disagree as to some redactions; but I think we can
 8   handle that over lunch --
 9              THE COURT:  Okay.
10              MR. MATHUES:  -- rather than right now.
11              THE COURT:  Wasn't it -- if memory -- I don't
12   have the order right in front of me -- Section D or
13   something like that, within that report?  I don't recall
14   exactly what it was.  Why don't you just work on the
15   redactions.  Thank you for alerting me.  I'll read
16   about -- I'll reread that specific section.  If you need
17   me to make a ruling after you're done, if you can't agree
18   to something, let me know; but you'll have time over
19   lunch, I'm sure.
20              MR. MATHUES:  Understood, Your Honor.
21   Thank you.
22              THE COURT:  All right.  Take about a
23   five-minute break.  Get yourself together.  I'll go down
24   and take the final excuses from the jury's -- jury pool,
25   and we'll go from there.  All right.
```

```
 1                    (Recess, 9:15 a.m. to 9:34 a.m.)

 2                    (Voir dire proceedings commence, 9:34 a.m.;

 3                    jury is impaneled and sworn, 10:31 a.m.)

 4            THE COURT:  All right.  We're going to do a few

 5     logistical things before we start.  We're going to show

 6     you -- well, not "we."  I'm not going to.  We're going to

 7     have -- my courtroom deputy and the court security

 8     officers are going to show you where the jury room is,

 9     show you what's available for you in there, show you

10     where the restrooms are in there.

11            We're also going to rearrange things so you're

12     all sitting in a different configuration, the reason

13     being those of you who are stuck with the pillars right

14     behind you -- and two of you already are -- you might

15     have noticed you can't lean your chair back.  And as I

16     have said many times before, inevitably at some point

17     during the trial, you're going to lean your head back,

18     thunk your head against the pillar.  It makes a big

19     noise.  It's very distracting.  So we rearrange everybody

20     so it's a more friendly configuration.  We're going to do

21     that, and then we'll bring you back in here, and I'll

22     give you my preliminary instructions and the opening

23     statements.

24            So, Teresa, you ready?

25            COURTROOM DEPUTY:  Yes.
```

1          THE COURT:  So we're going to take about a

2   five-minute break, and we'll bring you right back in

3   here.

4               (Jury absent, 10:32 a.m.)

5               (Recess, 10:32 a.m. to 10:42 a.m.)

6          THE COURT:  All right.  Mr. Flaxman, any reason

7   not to bring the jury in?

8          MR. FLAXMAN:  [Gesturing.]

9          THE COURT:  Should we bring the jury back in?

10         MR. FLAXMAN:  Yes.

11         MR. MATHUES:  No objection, Your Honor.

12         THE COURT:  All right.  Let's bring them back.

13              (Brief pause in proceedings.)

14              (Jury present, 10:44 a.m.)

15         THE COURT:  All right.  Be seated.  Everybody's

16  back in place.  All right.  I'm going to now read you my

17  preliminary instructions.

18         Ladies and gentlemen, you are now the jury in

19  this case.  I'm going to take a few minutes to describe

20  your duties as jurors and to give you instructions

21  concerning the case.

22         As the judge in this case, one of my duties is

23  to decide all questions of law and procedure.  In these

24  preliminary instructions, during the trial, and at the

25  end of the trial, I will instruct you on the rules of law

1  that you must follow in making your decision.  The

2  instructions that I give you at the end of the trial will

3  be more detailed than the instructions I am giving you

4  now.  Each of you will have a copy of the instructions

5  that I give you at the end of the case.

6           You have two duties as jurors.  Your first duty

7  is to decide the facts from the evidence that you see and

8  hear in court.  Your second duty is to take the law as I

9  give it to you at the end of the case, apply it to the

10  facts, and decide if the plaintiff has proved his case by

11  a preponderance of the evidence.

12           You must perform these duties fairly and

13  impartially.  Do not let sympathy, prejudice, fear, or

14  public opinion influence you.  In addition, do not let

15  any person's race, color, religion, national ancestry, or

16  gender influence you.  You should not take anything that

17  I say or that I do during the trial as indicating what I

18  think of the evidence or what I think your verdict should

19  be.

20           The position of the parties can be summarized

21  as follows:  Plaintiff Brooks alleges that Defendant City

22  of Kankakee retaliated against him for protected speech

23  activities.  Defendant City of Kankakee denies

24  retaliating against Plaintiff Brooks.

25           Now, when I say a particular party must prove

1  something by "a preponderance of the evidence," this is

2  what I mean:  When you have considered all the evidence

3  in the case, you must be persuaded that it is more

4  probably true than not true.

5        You may consider only the evidence that you see

6  and hear in court.  You may not consider anything you may

7  see or hear outside of court, including anything from the

8  newspaper, television, radio, the Internet, or any other

9  source.  The evidence includes only what the witnesses

10 say when they are testifying under oath, the exhibits

11 that I allow into evidence, and any facts to which the

12 parties stipulate.  A stipulation is an agreement that

13 certain facts are true or that a witness would have given

14 certain testimony.  Nothing else is evidence.

15        Any statements and arguments that the lawyers

16 make, those are not evidence.  If what a lawyer says is

17 different from the evidence as you hear or as you see it,

18 the evidence is what counts.  The lawyers' questions and

19 objections, likewise, are not evidence.

20        A lawyer has a duty to object if he thinks a

21 question or evidence is improper.  When an objection is

22 made, I will be required to rule on the objection.  If I

23 sustain an objection to a question a lawyer asks, you

24 must not speculate on what the answer might have been.

25 If I strike testimony or I strike an exhibit from the

1    record or if I tell you to disregard something, you must

2    not consider it.  Pay close attention to the evidence as

3    it is being presented.

4              During your deliberations, you will have some

5    of the exhibits that I allow into evidence, but you will

6    not -- will not -- have a transcript of anyone's

7    testimony.  You have to make your decisions based on what

8    you recall of the evidence.

9              You may have heard the terms "direct evidence"

10   and "circumstantial evidence."  Direct evidence is

11   evidence that directly proves a fact.  Circumstantial

12   evidence is evidence that indirectly proves a fact.  For

13   example, direct evidence that it was raining outside is

14   testimony by a witness that it was raining.  Indirect

15   evidence that it was raining outside is the observation

16   of someone entering a room carrying a wet umbrella.  You

17   are to consider both direct and circumstantial evidence.

18   The law does not say that one is better than the other.

19   It is up to you to decide how much weight to give to any

20   evidence, whether direct or circumstantial.  Give the

21   evidence whatever weight you think and believe it

22   deserves.  Use your common sense in weighing the

23   evidence, and consider the evidence in light of your own

24   everyday experience.

25             People sometimes look at one fact and conclude

1    from it that another fact exists.  This is called an

2    inference.  You are allowed to make reasonable

3    inferences, so long as they are based on the evidence.

4            Part of your job as jurors will be to decide

5    how believable each witness was and how much weight to

6    give each witness's testimony.  I will give you

7    additional instructions about this at the end of the

8    trial.

9            Do not make any decisions by simply counting

10   the number of witnesses who testified about a certain

11   point.  What is important is how believable the witnesses

12   were and how much weight you think their testimony

13   deserves.

14           Another few things.  You will be permitted to

15   take notes during the trial.  If you take notes, you may

16   use them during deliberations to help you remember what

17   happened during the trial.  You should use your notes

18   only as aids to your memory.  The notes are not evidence.

19   All of you should rely on your independent recollection

20   of the evidence, and you should not be unduly influenced

21   by the notes of other jurors.  Notes are not entitled to

22   any more weight than the memory or impressions of each

23   juror.

24           Further, recall my instructions that I just

25   said about transcripts.  You will not have a transcript

1    of anyone's testimony.  For that reason, do not be so

2    busy taking notes that you actually miss the testimony of

3    any witness.

4           Before we begin the trial, I want to discuss

5    several rules of conduct that you must follow in your

6    role as jurors.  First, you should keep an open mind

7    throughout the trial.  Do not make up your mind about

8    what your verdict should be until after the trial is

9    over, after you have received my final instructions on

10   the law, and you and your fellow jurors have had a chance

11   to discuss the evidence.

12          Your verdict in this case must be based

13   exclusively on the law as I give it to you and the

14   evidence that's presented during the trial.  So for this

15   reason and to ensure fairness to both sides in this case,

16   you must obey the following rules.  These rules apply

17   both when you are here in court and when you are not in

18   court, so these rules apply until you have returned a

19   verdict in this case.

20          First, you must not discuss this case,

21   including discussing anything about anyone involved in

22   the case, among yourselves until you go to the jury room

23   to deliberate after the trial has completed.  All right?

24          Second, you must not communicate with anyone --

25   anyone -- about the case, including anybody involved in

1    the case, until after you have returned your verdict.

2    When you're not in the courtroom, you must not allow

3    anyone to communicate with you about the case.  You must

4    not allow anyone to give you information about the case

5    or about anyone who is involved in the case.

6            If someone does try to communicate with you or

7    talk to you about the case or about somebody who's

8    involved in the case, or you overhear something or you

9    learn any information about the case or someone involved

10   in the case when you're not in the courtroom, you must

11   report this to me immediately.  So either tell one of the

12   court security officers or tell my courtroom deputy or

13   tell me.

14           You may tell your family and you may tell your

15   employer that you're serving on a federal jury, so you

16   can explain to them you have to be in court.  However,

17   you must not -- please do not communicate with them about

18   the case or anyone involved in the case until after

19   you've returned your verdict.  Just tell them you're on a

20   federal jury trial.

21           All the information you're going to need to

22   decide the case will be presented here in court; so,

23   also, don't look up, obtain, consider any information

24   from any outside source.  There's two reasons for these

25   rules.  First -- well, obviously, it wouldn't be fair to

1  the parties for you to -- in the case -- for you to

2  consider outside information or communicate information

3  about the case to other people.

4          Secondly, if you did do that, any outside

5  information you receive could be incorrect or misleading.

6  So when I say that you may not obtain or consider any

7  information from any outside sources and when I say you

8  may not communicate with anyone about the case, what I'm

9  referring to is any and all means by which people

10  communicate or obtain information nowadays.

11          So this includes, for example, not just

12  face-to-face conversations or phone calls; it means

13  looking things up, Googling things, doing research;

14  reading, watching, listening to any reports about

15  anything in the news media; any type of communication

16  using any type of electronic device -- so things like

17  smartphones, PDAs, tablets, Apple watches, any other type

18  of smartwatch -- anything.  Also, anything involving the

19  Internet is a "no."  Text messaging; blogs, any social

20  networking sites like Facebook, Snapchat, Twitter,

21  Google+, Google Hangouts -- any of those things, any

22  other form of communication at all -- don't do it.  If

23  you hear, see, or receive any information about the case

24  by these or any other means, report that to me

25  immediately.

 1              Let me give you a brief word about Facebook and

 2    Snapchat.  As far as Facebook and Snapchat are concerned,

 3    I know some of you may have habits where you frequently

 4    post or get on Facebook or Snapchat.  So even though --

 5    and I realize this might be difficult for some of you.

 6    You must not make any postings regarding this trial

 7    because, if you do that, a response could prejudice you

 8    or bias you in some fashion, including providing you with

 9    information that is incorrect or misleading.  So for the

10    duration of this trial, I'm directing you not to make any

11    postings to your Facebook account.  Don't post anything

12    or use any bit of your Snapchat account, if you have one.

13              In order to ensure that neither the attorneys

14    nor the parties communicate with you, like I told you

15    before on morning break, I have instructed them to ignore

16    you; to not even show you common courtesy, such as

17    holding doors open or morning greetings.  In other words,

18    if you recall, I told them to be rude to you, and I told

19    you to be rude to them.

20              The reason for this rule is simple.  There are

21    cameras all around the building, both inside and outside.

22    If the cameras see you communicating with an attorney,

23    communicating with a party or a witness, this will be

24    reported to me.  As I said before, I then have to stop

25    doing what I'm doing.  Everybody has to wait, and I waste

1 everyone's time simply to find out that two people

2 exchanged a "good morning" or a "thank you."  So for that

3 reason, I'm again instructing you for the duration of the

4 trial to be rude to the attorneys.  Be rude to the

5 parties.  Please ignore them.  Do not acknowledge them in

6 any way until the trial is over.  They will do likewise

7 regarding you.

8           I try to have the following hours.  We start

9 most mornings here in the courtroom around 9:15.  So I

10 ask you to be in the jury room no later than about 9:10.

11 That way, we can start on time.  We end most days around

12 4:00.  That should give everybody time -- even those of

13 you who are driving for an hour and a half to two

14 hours -- to get you home by 6:00.  We may stop a little

15 early, or we may stay a little later to break if a

16 witness is testifying or something else is going on; but

17 I try to get done around 4:00 most days.

18           We take our lunch sometime between 11:30 and

19 noon.  I try to give you an hour and 15 minutes for

20 lunch, although sometimes it can be a little bit shorter;

21 sometimes it can be a little bit longer.  We take one

22 morning break and one afternoon break.  Those are usually

23 about 10 to 15 minutes long.

24           A couple more procedural matters.  I have

25 limited control over the temperature in the courtroom, so

1  I'm going to encourage you to bring a coat or sweater

2  every day -- a jacket, what have you.  It's better to

3  have it and not need it than need it and not have it.

4  Sometimes in the afternoon especially it can get very

5  cold here in the courtroom from the air conditioning.

6           Also, if any of you need to take a break for

7  any reason whatsoever, raise your hand, catch my

8  attention, catch my courtroom deputy's attention; and

9  we'll stop and take a break.

10          You should know:  As far as I am concerned, one

11  of my highest priorities is not wasting your time.  I

12  mean, you're here serving as jurors on your time.  I

13  don't want to waste it.  So for that reason, lots of

14  times the attorneys and I work over the break.  Our

15  breaks -- you might have 15 minutes; we might have two

16  because I try to maximize your time.  I don't want to

17  waste it.

18          Likewise, I'll sometimes work with the

19  attorneys before you arrive.  I sometimes work with them

20  after you leave.  I sometimes work over part of the lunch

21  hour.  So if we -- if we start later or we take longer

22  breaks, it's usually because I'm working with the

23  attorneys to keep the trial moving forward.  I hate

24  wasting your time.

25          All right.  So we're ready to begin the trial.

```
1    The trial proceeds in the following manner.  First, the
2    plaintiff and the defendant may make an opening
3    statement.  An opening statement is not evidence.  All
4    right?  An opening statement is a summary of what each
5    side expects the evidence will show.  After the opening
6    statements, you're going to hear the evidence.  After the
7    evidence has been presented, I instruct you on the law;
8    and then after I instruct you on the law, the parties are
9    allowed to make closing arguments.  Then after that, you
10   go to the jury room to deliberate.  That's the sequence
11   of events.
12            So with that being said, on behalf of the
13   plaintiff, opening statement, Mr. Flaxman.
14            MR. FLAXMAN:  Thank you, Your Honor.
15            Good morning again.  My name is Kenneth
16   Flaxman.  I represent Mr. Brooks, who's sitting at the
17   table.
18            One of the promises that I will make to you in
19   my opening statement is that we'll be done tomorrow.
20   We'll be done probably before 4:00 today, and we will
21   finish tomorrow.  That is my absolute promise.
22            This case is about a police officer who worked
23   for the City of Kankakee for 23, 24 years who got a
24   letter back in April of 2016 from Mr. Regnier, who was
25   then the police chief of the City of Kankakee.  That
```

1    letter said -- and I'll -- you'll get a chance to see the

2    letter because the parties have agreed that it will be

3    presented to you as a piece of evidence.

4            That letter said:  You made these statements

5    that I think were untrue to the EEOC at a hearing, to the

6    Police and Fire Commission at a public hearing; and I

7    don't think you should make those statements.  They

8    disparage the police department.  And if you keep talking

9    about those things, you're going to get fired.

10           And the judge will give you an instruction

11   after all the evidence about what the law is and what

12   police chiefs or supervisors or bosses are allowed to do

13   to someone when they make statements.

14           And you're going to see -- you're going to hear

15   a lot about what those statements were, and some of them

16   are referred to in the letter.  One of them is about, is

17   referring to an earlier lawsuit that Mr. Brooks did with

18   some other African American police officers at Kankakee

19   complaining about discrimination in the police

20   department.  There was a trial, I think in this

21   courtroom, back in 2005.  The jury found against the

22   police officers.  There was an appeal; and while the case

23   was pending on appeal, there was a resolution in

24   something called an agreed order.

25           And you'll get a chance to see the agreed

1    order.  That's another joint exhibit that the parties

2    will be presenting to you.  And the agreed order required

3    the City to do some things in its promotion process of

4    police officers.  It also required the City to pay the

5    lawyer who rep-- and it wasn't me -- another lawyer who

6    represented the plaintiffs, like 80 -- 60 or $80,000.

7            One of the things that the police chief, former

8    police chief criticized Mr. Brooks for doing was

9    referring to this agreed order as a "consent decree."

10   And the chief, former chief will testify, and he'll get

11   to tell you why he thinks that was disparaging, why it

12   was harmful to the police department to call an agreed

13   order a consent decree.  I'm not sure what he'll say, but

14   you'll have a chance to hear him tell you why he thinks

15   it was wrong.  It was bad for morale to refer to

16   something that was an agreed order as a consent decree.

17           Something else that the police chief criticized

18   Mr. Brooks for in that letter was about making statements

19   about a specific officer's drug use, his promotion, and

20   an accident in which he was involved.  And Mr. Brooks

21   made those statements; and those statements, Mr. Brooks

22   will tell you -- and I think the chief will agree -- were

23   true.

24           Back in 2014, there was a police officer named

25   Paul Berge who was working, I think, as a canine officer

1   for a consortium of -- Metropolitan Enforcement Group

2   that was out trying to, as part of the war on drugs,

3   trying to arrest drug dealers.

4           Back in, I think, February of 2014, Officer

5   Berge was sus-- was caught using steroids, and they

6   weren't steroids he got from a prescription or from the

7   doctor.  They were illegal, nonprescribed steroids.

8   Officer Berge was kicked out of the MEG Unit and came

9   back to work at Kankakee.

10          About two months after he had been -- Officer

11  Berge had been revealed to be an illegal steroid user, he

12  was involved in a one-car accident where he left a tavern

13  and totaled his car and then drove home and somehow got

14  that one-car accident to be reported as a hit-and-run.

15          And you'll see that, in 2016, there was

16  something called a last-chance agreement where Berge

17  agreed that he had been drunk leaving a tavern, and he

18  made a false police report; and he was sorry, and he

19  won't do it again.  That was two years later, around the

20  time that Mr. Brooks started complaining about this guy,

21  Mr. Berge, getting favorable treatment.

22          The other thing you'll hear that Mr. Brooks

23  complained about is that back in January of 2016, after

24  Berge had been caught using illegal drugs, after he had

25  been caught with this false police report, Berge got

1    promoted to sergeant by the chief.  The chief will tell

2    you that he has -- he had, when he was the chief, the

3    discretion to decide which of the three people with the

4    highest score would be promoted to sergeant.  He didn't

5    have to pick Mr. Berge, but, but he picked Mr. Berge.

6          And Mr. Brooks was complaining about this.  He

7    was speaking up at an EEOC hearing.  He was speaking up

8    before the Police and Fire Commission.  And he was

9    speaking up, saying, "There's a cover-up going on here.

10   Why is this guy getting this favorable treatment?  Why

11   wasn't he fired for using illegal drugs?  Why wasn't he

12   fired for making a false police report?  Why is he

13   promoted to sergeant?"

14         And what he got was this letter from the chief

15   saying, "Stop saying that stuff.  Stop complaining about

16   discipline.  Those are private matters.  We'll take care

17   of it.  If you say stuff like that again in public or in

18   private" -- and you'll see that in the letter -- "you're

19   going to get fired."

20         And that's why we're here.  Mr. Brooks likes

21   his job.  He likes being a police officer.  He likes

22   enforcing the law.  He's not part of some code of silence

23   or giving passes to people who break the law.  He's an

24   honest cop, and it made him a little distressed to feel

25   that he was going to lose his job if he kept being an

1  honest cop.

2          And the judge will tell you what the law is,

3  and he'll tell you what kind of damages -- for what

4  issues, what, what elements of damages are when Mr.

5  Brooks is going to tell you it was a little distressing

6  to think "I'm going to lose my job for doing my job."

7          And then you'll have a chance to hear us again

8  in closing arguments and deliberate, and I think we'll be

9  done tomorrow.

10         Thank you.

11         THE COURT:  Thank you, Mr. Flaxman.

12         Mr. Mathues.

13         MR. MATHUES:  Thank you, Your Honor.

14         There's an old saying, and maybe you've heard

15  it:  Everybody is entitled to their own opinion, but

16  they're not entitled to their own facts.

17         What the evidence will show you today and

18  tomorrow is that no one retaliated against Mr. Brooks for

19  having an opinion.  Nobody retaliated against Mr. Brooks

20  for sharing an opinion.  Nobody told Mr. Brooks that he'd

21  be fired for talking about an opinion.

22         What you will see is that Mr. Brooks did

23  receive a written reprimand and was told to stop talking

24  about his own facts.  That is the difference that will

25  come before you in the evidence today and tomorrow.

1            And since we will be here together for the next

2    two days, I will reintroduce myself.  I'm David Mathues.

3    My partner is Charles Hervas.  And we're happy to

4    represent the City of Kankakee, Illinois.

5            And as the judge pointed out, we can't bring

6    the City -- even one of those little mini-scale models --

7    in here, but you will hear from people who work for the

8    City.  After all, the City is just made up of the people

9    who work there.  You'll hear from two.  You'll hear from

10   the former chief, Larry Regnier; and you'll hear from a

11   current lieutenant, Robin Passwater.

12           Former Chief Regnier -- we'll give you an

13   overview of his background.  He's a former Navy veteran,

14   a welder, who then spent almost 35 years in the Kankakee

15   Police Department, working his way up from patrolman to

16   sergeant to lieutenant to deputy chief and finally, for

17   seven years, chief.  He'll tell you how his

18   responsibilities changed, the challenges of being a

19   police chief, and why Mr. Brooks's attempt to have his

20   own facts rather than an opinion was damaging to the

21   police department and why he sent Mr. Brooks the letter

22   of reprimand.

23           You will also hear from Lieutenant Robin

24   Passwater, who's been a police officer for over 20 years.

25   He'll summarize his background.  He was a patrolman.  He

1    was a sergeant.  He was actually president of the police

2    union for Kankakee for a number of years, and he is now a

3    lieutenant.  He heard some of Mr. Brooks's statements;

4    and he will tell you what he heard, why it's a problem,

5    and about his conversations with the chief.

6              Now, as you've heard, this is a case about

7    retaliation.  That's a serious matter.  And even though

8    we will be done tomorrow, even though there's only a

9    handful of witnesses, it doesn't make this case any less

10   serious.  Retaliation is a serious thing.  And just look

11   around to where we are.  That underscores it.  We've got

12   the high ceilings, the wood panels, the judge, all of us

13   in suit and ties.  Many of you have come an hour or more,

14   and you've shown that you take it seriously.  You're

15   here, and we appreciate that.

16             But seriousness has two sides, one being if it

17   happens to you; the other being if you're accused of it,

18   and it didn't happen.  Here, the evidence will be that

19   the retaliation didn't happen; and it wasn't for Mr.

20   Brooks's opinion, but for his attempt to have his own

21   facts.

22             As you look at the evidence, you'll see three

23   patterns.  You'll see a pattern and distinction between

24   statements of fact and claims of discrimination or

25   unfairness.  You'll see a pattern and the difference

1    between deliberate misinformation and genuine confusion.

2    And you'll see a pattern and the difference between

3    looking out for oneself versus looking out for the

4    department.

5         First and foremost is the distinction about

6    statements of fact.  You heard from Plaintiff's attorney

7    about this other officer, Officer Berge, who did some

8    things that -- no one's going to sit in that chair and

9    tell you that what Officer Berge did is good or that

10   someone ought to do it or that that's the behavior that

11   is wanted for the police department.

12        What you will hear specifically is that in

13   making his public statements -- it's not just about what

14   Officer Brooks said; it's about things he didn't say, and

15   also things that you didn't hear when the Plaintiff's

16   attorney was up here.

17        You'll hear that Officer Berge didn't just come

18   back to work, as was told to you, after the steroids.

19   What you will hear is that he got 30 days without pay.

20   You will hear that he was sent for drug testing.

21        You will hear that -- you heard about him being

22   promoted to sergeant.  What you didn't hear is back in

23   2014 when the steroid news came out -- and Chief Regnier

24   will tell you -- he skipped over Paul Berge; even though

25   Paul Berge was the top person on the list, he skipped him

```
 1   over.

 2            And yet, you will hear that what Richard Brooks

 3   was saying was not an opinion that more should have been

 4   done, but that nothing was done.  And you'll be the judge

 5   between statements of "nothing was done" versus the

 6   discipline I just mentioned.

 7            Also, when it comes to Officer Berge's car

 8   crash and false police report, no one's going to sit here

 9   and tell you that that was a good thing or good behavior.

10   The issue:  Where you will hear that Mr. Brooks is not

11   merely having a difference of opinion, not merely

12   claiming that, you know, another officer did the same

13   thing and got more severely disciplined, but attempted to

14   have his own facts as, once again, Mr. Brooks stood up

15   before the Police and Fire Commission, and he stood up at

16   a hearing in the mayor's office and said nothing was

17   being done.

18            The evidence will show that's not true.  The

19   evidence will show that once the police department

20   investigated and found out what Officer Berge had done --

21   and, in fact, I should mention that it happened a number

22   of years in the past -- that Officer Berge received

23   another 30-day suspension without pay; that he had to

24   sign a last-chance agreement.

25            You'll actually get a chance to see that
```

1   last-chance agreement.  You'll see Chief Regnier's name

2   on it.  You'll see Paul Berge's name on it.  You'll see

3   30 days without pay.  You'll see that Berge gave up any

4   right to appeal that suspension and fee.  If he messes up

5   again, he's out.

6          What will come out in this case is that the

7   very moment -- literally, the very moment -- Richard

8   Brooks is standing up and telling the Police and Fire

9   Commission nothing is being done, Paul Berge is serving a

10  30-day unpaid suspension on his last-chance agreement.

11  And in light of this distinction, it will be for you to

12  come back at the end of the case and decide:  Is Richard

13  Brooks being reprimanded for sharing an opinion?  Is he

14  being told that there will be discipline if he continued

15  sharing an opinion?  Or is this about his attempt to have

16  his own facts?

17         You will also see the agreed order from the

18  former case.  In fact, I should tell you:  This case that

19  you are hearing today is not the first time Mr. Brooks

20  has filed suit against the Kankakee Police Department.

21  You'll hear about the case in two thousand -- the early

22  2000s; that a portion of those cases, the jury sided with

23  the police department.  He filed that suit.  Another

24  portion was settled in an agreed order.

25         You'll also hear that over the very same letter

1    that you'll see, Officer Brooks filed a complaint with

2    the Illinois Department of Human Rights.  They

3    investigated.  You'll get to see that resolution, and the

4    Department of Human Rights determined that there was not

5    substantial evidence of retaliation.

6              Mr. Brooks may try to tell you in this talk

7    about a consent decree that he thought about some other

8    document other than the agreed order you will see.  If

9    that's what he tells you, you won't see such a document,

10   and you won't hear anyone come in and tell you it exists.

11   Maybe Mr. Brooks will try to tell you that this agreed

12   order is what he was talking about.

13             But then you'll get to look at that agreed

14   order for yourself, and you will see there where it says

15   that that agreed order expires in 2011, or after two

16   promotional periods, which the chief will tell you was

17   also 2011.

18             Maybe you're sitting there thinking, "Wait a

19   minute.  2011?  I thought we heard 2014, 2016."  You're

20   right.

21             What you will hear is in trying to have his own

22   facts, Officer Brooks is telling the Police and Fire

23   Commission, telling the EEOC, saying at the mayor's

24   office that the City is in violation of what he's calling

25   a consent decree; and if he's talking about a consent

1    decree, you'll see no evidence exists.  If he's talking

2    about this agreed order, you'll see that it expired two

3    or three years ago, before he stood up to say what he was

4    going to say.

5            And as you look at the pattern of the things

6    that Officer Brooks was told and what he did and didn't

7    do, you can make a decision, not just as the difference

8    between statements of fact and allegations of retaliation

9    or discrimination, not just between genuine confusion or

10   deliberate deception or withholding of information.

11           And, finally, you'll see a difference between

12   looking out for oneself and looking out for the police

13   department.

14           Chief Regnier will be sitting right there, and

15   he'll tell you several things.  You know, one thing he

16   will tell you is that when it comes to doing police work,

17   he doesn't have the slightest -- he never had the

18   slightest problem with Richard Brooks, that he was a good

19   and competent patrol officer.  Even though Richard Brooks

20   has filed suits, he'll say:  When it came to the work, no

21   complaints.

22           But Chief Regnier will also explain the

23   challenges of being police chief.  He'll explain the

24   paramilitary structuring of the police department, the

25   need for a clear chain of command and accountability up

1   and down, the need to focus on the mission as opposed to

2   any one individual.  And he'll explain to you why someone

3   going around saying that there's a consent decree that

4   puts the Kankakee Police Department in a particular

5   category as a problem department, that crosses the line,

6   why that's a problem, why that harms the department when

7   it is, in fact, not true, and why he decided that he

8   needed to tell Mr. Brooks to stop.

9            He'll further sit there and explain why a

10  person standing up in multiple public forums saying facts

11  about internal discipline that are simply -- simply false

12  is a problem and why he decided to write a written

13  reprimand.

14           You'll see that letter.  You'll see the agreed

15  order.  As I said, you will see the Illinois Department

16  of Human Rights report, and you'll see Paul Berge's

17  last-chance agreement.  These are all things that, as

18  they say, seeing is believing.  You won't have to take my

19  word for it or anyone else's; it will be right in front

20  of you -- and not just from those documents alone; but,

21  in addition, the testimony.

22           At the end of this case, we'll come back in

23  front of you and ask you to look at the facts again and

24  to conclude that what's going on here is not unlawful

25  retaliation.  What's going on here is not a person who is

1   a good officer being told that he can't have an opinion

2   or share that opinion.

3           What's going on is a person who wants to have

4   their own facts.  And the chief said when those facts are

5   not facts and they are damaging to the mission of the

6   police department, something needs to be done, and the

7   chief wrote Officer Brooks a written reprimand.

8           And based on all of that, we will ask you to

9   return a verdict in favor of the City of Kankakee.

10          Thank you for your time.

11          THE COURT:  Thank you, Mr. Mathues.

12              (Brief pause in proceedings.)

13          THE COURT:  Mr. Flaxman, you may call your

14  first witness.

15          MR. FLAXMAN:  The former chief.

16              LARRY REGNIER, sworn, 11:21 a.m.,

17              DIRECT EXAMINATION BY MR. FLAXMAN:

18      Q    Good morning, sir.

19      A    Good morning.

20      Q    Could you state your name and spell your last

21  name for the court reporter, please?

22      A    Larry Regnier, R-e-g-n-i-e-r.

23      Q    And at one point, were you the police chief of

24  the City of Kankakee?

25      A    Yes.

1    Q    When did you stop being the police chief?

2    A    On May 1st of 2017.

3    Q    Are you presently employed?

4    A    No, I'm not.

5    Q    Okay.  And was May 1st of 2017 the same date

6    that a new mayor was put into office, --

7    A    Yes.

8    Q    -- inaugurated into office?

9    A    Yes.

10    Q    How long did you work for the Kankakee Police

11    Department?

12    A    Over 34 years.

13    Q    And did you work your way up the ranks?

14    A    Yes.

15    Q    When did you become chief?

16    A    In 2010.

17    Q    What was your position immediately before

18    becoming chief?

19    A    I was the deputy chief of police.

20    Q    Okay.  Did the City of Kankakee take part in a

21    Metropolitan Enforcement Group?

22    A    Yes.

23    Q    Could you tell the ladies and gentlemen of the

24    jury what, what that did?

25    A    It's a, it's a group of area law enforcement

BROOKS v. CITY OF KANKAKEE, 17-2265 -- Jury Trial (4/30/19)

1    agencies that get together; and it's a, it's a drug unit.

2    And they focus on guns, drugs, and gangs.  Each

3    department within the, in the metropolitan area adds an

4    officer.  Some do; some don't put an officer in there.

5    But it's a, it's a group that consists of numerous

6    jurisdictions.

7         Q    How many -- back in 2014, how many Kankakee

8    officers were part of that enforcement group?

9         A    I believe there were six.

10        Q    Was one of those a fella named Paul Berge?

11        A    Yes.

12        Q    Was one of the -- was there a supervisor from

13   Kankakee who was part of the enforcement group?

14        A    Yes.

15        Q    Who was that?

16        A    In 2014, I -- I'm not sure at that point.

17        Q    Okay.  Now, was Berge's job to arrest drug

18   dealers?

19        A    Yes.

20        Q    At some point, did you learn that Berge was

21   using illegal drugs?

22        A    Yes.

23        Q    Did you ask him who his drug dealer was?

24        A    No.

25        Q    Why not?

BROOKS v. CITY OF KANKAKEE, 17-2265 -- Jury Trial (4/30/19)

1          MR. MATHUES:  Objection to relevance, Your
2     Honor.
3          THE COURT:  Overruled.
4     A     Why did I not ask him who his drug dealer was?
5     Q     Right.
6     A     We allowed the Illinois State Police to take
7     over the investigation of the steroids.
8     Q     Okay.  And at some point, you looked at their
9     investigation, didn't you?
10    A     Yes.
11    Q     And you saw that they didn't ask him who his
12    drug dealer was; is that right?
13    A     That's correct.
14    Q     Was it against the law for Officer Berge to be
15    buying drugs from a drug dealer?
16    A     Yes.
17    Q     Was it against the law for him to be using
18    drugs while he was a sworn police officer?
19    A     Yes.
20    Q     Did you fire him?
21    A     No.  I did not.
22    Q     Could you have fired him?
23    A     Could have.  Yes, sir.
24    Q     And instead of firing him, you entered into
25    this last-chance agreement with him, didn't you?

BROOKS v. CITY OF KANKAKEE, 17-2265 -- Jury Trial (4/30/19)

1      A      No.  Not at that point, no.

2      Q      Well, what's a last-- can you tell the ladies

3    and gentlemen of the jury what a last-chance agreement

4    is?

5      A      It's an agreement with the City of Kankakee and

6    the person who the last-chance agreement was with, along

7    with the police union that represents them.

8      Q      And is it a formal agreement where a police

9    officer has been involved in some wrongdoing and that the

10   officer is given one last chance?  Is that right?

11     A      Yes.

12     Q      And are you telling us that you didn't do that

13   kind of last-chance agreement with Mr. Berge after he was

14   caught buying and using illegal drugs?

15     A      Not at that point, no.

16     Q      Did you do anything with him at that point when

17   you discovered he was buying and using illegal drugs?

18     A      Yes, sir.

19     Q      And that, of course, was written down in some

20   kind of document, wasn't it?

21     A      Yes.

22     Q      It was a document that required that he take

23   random drug tests; is that right?

24     A      Yes.

25     Q      Have you ever seen that document, sir?

1       A    I, I do not -- I do not know if I've ever seen

2  it or not.

3       Q    As a matter of fact, you don't know from your

4  firsthand knowledge that there ever was a document that

5  required Mr. Berge to take drug tests?

6       A    I believe he was verbally told that.

7       Q    And you didn't tell him that verbally, did you?

8       A    Yes, sir.

9       Q    And you told him -- you told him, "Officer

10  Berge, would you promise to take drug tests for

11  18 months?"

12      A    No, sir.

13      Q    Okay.  And you, you also did a last-chance

14  agreement with Mr. Berge back in -- when was it?  Do you

15  remember when that was, sir?

16      A    Yes, sir.  That would be in 2014.

17      Q    Well, have you had a chance to look at the

18  last-chance agreement --

19      A    Yes.

20      Q    -- before coming here today?

21      A    Yes.

22      Q    And --

23      A    If I may, can I correct myself, sir?

24      Q    Sure.

25      A    It was 2016 he was given the last-chance

1    agreement.

2        Q    And did that last-chance agreement refer to

3    Officer Berge having used steroids back in 2014?

4        A    Yes.

5        Q    And that use of steroids in 2014 in the

6    last-chance agreement, that was after he'd been caught in

7    February 2014; isn't that right?

8        A    Yes.

9        Q    And in the last-chance agreement, Officer Berge

10   said, "I was drunk and under the influence of illegal

11   steroids when I was in a -- when I drove, when I wrecked

12   my personal vehicle into the side of a building."

13            Is that right?

14       A    I do not recall him stating that.  No.

15       Q    Well, do you recall him stating that he wrecked

16   his personal vehicle while he was under the influence of

17   alcohol and unprescribed steroids?

18       A    Yes.

19       Q    Unprescribed steroids, is that the same as

20   illegal steroids?

21       A    Yes, it is.

22       Q    And this, the -- his incident with that, that

23   was in April of 2012; is that right?

24       A    Yes.

25       Q    That was after he had been caught being a MEG

1    officer using illegal drugs; is that right?

2        A    No.

3        Q    You sure?

4        A    Yes, sir.

5        Q    Well, when was it that he was caught using

6    illegal drugs as a MEG agent?

7        A    It would be late 2013 or early 2014.

8        Q    Well, early 2014 is before April of 2014, isn't

9    it?

10       A    You just asked me if it was 2012.

11       Q    I'm sorry.

12            Okay, so Mr. Berge admitted in his last-chance

13   agreement that he had been using illegal steroids in

14   2012; is that right?

15       A    Yes.

16       Q    So that means he'd been using illegal steroids

17   for almost two years before he was caught; is that right?

18       A    That's correct.

19       Q    Did you think that would be bad for the morale

20   of the police department for it -- to have an officer

21   working in the drug unit for almost two years who was

22   using drugs?

23       A    I didn't think it was bad.  I knew it was bad.

24       Q    And you knew it was bad for an officer working

25   in the drug unit to be buying illegal drugs for almost

BROOKS v. CITY OF KANKAKEE, 17-2265 -- Jury Trial (4/30/19)

1    two years; is that right?

2        A    That is correct.

3        Q    And you could have fired Mr. Berge; isn't that

4    right?

5        A    I could have attempted to.  Yes.

6        Q    Did you write him a letter saying, "I'm going

7    to fire you, Mr. Berge"?

8        A    No.

9        Q    Is Mr. Berge black or white?

10       A    He's white.

11       Q    Okay.  And did you pick Mr. Berge to be

12   promoted to sergeant?

13       A    Yes, I did.

14       Q    Now, back in April of 2016, did you write a

15   letter to Richard Brooks?

16       A    Yes.

17       Q    And Mr. Brooks is the person sitting to my

18   right; is that correct?

19       A    That's correct.

20       Q    And he's been a police officer at Kankakee for,

21   oh, 23, 24 years; is that right?

22       A    I don't know the exact date that he started;

23   but it's been, yes, a while.

24       Q    And he's been a good officer, hasn't he been?

25       A    He's a very good officer.

BROOKS v. CITY OF KANKAKEE, 17-2265 -- Jury Trial (4/30/19)

1      Q    Okay.  And in that letter, you told him, "If
2   you keep making comments, you're going to get fired"; is
3   that right?
4      A    Nope.  No, sir.  I'm sorry.
5      Q    Okay.  Let me show you what's been marked as
6   Joint Exhibit 1.
7           MR. FLAXMAN:  And may I publish this to the
8   jury, Your Honor?
9           THE COURT:  Any objection to its admission, Mr.
10  Mathues?
11          MR. MATHUES:  No, Your Honor.
12          THE COURT:  Joint Exhibit 1 is admitted at this
13  time.  You may publish.
14          MR. FLAXMAN:  Thank you.
15              (Brief pause in proceedings.)
16          MR. FLAXMAN:  I'm going to -- I have copies.
17          THE COURT:  Oh, actually, you don't need to.
18  We're going to show it on the big screen.
19          MR. FLAXMAN:  I, I -- I like paper.
20          THE COURT:  You want to do old-school and hand
21  out paper?  Go ahead.
22          MR. FLAXMAN:  Thank you.
23          THE COURT:  The record can reflect that copies
24  of Joint Exhibit 1 are being handed to the members of the
25  jury.

BROOKS v. CITY OF KANKAKEE, 17-2265 -- Jury Trial (4/30/19)

```
 1              MR. FLAXMAN:  May I?

 2              THE COURT:  Sure.

 3              MR. FLAXMAN:  Thank you.

 4              THE COURT:  And a copy's being handed to the

 5    witness.  You may approach.

 6              Do you want to use the big screen, or are you

 7    going 100 percent old-school?

 8              MR. FLAXMAN:  I'm going old.

 9              THE COURT:  All old-school.

10              MR. FLAXMAN:  Prehistoric.

11              THE COURT:  All right, is there a -- do you

12    have a copy for me?  Can I have a copy?

13              MR. FLAXMAN:  Oh, sure.

14              THE COURT:  If you're not going to put it on

15    the screen, then I can't see it.

16    BY MR. FLAXMAN:

17         Q    All right.  Joint Exhibit 1, this is a copy --

18    is it not? -- of the letter you wrote to Mr. Brooks back

19    in April of 2016?

20         A    Yes.

21         Q    And you wrote this by yourself; is that right?

22         A    That's correct.

23         Q    As a matter of fact, you typed it by yourself?

24         A    That's correct.

25         Q    You didn't run it by lawyers to look at it and
```

1  review it, did you?

2       A    No.

3       Q    Okay.  And page 3, is that your signature?

4       A    Yes, it is.

5       Q    And could you read to us the last sentence

6  before your signature?

7       A    "This order is hereby issued to you, and any

8  future violation of this policy will be grounds for your

9  discipline up to and including termination of your

10 appointment with the Kankakee Police Department."

11      Q    And by "termination," did you mean he could be

12 fired?

13      A    Yes.

14      Q    Let's look at page 1.  Were you present at a

15 combined Police and Fire Commission meeting at the Public

16 Safety Center in the combined training room on April 12,

17 2016, at about 5:00 p.m.?

18      A    I, I have, I have a recollection of being

19 there; however, I've been told that I was not there.

20 That could be.

21      Q    So when you wrote this, were you relying on

22 what somebody told you about the meeting?

23      A    About that one, yes.

24      Q    Okay.  And in this first paragraph you wrote

25 about this is the third time that you either witnessed or

1    heard about Mr. Brooks making disparaging remarks.

2              What did you mean by "disparaging remarks"?

3        A    Making untrue statements, making statements

4    that were not exactly the truth, and statements that he

5    probably knew about but did not finish laying the

6    information out.

7        Q    Well, the first of those statements was at a

8    hearing before the EEOC in Chicago; is that right?

9        A    That's correct.

10       Q    So, was Mr. Brooks a witness at that hearing,

11   if you recall?

12       A    I, I cannot recall exactly what that one was

13   about.  I don't know if it was Mr. Brooks --

14       Q    The EEOC is a government agency that enforces

15   the equal employment laws of the United States of

16   America; is that right?

17       A    Yes.

18       Q    And Mr. Brooks, back in that meeting, was

19   making a statement for the use of the EEOC in an

20   investigation; is that right?

21       A    Yes.

22       Q    Was he working as a police officer of the City

23   of Kankakee when he made those statements?

24       A    Yes.

25       Q    And, and you didn't think Mr. Brooks was

1    telling the truth to the EEOC; is that right?

2         A    At that point in time, I did not -- I was

3    pretty sure I knew what he was talking about when he was

4    talking about "officers that were on drugs" and "nothing

5    was being done."

6              I had no idea about a car crash.

7              And I also knew that there was no consent

8    decree issued by the Department of Justice to the

9    Kankakee Police Department.

10        Q    Well, you didn't write anything in your letter,

11   Joint Exhibit 1, about a consent decree with the

12   Department of Justice, did you?

13        A    I believe at some portion, there is one in

14   here.

15        Q    Well, in paragraph 2, you wrote that, at the

16   EEOC hearing, Mr. Brooks made reference "numerous times

17   about a consent decree."

18        A    Yes.

19        Q    Could you tell the ladies and gentlemen of the

20   jury why it was disparaging of the Kankakee Police

21   Department for Mr. Brooks to say there had been a consent

22   decree?

23        A    A consent decree is when the Kankakee Police

24   Department would have been, basically, investigated by

25   the United States Department of Justice for rights

BROOKS v. CITY OF KANKAKEE, 17-2265 -- Jury Trial (4/30/19)

1   violations, either against people or -- other instances.

2   Their civil rights had been violated, and the police

3   department was found guilty of that.

4        Q    So, is it your, your -- are you telling us that

5   when there's a consent decree, it's because somebody's

6   been found guilty; is that right?

7        A    No.

8        Q    Have you ever seen a consent decree with the

9   Department of Justice --

10       A    I --

11       Q    -- against a municipality involving its police

12  department?

13       A    I've never read one; however, I've heard from

14  administrators who are under one.

15       Q    And every consent decree that you've spoken to

16  administrators about begins with language that "this is

17  not an admission of wrongdoing"; isn't that right?

18       A    I, I've never read any consent decree.

19       Q    And there's nothing -- is there anything in

20  Joint Exhibit 1 which talks about the Department of

21  Justice?

22       A    I don't believe so.

23       Q    Now, there was an agreed order that had been

24  entered back in 2005; is that right?

25       A    Yes.

1    Q    And you are -- that was in a case called

2    "Baptist, Brooks, Dumas, Hunt, and Upton versus The City

3    of Kankakee"?

4    A    Yes.

5    Q    And that was an order that involved the way the

6    City would do promotions in the future; is that right?

7    A    Yes.

8    Q    Mr. Brooks was a party to that order, wasn't

9    he?

10   A    Yes.

11   Q    And that order started out with that language I

12   used before about "there's no admission of liability or

13   wrongdoing"?

14   A    I would have to see the agreement.

15        MR. FLAXMAN:  Well, may I move the admission

16   into evidence of Joint Exhibit 2 and publish it to the

17   jury and tender a copy to the witness?

18        THE COURT:  Any objection, Mr. Mathues?

19        MR. MATHUES:  No, Your Honor.

20        THE COURT:  Joint Exhibit 2 is admitted.  You

21   may approach, provide a copy to the witness.

22        MR. FLAXMAN:  And to the Court.

23        THE COURT:  Are you going -- what's the term

24   you used? -- prehistoric?  Are you going prehistoric with

25   this as well or --

```
 1            MR. FLAXMAN:  Yes.

 2            THE COURT:  All right.  You may provide copies

 3   to the jury at this time, as well as to the witness; and

 4   if you have a copy for me, I'd appreciate it.

 5            Thank you.  I now have a copy of Exhibit 2.  I

 6   already received a copy of Joint Exhibit 1.

 7               (Brief pause in proceedings.)

 8   BY MR. FLAXMAN:

 9       Q    Is there anything disparaging about the

10   Kankakee Police Department in that Agreed Judgment Order?

11       A    No.

12            I believe you asked me if the agreement order

13   started with we'd been found guilty of nothing.

14       Q    No.

15            And there's nothing in this agreed order that

16   the City of Kankakee had been found guilty of anything;

17   is that right?

18       A    That's correct.

19       Q    Now, did you believe that Mr. Brooks was

20   referring to this agreed order when he talked about a

21   consent decree?

22       A    I did not know what he was referring to.

23       Q    But you didn't like what he was saying, did

24   you?

25       A    I knew that there was no consent decree which
```

1    the Kankakee Police Department was working under.

2         Q    And you felt it was disparaging to the City of

3    Kankakee for Mr. Brooks to say that there had been an

4    agreed order; is that right?

5         A    That's correct.

6         Q    Okay.  Now, in that letter, Exhibit 1, you

7    criticized -- oh, did you criticize Mr. Brooks -- this is

8    the bottom of page 1 -- for making statements about "a

9    specific officer's drug use, his promotion, and an

10   accident in which he was involved"?  Is that right?

11        A    I didn't criticize him.  I spoke in facts.

12        Q    Now, was Officer Berge's illegal drug use

13   commonly known in the police department back in the

14   beginning of 2014?

15        A    Prior to the investigation by the State Police?

16        Q    Well, there was a newspaper article about a

17   Kankakee police officer being suspended for illegal drug

18   use; is that right?

19        A    Yes.

20        Q    And then there was another newspaper article

21   when that police officer was suspended from the

22   Metropolitan Enforcement Group in March of 2014; is that

23   right?

24        A    Yes.

25        Q    And there was a story about how Officer Berge's

1  girlfriend brought all of his drugs to the police

2  department and said, "Look what Paul's been doing"?

3      A    I don't recall a story that said that.  No.

4      Q    But it was well known -- it wasn't a secret

5  that Officer Berge had been caught using steroids and

6  buying steroids; is that right?

7      A    Probably -- we'd never made a public

8  announcement about it, but it was probably pretty

9  well-known within the police department.  Yes.

10      Q    It was pretty well-known amongst the --

11      A    Throughout the town.

12      Q    Throughout the town, right.

13          And it was important to morale for everybody to

14  know how you handled this police officer who was using

15  and buying illegal drugs; is that right?

16      A    Like I said, I didn't make any public or

17  internal statements about what had happened to Officer

18  Berge.

19      Q    So you didn't make any public statement that

20  Officer Berge was being suspended for 30 days for buying

21  and using illegal drugs, did you?

22      A    No.  I did not.

23      Q    And you didn't make any illegal statement that

24  "We're giving him another chance," did you?

25      A    Made an illegal statement?

1      Q    I'm sorry.  I'll rephrase the question.

2            You didn't make a statement that "We're giving

3    Officer Berge another chance after he was caught buying

4    and using illegal drugs," did you?

5      A    The last-chance agreement did not occur until

6    after we were made aware of the traffic crash.

7      Q    And that was in -- what year was that, sir?

8    2016?

9      A    I believe so.  Yes.  And, and it was -- it

10   should have been shortly after he was promoted we found

11   out about it; I believe in February --

12     Q    Did --

13     A    -- 2016.

14     Q    Did you find out about -- about the drunken car

15   crash from Mr. Brooks?

16     A    I don't know anything about a drunken car

17   crash.  I know about a car crash.

18     Q    And did you find, find that out after Mr.

19   Brooks complained to the Police and Fire Commission about

20   it being swept under the rug?

21     A    That was not at the Police and Fire Commission.

22     Q    Well, did you find out after Mr. Brooks spoke

23   up about it?

24     A    After we were in a, an appeal for a -- in the

25   mayor's office.

BROOKS v. CITY OF KANKAKEE, 17-2265 -- Jury Trial (4/30/19)

```
 1        Q     Okay.  Let me show you what's --
 2             MR. FLAXMAN:  Well, may I move the admission
 3    into evidence of Joint Exhibit 4, the last-chance
 4    agreement?
 5             THE COURT:  You said 4?
 6             MR. FLAXMAN:  Yes.
 7             THE COURT:  Any objection?
 8             MR. MATHUES:  No, Your Honor.
 9             THE COURT:  Exhibit -- Joint Exhibit 4 is
10    admitted at this time.  You may approach.
11             Give a copy to the witness.
12             Can I presume, Mr. Flaxman, that you're going
13    old-school throughout all of these exhibits?
14             MR. FLAXMAN:  Yes, Judge.
15             THE COURT:  All right, then I'll just make a
16    standing order that you can provide copies to the jury,
17    myself, my court reporter, and the witness.
18    BY MR. FLAXMAN:
19        Q     Can you tell us what that is, please, sir?
20        A     This is the last-chance agreement that was
21    given to Mr. Berge.
22        Q     And the last page has a date which the lawyers
23    have agreed is really 2016, not 2015; is that right?
24        A     That would be correct.
25        Q     Did this last-chance agreement have anything
```

1  about drug testing?

2      A    No.

3      Q    This is the agreement that, that includes Mr.

4  Berge's admission -- or his acknowledgment that he

5  totaled, or wrecked his personal vehicle while under the

6  influence of alcohol and unprescribed steroids; --

7      A    That's correct.

8      Q    -- is that right?

9      A    That's correct.

10      Q    And by "unprescribed steroids," you mean

11  illegal steroids --

12      A    Yes.

13      Q    -- that he bought from a drug dealer, right?

14          MR. MATHUES:  Objection, asked and answered

15  multiple times.

16          THE COURT:  I'll overrule it, although we've

17  heard this a number of times.  You need to move on to a

18  different area.

19  BY MR. FLAXMAN:

20      Q    And this last-chance agreement wasn't

21  entered in, was -- how much time passed from when Mr.

22  Berge was discovered to be using illegal steroids,

23  illegal drugs, until the last-chance agreement was

24  signed?  About two years, right?

25      A    Yes, sir.

1        Q    And you're telling us you didn't know about the

2   car accident episode when you promoted Mr. Berge; is that

3   right?

4        A    That is correct.

5        Q    You knew about the steroids, right?

6        A    Yes.

7        Q    And you didn't do a last-chance agreement about

8   the steroids, did you?

9             MR. MATHUES:  Objection, asked and answered

10   multiple times.

11            THE COURT:  Sustained.  We've already gone over

12   this.

13   BY MR. FLAXMAN:

14        Q    Now, the statements -- let's go back to Joint

15   Exhibit 1, the paragraph at the bottom of page 1.

16            You told Mr. Brooks that all of the issues

17   about Mr. Berge's drug use, his promotion, and an

18   accident had been dealt with and adjudicated by the

19   Department; is that right?

20        A    Yes.

21        Q    Had that been publicly announced?

22        A    I never made a public announcement about

23   anybody's discipline.

24        Q    Did you think it was disparaging to the

25   Kankakee Police Department for people to believe that

1    nothing had happened to an officer who was caught using

2    and buying illegal drugs?

3         A    That wasn't the case, sir.

4         Q    Well, did you make a public statement of any

5    sort about discipline that had been imposed upon Mr.

6    Berge?

7         A    No.

8              MR. MATHUES:  Objection, asked and answered

9    multiple times.

10             THE COURT:  Overruled.

11        A    No.

12             THE COURT:  Let's ask -- move on to a different

13   area, --

14             MR. FLAXMAN:  Okay.

15             THE COURT:  -- Mr. Flaxman.

16   BY MR. FLAXMAN:

17        Q    And then in that, the last-chance agreement,

18   you told, you told Mr. Brooks -- did you not? -- that it

19   wasn't any of his business what happened to Mr. Berge; is

20   that right?

21        A    No.

22        Q    It's not right?

23        A    It's not in the last-chance agreement.

24        Q    Well, no.

25             The Joint Exhibit 1, that's your letter of

1    April 25, 2016?

2         A    Yes.

3         Q    And at the bottom of that, you said, you

4    wrote -- did you write that "The discipline administered

5    by the Department to another officer is, quite frankly,

6    none of your business, or anyone else's for that matter,

7    except for the officer involved"?  Is that right?

8         A    Yes.

9         Q    You didn't think it was a matter of public

10   concern about an officer using and buying illegal drugs

11   being promoted to sergeant?

12             MR. MATHUES:  Objection, asked and answered

13   multiple times.

14             THE COURT:  Sustained.  We've already covered

15   this, Mr. Flaxman.

16   BY MR. FLAXMAN:

17        Q    And at the top sentence of paragraph, of Joint

18   Exhibit 1, you described Mr. Brooks's statement as

19   "inappropriate"?

20             THE COURT:  I'm sorry.  Where are you?

21             MR. FLAXMAN:  Page 2 of Exhibit 1, the --

22             THE COURT:  Oh, page 2.  Sorry.  Go ahead.

23   BY MR. FLAXMAN:

24        Q    Page 2 of Exhibit 1, the second line, "your

25   inappropriate public statements," did you write that?

1        A    Yes, I did.

2        Q    And by "inappropriate public statements," did

3    you mean Mr. Brooks saying that nothing happened to this

4    guy, Mr. Berge?

5        A    Yes.

6        Q    Why was that inappropriate, sir?

7        A    There had been newspaper articles about what

8    had happened with the steroids, about Mr. Berge.

9        Q    Was, was there a newspaper article about Mr.

10   Berge being promoted to sergeant?

11       A    Yes.

12       Q    Was there a newspaper article about Mr. Berge

13   signing a last-chance agreement?

14       A    No.

15       Q    Was there a newspaper article about Mr. Berge

16   being -- promising you orally not to use steroids

17   anymore?

18            MR. MATHUES:  Objection, mischaracterizes the

19   testimony.

20            THE COURT:  I'll summarize that -- sorry.  I'll

21   sustain that.

22   BY MR. FLAXMAN:

23       Q    Now, in the, the next paragraph -- or the first

24   full paragraph on page 2, it starts out, "You have taken

25   it upon yourself to profess these inaccurate facts."

```
 1              And those "inaccurate facts," you're talking
 2      about Mr. Brooks saying that there was a consent decree?
 3         A     One of them.
 4         Q     And the other inaccurate fact was saying that
 5      Mr. Berge had been promoted to sergeant?
 6         A     No.
 7         Q     Well, Mr. -- that's something that Mr. Brooks
 8      said, that Mr. Berge had been promoted to sergeant; isn't
 9      that right?
10         A     Right.  I didn't say -- I didn't state -- I
11      didn't say that was inaccurate, and I didn't take
12      exception to it.
13         Q     Well, was it inappropriate for Mr. Brooks to
14      say that Mr. Berge had been promoted to sergeant?
15         A     No.
16         Q     Was it inappropriate for Mr. Brooks to say that
17      Mr. Berge had been caught buying and using illegal drugs?
18              MR. MATHUES:  Objection, asked and answered
19      multiple times.
20              THE COURT:  Yeah.  We've covered that, Mr.
21      Flaxman.  Sustained.
22      BY MR. FLAXMAN:
23         Q     And then the next paragraph, you say that Mr.
24      Brooks has "no factual basis except what you think or
25      what someone else may have told you"; is that right?
```

1        A    Yes.

2        Q    That wasn't true, was it, sir?

3        A    Yes, sir, it was.

4        Q    Mr. Brooks -- did Mr. Brooks have a factual

5   basis to say that Officer Berge had been promoted to

6   sergeant?

7             MR. MATHUES:  Objection, mischaracterizes the

8   testimony.

9             THE COURT:  That's -- sustained.  You're going

10  to have to ask that question -- you can ask that question

11  a different way, and I would not sustain the objection.

12  BY MR. FLAXMAN:

13       Q    Did Mr. Brooks have a factual basis to say that

14  Officer Berge had been caught using and buying drugs?

15       A    Yes.

16       Q    Did he have a factual basis to say that there

17  had been an agreed order?

18            MR. MATHUES:  Objection, mischaracterizes the

19  testimony.  There's no testimony as to Mr. Brooks ever

20  said there was an agreed order.

21            THE COURT:  Yeah.  I'm going to sustain that.

22            Just be careful how you phrase these things,

23  Mr. Flaxman.

24            MR. FLAXMAN:  Okay.

25

1  BY MR. FLAXMAN:

2      Q    Now, other than -- could you tell us, as best

3  you can, what these inaccurate facts were that Mr. Brooks

4  had been telling at these public meetings?

5      A    That the Kankakee City Police Department was

6  under a consent decree; that the, an officer had been

7  using drugs and that nothing had ever happened to him;

8  that he wrecked a car and that the incident was covered

9  up, and nothing was ever done.

10     Q    Well, the car accident, that's -- when did that

11  take place, sir?

12     A    In 2012.

13     Q    And when was Mr. Berge disciplined for that

14  2012 car accident?

15     A    In 2016.

16     Q    And is it your testimony that there wasn't a

17  cover-up for four years when discipline was imposed?

18          MR. MATHUES:  Objection, vague form of the

19  question.

20          THE COURT:  I don't -- well, I'll sustain it on

21  my own, on my own objection.  I don't understand your

22  question.  So, sustained because the Court doesn't

23  understand what you're asking.

24          MR. FLAXMAN:  I, I -- I'll try to do better.

25

1  BY MR. FLAXMAN:

2      Q    Mr. Brooks complained that there -- nothing had

3  happened to Mr. Berge for four years after that April,

4  that 2012 car accident; is that right?

5      A    Yes.

6      Q    And he said that there was a cover-up; is that

7  right?

8      A    That's what he said.  Yes.

9      Q    Now, what took four years for the police,

10 Kankakee Police Department, to discover the truth about

11 that April 12th incident?

12     A    It was --

13     Q    April of 2012 incident.

14     A    No one ever brought it forward to tell us that

15 the incident had even occurred.

16     Q    And did someone bring it forward in 2016?

17     A    Yes.

18     Q    Who was that?

19     A    Mr. Brooks.

20     Q    And were you going to discipline him for

21 bringing that forward, telling you that there had been a

22 cover-up of a car crash, a drunken driver car crash in

23 2012?

24          MR. MATHUES:  Objection, form of the question.

25          THE COURT:  Yeah.  I'll sustain.  That's,

1    that's -- ask that a different way.

2                MR. FLAXMAN:  Okay.

3    BY MR. FLAXMAN:

4        Q    So when Mr. Brooks brought that forward, he had

5    a factual basis for telling you that there had been a

6    cover-up of the 2012 accident; is that right?

7        A    No.

8        Q    Well, after Mr. Brooks brought it forward in

9    2016, did the police department do an investigation?

10       A    Yes, we did.

11       Q    And did the investigation result in that

12   last-chance agreement?

13       A    Yes.

14       Q    And it resulted in Officer -- or then-Sergeant

15   Berge confessing to being under the influence of alcohol

16   and unprescribed steroids when he wrecked his car back in

17   2012; is that right?

18       A    Yes.

19       Q    And --

20                MR. MATHUES:  Objection.

21                THE COURT:  Whoa, whoa, whoa.

22                Are you objecting to that?

23                MR. MATHUES:  Objection, mischaracterized

24   testimony as to the word "confess."

25                THE COURT:  We're getting into some -- I'll

BROOKS v. CITY OF KANKAKEE, 17-2265 -- Jury Trial (4/30/19)

1    sustain that objection.

2              Just be careful how you're asking these

3    questions, Mr. Flaxman.  You can ask the same question a

4    different way.

5              MR. FLAXMAN:  I, I didn't hear what the

6    objection was.

7              THE COURT:  You used the word "confessed."

8              MR. FLAXMAN:  Well, okay.

9    BY MR. FLAXMAN:

10        Q    Did Mr. Brooks's complaint result in Officer --

11   or then-Sergeant Berge signing this last-chance agreement

12   in which he acknowledged that "on April 12, 2012, in the

13   early-morning hours, he wrecked his personal vehicle into

14   the side of a commercial building in the 100 block of

15   West Hickory Street, causing over $500 in damage to his

16   vehicle, while under the influence of alcohol and

17   unprescribed steroids, and left the scene without filing

18   a police report"?

19             Is that right?

20        A    Yes.

21        Q    And why -- could you tell the ladies and

22   gentlemen of the jury why it is that you told Mr. Brooks

23   if he said that again he could be fired?

24        A    Because he said it -- I didn't tell him he was

25   gonna be fired.  I told him there would be aggressive

1  discipline applied --

2      Q    And --

3      A    -- up to and including termination should he

4  continue to do that.

5      Q    Did you, did you tell him -- did you wink when

6  you said that and "We're not going to fire you; we're

7  just going to do aggressive discipline"?

8      A    No.

9      Q    Now, Mr. Brooks made that complaint about the

10  cover-up at a hearing with the mayor back in 2016; is

11  that right?

12      A    That's correct.

13      Q    And did the mayor tell you "What's the story

14  here?  Go investigate this"?

15      A    No.  I was able to explain to her at that point

16  that we now had a name of the person that he had made

17  reference to and refused to tell us previously.

18      Q    Did you investigate that -- did the Kankakee

19  Police Department investigate that incident, or was that

20  also the State Police?

21      A    No.  The City Inspector, the Internal Affairs

22  officer, made that investigation.

23      Q    Did they look into whether then-Sergeant Berge

24  had claimed, made an insurance claim about his car being

25  wrecked?

```
 1              MR. MATHUES:  Objection, personal knowledge and
 2    relevance.
 3              THE COURT:  I'll sustain as to relevance.
 4    BY MR. FLAXMAN:
 5         Q    Well, would that also be misconduct for a
 6    police officer to make a false insurance claim?
 7              MR. MATHUES:  Objection.
 8              Judge, can I have a sidebar?
 9              THE COURT:  Yes.
10              (Sidebar, outside jury's hearing.)
11              THE COURT:  What's going on?
12              MR. MATHUES:  Judge, there is -- I would object
13    to this line of questioning.  It's creating a false
14    impression to the jury.  There is no evidence of any kind
15    of insurance misconduct.  There is no evidence, and
16    there's been no disclosure in this case, of any basis of
17    knowledge that any witnesses were reprimanded for any
18    kind of insurance misconduct.  And for that reason, I
19    object to this line of questioning as improper and
20    prejudicial under Rule 403.
21              THE COURT:  Mr. Flaxman.
22              MR. FLAXMAN:  I, I believe the witness will say
23    that there was no investigation into whether he made a
24    false insurance claim, and that's -- we would argue, I
25    believe, that that's another part of the cover-up that
```

1    Mr. Brooks is complaining about.

2           MR. MATHUES:  May I please respond, Your Honor?

3           THE COURT:  Yes.

4           MR. MATHUES:  There is no evidence that I'm

5    aware of -- and certainly none in the testimony -- that

6    Mr. Brooks ever made allegations about a false insurance

7    claim or that Mr. Brooks ever said that there was a false

8    insurance claim or even mentioned any sort of insurance

9    claim.  Mr. Brooks certainly never said that at his

10   deposition, and there's been no disclosure along those

11   lines.

12          So I would reiterate my objections.

13          THE COURT:  All right.  I don't recall --

14   obviously, I don't know every single bit of evidence, but

15   there's been no indication to me in the record whatsoever

16   that there was any evidence of any insurance fraud.  It

17   certainly wasn't brought up in any of the motions in

18   limine or any summary judgment motions which detailed Mr.

19   Brooks's complaints that he made.  This is also new to

20   the Court.

21          I'm going to sustain Mr. Mathues's objection.

22          Simply move off of this insurance fraud topic,

23   and don't bring it up again.

24          MR. FLAXMAN:  I understand.

25              (In open court.)

BROOKS v. CITY OF KANKAKEE, 17-2265 -- Jury Trial (4/30/19)

1              THE COURT:  You may ask your next question, Mr.

2    Flaxman.

3              MR. FLAXMAN:  Thank you, Your Honor.

4    BY MR. FLAXMAN:

5         Q    Now, do you have that Joint Exhibit 4 in front

6    of you?  That's the Last-Chance Discipline Agreement?

7         A    Yes.

8         Q    Why did you do a Last-Chance Discipline

9    Agreement about the steroid use?

10             MR. MATHUES:  Objection, mischaracterizes the

11   testimony.

12             THE COURT:  He can explain the purpose of the

13   last-chance agreement, so overruled.

14             WITNESS REGNIER:  The purpose of the last--

15   could you repeat your question to me again, please, sir?

16   BY MR. FLAXMAN:

17        Q    How many last-chance agreements did Officer --

18   Sergeant Berge have?

19        A    One.

20        Q    And that's the one that's before you, Joint

21   Exhibit 4, --

22        A    That's right.

23        Q    -- correct?

24             And this last-chance agreement came about after

25   Mr. Brooks called to your attention the, the 2012 car

BROOKS v. CITY OF KANKAKEE, 17-2265 -- Jury Trial (4/30/19)

1    wreck incident; is that right?

2        A    Yes.

3        Q    Why did you not do a last-chance agreement when

4    you learned that Officer Berge had been buying and using

5    illegal drugs?

6        A    Because he was sent through treatment, and he

7    was suspended for 30 days.

8        Q    And there was -- well, the last-chance

9    agreement has a promise that:  "If I get caught engaging

10   in this kind of wrongdoing again, I can be fired; and I

11   won't appeal."  Is that right?

12       A    That's correct.

13       Q    Why didn't you have Officer Berge sign that

14   kind of agreement when he went through treatment for his

15   illegal steroid buying and using?

16           MR. MATHUES:  Objection, asked and answered.

17           THE COURT:  No, not this part of the question.

18           Go ahead.  Overruled.

19       A    Why didn't I do one with the steroids?

20       Q    Right.  An agreement where, if he'd get caught

21   using steroids again, he -- he'll be fired, and he won't

22   appeal.

23       A    All of this was coming to a culmination at the

24   same time.  That's why we did the second-chance agreement

25   after we found out about the car crash.

BROOKS v. CITY OF KANKAKEE, 17-2265 -- Jury Trial (4/30/19)

1       Q    So when was it that Officer Berge went to

2  treatment for his illegal steroid use?

3       A    It was late 2013/early 2014 when we made the

4  discovery.

5       Q    And --

6       A    I believe, I believe he was, he was in

7  treatment in 2014.

8       Q    Well, this last-chance agreement, Exhibit 4, is

9  from 2016.

10      A    Yes.

11      Q    Why didn't you have a last-chance agreement in

12 2014 or 2015 with Officer Berge?

13      A    At that point, I didn't feel it was necessary.

14      Q    And why is that, sir?

15      A    He was, he was going through treatment.  I let

16 him, I let him continue to be a police officer in the

17 City of Kankakee.  When he was done with treatment, he

18 was returned back to duty.

19      Q    Was he off -- was he off duty for, when he was

20 going through treatment?

21      A    Yes.

22      Q    Okay.  And when he came back after treatment,

23 did he sign an agreement saying, "I agree to do voluntary

24 drug tests for some period of time"?

25      A    No.

1    Q    Isn't that preferential treatment?

2         MR. MATHUES:  Objection, calls for a legal

3    conclusion.

4         THE COURT:  If -- I'll sustain.  You can

5    rephrase the question.

6    BY MR. FLAXMAN:

7    Q    Isn't that very easy -- very light discipline

8    for a police officer who's caught buying and using

9    illegal drugs?

10   A    The, in my opinion, he had been given a 30-day

11   unpaid suspension.  He was off work for approximately six

12   months of time going through treatment.

13        I felt that, at that time, he had put in the

14   effort to successfully go through the treatment.  He'd

15   agreed for us to randomly test him for the next six

16   months.  I felt like he had the, he had the additional

17   chance coming.

18   Q    He didn't -- there was no written agreement

19   about random drug testing for six months, was there?

20   A    It was more than six -- more than six months.

21   Q    Well, was there a written agreement to that?

22   A    No.

23   Q    And that was something -- was it not? -- that

24   Mr. Brooks complained about, about the treatment that

25   Officer Berge got from you?

 1              MR. MATHUES:  Objection, mischaracterizes the

 2   testimony.

 3              THE COURT:  I'll, I'll sustain that.

 4              MR. FLAXMAN:  Okay.

 5   BY MR. FLAXMAN:

 6      Q    Now, you didn't like Officer Brooks complaining

 7   about the way you had treated Officer and then-Sergeant

 8   Berge, did you?

 9      A    I didn't like it?

10      Q    Right.

11      A    It didn't really matter to me what he thought.

12      Q    Well, --

13              THE COURT:  Wait.  I -- explain that.  What?

14              WITNESS REGNIER:  It didn't, it didn't -- it

15   didn't matter to me what Mr. Brooks thought.  My, my view

16   of what had happened is a broader view.  It goes toward

17   the mission of the police department as far as -- you

18   know, he is portraying things in an untrue manner.  He

19   said that there was a cover-up and that, that nothing had

20   happened to him when, in fact, lots had happened to him.

21              THE COURT:  Okay.  I'm -- by "him," you're

22   talking about Mr. Berge?

23              WITNESS REGNIER:  Mr. Berge.  I'm sorry,

24   Your Honor.

25              THE COURT:  That's where I got confused.

BROOKS v. CITY OF KANKAKEE, 17-2265 -- Jury Trial (4/30/19)

```
1              WITNESS REGNIER:  Okay.  I'm sorry.

2              THE COURT:  Okay.  I understand.

3              WITNESS REGNIER:  Yes.

4              THE COURT:  I understand.

5              All right, go ahead and ask another question.

6    That's fine.

7              MR. FLAXMAN:  Thank you, Your Honor.

8    BY MR. FLAXMAN:

9         Q    Did you ever write a letter to Officer Berge,

10   or Sergeant Berge, saying, "If you do this again, if you

11   use steroids again, you're going to be fired"?

12             MR. MATHUES:  Objection, asked and answered.

13             THE COURT:  Sustained.

14             MR. FLAXMAN:  Okay.

15   BY MR. FLAXMAN:

16        Q    Is there anything in the Last-Chance Discipline

17   Agreement, Joint Exhibit 4, about not using steroids

18   anymore?

19        A    I don't believe so.

20        Q    And in your letter to Mr. Brooks -- Exhibit 1,

21   page 3 -- you wrote to him that he couldn't make any

22   criticisms "of other police officers, including the

23   statement of inaccurate information, in public or

24   private."

25             Do you see that?
```

1        A     Yes, sir.

2        Q     Why were you telling Mr. Brooks that if he made

3   private, nonpublic criticism you could discipline him?

4        A     Because he was going to aldermen and other

5   officials, telling them the same story.  They would then

6   present it on the Council floor, which made it public.

7        Q     You didn't write that, did you?

8        A     No.

9        Q     Okay.  So the way you wrote it, if he told his

10  wife that "there's bad doings in the Kankakee Police

11  Department," you could discipline him for that, couldn't

12  you?

13            MR. MATHUES:  Objection, mischaracterizes the

14  testimony.

15            THE COURT:  I'll sustain that.

16  BY MR. FLAXMAN:

17       Q     You didn't want Mr. Brooks talking to City

18  Council members; is that right?

19            MR. MATHUES:  Objection, mischaract--

20            WITNESS REGNIER:  I have absolutely no problem

21  with him --

22            MR. MATHUES:  Go ahead.

23            WITNESS REGNIER:  I'm sorry.

24            MR. FLAXMAN:  You didn't want Mr. Brooks --

25  there --

```
 1              THE COURT:  Stop.  Whoa, whoa.  Stop.

 2              All right, my court reporter's really good, but

 3    she cannot take down multiple people saying things at the

 4    same time.

 5              All right, did you -- I lost track of where you

 6    were objecting.

 7              MR. MATHUES:  I was about to object.  I heard

 8    the answer.  I with-- I heard Mr. -- the answer.  I

 9    withdraw the objection.

10              THE COURT:  All right.  So, Mr. Regnier, as I

11    understand it, your answer -- well, I'm not going to put

12    words in your mouth.  Say your answer again.

13              WITNESS REGNIER:  I have absolutely no problem

14    with Mr. Brooks talking to any elected official, any

15    person appointed to any board at any time.

16              However, the, the things that he is telling

17    them must be true and accurate.

18    BY MR. FLAXMAN:

19         Q    And would there be a jury deciding if his

20    statements were truthful and accurate?

21         A    No, sir.

22         Q    There would just be you; is that right, sir?

23         A    No.

24         Q    Well, would there be your command staff

25    deciding if Mr. Brooks made truthful and accurate
```

1    statements?

2        A    No, sir.  The truth is the truth.

3            MR. FLAXMAN:  Okay, if I could just have a

4    minute, Your Honor.

5            THE COURT:  Take your time.

6               (Brief pause in proceedings.)

7            MR. FLAXMAN:  I have nothing further,

8    Your Honor.

9            THE COURT:  All right.  Ladies and gentlemen,

10   it's 12:11.  It's time for lunch.  It's actually a little

11   bit past when we normally go to lunch.  As I said, I try

12   to break things when there's a natural time to break.

13           I have to read you something.  Let me tell you:

14   For timing purposes, before I read you what I'm going to

15   call "my admonition," if you get out of here at 12:15 --

16   because I'm not going to read for that long -- why don't

17   you try to come back in the jury room about 1:25, and

18   we'll bring you in here about 1:30.  So I'm going to give

19   you a little bit more than an hour.

20           Now, during our break this afternoon and our

21   break this evening, I'm not going to read this whole

22   instruction to you again.  You've already heard most of

23   it in different fragments.  I'm simply going to call it

24   "my admonition."  All right?

25           So we're about to take our first lunch break

1    during the trial.  I want to remind you of the

2    instructions I gave you earlier.  Until the trial is

3    over, you are not to discuss the case with anyone,

4    including your fellow jurors.  Don't discuss it with

5    members of your family.  Don't discuss it with any people

6    involved in the trial.  Don't discuss it with anyone.

7            This includes face-to-face conversations, phone

8    calls, any communications at all, whether it's Facebook,

9    Twitter, Snapchat, texting.  Don't discuss the case by

10   any means or any form of communication at all.

11           I've already told you about Facebook and

12   Snapchat.  I don't know if any of you use Facebook or

13   Snapchat, but don't post anything about the trial.  If

14   you get a response, that could prejudice you, taint the

15   jury.  You might be kicked off the jury.  Don't do it.

16   As I said, for the duration of the trial, I'm directing

17   you to stay off your Facebook and Snapchat accounts.

18           You can tell your family.  You can tell your

19   employer over the lunch break and any other break we

20   have, if they ask, that you're serving on a federal jury;

21   so you can explain you have to be in court.  Again, don't

22   talk to them about the case, anyone involved in the case,

23   anything about the case whatsoever.

24           If anyone approaches you and tries to talk to

25   you about the case, don't tell your fellow jurors what

1    happened.  Instead, tell me; tell my courtroom deputy;

2    tell the court security officers.

3            I have not seen any media in here today; but

4    just in case someone mentions it on the radio or

5    television or you see something in the newspaper this

6    evening -- in case I forget to tell you later -- just

7    don't read the article.  Turn the radio off.  Turn to a

8    different channel, station, whatever.

9            Remember, I mean, the bottom line comes down

10   to:  Keep an open mind.  Keep an open mind until you've

11   received all the evidence, you've heard my instructions,

12   you've heard the arguments of the attorneys, and you've

13   had a chance to talk to your fellow jurors.  Keep an open

14   mind.

15           I'm not going to repeat these things to you at

16   every break.  I'm just calling this "my admonition."  So

17   this is the last time -- first and last time you'll hear

18   me read the whole thing.  From now on, I'll just say,

19   "Remember my admonition," and you'll know what I'm

20   talking about.  So, that's it.

21           Try to be back in the jury room at 1:25.  We'll

22   bring you in here at 1:30.  Have a good lunch.

23              (Jury absent, 12:14 p.m.)

24           THE COURT:  The jury's left the courtroom.  Be

25   seated.

```
 1              Just for my own timing purposes, Mr. Flaxman,
 2     after Mr. Regnier, who do you think you're going to call?
 3              MR. FLAXMAN:  Mr. Brooks.
 4              THE COURT:  All right.  And can I safely
 5     presume, between Mr. Regnier and Mr. Brooks, we're going
 6     to take up the afternoon?
 7              MR. FLAXMAN:  Well, it depends on your position
 8     about going beyond the scope of direct for an adverse
 9     witness.  Do you want them to call him in their case
10     again, or do you want to go --
11              THE COURT:  No.  I would prefer we do all the
12     witnesses at one time rather than call people back and
13     forth, unless that's going to cause an issue that I'm not
14     aware of.
15              Do you have an objection to that, Mr. Flaxman?
16              MR. FLAXMAN:  No.
17              THE COURT:  Mr. Mathues, do you have -- do you
18     wish to recall him later and limit your, limit your
19     examination in the plaintiff's case?  Or do you intend to
20     ask all the questions when it's your turn?
21              MR. MATHUES:  Judge, I believe we're going to
22     ask to bring zero questions -- I'm sorry [turning on
23     microphone].
24              I'm sorry, Your Honor.  Also, I should stand
25     up; I apologize.
```

```
 1              THE COURT:  Yep, yep, yep -- no.  You don't
 2   have to apologize to me.  The court reporter's going to
 3   give you "the look," and then you're going to know.
 4              MR. MATHUES:  Judge, what I anticipate doing is
 5   asking Former Chief Regnier zero questions now and
 6   calling him in our case-in-chief and going from there.
 7              THE COURT:  Okay, that's fine.
 8              MR. MATHUES:  If the Court has a problem with
 9   that, I can adjust.
10              THE COURT:  No.  I don't tell people.  I let
11   everybody try their own case, so you can do it that way.
12              All right, so I'll see everybody back here,
13   then, at 1:25 unless somebody has something else to
14   raise.  I see everybody's shaking their head "no."  I'll
15   see you back at 1:25.  Have a good lunch.
16              (Recess, 12:16 p.m. to 1:30 p.m.)
17              THE COURT:  All right.  We're back on the
18   record.  All parties and counsel are present.
19              I've been advised all the jurors are back from
20   lunch.
21              Mr. Flaxman, should we bring the jury back in?
22              MR. FLAXMAN:  Yes, Your Honor.
23              THE COURT:  Mr. Mathues?
24              MR. MATHUES:  No objection, Your Honor.
25              THE COURT:  Let's bring them back.
```

 1          (Brief pause in proceedings.)

 2          (Jury present, 1:32 p.m.)

 3          THE COURT:  All right.  Have a seat.  Hope

 4  everybody had a good lunch, and we're ready to continue.

 5          Mr. Mathues.

 6          MR. MATHUES:  Judge, at this time, we have no

 7  questions for the chief.  We will be calling him in the

 8  defendant's case.

 9          All right, Mr. -- oh, Mr. Regnier isn't even up

10  there.  All right, well, he can step down.

11          (Witness Regnier excused, 1:32 p.m.)

12          THE COURT:  All right, Mr. Flaxman, you can

13  call your next witness.

14          MR. FLAXMAN:  My next witness is Mr. Brooks,

15  the plaintiff.

16          RICHARD BROOKS, sworn, 1:33 p.m.

17          THE COURT:  I take it, Mr. Mathues, Mr. Regnier

18  knew you were not going to ask any questions?

19          MR. MATHUES:  That's correct, Your Honor.

20          THE COURT:  All right.  Mr. Flaxman, whenever

21  you're ready.  You may proceed.

22          MR. FLAXMAN:  Thank you, Your Honor.

23          DIRECT EXAMINATION BY MR. FLAXMAN:

24     Q    Could you tell the ladies and gentlemen of the

25  jury your name again, please?

```
 1        A     Richard Brooks, B-r-o-o-k-s.

 2        Q     And you're a police officer at the City of

 3   Kankakee; is that right?

 4        A     Yes, I am.

 5        Q     For how long have you been a Kankakee police

 6   officer?

 7        A     23 years.

 8        Q     And what's your -- what kind of work do you do

 9   as a police officer?

10        A     Patrolman.

11        Q     Okay.  Do you agree with the former chief that

12   you're a good officer?

13        A     Yes, I do.

14        Q     Okay.  What did you do before becoming a police

15   officer?

16        A     I was a sergeant-at-arms officer at the

17   Braidwood nuclear plant.

18        Q     And how long did you do that?

19        A     Two years.

20        Q     What's the extent of your formal education?

21        A     I graduated at the Governors State University,

22   criminal justice, bachelor's.

23        Q     And when was that?

24        A     '94.

25        Q     And you live in Kankakee?
```

BROOKS v. CITY OF KANKAKEE, 17-2265 -- Jury Trial (4/30/19)

```
 1        A    Yes, I do.

 2        Q    Married?

 3        A    Yes, I am.

 4        Q    And you have -- how many children do you have?

 5        A    Two girls.

 6        Q    How old are they?

 7        A    One is 18, and the other is 30.

 8        Q    Have you ever intentionally made any

 9   disparaging comments about the Kankakee Police

10   Department?

11        A    Absolutely not.

12        Q    Okay.  Let me show you what's been introduced

13   into evidence as Joint Exhibit 1.

14             (Brief pause in proceedings.)

15        Q    Did you receive that letter back in 2016 from

16   the chief?

17        A    Yes, I did.

18        Q    And it's dated April 25, 2016.  When did you

19   receive it?

20        A    It would have been around about that date.

21        Q    Did you read the whole thing?

22        A    Yes, I did.

23        Q    How did you feel as you were reading it?

24        A    First, I was kind of taken aback that I would

25   receive something such as this threatening my employment
```

BROOKS v. CITY OF KANKAKEE, 17-2265 -- Jury Trial (4/30/19)

1   for just doing my civic duty.  And a whole lot of things

2   were going through my head, emotional distress, and I was

3   angry.

4        Q    Now, this letter refers to a, a hearing at the

5   EEOC in Chicago in 2014.  Was there a hearing at the EEOC

6   or at the State Department of Human Rights?

7        A    Illinois Department of Human Rights.

8        Q    And was the chief there, or was somebody there

9   for him?

10       A    Robin Passwater.

11       Q    And who is Robin Passwater?

12       A    He's a lieutenant with the department.

13       Q    Did you make references to a consent decree at

14   that hearing before the Illinois Department of Human

15   Rights?

16       A    I mentioned it; but I, at the time, meant an

17   agreed order, which I think they're synonyms.  They're

18   very similar.

19       Q    Did you mistakenly refer to the agreed order as

20   a consent decree?

21       A    Yes, I did.

22       Q    As you sit here today, do you believe or

23   understand there to be any difference between an agreed

24   order and a consent decree?

25       A    No.  I do not.

BROOKS v. CITY OF KANKAKEE, 17-2265 -- Jury Trial (4/30/19)

1       Q    Were you trying to criticize or place in a

2   false light the Kankakee Police Department when you

3   referred to the agreed order as a consent decree?

4       A    No.  I did not.

5       Q    Did you ever at any time ever say that there

6   was an agreed order that involved the United States

7   Department of Justice and the City of Kankakee?

8       A    I have said that.  Yes.

9       Q    You said that there -- well, was there a

10  consent decree with the United States Department of

11  Justice?

12      A    As I stated, I was explaining myself to the

13  representative at the Illinois Department of Human

14  Rights, and it was to my understanding -- I thought they

15  were similar at the time, and I might have called the

16  agreed order a consent decree.

17      Q    Well, did you mention the United States

18  Department of Justice?

19      A    No.  No, I didn't.

20      Q    Okay.  Now, that, that proceeding before the

21  Illinois Department of Human Rights, was that like we're

22  here today, with a courtroom and a jury and a judge?

23      A    No.  It was not.

24      Q    Could you -- was it, like, in a conference

25  room?

BROOKS v. CITY OF KANKAKEE, 17-2265 -- Jury Trial (4/30/19)

1     A     Yes.

2     Q     Was it in a conference room?

3     A     Yes, it were.

4     Q     And did you have a lawyer?

5     A     No.  I did not, not at that time.

6     Q     Were there representatives from the City of

7  Kankakee?

8     A     Yes.  And they had lawyers.

9     Q     And then to get to the conference, had you

10  filed the charge with the Department of Human Rights?

11     A     Yes, I did.

12     Q     Did you -- was that conference to go over the

13  charge?

14     A     Yes.

15     Q     Now, at one point, did you file a charge with

16  the Illinois Department of Human Rights about this

17  letter, Joint Exhibit 1, that the chief had written to

18  you?

19     A     Yes, I did.

20     Q     And they said there was -- they didn't agree

21  with you that there was anything discriminatory about the

22  letter; is that right?

23     A     No substantial evidence.

24     Q     Okay.  And we -- you disagree with that, and

25  that's why we're here today; is that right?

BROOKS v. CITY OF KANKAKEE, 17-2265 -- Jury Trial (4/30/19)

```
 1        A      Yes.

 2               MR. MATHUES:  Objection to leading.

 3               THE COURT:  Overruled.

 4               MR. FLAXMAN:  Okay.  Now, let me show you

 5     what's -- well, we'd move admission into evidence of

 6     Joint Exhibit 3, which I think is agreed.

 7               THE COURT:  Any objection?

 8               MR. MATHUES:  No, Your Honor.

 9               MR. FLAXMAN:  And may I publish it?

10               THE COURT:  You may publish it.

11               (Brief pause in proceedings.)

12               THE COURT:  Mr. Mathues, you -- for the record,

13     you have agreed with the form that 3, Joint Exhibit 3 is

14     in at this time?

15               MR. MATHUES:  Yes, Your Honor.

16               THE COURT:  Okay.

17               MR. FLAXMAN:  And could we tell the jury that

18     the, those black marks, that they're at Your Honor's

19     order?

20               THE COURT:  Ladies and gentlemen, what Mr.

21     Flaxman is referring to -- and, earlier, you heard me ask

22     Mr. Mathues a question -- there are various portions in

23     this order that have been redacted based on an order that

24     I entered.  You need not concern yourself with the

25     reasons for the redaction.  Suffice it to say that it's
```

BROOKS v. CITY OF KANKAKEE, 17-2265 -- Jury Trial (4/30/19)

```
 1    part of an order that I entered that is no matter you

 2    need to consider.

 3                  (Brief pause in proceedings.)

 4    BY MR. FLAXMAN:

 5         Q    Now, if you turn to page 7 where it says

 6    "Complainant's Allegations, Count D," is that the

 7    paragraph about Joint Exhibit 1, the letter from the

 8    chief?

 9         A    Yes.

10         Q    Okay.  Do you remember how much time was spent

11    at that conference talking about Count D, the letter from

12    the chief?

13              MR. MATHUES:  Objection, vague and facts not in

14    evidence.

15              THE COURT:  Well, I'll sustain because, not

16    only for that reason, I don't understand your question.

17              MR. FLAXMAN:  Okay.

18              THE COURT:  Ask the question --

19    BY MR. FLAXMAN:

20         Q    Was, was there a discussion at that

21    fact-finding hearing before the Illinois Department of

22    Human Rights about those allegations, Count D, that are

23    shown on page 7?

24         A    Yes.  There --

25              MR. MATHUES:  Objection.
```

BROOKS v. CITY OF KANKAKEE, 17-2265 -- Jury Trial (4/30/19)

1              THE COURT:  Are you going to object?  Because

2    if you're not, I'm going to tell you:  I still don't

3    understand your question.

4              MR. MATHUES:  I was going to object to hearsay,

5    Your Honor.

6              THE COURT:  Well, I still don't understand what

7    you're asking him.

8              MR. FLAXMAN:  Well, --

9              THE COURT:  I mean, are you referring to the

10   exhibit?  Are you asking him about what happened at

11   the -- I'm not sure what you're asking here.

12             MR. FLAXMAN:  Okay.

13             THE COURT:  You're going to have to ask the

14   question a different way.

15             MR. FLAXMAN:  Okay.  I, I -- it's been a long

16   time since I've done this, Judge.

17   BY MR. FLAXMAN:

18        Q    At the Human Rights hearing, was there a

19   discussion of your complaints?

20        A    Yes.

21        Q    And was one of your complaints what's referred

22   to on page 7 as Count D, the April 25th letter?

23        A    Yes.

24        Q    And how many minutes, if you recall, was spent

25   discussing Count D, the April 25th letter?

BROOKS v. CITY OF KANKAKEE, 17-2265 -- Jury Trial (4/30/19)

```
1        A     It wasn't a whole lot --

2        Q     Okay.

3        A     -- at the time.

4        Q     Did -- now, did the people -- did the Illinois

5   Department of Human Rights know everything there was to

6   know about the April 25th letter?

7              MR. MATHUES:  Objection, calls for speculation.

8              THE COURT:  Yeah, I'll -- sustained.

9              MR. FLAXMAN:  Okay.

10  BY MR. FLAXMAN:

11       Q     Let's go to the April 25th letter.  You see the

12  first paragraph where, like the eighth line down, "you

13  making disparaging remarks about the police department"?

14       A     Yes.

15       Q     Did you ever make disparaging remarks about the

16  police department?

17       A     No.  I did not.

18             THE COURT:  Are you on Joint Exhibit 1?

19             MR. FLAXMAN:  Exhibit 1.

20             THE COURT:  All right.  Go ahead.

21             MR. FLAXMAN:  Okay.

22  BY MR. FLAXMAN:

23       Q     Did you ever -- let's look at Exhibit,

24  paragraph 2, there's a statement in there about you said

25  the City had lost the lawsuit that you had brought.
```

1      A      No.  I didn't say that.

2      Q      Now, had you brought a lawsuit in 2003?

3      A      Yes, we did.

4      Q      And how many -- when you say "we," were there

5  other people with you in the lawsuit?

6      A      Myself and four other officers.

7      Q      Were they African American officers?

8      A      Yes, they were.

9      Q      Are any of them -- well, is one the present --

10  is one of those officers in the case the present chief at

11  Kankakee?

12     A      Acting chief, yes.

13     Q      And was there another one -- what's his name?

14     A      Willie Hunt.

15     Q      Was there another plaintiff in that case who

16  was also, had been the chief at one time?

17     A      Yes.  They were appointed by the new mayor.

18     Q      What was his name, that was appointed?

19     A      Price Dumas.

20     Q      Okay.  And the other two plaintiffs in the case

21  with you, the 2005 case, do they still work for Kankakee

22  as a police officer?

23     A      Willie Hunt does.

24     Q      Okay.  Well, okay.  Willie Hunt and -- Willie

25  Hunt, Dumas, and you.  Who are the other two plaintiffs?

1      A    Joe Baptist, he's retired; and Lamont Upton is

2  deceased now.

3      Q    Okay.  Now, did your lawsuit help them -- help

4  Hunt and Dumas become chief and acting chief?

5           MR. MATHUES:  Objection --

6           THE COURT:  Sustained.

7           MR. MATHUES:  -- for speculation.

8  BY MR. FLAXMAN:

9      Q    In that lawsuit, the 2005 lawsuit, did you have

10  a trial?

11      A    Yes, we did.

12      Q    Was there a trial on the whole case or just

13  part of the case?

14      A    Two separate, just partial.

15      Q    Okay.  And was -- the jury found against you on

16  the first part of the case; is that right?

17      A    Yes.

18      Q    And then there was an appeal?

19      A    Yes.

20      Q    And the appeal was resolved with this agreed

21  order that we've introduced into evidence; is that right?

22           MR. MATHUES:  Objection to leading, Your Honor.

23           MR. FLAXMAN:  This is background.

24           THE COURT:  It's harmless at this point, so

25  overruled.

1       A      Yes.

2       Q      Now, did you ever say that there was a judgment

3   entered against the City in that 2005 lawsuit?

4       A      Absolutely not.

5       Q      And, you know, the letter, the April 25th

6   letter, also says that you "made statements about a

7   specific officer's drug use."

8              Who was that -- did you make statements about a

9   specific officer's drug use?

10      A      Paul Berge.

11      Q      And what statements did you make?

12      A      Well, the statements that I was -- my

13  concerns -- I had concerns about him using the drugs; but

14  the main thing that I had spoke about was about the

15  hit-and-run accident because the drug use was already

16  prior knowledge.

17      Q      Well, did, did everybody -- how did -- how was

18  it common knowledge that Berge had been using drugs?

19      A      There was an article in the Daily Journal, just

20  the Kankakee Daily Journal -- or the Daily Journal, I

21  should say.

22      Q      And before the -- well, what statements did you

23  make about an accident in which Berge had been involved?

24      A      I explained what I had learned, that I had ran

25  into a commander --

1      Q      Well, no.  Without telling us what you said,

2   just -- what were they about?

3      A      Can you repeat the question?

4      Q      Okay.  You made, you made statements about

5   Berge being involved in a, that one-car accident.  Were

6   those statements truthful?

7      A      Yes, they were.

8      Q      And as a matter of fact, were those statements

9   reflected in that last-chance agreement we've introduced

10   into evidence?

11           MR. MATHUES:  Objection to leading, Your Honor.

12           THE COURT:  Sustained.

13           MR. FLAXMAN:  Okay.

14   BY MR. FLAXMAN:

15      Q      Were you trying to disparage the department by

16   talking about the treatment that Officer Berge received?

17      A      No, I didn't --

18           MR. MATHUES:  Objection.

19      A      -- did not.  I thought I was protecting the

20   Department.

21           THE COURT:  If that was an objection, it was

22   overruled.

23      Q      Were you trying to say anything untruthful when

24   you made statements about Berge's drug use, his

25   promotion, and an accident in which he was involved?

BROOKS v. CITY OF KANKAKEE, 17-2265 -- Jury Trial (4/30/19)

```
 1              MR. MATHUES:  Objection --

 2        A    No.

 3              MR. MATHUES:  -- to leading, Your Honor.

 4              THE COURT:  It's harmless leading.

 5              You know, just be careful, Mr. Flaxman.  You're

 6   borderline here on some of these questions.

 7        A    No.  I did not.

 8        Q    Now, when you read this letter on that first

 9   page where the chief wrote to you about "the discipline

10   administered . . . to another officer is, quite frankly,

11   none of your business," did you agree with that

12   statement?

13        A    No.  I did not.

14        Q    Why not?

15        A    We're public servants, and the public has a

16   right to know if we're involved in illegal activity.

17        Q    And did you make your statements about Berge's

18   illegal activity at a public forum?

19        A    Yes, I did.

20        Q    Were you in uniform when you made them at the,

21   when you spoke at the Police and Fire Commission hearing?

22        A    No.  I was not.

23        Q    Now, if you'd turn to page 2, the chief says

24   that you professed inaccurate facts.  Do you see that?

25        A    [No response.]
```

BROOKS v. CITY OF KANKAKEE, 17-2265 -- Jury Trial (4/30/19)

1      Q      The first full paragraph, "You have taken it
2  upon yourself to profess these inaccurate facts."
3      A      Yes, I do.  I see it.
4      Q      Did you ever profess any inaccurate facts about
5  Officer Berge?
6            MR. MATHUES:  Objection to leading, Your Honor.
7            THE COURT:  Sustained.
8  BY MR. FLAXMAN:
9      Q      Did you ever profess any inaccurate facts?
10     A      No.  I did not.
11     Q      Did you ever profess any stories to which you
12  have no factual basis?
13            MR. MATHUES:  Objection --
14            THE COURT:  Sustained.
15            MR. MATHUES:  -- to leading, Your Honor.
16            THE COURT:  You're going to have to ask
17  non-leading questions, Mr. Flaxman.
18  BY MR. FLAXMAN:
19     Q      Were you trying to get any -- well, what were
20  you trying to accomplish by making those public
21  statements?
22     A      As I stated, I felt I had a civic duty to
23  report any illegal activity that was being performed by
24  any officer; and if I felt that it was not being punished
25  or I felt that the people in charge was covering it up, I

1  felt I had a duty to report it.

2      Q    Have you ever heard the phrase "code of

3  silence"?

4           MR. MATHUES:  Objection, Your Honor.

5           THE COURT:  I'll overrule that.  You can answer

6  that question, but we're not going to go down this way

7  very far.

8      A    Yes, I have.

9      Q    Were you being part of a code of silence by

10 making your public statements?

11     A    No.  I was not.

12     Q    Now, the -- page 3, the first sentence is this

13 order to cease any public, "any further public

14 disparagement."  What did you understand that to mean?

15     A    It's like he was trying to tell me I was doing

16 something wrong when I thought I was doing the right

17 thing.

18     Q    Was, was he telling you to shut up?

19          MR. MATHUES:  Objection to leading, Your Honor.

20          THE COURT:  Sustained.

21 BY MR. FLAXMAN:

22     Q    How did you interpret what he told you to do?

23     A    I thought he was trying to bridle my tongue and

24 prevent me from reporting any illegal activity that any

25 officer was committing.

1          Q     And then when you read the -- did you read the

2     last sentence?

3          A     Yes.

4          Q     And what did you take away from that?

5          A     I had -- well, it really upsetted me because I

6     thought that I was being put in a position to make a

7     choice between doing the right thing -- reporting illegal

8     activities -- or losing my job.

9          Q     When you say it "upsetted" you, what do you

10    mean by that?

11         A     Well, basically, I felt that I was doing the

12    right thing; and to be told by someone I respected that I

13    wasn't, it really upsetted me.

14         Q     Well, did you have trouble sleeping?

15         A     Also, I was losing my hair, which you can see.

16         Q     Aside from losing your hair, did you have any

17    other emotional problems from being threatened that you

18    would be fired if you kept speaking out?

19         A     Well, I had anxieties.  I was depressed and,

20    you know, very upset.

21         Q     Okay.  You didn't go for treatment, though, did

22    you?

23         A     No.  I did not.  Those are just the feelings I

24    had.

25         Q     Now, could you tell the ladies and gentlemen of

1   the jury how this trial is different than that hearing

2   before the Illinois Department of Human Rights that's

3   reflected in Joint Exhibit 3?

4              MR. MATHUES:  Objection, basis of knowledge and

5   form of the question, Your Honor.

6              THE COURT:  Well, I'll sustain as to relevancy.

7   I mean, it's a hearing.  This is a trial.

8              MR. FLAXMAN:  Okay.

9              THE COURT:  Next.

10  BY MR. FLAXMAN:

11      Q    Well, did you have a full chance to tell your

12  side of the story at the Illinois Department of Human

13  Rights?

14             MR. MATHUES:  Objection to the form of the

15  question, Your Honor.

16             THE COURT:  No.  I'll overrule that.  He can

17  answer that question.

18             WITNESS BROOKS:  Will you repeat the question,

19  please?

20  BY MR. FLAXMAN:

21      Q    Did you have a full chance to tell your side of

22  the story to the Illinois Department of Human Rights?

23      A    Not the whole story.

24      Q    And you've had that, that chance today, haven't

25  you?

BROOKS v. CITY OF KANKAKEE, 17-2265 -- Jury Trial (4/30/19)

```
 1        A    Yes.

 2             MR. FLAXMAN:  Thank you.  Nothing further.

 3             THE COURT:  Mr. Mathues.

 4               CROSS-EXAMINATION BY MR. MATHUES:

 5        Q    Good afternoon, Officer Brooks.

 6        A    How you doing?

 7        Q    Officer Brooks, when you were standing in front

 8   of the Police and Fire Commission on April 12, 2016,

 9   doing what you have just told us you believed to be your

10   civic duty, did you tell the Police and Fire Commission

11   that at that moment in time Paul Berge was serving a

12   30-day unpaid suspension?

13        A    No, I didn't, because he was showing up at

14   work.

15        Q    Is it your testimony, as you sit here today,

16   that Paul Berge was working during the month of

17   April 2016?

18        A    If my memory serves my -- correct, I don't

19   remember him taking time off.

20        Q    That wasn't quite my question, Mr. Brooks.

21             My question was:  Is it your testimony, as you

22   sit here today, to this jury that Paul Berge was working

23   as a Kankakee police officer during the month of

24   April 2016?

25             (Brief pause in proceedings.)
```

BROOKS v. CITY OF KANKAKEE, 17-2265 -- Jury Trial (4/30/19)

1      A    Again, I have to say I don't remember him

2  taking time off because we can use vacation days to fill

3  in for our suspensions.

4      Q    That wasn't quite my question.

5           Is it your testimony that Paul Berge was

6  working as a Kankakee police officer during the month of

7  April of 2016?

8      A    I'm not sure at this time.

9      Q    But you didn't tell the Board of Police and

10 Fire Commissioners that he was currently serving a 30-day

11 unpaid suspension?

12          MR. FLAXMAN:  Objection.

13          THE COURT:  Grounds?

14          MR. FLAXMAN:  Argumentative.

15          THE COURT:  No.  Overruled.  He can answer that

16 question.

17     A    No.  I did not.

18     Q    You told us on direct examination that at the

19 2014 EEOC, or Illinois Department of Human Rights

20 proceeding, you may have referred to the agreed order as

21 a consent decree; is that true?

22     A    Yes.

23     Q    And you were referring to the agreed order that

24 was part of the case brought by yourself and three other

25 officers, correct?

BROOKS v. CITY OF KANKAKEE, 17-2265 -- Jury Trial (4/30/19)

```
 1       A      Four other officers.

 2       Q      Four other, I apologize.  Four other officers.

 3       A      Yes.

 4       Q      After the 2014 hearing, did Lieutenant

 5  Passwater tell you there was no consent decree against

 6  the Kankakee Police Department?

 7       A      No.  He did not.

 8       Q      After the 2014 hearing, did Former Chief Larry

 9  Regnier tell you there was no consent decree against the

10  Kankakee Police Department?

11       A      Repeat the question.

12       Q      After the 2014 hearing, did Former Chief Larry

13  Regnier tell you that there was no consent decree against

14  the Kankakee Police Department?

15       A      I don't recall, other than this letter.

16       Q      The letter also references a hearing in the

17  mayor's conference room in February of 2016.  In that

18  hearing in the mayor's conference room in February 2016,

19  did you use the words "consent decree"?

20       A      No.  I did not.

21       Q      Did you refer to an agreed order?

22       A      I didn't refer to either one.  I only reported

23  about Berge to the mayor and requested an investigation.

24       Q      In the 2006 -- strike that.

25              In the -- April 12, 2016, when you made the
```

1  comments before the Board of Police and Fire Commission,

2  did you reference there being a consent decree or an

3  agreed order against the Kankakee Police Department?

4      A    No.  I did not.

5          MR. MATHUES:  Judge, may I approach the

6  witness?

7          THE COURT:  Sure.  Go ahead.

8  BY MR. MATHUES:

9      Q    Officer Brooks, I'm going to put up on the

10  screen here what's been previously marked as Joint

11  Exhibit Number 2.  I'd just ask you if you recognize what

12  we're looking at?

13      A    I can't see that.

14          THE COURT:  If you turn to your right, there's

15  a screen that has everything on it.

16          (Brief pause in proceedings.)

17  BY MR. MATHUES:

18      Q    This is the agreed order that you were

19  referencing, Officer Brooks; there's five names at the

20  top?

21      A    Yes.

22      Q    One of them's yours?

23      A    Yes.

24      Q    Mr. Brooks, I'm going to direct your attention

25  to page 3.  I'm going to go semi old-school and use a

1    highlighter.  I'm going to highlight paragraph 10.

2            Do you see where I've highlighted paragraph 10,

3    Officer Brooks?

4        A    Yes.

5        Q    Will you please read what I've highlighted to

6    the jury?

7        A    "This order shall remain in full force and

8    effect through January 31, 2011, or for a period of two

9    promotional examinations following the entry of the

10   order, whichever occurs last."

11       Q    In that 2014 hearing, did you tell the Illinois

12   Department of Human Rights that the document you were

13   referring to by a consent decree had an expiration date?

14       A    No.  I did not.

15       Q    And that hearing was in 2014, correct?

16       A    Yes, it was.

17       Q    Speaking of the Illinois Department of Human

18   Rights, you filed a complaint with them over the letter

19   that Chief Regnier wrote you, correct?

20       A    Yes, I did.

21       Q    And you filed that complaint on May 2, 2016, so

22   within a week of getting the letter from the Chief?

23            MR. FLAXMAN:  Object to the form of the

24   question.

25            THE COURT:  No.  Overruled.

1       A     Yes.  I filed it immediately.  Yes.

2       Q     And there was a hearing on your letter,

3  correct?

4       A     Yeah.  Yes, there was.

5       Q     You were present there?

6       A     Yes.

7       Q     And the Illinois Department of Human Rights is

8  an organization for the State of Illinois, correct?

9       A     Yes.

10      Q     You -- Chief Regnier is not a member, correct?

11      A     No.

12      Q     To the best of your knowledge, no city official

13  for the City of Kankakee is a member of the Illinois

14  Department of Human Rights, correct?

15      A     Not to the best of my knowledge.

16      Q     And when you went to the hearing for the

17  complaint you filed in this letter, that wasn't your

18  first time in the Illinois Department of Human Rights,

19  was it?

20            MR. FLAXMAN:  Objection.

21            THE COURT:  Grounds?

22            MR. FLAXMAN:  Motion in limine.

23            THE COURT:  Well, I'm not sure --

24            MR. MATHUES:  May I please respond, Your Honor?

25            THE COURT:  I think I know where you're -- I

BROOKS v. CITY OF KANKAKEE, 17-2265 -- Jury Trial (4/30/19)

1    mean, overruled for the moment.  I think I know where

2    you're going.  I don't think you're going in the way of

3    my order.

4            Go ahead and answer the question.  Then I'll

5    see where you go.

6    BY MR. MATHUES:

7        Q    When you appeared -- well, strike that.

8            I want to go back a step.  Officer Brooks, when

9    Mr. Flaxman was asking you questions a few minutes ago,

10   you told us you were part of the hearing before the

11   Illinois Department of Human Rights in 2014, correct?

12       A    I was a witness.

13       Q    You were there; you were a witness?

14       A    Yes.

15       Q    So in 20-- when you filed the complaint before

16   the Illinois Human Rights over the letter, the written

17   reprimand that Chief Regnier sent you, that wasn't the

18   first time you'd been in the room where a hearing was

19   held before the Illinois Department of Human Rights,

20   correct?

21       A    I was a witness for Officer B.J. Moore.

22       Q    My question, Mr. Brooks, was a little bit

23   different.

24            My question was:  When you were present for the

25   hearing for your complaint about Chief Regnier's written

BROOKS v. CITY OF KANKAKEE, 17-2265 -- Jury Trial (4/30/19)

1    reprimand, that wasn't the first time you'd set foot in a

2    hearing for the Illinois Department of Human Rights?

3         A    No.  It was not.

4              MR. MATHUES:  Judge, may I approach and use

5    what's been previously marked, or --

6              THE COURT:  Yes.

7              MR. MATHUES:  -- admitted as Joint Exhibit

8    Number 3?

9              THE COURT:  Sure.

10   BY MR. MATHUES:

11        Q    And you were allowed to speak at that hearing

12   before the Illinois Department of Human Rights on your

13   grievance against Chief Regnier's letter, correct?

14        A    Yes, I was.

15        Q    I'm going to direct your attention, Officer

16   Brooks, to what will be page 8 of what is marked as Joint

17   Exhibit 3.

18             THE COURT:  Mr. Mathues, are we old-school

19   or -- never mind.  I see what you're doing.

20   BY MR. MATHUES:

21        Q    Officer Brooks, would you please read for the

22   jury what I've highlighted?

23        A    "A finding of lack of substantial evidence is

24   recommended because the complainant has failed to

25   establish a nexus between his written discipline and his

BROOKS v. CITY OF KANKAKEE, 17-2265 -- Jury Trial (4/30/19)

1    involvement in a protected activity when he previously

2    opposed alleged unlawful discrimination."

3        Q    And just so we're clear:  "Complainant," that's

4    you, correct?

5        A    Yes.

6        Q    And if it says "Respondent," that's the City of

7    Kankakee, correct?

8        A    Yes.

9        Q    I'm going to highlight another sentence a

10    little bit further down.

11              (Brief pause in proceedings.)

12        Q    I highlighted another sentence a little bit

13    further down.  Would you please read that for the jury?

14        A    "The investigation revealed that Respondent

15    acted within its policy when it issued Complainant the

16    written warning after Complainant reported, or accused

17    the officer of filing a false police report."

18        Q    I highlighted a little bit more at the bottom

19    of page 8 and would ask you to read that, starting with

20    the word "furthermore."

21        A    "Furthermore, the investigation revealed that

22    Respondent has also issued other patrolmen" --

23        Q    I apologize, Officer Brooks.  I did a bad job

24    highlighting.  Could you go ahead and finish that page?

25        A    "Written warnings after making."

BROOKS v. CITY OF KANKAKEE, 17-2265 -- Jury Trial (4/30/19)

1       Q     Then I'll turn over to page number 9.

2       A     "Disparaging comments or making insensitive

3    posts on social."

4       Q     Then the last sentence, Officer Brooks, I'm

5    going to highlight that and ask you to read that for the

6    jury.

7       A     "There is not substantial evidence that shows

8    on April 25, 2016, Respondent issued Complainant a

9    written warning in retaliation to opposing unlawful

10   discrimination."

11      Q     And the Illinois Department of Human Rights'

12   finding of "no substantial evidence," that wasn't the

13   only time a tribunal has ruled against you in terms of

14   your allegations against the Kankakee Police Department,

15   correct?

16            MR. FLAXMAN:  Objection.

17            THE COURT:  Sustained.

18   BY MR. MATHUES:

19      Q     Officer Brooks, with respect to the case that

20   you were a part of back in 20-- in the early 2000s with

21   four other officers, some of those claims were heard by a

22   jury, correct?

23      A     Yes.

24      Q     And the jury found against you?

25      A     The first half.

BROOKS v. CITY OF KANKAKEE, 17-2265 -- Jury Trial (4/30/19)

1     Q    As to the half of the claims the --

2     A    The first half, --

3     Q    -- jury heard?

4     A    -- yes.

5     Q    And in that case, Chief Regnier testified on

6   behalf of the City, correct?

7     A    Yes, he did.

8     Q    Fair to say you were disappointed with the jury

9   verdict?

10          MR. FLAXMAN:  Objection.

11          THE COURT:  Grounds?

12          MR. FLAXMAN:  It's not relevant to what this

13   case is about.

14          THE COURT:  Well, he can express his -- he can

15   express his opinion as to how he viewed -- look, we have

16   all sorts of evidence already about the nature of the

17   prior lawsuit.  The jury's already heard about it, who

18   was involved in it.  We've already heard testimony about

19   what the results were, what happened afterwards, to some

20   extent.

21          I believe it's appropriate for the plaintiff,

22   who's now testifying, to indicate how he felt about that

23   verdict.  One of the issues is, of course, intent, that

24   the jury will have to decide.  So I'm going to allow that

25   question with that explanation so we have a clear record.

BROOKS v. CITY OF KANKAKEE, 17-2265 -- Jury Trial (4/30/19)

1          Go ahead and answer the question, Mr. Brooks.

2      A    The first part I was disappointed, but the

3  overall I was satisfied.

4      Q    In fact, you were also disappointed in the

5  agreed order because you believed you didn't benefit from

6  those changes; is that correct?

7          MR. FLAXMAN:  Object to the form of the

8  question.  It seems --

9          THE COURT:  You're going to have to -- I'll

10  sustain that.  You're going to have to ask some more

11  foundational questions.

12  BY MR. MATHUES:

13      Q    As to -- let's take a step back, Officer

14  Brooks.

15          As to the part of the case the jury didn't

16  hear, there was the agreed order mentioned that we've all

17  seen in this case, correct?

18      A    I'm not understanding your question.

19      Q    I'll take it another step back.

20          We've already established one part of the case

21  the jury ruled against you, correct?

22      A    Yes.

23      Q    The other part of the case there was a

24  settlement agreement, correct?

25      A    Yes.

BROOKS v. CITY OF KANKAKEE, 17-2265 -- Jury Trial (4/30/19)

1      Q      And there was an agreed order entered with the

2   Court as part of that settlement agreement, --

3      A      Yes.

4      Q      -- true?

5             And as part of the settlement agreement, there

6   were some changes and recommended changes in the

7   promotional process at the Kankakee Police Department,

8   correct?

9      A      Yes.

10     Q      And, in fact, isn't it true that you were

11  disappointed in the, that portion of the settlement

12  agreement because you believed you didn't benefit from

13  it?

14     A      As I stated, I was satisfied with it.

15             (Brief pause in proceedings.)

16             MR. FLAXMAN:  Could we have a sidebar about

17  collateral issues?

18             THE COURT:  Yeah.  Come on up.

19             (Brief pause in proceedings.)

20             (Sidebar, outside jury's hearing.)

21             MR. FLAXMAN:  It sounds like we're about to get

22  into impeachment on a collateral matter.

23             MR. MATHUES:  Judge, Officer Brooks has

24  testified today differently to what he testified before

25  in his deposition.  He said in his deposition he didn't

1   benefit from the agreed order, and part of my theory of

2   the case is that his disappointment of the outcome goes

3   to bias.

4           And, also, we believe that his credibility is,

5   is highly relevant; and the jury obviously would get an

6   instruction that they can consider impeachment, whether

7   it's a collateral matter or not, and they can weigh that.

8   But that's ultimately a question for the jury, and I

9   should be allowed to bring in that Officer Brooks

10  testified differently before.

11          THE COURT:  I'm going to allow the questions

12  for impeachment purposes based on his answers at the

13  deposition.  Certainly, the jury has to make credibility

14  findings, especially because this is the plaintiff

15  himself.  His credibility is definitely an issue.  I'm

16  not expecting us to go very far into this.  My

17  understanding is these questions are only being posed for

18  purposes of impeachment of the witness and his

19  credibility.  Therefore, I'm going to allow limited

20  questions in this area.

21              (In open court.)

22  BY MR. MATHUES:

23      Q    Officer Brooks, do you recall:  Back on

24  August 30, 2018, I took your deposition in this case?

25      A    Yes, I do.

BROOKS v. CITY OF KANKAKEE, 17-2265 -- Jury Trial (4/30/19)

 1      Q     And at the deposition, it was me and you and an

 2   attorney representing you and a court reporter, correct?

 3      A     Yes.

 4      Q     And just like today, I asked you questions, and

 5   you gave me answers.  True?

 6      A     Yes.

 7      Q     And before we started asking any questions in

 8   that deposition, you took an oath to tell the truth,

 9   correct?

10      A     And I did.

11      Q     The same oath you took today, correct?

12      A     Yes.

13      Q     Do you recall on page 8 of your deposition

14   transcript being asked these questions and giving these

15   answers?

16          "Question:  Yeah.  And then some of the other

17   claims, ultimately they were settled.  There was a

18   settlement agreement in the, entered in the Baptist case;

19   is that correct?

20          "Answer: --

21          MR. FLAXMAN:  Could I have the page again?  I'm

22   sorry.

23          MR. MATHUES:  Page 8.  I'm sorry, Mr. Flaxman.

24   Let me know when you get there.

25          MR. FLAXMAN:  What line was it?

1              MR. MATHUES:  I'm going to start again.  I'll

2     start on line 4.

3     BY MR. MATHUES:

4          Q    "Question:  Yeah.  And then some of the other

5     claims, ultimately they were settled.  There was a

6     settlement agreement entered in the Baptist case; is that

7     correct?

8              "Answer:  Yes.

9              "Question:  And as part of those claims and

10    part of that settlement agreement, there were some

11    changes made to the hiring and promotional process of the

12    Kankakee Police Department; is that correct?

13             "Answer:  That's kind of hard for me to say.

14             "Question:  What do you mean by that?

15             "Answer:  I didn't benefit from any of them."

16             Back at your deposition, were you asked those

17    questions, and did you give those answers?

18             MR. FLAXMAN:  Objection.

19             THE COURT:  No.  This is proper impeachment.

20             Go ahead.

21             WITNESS BROOKS:  Can you read the -- I, I, I

22    didn't catch that.  Can you read --

23             THE COURT:  Mr. Mathues, were you asked these

24    questions, and did you give these answers?

25             Take it from there.

1          MR. MATHUES:  I didn't hear what Officer Brooks

2     said.

3          WITNESS BROOKS:  Also, can I see that?

4          MR. MATHUES:  Absolutely.

5          Judge, may I approach the witness?

6          THE COURT:  You may approach.  You are giving

7     him the referenced section of his deposition?

8          MR. MATHUES:  Correct, Your Honor.  It shows

9     pages -- it's printed on four sheets to a page, pages 1

10    through 4 and pages 5 though 8; go to pages 9 through 12.

11         WITNESS BROOKS:  I'm gonna say:  When I read

12    this, this --

13         THE COURT:  No, no, no.  No.

14    BY MR. MATHUES:

15    Q    I'm going to hand you the exhibit; and, Officer

16    Brooks, take a look at the exhibit.

17    A    Okay.  Can you show me what part you want --

18         MR. MATHUES:  Actually, Judge, I'm going to

19    step -- permission requested to put it up on the screen

20    for the jury?

21         THE COURT:  Any objection to that?  It might be

22    easier.

23         MR. FLAXMAN:  No.  I could give Mr. Brooks the

24    one-to-a-page stuff that, and he could read it that way.

25         MR. MATHUES:  Judge, I would like -- I'm, I

1   would like to put it up on the screen.

2           THE COURT:  Yeah, just put it up on the --

3           MR. FLAXMAN:  The one-to-a-page up on the

4   screen might be better.

5           THE COURT:  All right.  Use -- Mr. Flaxman is

6   providing a copy of the deposition that is on the

7   one-page-to-a-sheet format as opposed to the format we

8   sometimes see, ladies and gentlemen, which has four pages

9   on one sheet.

10          Go ahead, Mr. Mathues.  You may proceed.

11  BY MR. MATHUES:

12      Q    First things first, do you recognize your name

13  at the top of the deposition transcript that we have been

14  looking at?

15      A    Yes, I do.

16      Q    It says "Richard Brooks versus the City of

17  Kankakee, Illinois"?

18      A    Yes.

19      Q    And that, that's the case caption; that's the

20  title of the case that we're all here for today.

21  Correct, Mr. Brooks?

22      A    Yes.

23      Q    You see on the transcript there is a "Q" and

24  then followed -- for each line followed by words, and

25  then there is an "A."  The "A" is below it.

1          Do you see what I'm referring to?

2     A    Yes.

3     Q    Officer Brooks, you're able to see where I've

4    drawn a highlighted box in a semi old-school fashion?

5     A    Yes.

6     Q    Beginning where I've highlighted -- I started

7    with a "Q" for a question -- will you please read that

8    for the jury?  And for the "Q," say "question."  And for

9    the "A," say "answer."

10         THE COURT:  This is page 8, line 9, you're

11   starting on?

12         MR. MATHUES:  Yes, Your Honor.

13    A    "Question:  As part -- and as part of those

14   claims and part of that settlement agreement, there were

15   some changes made to the hiring and promotional process

16   of the Kankakee Police Department; is that correct?

17         "Answer:  That's kind of hard for me to say.

18         "Question:  What do you mean?

19         "Well, I didn't benefit from any of them.  I'm

20   still a patrolman."

21    Q    Officer Brooks, back at your deposition, were

22   you, indeed, asked those questions; and did you, indeed,

23   give those answers?

24    A    Yeah.  I'm still a patrolman.

25    Q    That wasn't quite my question, Officer Brooks.

1      A      But that's why I said it, sir.

2      Q      The full -- the language that you just read,

3   were you asked those questions, and did you give those

4   answers?

5      A      Yes, I did.

6      Q      When you were complaining to the various

7   tribunals of Mr. Berge's behavior, did you tell -- did

8   you say at any of the three public forums that nothing

9   was being done as far as Paul Berge's conduct?

10     A      For the accident, yes.

11     Q      How about for the steroids?

12     A      For the accident, yes.

13     Q      So for the steroids, is that a "yes," or is

14   that a "no," Officer Berge [sic]?  Sorry, I didn't mean

15   to put you in that category.

16     A      I spoke about the accident.

17     Q      Let me ask the question again.

18            At the public forum where you spoke about

19   Officer Berge and steroids, did you say there was nothing

20   being done about an officer's steroid use or drug use or

21   whatever phrasing you used?

22     A      No.  I did not.  I requested that it be

23   investigated, and I was told that it would be.

24     Q      When it came to Officer Berge and the

25   automobile accident, when you were standing in front of

 1    the Board of Police and Fire Commission on April 12th of

 2    2016, did you say nothing was being done about Paul

 3    Berge's behavior?

 4         A    I did for the accident.  Yes.

 5         Q    You would agree with me, though -- would you

 6    not? -- that a 30-day unpaid suspension is not "nothing"?

 7              MR. FLAXMAN:  Objection.

 8              THE COURT:  No.  Overruled.

 9         A    For the accident?

10         Q    My, my question was a little simpler, Officer

11    Brooks.  I apologize if I, it was confusing.

12              Would you agree with me that a 30-day unpaid

13    suspension is not "nothing"?

14         A    For the drugs or the accident?  I'm not

15    understanding your question.

16         Q    I didn't ask specially for either one.  My

17    question is very simple.  Would you agree with me that a

18    30-day suspension without pay is not "nothing"?

19              MR. FLAXMAN:  Judge, the question is -- nobody

20    knows what "not nothing" means.  I don't.  He doesn't.

21    You don't.  The jurors don't.

22              THE COURT:  All right.  I understood the

23    question.  I'm going to -- I'll tell you what.  I'll

24    sustain the objection, only to the extent, Mr. Mathues --

25    try to rephrase the question.

BROOKS v. CITY OF KANKAKEE, 17-2265 -- Jury Trial (4/30/19)

1          But I'm mindful of the fact that, on direct

2   examination, Mr. Flaxman already solicited from Chief

3   Regnier about the degree of punishment imposed, so this

4   is the flip side of that.

5          If you ask the question a different way, Mr.

6   Mathues, that might be preferable.

7   BY MR. MATHUES:

8      Q    Officer Brooks, Paul Berge was, in fact,

9   disciplined for his use of the steroids, correct?

10     A    As I stated, we wouldn't have knowledge because

11  you can exchange vacation time for suspended time.

12     Q    Officer Brooks, that -- this is a "yes" or a

13  "no" question, Officer Brooks.

14         THE COURT:  Try to answer the question that's

15  being asked.

16         WITNESS BROOKS:  Can you ask the question

17  again?

18  BY MR. MATHUES:

19     Q    As you sit here today, is it your testimony

20  that nothing happened to Paul Berge as a result of his

21  getting caught using illegal steroids?

22     A    No.  That's not my testimony.  No.

23     Q    In fact, Officer Brooks, as you sit here today,

24  you know Paul Berge was suspended for 30 days without pay

25  for getting caught using illegal steroids?

BROOKS v. CITY OF KANKAKEE, 17-2265 -- Jury Trial (4/30/19)

```
1        A    Sir, I have to honestly tell you I don't know
2   that.
3        Q    And when it comes to the automobile accident,
4   in fact, something did happen to Paul Berge because of
5   the automobile accident, correct?
6        A    I don't understand what you're asking.
7             MR. MATHUES:  Judge, may I use the --
8             THE COURT:  Yes.
9                (Brief pause in proceedings.)
10  BY MR. MATHUES:
11       Q    By the way, Officer Brooks, you are aware that
12  a police officer, when they get discipline, whatever it's
13  for -- whether that's yourself or any other officer --
14  the union contract gives you the right to challenge that
15  discipline, correct?
16       A    Yes, they do.
17       Q    And sometimes the officer challenges that
18  discipline and they win, true?
19       A    Yes.
20       Q    Sometimes the officer challenges that
21  discipline and they lose, true?
22       A    Yes.
23       Q    And sometimes the officer challenges that
24  discipline, and whoever's the arbitrator splits the baby,
25  true?
```

1     A    I --

2     Q    There is a compromise?

3     A    Yes.

4     Q    Fair to say that right to challenge the

5  discipline, that's in your union contract, correct?

6     A    Yes.

7     Q    That's something that the police union, of

8  which you're a member, negotiated and bargained for as an

9  important right; is that true?

10     A    Yes.

11     Q    Officer Brooks, I would like you to read for

12  the jury what I've highlighted, that paragraph 1.  This

13  is Joint Exhibit Number 4, the Last-Chance Discipline

14  Agreement of Paul Berge.

15     A    Number 1?

16     Q    Yes, sir.  What I've highlighted.

17     A    "Berge will serve an unpaid suspension of 30

18  calendar days, which will commence April 1, 2016, and

19  shall continue through May 1, 2016.  Berge and the union

20  agree that this penalty is fair and appropriate and

21  accept and agree to this discipline and agree not to file

22  a grievance or otherwise challenge it in any way."

23     Q    I'm going to ask you to read paragraph 2, which

24  I've just highlighted below that, Officer Brooks.

25     A    "Berge will never again commit or participate

 1  in any of the discussed actions or behaviors identified

 2  in the course of the investigation, or any other major

 3  violation of a Kankakee Police -- police or procedure of

 4  the kind involved in this matter."

 5         And I must say that this was never brought

 6  before the body.

 7         MR. MATHUES:  Objection, move to strike as

 8  nonresponsive, Your Honor.

 9         THE COURT:  That is -- ladies and gentlemen,

10  disregard that last statement made by the witness.  That

11  was not in response to a question.

12  BY MR. MATHUES:

13     Q    Officer Brooks, I'm going to ask you to read

14  one more thing which I've highlighted below that.

15     A    "Berge and the union agree that Berge

16  employment shall terminate immediately and automatically

17  in the event that Berge violates this agreement."

18     Q    In light of everything we just read for the

19  jury, is it your testimony, Officer Brooks, that nothing

20  happened to Paul Berge as a result of his conduct being

21  involved in the crash?

22     A    My testimony --

23         MR. FLAXMAN:  Objection, --

24     A    -- it's common knowledge.

25         MR. FLAXMAN:  -- [inaudible].

BROOKS v. CITY OF KANKAKEE, 17-2265 -- Jury Trial (4/30/19)

1          THE COURT:  Well, hold on.  He just answered

2    the question.  Do you still wish to object?  He's already

3    answered it.

4          MR. MATHUES:  I didn't hear the answer.  I

5    apologize.  Would the Court --

6          THE COURT:  Well, --

7          MR. MATHUES:  -- would Your Honor --

8          MR. FLAXMAN:  I --

9          THE COURT:  -- now he's going to object.

10          MR. FLAXMAN:  I didn't hear it either, but I --

11    the question is:  Is that the way he feels now, after

12    reading this?  Or is this the way he felt when he was

13    making the statements back in 2016?

14          THE COURT:  So the ques-- objection is to the

15    nature of the question, if you could clarify.  I'll

16    sustain it.  Ask a more clear question.

17    BY MR. MATHUES:

18     Q    Is it your testimony today, telling this jury,

19    that nothing happened to Paul Berge as a result of his

20    conduct being involved in the automobile accident?

21          MR. FLAXMAN:  Objection, relevance.  It's

22    not --

23          THE COURT:  Nope, nope.  It's relevant.

24     A    If this is true -- this is my first time seeing

25    this -- I have knowledge.

1    Q    Officer Brooks, did you ever go to the Kankakee

2  County State's Attorney's Office with what you believed

3  to be true regarding Paul Berge's conduct?

4    A    No.  I did not.

5    Q    Did you ever go to Chief Regnier and ask, "Hey,

6  Chief Regnier, Paul Berge is making us look bad with the

7  steroids.  What are you doing about it"?

8    A    Can I say I didn't go, but just --

9         MR. MATHUES:  I didn't ask you -- Judge, I

10  would respectfully ask --

11        THE COURT:  You have to ask --

12        WITNESS BROOKS:  I didn't.  No, I didn't.

13        THE COURT:  Thank you.

14  BY MR. MATHUES:

15    Q    That was the steroids.

16        With respect to the car crash, did you ever go

17  into Chief Regnier's office and say, "Hey, Chief Regnier,

18  Paul Berge is making us look bad.  I know what he did.

19  What are you doing about it"?

20        MR. FLAXMAN:  That, that assumes that this

21  witness knew that steroids were involved in the car

22  crash.

23        THE COURT:  He can answer it -- overruled.  He

24  can answer the question if he knows.

25    A    I utilized my rights of the rules and

 1   regulations at that time.  I had knowledge that the chief

 2   knew about it and covered it up, so at that time --

 3           MR. MATHUES:  Judge, objection.  Move to

 4   strike.  That was not responsive to the question.

 5           THE COURT:  Well, that -- okay, overruled.

 6           Ask the question again.

 7           And, Mr. Brooks, you have to answer the

 8   question being asked.

 9   BY MR. MATHUES:

10       Q   Officer Brooks, did you ever go into Chief

11   Regnier's office and say, "Chief Regnier, what are you

12   doing about discipline for Paul Berge for being involved

13   in the automobile accident and making a false police

14   report"?

15       A   No.  I did not.

16       Q   Now, that accident actually happened -- that

17   Paul Berge was involved in and misreported -- that

18   happened in 2012, correct?

19       A   Yes.

20       Q   Do you know what year you learned about what

21   happened with Paul Berge?

22       A   I learned from the offi--

23           MR. MATHUES:  I -- objection, move to strike.

24           The question is:  What year did you learn what

25   Mr. Berge had done?

BROOKS v. CITY OF KANKAKEE, 17-2265 -- Jury Trial (4/30/19)

1          THE COURT:  I'm not going to strike it because
2   nobody heard what he said.
3          Mr. Brooks, answer the question being asked.
4          Do you know what year --
5          WITNESS BROOKS:  I learned --
6          THE COURT:  Go ahead.
7          WITNESS BROOKS:  I learned around about 2013.
8   BY MR. MATHUES:
9       Q    When you were being asked questions by Mr.
10  Flaxman, you heard references to newspaper articles
11  reporting Mr. Berge getting suspended for the use of
12  steroids, correct?
13      A    Yes.
14      Q    Did you read those articles when they came out?
15      A    I don't recall.
16      Q    You can't say one way or the other?
17      A    I don't recall.
18      Q    And when you say you don't recall, Officer
19  Brooks, are you saying you didn't read them, or you don't
20  know whether you read them or not?
21      A    I don't recall, sir.
22      Q    When you say you don't recall -- I'm just
23  trying to get your testimony clear -- is it that you
24  don't know one way or the other?
25          MR. FLAXMAN:  Objection.

BROOKS v. CITY OF KANKAKEE, 17-2265 -- Jury Trial (4/30/19)

1          THE COURT:  No, no.  He's clarifying the

2     answer.  Let him ask the question.

3          MR. FLAXMAN:  If we go back to the original

4     question, it's not -- we're not at the original question

5     anymore.

6          MR. MATHUES:  That's because the original

7     question was not answered, Your Honor.

8          THE COURT:  All right.  Don't bicker with each

9     other through me.

10          Mr. Mathues, ask a question.  Mr. Brooks,

11     answer the question asked.  Go ahead.

12     BY MR. MATHUES:

13      Q    The newspaper article's reporting on Paul

14     Berge's 30-day suspension for getting caught using

15     steroids, --

16          MR. FLAXMAN:  Objection.

17      Q    -- did you read that?

18          MR. FLAXMAN:  There's absolutely no evidence

19     there was a newspaper report of a 30-day suspension.  The

20     newspaper report actually says, "The chief won't tell us

21     what discipline is being imposed."

22          THE COURT:  Well, the jury's going to recall

23     the evidence.

24          Mr. Brooks, answer the question being posed.

25          WITNESS BROOKS:  Can you ask the question,

1  please?

2        MR. MATHUES:  Your Honor, can I ask the court

3  reporter to please read back that question?

4        THE COURT:  Go ahead.

5        MR. MATHUES:  Will you please read back the

6  question?

7        COURT REPORTER:  "Question:  The newspaper

8  article's reporting on Paul Berge's 30-day suspension for

9  getting caught using steroids, did you read that?"

10        WITNESS BROOKS:  I would have to say "no" at

11  this time.

12        MR. MATHUES:  Judge, may I approach the ELMO?

13        THE COURT:  Yes, you may.

14  BY MR. MATHUES:

15     Q   Officer Brooks, I want to show you what's been

16  previously marked and agreed as Joint Exhibit Number 1.

17  I'm going to highlight a few places.

18             (Brief pause in proceedings.)

19     Q   Officer Brooks, I've highlighted just two

20  parts.  Will you please read the first phrase that I've

21  highlighted?

22     A   "Statements that are not true."

23     Q   Will you please read the second that I've

24  highlighted?

25     A   "Your representations are factually false."

BROOKS v. CITY OF KANKAKEE, 17-2265 -- Jury Trial (4/30/19)

```
 1              THE COURT:  Those were on page 1 of Joint
 2   Exhibit 1.
 3              MR. MATHUES:  My apologies, Your Honor.
 4              We're now moving to page 2 of Joint Exhibit 1.
 5   BY MR. MATHUES:
 6       Q    I have highlighted three clauses.  Will you
 7   please read the first?
 8       A    "Inaccurate facts."
 9       Q    Will you please read the second?
10       A    "No factual basis."
11       Q    Will you please read the third?
12       A    "Inaccurate and false claims."
13       Q    And will you please read the last that I've
14   highlighted?
15       A    "Making false public statements."
16       Q    We're now turning to page 3.  The top paragraph
17   begins with "I am hereby ordering you . . . ."  That's
18   the order that, from the chief, correct, that he gave you
19   in the written reprimand?
20       A    Yes.
21       Q    Will you show the jury where in that paragraph
22   it says you may not speak out about Paul Berge's
23   misconduct?
24              MR. FLAXMAN:  Objection.
25              THE COURT:  Grounds?
```

```
 1              MR. FLAXMAN:  It argues with the witness.  It

 2  doesn't state -- it's an improper question about where it

 3  says something in a particular paragraph; and we're

 4  talking about the whole document, not a particular

 5  sentence.

 6              THE COURT:  Overruled.  He can direct him to --

 7  we're on page 3 -- overruled.

 8              MR. FLAXMAN:  The question should be, "Does it

 9  say that?", rather than "Where does it say that?"  That

10  assumes that the witness has said it does say that.

11              THE COURT:  No.  I disagree.

12              Go ahead ask the question again.

13              MR. MATHUES:  Your Honor, may the court

14  reporter please read back the question?

15              THE COURT:  She may.

16              COURT REPORTER:  "Question:  Will you show the

17  jury where in that paragraph it says you may not speak

18  out about Paul Berge's misconduct?

19      A    Based on this paper here, it was in response to

20  me complaining about the accident, so I'm looking at "to

21  cease any further public disparagement," and he also

22  complained about me --

23              MR. MATHUES:  Objection.  Move to strike as

24  nonresponsive, Your Honor.

25              THE COURT:  It will be stricken as
```

BROOKS v. CITY OF KANKAKEE, 17-2265 -- Jury Trial (4/30/19)

1    nonresponsive.

2            Mr. Brooks, you have to answer the question

3    that's posed before you.  Your attorney will have a

4    chance to redirect you later on.  But for now, when Mr.

5    Mathues asks you a question, you need to answer the

6    question.

7            WITNESS BROOKS:  Can you ask it again, ma'am,

8    please, so I make sure I understand it?

9            THE COURT:  Read the question again.

10           COURT REPORTER:  "Question:  Will you show the

11   jury where in that paragraph it says you may not speak

12   out about Paul Berge's misconduct?"

13           (Brief pause in proceedings.)

14   A    "I am hereby ordering you to cease any further

15   public disparagement . . . or criticism of other police

16   officers."

17   Q    Why don't you go ahead and read the next -- I'm

18   going to highlight it.  Go ahead and read where you'd

19   left off reading.

20   A    "Including a statement of inaccurate

21   information."

22   Q    The written reprimand letter that we're looking

23   at, does the letter read that you may not speak out about

24   misconduct of other officers?

25   A    I'm sorry.  I'm not -- are you talking about

1    this that you're showing me?  I'm not understanding the

2    question.

3        Q    Yes, Officer Brooks.  The written reprimand

4    letter that we're looking at right now.

5        A    Uh-huh.

6        Q    Do you see a sentence that says, "You may not

7    speak out about misconduct of other officers"?

8                (Brief pause in proceedings.)

9        Q    It's not there, is it?

10       A    The way you're wording it, it's not there.  No.

11       Q    When you were on direct examination, your

12   attorney asked you for your opinion about preferential

13   treatment.  You remember that question?

14       A    Yes.

15       Q    The letter does not say you may not complain

16   about preferential treatment to other officers, correct?

17       A    No.  That's not what it says.

18           MR. MATHUES:  Actually, Judge, may I come back

19   to the ELMO?

20           THE COURT:  Yes.

21   BY MR. MATHUES:

22       Q    I'll show you one more line, Officer Brooks.

23   It's towards the bottom of page 2 of Joint Exhibit

24   Number 1.  I'm going to highlight and read, "Prohibits

25   giving false or misleading statements . . . or omitting

1    material information."

2            Did I read it -- the part that I read, did I

3    read it accurately, Mr. Brooks?

4        A    You left out "misrepresenting."

5        Q    I apologize.  You're 100 percent right.  I'll

6    read it again.

7            "Prohibits giving false or misleading

8    statements or misrepresenting or omitting material

9    information," did I read that part correctly?

10       A    Up to that point, yes.

11       Q    Officer Brooks, as a matter of common sense and

12   human experience and also as an experienced police

13   officer, would you agree that it's -- you can mislead a

14   person by what you leave out as well as by what you say?

15       A    I would say that's true.  Yes.

16           MR. MATHUES:  Judge, may I have just a moment

17   to confer with my co-counsel?

18           THE COURT:  You may.

19               (Brief pause in proceedings.)

20   BY MR. MATHUES:

21       Q    Officer Brooks, at no point have you ever heard

22   either Chief Regnier or Lieutenant Passwater direct a

23   racial slur at yourself, correct?

24       A    No.  I have not.

25           MR. MATHUES:  Judge, I don't have any more

1  questions for Officer Brooks.

2          THE COURT:  Mr. Flaxman, redirect?

3          MR. FLAXMAN:  Thank you, Your Honor.

4              (Brief pause in proceedings.)

5          REDIRECT EXAMINATION BY MR. FLAXMAN:

6      Q    Do you still have that Agreed Judgment Order,

7  Joint Exhibit 3, in front of you?

8      A    Yes.

9      Q    And I just read it --

10         THE COURT:  I think that's Joint Exhibit 2; is

11  it not?

12         MR. FLAXMAN:  Exhibit 2, I'm sorry.  Exhibit 2.

13         WITNESS BROOKS:  No.  I don't have that.  I got

14  3, 3 and 1.

15         MR. FLAXMAN:  Let me hand it to you, if I may.

16  BY MR. FLAXMAN:

17     Q    Could you tell the ladies and gentlemen of the

18  jury what the title is of that agreed order?

19     A    "Agreed Judgment Order."

20     Q    And do you have Joint Exhibit 1 in front of

21  you, the letter you got from the chief?

22     A    Yes.

23     Q    If you look at the next-to-the-last sentence on

24  the second paragraph, the chief wrote to you, "The

25  Chief -- the City did not lose the lawsuit, and certainly

1    no judgment was entered against the City."

2              Do you see that?

3        A    Yes.

4        Q    Was the chief lying to you when he said no

5    judgment was entered?

6        A    I would have --

7        Q    That judg-- the thing you just read said

8    "Agreed Judgment Order."  That's the judgment.

9              Was the chief misrepresenting facts when he

10   said no judgment was entered?

11             MR. MATHUES:  Objection, argumentative and

12   compound.

13             THE COURT:  It is compound.  It is

14   argumentative.  So I'll sustain that.

15   BY MR. FLAXMAN:

16       Q    Well, there was an Agreed Judgment Order

17   entered in that first case; is that right?

18       A    Yes.

19       Q    And Mr. Mathues asked you about newspaper

20   articles.  Remember that?

21       A    Yes.

22       Q    And he asked you about newspaper articles about

23   a 30-day suspension.

24       A    Yes.

25       Q    Did you ever see a newspaper article about a

BROOKS v. CITY OF KANKAKEE, 17-2265 -- Jury Trial (4/30/19)

1    30-day suspension?

2         A    No.  I did not.

3         Q    When's the first time you learned about a

4    30-day suspension for illegal steroid use?

5         A    Today.

6         Q    Is that when -- and when -- during whose

7    testimony?

8         A    The chief.

9         Q    Have you ever seen a document saying, "You are

10   suspended for 30 days --

11        A    No.

12        Q    -- for illegal steroid use"?

13        A    No.  I have not.

14        Q    So the only document you've seen about a

15   suspension is this last-chance agreement from 2016; is

16   that right?

17             MR. MATHUES:  Objection to leading, Your Honor.

18             THE COURT:  Sustained.

19             MR. FLAXMAN:  Okay.

20   BY MR. FLAXMAN:

21        Q    How many documents have you seen about a 30-day

22   suspension for Mr. Berge?

23        A    Today or --

24        Q    At any time.

25        A    Only the ones today.

1      Q      Okay.  And that's the last-chance agreement; is

2    that right?

3              MR. MATHUES:  Objection to leading.

4              THE COURT:  Gentlemen, come on.  Overruled.

5              Mr. Flaxman, try not to do leading questions.

6    That's harmless leading; but, again, you're walking --

7              MR. FLAXMAN:  I --

8              THE COURT:  -- close to the line.  He's your

9    witness.  Try non-leading questions.

10   BY MR. FLAXMAN:

11     Q      Now, those newspaper articles that Mr. Mathues

12   asked you about, did you have a chance to look at them in

13   preparation for your testimony today?

14             MR. MATHUES:  Objection to relevance.

15             THE COURT:  Well, I'm not sure -- overruled,

16   although --

17             MR. FLAXMAN:  There was a --

18             THE COURT:  -- don't go too far into this.

19             MR. FLAXMAN:  -- question asked about, "Did you

20   read the newspaper article about the 30-day suspension?"

21             I'm trying to show that that was a blatant

22   misrepresentation of known facts, Your Honor.  I think I

23   should be entitled that latitude.

24             THE COURT:  He can, he -- I'm letting him

25   answer the question.

BROOKS v. CITY OF KANKAKEE, 17-2265 -- Jury Trial (4/30/19)

1      A    I saw it when you showed it to me today.

2      Q    Okay.  And was there any reference in the

3   newspaper articles you looked at today about Berge and

4   it -- about a 30-day suspension?

5      A    No.  It was not.

6      Q    Okay.  Now, you were asked this question --

7           MR. MATHUES:  Judge, can I have a sidebar?

8           THE COURT:  Yes.

9              (Sidebar, outside of jury's hearing.)

10          MR. MATHUES:  Judge, Mr. Flaxman is accusing me

11   of lying in front of this jury, and he is dead wrong.  I

12   have in front of me a newspaper article that -- on my

13   phone -- and it refers to "drug cop suspended for -- drug

14   enforcement cop suspended for steroid use."

15          It is -- he is creating a misrepresentation in

16   front of the jury, and I will concede it is partially

17   correct, but it doesn't list the number of days.

18          But if Mr. Flaxman is going to accuse me of

19   misrepresenting things in front of the jury, he needs to

20   get his facts right.

21          MR. FLAXMAN:  May I respond?

22          THE COURT:  Yes.

23          MR. FLAXMAN:  That entire article talks

24   about -- it doesn't talk about a day of suspension, in

25   days.  It talks about being suspended from the MEG Unit.

1    That was the March article.  It doesn't talk about the --

2    the only article about suspension says "Chief, Chief did

3    not say what discipline would be imposed," saying it's

4    private.

5            I tried to stop this with an objection saying

6    it assumes facts not in evidence, and Mr. Mathues

7    insisted on saying the newspaper article about a 30-day

8    suspension.  And there is none.  And for all we know,

9    there was no 30-day suspension.

10           MR. MATHUES:  Judge, I actually have a copy of

11   the 30-day suspension for Mr. Berge for that.  And,

12   honestly, I didn't get it until getting ready, and I

13   wasn't going to bring it forward.  But now that Mr.

14   Flaxman is accusing us of lying again, I have the right

15   to present that to the jury.

16           THE COURT:  You talking about a newspaper

17   article?

18           MR. MATHUES:  I'm talking about, Your Honor,

19   first of all, with respect to the newspaper article.

20           Now Mr. Flaxman is saying that there's no

21   evidence that Mr. Berge was ever suspended for the 30,

22   for 30 days for these steroids, and I would like to be

23   able to correct that false impression with the jury

24   because I can get a document to show that.

25           Now, Mr. Flaxman, before he accused me of

1  anything else, never asked for a single document of

2  discovery in this case.

3        THE COURT:  All right.  First off, as far as

4  the newspaper article is concerned, I do not understand

5  Mr. Flaxman to be accusing you of misrepresenting

6  anything.  The last set of questions, which I looked at

7  right when you said "sidebar," he was asking Mr. Brooks

8  if he saw these articles before he was shown the articles

9  today.

10        His knowledge of the articles is limited.  As

11  long as Mr. Flaxman keeps his questions to what Mr.

12  Brooks says and not general statements that these

13  articles don't exist, I don't think we have a problem.

14  That way, he's not impinging your credibility nor your

15  honesty.

16        As far as whether there was a 30-day

17  suspension, if you wish to clarify that through the

18  direct examination of Chief Regnier in your case-in-chief

19  and present that document, that will be allowed because

20  at this point I think the door has been opened, and that

21  would be appropriate.

22        MR. FLAXMAN:  I opened the door because no

23  documents had been presented, and I assumed that there

24  was none.  And now to sandbag me and show it in the

25  middle of the trial -- well, we have this document which

BROOKS v. CITY OF KANKAKEE, 17-2265 -- Jury Trial (4/30/19)

1   we didn't disclose; it wasn't in the pretrial order.  But

2   here is -- now, in the search for truth, we want to

3   present it.  We want to sandbag you and cut your legs

4   off.

5           THE COURT:  I don't consider it sandbagging.  I

6   think it's an appropriate response to the door being

7   opened as to whether it exists or not.  I'm not going to

8   relitigate a dis-- potential discovery dispute during the

9   middle of the trial.  I think the door's been opened.  I

10  think it's appropriate to clarify that.

11          Chief Regnier already testified that there was

12  a 30-day suspension, so all it's doing is providing

13  documentation for what Chief Regnier already testified

14  to.  Any prejudicial effect is going to be overruled

15  on -- overcome by the probative value of that because

16  it's minimal.  Chief Regnier has already testified to it.

17          And as far as this newspaper article goes, both

18  you gentlemen need to move off of it right now.  We've

19  had enough about this because we are going to get into

20  some trouble here pretty quickly if you keep drawing on

21  this.

22          My interpretation of the witness's testimony

23  and his answers on multiple questions thus far from both

24  of you is that he didn't see it.  He didn't know about

25  it.  He's not saying it didn't exist.  He just doesn't

1  know about it.  That's why I keep directing him to answer

2  the question.

3          So it's been covered.  Move on to a different

4  area.

5          MR. MATHUES:  Understood, Your Honor.

6              (In open court.)

7          THE COURT:  You may proceed.

8  BY MR. FLAXMAN:

9      Q    Let's go to this "the 30 days is not nothing"

10  question.

11          Are police officers in the City of Kankakee

12  Police Department allowed to take time due as a

13  suspension time?

14      A    Yes.

15      Q    Could you explain to the ladies and gentlemen

16  of the jury what that means?

17      A    If you're suspended and if you have available

18  vacation days, you're allowed -- you are allowed to

19  exchange that; and that's why I wouldn't have known if

20  anyone, whether Berge had been suspended or not.

21      Q    Did you also get overtime pay that you could

22  trade for suspension time?

23      A    It would be comp time.  Yes.

24      Q    Could you trade comp time for --

25      A    Yes, you can.

BROOKS v. CITY OF KANKAKEE, 17-2265 -- Jury Trial (4/30/19)

1      Q     -- suspension time?

2      A     Yes.

3      Q     Okay.  So as far as you know, Berge was never

4  off the job?

5      A     As far as I know, no.

6      Q     And he might have been off the job, but -- did

7  you work the same shift as Berge?

8      A     No.  I did not.

9      Q     Okay.  Now, you were asked a lot of questions

10  about the letter.  And I think you looked at seven or

11  eight highlighted words, like "untrue" or "false."

12           Did you ever make any untrue statements about

13  Officer Berge?

14      A     No.  I did not.

15           MR. MATHUES:  Objection to leading, Your Honor.

16           THE COURT:  Overruled.

17           Again, Mr. Flaxman, that's harmless leading,

18  but be careful.

19               (Brief pause in proceedings.)

20  BY MR. FLAXMAN:

21      Q     You were asked about:  Why didn't you go to

22  Chief Regnier and tell him about the, the accident?

23           Why didn't you?

24      A     I had knowledge that he already knew.  He knew

25  the day, the next day of the accident.  I learned that

1    from his own commander; and in our rules and regs, it

2    states that if you don't trust or believe that the person

3    of a higher authority will act upon whatever needs to be

4    done, you can go to those other three entities I went to

5    and make your complaint.

6         Q    Okay.  Now, you looked at page 3 of the Joint

7    Exhibit 1, and it talked about you were instructed to

8    "cease further public disparagement... or criticism ...,

9    including the statement of inaccurate information."

10             What had you done to, that was public

11   disparagement?

12        A    Nothing to my knowledge.

13        Q    What had you done that was inaccurate -- what

14   have you said that was inaccurate information?

15        A    Nothing to my knowledge.

16             MR. FLAXMAN:  May I have just one second?

17             THE COURT:  Sure.

18             (Brief pause in proceedings.)

19   BY MR. FLAXMAN:

20        Q    You were also asked to look at Joint Exhibit 3,

21   the Department of Human Rights investigation report.  Do

22   you have that in front of you?

23        A    Yes.

24        Q    And then at page 9, where -- the last sentence

25   is, "There is not substantial evidence that shows on

BROOKS v. CITY OF KANKAKEE, 17-2265 -- Jury Trial (4/30/19)

1    April 25, 2016, Respondent issued Complainant a written

2    warning in retaliation to opposing unlawful

3    discrimination."

4        A    Yes.

5        Q    Do you know if that's the same issue that

6    you're presenting in this case?

7            MR. MATHUES:  Objection, calls for a legal

8    conclusion.

9            THE COURT:  Sustained.

10           MR. FLAXMAN:  Nothing further.

11           MR. MATHUES:  May I have a moment to confer

12   with my co-counsel?

13           THE COURT:  You may.

14               (Brief pause in proceedings.)

15           MR. MATHUES:  No more questions for Officer

16   Brooks, Your Honor.

17           THE COURT:  All right.  Officer Brooks, you may

18   step down.

19               (Witness Brooks excused, 2:56 p.m.)

20           THE COURT:  Ladies and gentlemen, we're going

21   to take a break.  We're going to take about a ten-minute

22   break and then come back, so we'll be back in the

23   courtroom about 3:05 or so.  All right?

24           Remember my admonition.  Keep an open mind.

25               (Jury absent, 2:56 p.m.)

```
1              THE COURT:  All right.  Jury's left the

2    courtroom.  Let's take a break; come back about 3:05.

3              MR. FLAXMAN:  We will be resting, Your Honor.

4              THE COURT:  After this, you're resting?

5              MR. FLAXMAN:  We're done, and they probably

6    will feel compelled to make a motion at the close of

7    Plaintiff's case.

8              THE COURT:  That's fine.  What I'll do is bring

9    the jury back in.  You can rest.

10             You intend to make a motion at that time?

11             MR. MATHUES:  We intend to make a motion.  We

12   don't intend to argue it.

13             THE COURT:  Okay.  We'll bring them in.  You

14   rest.  I'll take them back out.  You make your motion.

15   You make your response, although it sounds like there

16   won't be any argument.  And then we'll proceed from

17   there.

18             Do you have a witness available after this?

19             MR. MATHUES:  Yes, Your Honor.

20             THE COURT:  Assuming I don't grant your motion.

21             MR. MATHUES:  Assuming you don't, we do have a

22   witness available, Your Honor.

23             THE COURT:  All right.  And then we'll just go

24   until about 4:00 and then stop.  All right?

25             All right, take a break.
```

BROOKS v. CITY OF KANKAKEE, 17-2265 -- Jury Trial (4/30/19)

1             (Recess, 2:57 p.m. to 3:10 p.m.)

2             THE COURT:  Back on the record.

3             We're back on the record.  All parties and

4    counsel are present.

5             Should we bring the jury back in, Mr. Flaxman?

6             MR. FLAXMAN:  Yes, Your Honor.

7             MR. MATHUES:  Yes, Your Honor.

8             THE COURT:  All right.  Let's bring them in.

9             Oh, stop them.  Sorry.  Hold up.

10            I forgot:  You were going to rest.  You were

11   going to make a motion.  Yeah, go ahead and make your

12   motion now.

13            MR. MATHUES:  Judge, at this time, the defense

14   would move for judgment as a matter of law.  Your Honor

15   heard the evidence.  You know the law, and our position

16   is that they've not established a *prima facie* case.

17            THE COURT:  Do you have any response?

18            MR. FLAXMAN:  Yes.  A motion has to state

19   grounds.  Just moving does not comply with the rule.

20            THE COURT:  I believe you're saying he

21   hasn't -- your grounds would be lack of evidence

22   sufficient for the jury to find each of the elements

23   necessary to sustain the charge?

24            MR. MATHUES:  That's correct, Your Honor.

25            THE COURT:  All right.  That's a bare bones

1   argument, but the Court will so rule at this time.

2         Based on what I've heard, taking the light --

3   taking the evidence in the light most favorable to the

4   plaintiff, it is certainly possible that the jury could

5   find that the action taken by the Kankakee police chief,

6   Chief Regnier, in terms of the letter, could be

7   sufficient to (a) discourage someone from engaging in

8   protected activity; (b) they could find that Mr. Brooks's

9   statements either were protected activity and/or were not

10  inaccurate, whether it's before the Human Depart--

11  Illinois Department of Human Rights, the Police and Fire

12  Commissioners' meeting -- I think that's what it was

13  called -- or the meeting before the mayor on the appeal

14  of disciplinary action.

15        So the jury could find sufficient evidence at

16  this time, viewing the light -- viewing the evidence in

17  the light most favorable to the plaintiff, so I'll deny

18  the motion.

19        I hope I said that right when I said Police and

20  Fire Chief Commissioners' meeting.  I think that's what

21  it was called.  At least, I think that's what the

22  evidence was.

23        All right, so the motion's denied at this time.

24        Let's bring them in.

25            (Brief pause in proceedings.)

BROOKS v. CITY OF KANKAKEE, 17-2265 -- Jury Trial (4/30/19)

1              (Jury present, 3:15 p.m.)

2              THE COURT:  Mr. Flaxman, do you have any

3    further witnesses you intend to call?

4              MR. FLAXMAN:  No, Your Honor.  At this time,

5    the plaintiff would rest.

6              All right.  Mr. Mathues, does the defendant

7    wish to present evidence?

8              MR. MATHUES:  Yes, Your Honor.  We wish to call

9    in our case Former Police Chief Larry Regnier.

10             THE COURT:  All right.

11             MR. MATHUES:  Permission to go in the hall to

12   get him?

13             THE COURT:  Yes, sorry.  Yes.

14             (Brief pause in proceedings.)

15             THE COURT:  Chief Regnier, we'll swear you in

16   just for the record again.

17             LARRY REGNIER, sworn, 3:16 p.m.

18             THE COURT:  Whenever you're ready, Mr. Mathues.

19             DIRECT EXAMINATION BY MR. MATHUES:

20   Q    Good afternoon again, Chief.

21   A    Good afternoon.

22   Q    Spell your last name one more time for the

23   record.

24   A    R-e-g-n-i-e-r.

25   Q    Let us start at the beginning.  Can you give

1    the jury a snapshot of your work career, beginning when

2    you graduated high school?

3         A    I graduated Kankakee Westview High School in

4    1974.  I enlisted in the United States Navy, served there

5    from 1974 to 1978.  When I got out of the Navy, I worked

6    as a heavy equipment operator; also a certified welder

7    for Chicago Bridge & Iron.  In 1982, I got hired on as a

8    police officer.

9         Q    When you were first hired, what was your

10   position?

11        A    I was a patrol officer.

12        Q    And how did your position change over your time

13   at the Kankakee Police Department?

14        A    As you move up in the ranks, you -- as you move

15   up in the ranks, your responsibility also increases.

16   The -- you have to start thinking about supervising the

17   men under you, making sure everybody's doing the right

18   thing, making sure everybody stays focused on what the

19   mission of the department is.  It's kind of like

20   everybody is on the same team.  Everybody's got one

21   united goal in the, in mind.

22        Q    As far as moving up, Chief, how did that happen

23   in your career?

24        A    I was, I was a patrol officer from '82 -- in

25   1982.  Probably in '85, I was transferred up to the

1   Detective Bureau.  I spent a little less than a year up

2   there.  I was then transferred to the Tactical Unit that

3   we had going at the time.  This was also in '85.  In '85,

4   I then got promoted to sergeant and was moved back down

5   to the Patrol Division.  I spent from '85 to, I believe,

6   '91 as a sergeant, mostly working in Patrol.

7            At that time, I was then promoted to lieutenant

8   in 1991, and I worked as a lieutenant within the

9   department till 1996, where I was promoted to the

10  position of Investigations commander.  I served there

11  from 1996 to 2000.  At that time, I was appointed deputy

12  chief.  And in 2010, I was appointed chief.

13       Q    Did you stay as chief up until your retirement

14  in May of 2017?

15       A    Yes.

16       Q    When you were chief of police, what were your

17  responsibilities?

18       A    You manage the day-to-day actions of the police

19  department.  You, you, you know, have your finger on

20  what's going on with the shifts.  You make sure that,

21  that everybody's on the same page; like I say, the

22  unified response that we try to do where everybody is

23  trying to reach the same goal.

24            I -- another responsibility was I spoke with

25  community groups and other agencies, make sure that we

BROOKS v. CITY OF KANKAKEE, 17-2265 -- Jury Trial (4/30/19)

1  had -- everything was all on the same page, focused

2  toward one common goal.

3       Q    When you were chief, who was responsible for

4  officer discipline?

5       A    I was.

6       Q    And when you were the chief, who was

7  responsible for officer promotions?

8       A    I was.

9       Q    What kind of a structure does the Kankakee

10 Police Department have as far as an organizational

11 structure?

12      A    It's a paramilitary organization.  It's much

13 like any branch of the service where there is a, there's

14 a hierarchy.  There's a chain of command that is

15 established.  Everybody knows who they report to.  And it

16 works from the top to the bottom and from the bottom to

17 the top.  Everybody knows who they report to.

18      Q    Why does a police department have a

19 paramilitary command structure?

20      A    It goes to the unity of the department.  You

21 want to make sure that the orders that you give, or your

22 superiors give, are carried out, either by you or the men

23 under you.

24      Q    And how does the nature of the police work play

25 into the fact that there's a paramilitary structure?

BROOKS v. CITY OF KANKAKEE, 17-2265 -- Jury Trial (4/30/19)

```
1        A    It goes that when an officer answers a call or
2   something is done within the police department, it's done
3   the same way by everybody.  You know, everybody has their
4   own style, the way they do it.  But it's basically done
5   the same way, so you answer to the same people.
6        Q    I believe you told us earlier you know Mr.
7   Brooks, the plaintiff in this case, correct?
8        A    Yes, I do.
9        Q    How long have you known Officer Brooks?
10       A    Since he was hired.  I, I mean -- and I can't
11  tell you the date that Mr. Brooks was hired, but I was
12  one of his training officers when he first was hired.
13       Q    Have you been Mr. Brooks's supervisor in one
14  way or another for most of his, Officer Brooks's career?
15       A    Yes.
16       Q    During that time, have you observed how Officer
17  Brooks has performed in terms of his work on the street
18  as a patrolman?
19       A    Yes.  He's -- Officer Brooks is an excellent
20  police officer.  He's very efficient on the street.  You
21  never have to do, do a lot of going back with him.  He's,
22  he's a very efficient officer.
23       Q    Apart from his work on the street, during your
24  time as chief, have you heard Officer Brooks complain
25  about what he perceives to be discrimination on the job?
```

BROOKS v. CITY OF KANKAKEE, 17-2265 -- Jury Trial (4/30/19)

1      A     Yes.

2      Q     How many times have you heard him voice such

3   complaints?

4      A     I, I do not know.  I have never kept a count.

5      Q     At any point during your time as chief or as

6   deputy chief, have you ever told Officer Brooks that he

7   may not complain about what he perceives to be

8   discrimination on the job?

9      A     No.

10     Q     Have you ever threatened him with employee

11  discipline for complaining about his perception of

12  discrimination on the job?

13     A     No.  His thoughts are his own.  His opinions

14  are his own.

15     Q     You're familiar with a case that Officer Brooks

16  and several other officers brought back in the early

17  2000s, correct?

18     A     Yes.

19     Q     What was your position in the department at the

20  time?

21     A     I was deputy chief at the time.

22     Q     Was Mr. Brooks ever disciplined for bringing

23  that lawsuit?

24     A     No.

25     Q     The letter, that reprimand that we're all here

1    for today, are you aware whether Mr. Brooks filed any

2    complaints with the Illinois Department of Human Rights

3    over the written reprimand you sent him?

4         A    Yes.

5         Q    Was Mr. Brooks ever disciplined in any way for

6    filing that complaint about your written reprimand before

7    the Illinois Department of Human Rights?

8         A    No.

9         Q    Have you ever, however, issued Mr. Brooks a

10   written reprimand because of his public statements?

11        A    Yes.

12        Q    Can you explain for the jury what you did and

13   when you did it?

14        A    I guess I don't --

15        Q    That's a bad question.  I'll withdraw the

16   question.

17             When did you issue Mr. Brooks a reprimand

18   because of his public statements?

19        A    In April of 2016.

20        Q    In what form did you issue Mr. Brooks a written

21   reprimand?

22        A    On paper, on Department letterhead.

23        Q    And why did you issue that written reprimand?

24        A    Because he, on three occasions I'm aware of,

25   made incorrect, untrue statements about what was going on

BROOKS v. CITY OF KANKAKEE, 17-2265 -- Jury Trial (4/30/19)

1    in the police department.

2         Q    At a very high level, Chief Regnier, what were

3    the factually incorrect statements that were made?

4         A    That the Kankakee Police Department was under a

5    consent decree from his lawsuit in 2003; that the police

6    department had an officer who was doing drugs, and

7    nothing ever happened to him for it; and that we had an

8    officer that crashed a car that lied about it and

9    provided a false police report, but nothing was ever done

10   about it.

11        Q    What are the places where Mr. Brooks, you

12   either heard or were told about Officer Brooks making

13   those statements?

14        A    One was in 2014 at an EEOC hearing that I was

15   at.  He made those same things, only when he talked about

16   the drugs and the crash, he was very vague.  He said

17   there was, there was things that people were doing that,

18   that were not above board.

19        Q    When was the next time that -- but were you

20   physically present at that hearing?

21        A    Yes.

22        Q    When was the next time that Officer Brooks made

23   public statements that were the subject of your written

24   reprimand?

25        A    It would be in -- I believe it was February of

BROOKS v. CITY OF KANKAKEE, 17-2265 -- Jury Trial (4/30/19)

1   2016.  We were in the mayor's office on an appeal for an

2   unrelated matter that he was appealing, and he made those

3   same accusations.

4       Q    Was there anything different about -- strike

5   that.

6            Were you physically present at that time?

7       A    Yes.

8       Q    Was there anything different about what you

9   heard Officer Brooks say in February from what you had

10  heard -- February 2016, I apologize -- from what you had

11  heard back in 2014?

12      A    Yes.  He mentioned, he mentioned the name of an

13  officer in the crash.

14      Q    And then the third time would have been before

15  the Board of Police and Fire Commissions regarding the

16  things that Officer Brooks had said?

17      A    That's correct.

18      Q    And would it be correct to say, as you sit here

19  today, you're not 100 percent sure if you were there or

20  not?

21      A    That, that is also correct.

22      Q    Let's start with the first set of statements

23  that led to your written reprimand.  In the course of

24  your 30-something years in law enforcement, have you

25  heard references to the phrase "consent decree"?

1      A    Yes, I have.

2      Q    In light of your experience, including your

3  experience as a chief and a deputy chief, does that

4  phrase have a particular meaning?

5      A    Yes.

6      Q    Can you explain to the jury what that meaning

7  is?

8      A    That means that -- a consent decree is

9  basically an agreement between the Kankakee Police

10  Department and the United States Department of Justice

11  that usually comes -- the agreement is made because of an

12  investigation the Department of Justice has done about

13  your organization, and they have found you to be, have

14  committed -- your department to have committed numerous

15  and ongoing discrepancies with civil liberties and stuff

16  like that.

17      Q    What, in your experience and knowledge, are

18  some of the consequences that come with having a consent

19  decree against you as a police department?

20           MR. FLAXMAN:  Objection.  This is undisclosed

21  opinion testimony.

22           THE COURT:  He can testify as to what he thinks

23  his understanding is.  Overruled.

24           WITNESS REGNIER:  Can you repeat the question,

25  please?

1          MR. MATHUES:  Yes, Chief.

2    BY MR. MATHUES:

3          Q     Given -- based on your experience at the time

4    as a law enforcement officer, what are the consequences

5    of having a consent decree against you as a police

6    department?

7          A     It basically means that, that you must report

8    to the Department of Justice.  Basically, the Department

9    of Justice is running your police department for you

10   because of the discrepancies they've found.

11         Q     Is it a badge of honor if you have a consent

12   decree against you?

13         MR. FLAXMAN:  Objection, --

14         A     It is not a badge of honor.

15         MR. FLAXMAN:  -- relevance.

16         THE COURT:  I'm sorry, Mr. Flaxman.  I didn't

17   hear you object.  Overruled.

18         Just so the record is clear, my understanding

19   is Mr. Regnier is testifying simply as to his opinion

20   based on his role as the chief.  He is not testifying as

21   an expert, nor absolutely is he not rendering a legal

22   opinion.  He is simply testifying as to his personal

23   understanding based on his experience as the chief.

24   BY MR. MATHUES:

25         Q     During your time and experience as a police

BROOKS v. CITY OF KANKAKEE, 17-2265 -- Jury Trial (4/30/19)

1    chief, have you heard of other police departments that

2    had a consent decree against them?

3        A    Yes, I have.

4        Q    During the entire time that you were working at

5    the Kankakee Police Department, all 30-something years,

6    was there ever a consent decree issued against the

7    Kankakee Police Department?

8        A    No, there wasn't.

9        Q    When you heard Officer Brooks make statements

10   in 2014 with respect to there being a consent decree,

11   what, if anything, did you say to him?

12       A    I told him there was no consent decree.

13       Q    What, if anything, did Officer Brooks say back

14   to you when you told him that?

15            MR. FLAXMAN:  Objection, foundation for doing a

16   conversation.

17            THE COURT:  Yeah.  You're going to have to lay

18   a foundation as to where and when this took place.

19            MR. MATHUES:  Very well.  I'll take a step

20   back, Your Honor.

21   BY MR. MATHUES:

22       Q    You just testified that you had told Officer

23   Brooks that there was no consent decree against the

24   Kankakee Police Department.  Where were you when you told

25   him that?

BROOKS v. CITY OF KANKAKEE, 17-2265 -- Jury Trial (4/30/19)

1          A     In the EEOC hearing.

2          Q     Where in the State of Illinois is the building

3     that that was at?

4          A     It's in the James R. Thompson Center in

5     Downtown Chicago.

6          Q     Who, if anyone, was present with you when you

7     told Officer Brooks that?

8          A     City Attorney Patrick Power.  Mr. Brooks was

9     there.  And I believe Billy Joe Moore was there also.

10         Q     And this conversation when you told Officer

11    Brooks there was not a consent decree against the police

12    department despite him having said so, what, if anything,

13    did Officer Brooks say back to you?

14         A     He said that there was.

15         Q     While you were there with him, did Officer

16    Brooks show you any document entitled "Consent Decree"?

17         A     No.

18         Q     After the -- in this 2014 incident where

19    Officer Brooks had made the statement about a consent

20    decree and then you had a conversation with him and you

21    told him there wasn't, did you ever hear him say again

22    there was a consent decree against the Kankakee Police

23    Department?

24         A     Yes.

25         Q     When was the next time you heard him say that?

1     A    In February of 2016 in the mayor's office when
2   we were at the appeal hearing for the unrelated matter.
3     Q    And at that appeal hearing, what, if anything,
4   did you say in response to Officer Brooks's statements
5   that there was a consent decree?
6              MR. FLAXMAN:  Foundation.
7              THE COURT:  No.  Overruled.
8     A    I don't believe I answered up on that one at
9   all.
10             THE COURT:  You don't believe what?
11             WITNESS REGNIER:  I answered up.  I answered
12  anything that he said about the consent decree.
13             THE COURT:  All right.
14  BY MR. MATHUES:
15    Q    Chief Regnier, are you familiar with the agreed
16  order that was entered as part of the settlement in the
17  Baptist litigation?
18    A    Yes.
19    Q    And you told us you were deputy chief at the
20  time?
21    A    Yes.
22    Q    Are you familiar with what the terms of that
23  agreement were?
24    A    Yes.
25    Q    Is there an expiration in that agreed order?

BROOKS v. CITY OF KANKAKEE, 17-2265 -- Jury Trial (4/30/19)

1    A    There was.

2    Q    What is that expiration?

3    A    I know it was in 2011, January.

4    Q    Chief, is there --

5    A    January 31, 2011.

6    Q    In terms of the expiration, is there -- do you

7  recall whether there's anything else with respect to the

8  expiration, or is your memory exhausted as you're sitting

9  there on the stand?

10    A    Nothing else to do with the expiration.

11        MR. MATHUES:  Judge, may I approach the

12  witness?

13        THE COURT:  You wish to refresh his

14  recollection?

15        MR. MATHUES:  Yes, I do, Your Honor.

16        THE COURT:  You may approach.

17        MR. MATHUES:  Judge, I'm approaching the chief.

18  I'm handing him the document that's previously marked as

19  Joint Exhibit Number 2.  This is solely to refresh the

20  chief's recollection.  I'm turning to page 3, and I'm

21  going to hand it to him.

22        Chief, when your recollection is refreshed,

23  just look up at me, and I'll take the exhibit from you.

24        MR. FLAXMAN:  Judge, the document's in

25  evidence.  Paragraph 10 says when it expires.  We'll

BROOKS v. CITY OF KANKAKEE, 17-2265 -- Jury Trial (4/30/19)

1    stipulate to that.

2              THE COURT:  He can ask the questions.  He's

3    doing the proper format for refreshing recollection of a

4    witness.

5    BY MR. MATHUES:

6         Q    Chief, is your recollection now refreshed?

7         A    Yes.

8         Q    What else does the agreed order say in terms of

9    its expiration besides January 31, 2011?

10        A    Just that it -- it was in full force until that

11   date.

12        Q    Was there an alternative end date for, other

13   than January 31, 2011?

14        A    No.

15        Q    Is your memory exhausted again, Chief?

16        A    Yes, it is.

17             MR. FLAXMAN:  Objection.

18        A    I'm sorry.  I missed --

19             MR. MATHUES:  Judge, may I approach the ELMO?

20             THE COURT:  You can do it on the EL-- I think

21   Mr. Flaxman has already admitted -- already stated

22   correctly that it's admitted into evidence.  That might

23   save us all some time.

24             MR. MATHUES:  Mr. Flaxman, --

25             THE COURT:  You don't object, do you, Mr.

1   Flaxman, --

2           MR. FLAXMAN:  No.

3           THE COURT:  -- to him simply showing the

4   exhibit?  All right.  Go ahead.

5   BY MR. MATHUES:

6       Q    This has been highlighted, Chief.  I'm going to

7   read it.

8           THE COURT:  You're looking at Joint Exhibit 2.

9   What page?

10          MR. MATHUES:  It's number 3, Your Honor.

11          THE COURT:  Page 3.

12  BY MR. MATHUES:

13      Q    "This order shall remain in full force and

14  effect through January 31, 2011, or for a period of two

15  promotional exams following the entry of the order,

16  whichever occurs last."

17          Did I read that accurately?

18      A    You did.

19      Q    Is there a standard period for promotional

20  exams in the Kankakee Police Department?

21      A    Yes.

22      Q    How long is that?

23      A    Three years.

24      Q    Would two promotional exams be six years?

25      A    Yes.

1      Q    The agreed order, was it in effect in 2014 when

2  Officer Brooks made his comments at the EEOC hearing?

3      A    No.

4      Q    Was the agreed order in effect when Officer

5  Brooks made his comments in February of 2012?  Strike

6  that.  I withdraw that.  That was a bad question.

7           In February of 2016 at the hearing in the

8  mayor's office?

9      A    No.

10     Q    At any point when you heard Officer Brooks

11  referencing what he called the consent decree, did you

12  hear him tell -- strike that.

13          At any point when Officer Brooks was

14  referencing a consent decree, did you hear him say that

15  the agreed judgment order had expired in 2011?

16          MR. FLAXMAN:  Object to leading.

17          THE COURT:  Overruled.  It's harmless leading,

18  and it's not too different from questions you've asked,

19  Mr. Flaxman.

20     A    No.

21     Q    As far as Officer Brooks's comments at the

22  April 12, 2016, meeting of the Board of Police and Fire

23  Commissioners, if you weren't there, how would you know

24  what was said?

25     A    I would have sent one of my command staff

BROOKS v. CITY OF KANKAKEE, 17-2265 -- Jury Trial (4/30/19)

1    there, and they would have come back and told me.

2         Q    Who would you have sent as to the April 20,

3    2012 -- excuse me -- 2016, meeting?

4         A    I would have sent Deputy Chief Passwater at the

5    time.

6         Q    When you were the chief, would it be your

7    regular practice to attend the meetings of the Police and

8    Fire Commission?

9         A    Yes.

10        Q    Other than the agreed order that has been

11   admitted into evidence, have you ever seen a separate

12   document entitled "Consent Decree"?

13        A    No.

14        Q    I'd like to shift gears a little bit to the

15   next topic that you referenced in Officer Brooks's

16   comments, with respect to another officer's discipline.

17             What specifically did you hear Officer Brooks

18   say the first time at the hearing in 2014?

19        A    Just that there were, there were things that

20   were happening that were not above board.  He just talked

21   about the EEOC -- or, I'm sorry, about the consent

22   decree; and then he said, "There's other things going

23   on."

24             And when we asked him, "What?", he did not say.

25        Q    When you said we asked him what, who's the "we"

BROOKS v. CITY OF KANKAKEE, 17-2265 -- Jury Trial (4/30/19)

1    you're talking about?

2        A    Pat Power, the City attorney.

3        Q    Were you present for that conversation?

4        A    Yes.

5        Q    What did Officer Brooks say on this subject

6    matter in February of 2016?  So we're moving forward

7    approximately two years.

8        A    I -- basically, the same thing, only this time

9    he talked about the officer doing drugs, and I knew who

10   he was referring to there.  And then he actually said

11   Sergeant Berge's name when he talked about the crash.

12       Q    Was that the first time that you had ever --

13   strike that.

14            Before that moment in February of 2016 when

15   Officer Brooks mentioned Sergeant Berge's name with

16   respect to the crash, had you heard anything before that

17   from any source about Mr. Berge being involved in a car

18   crash?

19       A    No.

20       Q    When it came to Officer Berge using the

21   steroids, when did you find that out?

22       A    Late 2013/early 2014.

23       Q    When you first -- how did you get that

24   information?

25       A    His, his -- I believe it was his fiancee called

BROOKS v. CITY OF KANKAKEE, 17-2265 -- Jury Trial (4/30/19)

1    us, sent us pictures, told us he was using what she

2    believed was steroids, and that it wasn't right what he

3    was doing.

4        Q    Did you sweep that under the rug when you got

5    that information, Chief?

6        A    No.

7        Q    What did you do?

8        A    We called the Illinois -- we called -- first we

9    put Mr. Berge on, on administrative leave.  We called in

10   the Illinois State Police and asked them to handle the

11   investigation of the steroids for us.

12       Q    Why would you call in the State Police to do

13   that?

14       A    Because it would be investigating one of our

15   own, and we think it's better to have an outside agency

16   do that.

17       Q    Did you end up getting the report from the

18   State Police?

19       A    Yes.

20       Q    And what did you learn from that report?

21            MR. FLAXMAN:  Objection.

22            THE COURT:  Well, we talking on hearsay

23   grounds?

24            MR. FLAXMAN:  Yes.

25            THE COURT:  Yeah.  I'll overrule the objection,

BROOKS v. CITY OF KANKAKEE, 17-2265 -- Jury Trial (4/30/19)

1  with the understanding, Mr. Mathues, you're not asking to

2  describe what's in the report, just -- so, in other

3  words, not for the truth of the matter asserted but

4  simply to explain what he did afterwards, if anything.

5          MR. MATHUES:  That's correct, Your Honor,

6  after-affect on the listener.

7          THE COURT:  Okay, then, go ahead.

8  BY MR. MATHUES:

9      Q    What did you believe to be true about Officer

10 Berge and the steroids after you looked at the State

11 Police's report?

12         MR. FLAXMAN:  Objection.  He can say what he

13 did next.  He can't say, "What did you believe to be

14 true?"

15         "Everything they said because they're the State

16 Police."

17         That's, that's --

18         THE COURT:  Well, now we're talking about

19 semantics.  My understanding is -- look, did you take

20 action after you read the report?

21         WITNESS REGNIER:  Yes, sir.

22         THE COURT:  Okay.  Tell us what action you

23 took.

24         WITNESS REGNIER:  He was given a 30-day

25 suspension.  He was sent to treatment.  He was told that

1   he was going to be tested for steroids for at least a

2   period of 18 months randomly.

3   BY MR. MATHUES:

4        Q    During your tenure as chief, what was the

5   longest unpaid suspension that you could, that you issued

6   short of someone being terminated?

7        A    30 days.

8        Q    How many people got that suspension?

9        A    One.

10       Q    Who was that?

11       A    Paul Berge.

12       Q    In addition to the 30-day suspension and the

13  treatment and the testing, were there any other

14  consequences to Paul Berge's career at the Kankakee

15  Police Department with respect to the steroids?

16       A    Yes.  He was number one on the sergeant's

17  promotion list at that time.  And --

18       Q    And when you say "that time," what year is

19  that?

20       A    I believe that would be the 2011 list.

21       Q    And -- I'm sorry.  Go ahead.

22       A    And he was passed over, and I, I ended up

23  passing over another gentleman and promoting the guy who

24  was number three.

25       Q    I want to explain that to the jury.  When you

1    were telling the jury about the promotions list, can you

2    explain that and how that works?

3          A    Okay.  The -- when an officer wishes to go

4    forward for promotion, we give them a, a written test, an

5    oral test; and then there's, there's merit and efficiency

6    points that go along with that.  And there's, you know,

7    educational pay -- not educational pay, educational

8    points.  All that's combined.

9                And then there's also -- the merit efficiency

10   is when every supervisor in the department rates that

11   individual as they see him.  I then culminate that and

12   turn it in to Stanard & Associates, who administers the

13   tests for us; and they come up with the -- the final

14   points that everybody gets is on a list.

15         Q    Is that list publicly posted?

16         A    Yes.

17         Q    In early 2014, who was sitting at the top of

18   the list that was publicly posted?

19         A    Paul Berge.

20         Q    Did a sergeant's position open up in 2014?

21         A    Yes.

22         Q    Was that shortly after you had learned the

23   information about Officer Berge and the steroids?

24               MR. FLAXMAN:  Object to leading.  And we should

25   know when it was that he learned of that information

BROOKS v. CITY OF KANKAKEE, 17-2265 -- Jury Trial (4/30/19)

```
 1  directly.
 2          THE COURT:  I'm going to sustain only because
 3  I'm confused as to the dates myself.
 4          Did you -- I thought we were talking about
 5  two -- well, just tell me what we're -- give us the
 6  dates.  What are we talking about?
 7  BY MR. MATHUES:
 8      Q    Approximately when did you learn about Officer
 9  Berge and the steroid use?
10      A    In late 2013 or early 2014.  He began serving
11  his suspension for the steroids, I believe, in either
12  March or April of 2014, so it was sometime within that
13  period.
14      Q    Sometime -- at the time that Officer Berge was,
15  started serving that suspension, who was at the top of
16  the list for the sergeant promotion?
17      A    Paul Berge.
18          THE COURT:  And this is what you were referring
19  to as the 2011 list?
20          WITNESS REGNIER:  Yes, sir.
21          THE COURT:  That's where I got confused.
22          MR. MATHUES:  For clari-- may I please --
23          THE COURT:  Yes.
24  BY MR. MATHUES:
25      Q    For clarification, Chief Regnier, you had told
```

BROOKS v. CITY OF KANKAKEE, 17-2265 -- Jury Trial (4/30/19)

1    us -- how many years is a promotional period for the

2    Kankakee Police Department?

3         A    Three years.

4         Q    If there is a list that comes out in 2011, for

5    how long does that list stay in effect?

6         A    For three years.

7              THE COURT:  So that two -- when you said "the

8    2011 list" -- I'm making sure I understand this -- that

9    was still in effect all the way up through 2014 --

10             WITNESS REGNIER:  Yes, sir.

11             THE COURT:  -- when you're talking about --

12             WITNESS REGNIER:  It was still in effect.

13             THE COURT:  I understand now.  All right, go

14   ahead, Mr. Mathues.  Now I understand.

15   BY MR. MATHUES:

16        Q    When that list was in effect and Paul Berge,

17   despite his -- was ranked number one and there was a

18   sergeant position open, what did you do?

19        A    I passed him over.

20        Q    Why did you do that?

21        A    Because he had been involved in a -- I believe

22   he was still in treatment, and he was still -- you know,

23   had not been released back to duty yet.

24        Q    When it comes to who you can promote off the

25   list, is your dis-- what are you allowed to do?

BROOKS v. CITY OF KANKAKEE, 17-2265 -- Jury Trial (4/30/19)

```
 1      A     I can promote anyone from the top three.

 2      Q     Can you promote outside the top three?

 3      A     No.

 4      Q     Who, who of the top three did you promote?

 5      A     Mike Sneed.

 6      Q     By the way, what is Michael Sneed's race?

 7      A     He's black.

 8      Q     When it came to the drug testing that Officer

 9 Berge was required to do, what happened in terms of the

10 results of those drug testing?

11      A     They all came back negative.

12      Q     After the -- strike that.

13            In 2014, was there a new list for sergeant

14 promotions?

15      A     Yes.  It would have been late in 2014, but it's

16 still considered the 2014 list.

17      Q     Was that based on another round of competitive

18 testing and ratings?

19      A     Yes.

20      Q     Who was at the top of that list?

21      A     Paul Berge.

22      Q     At some point, did another sergeant's position

23 open up?

24      A     Yes.

25      Q     Would that have been in January of 2016?
```

BROOKS v. CITY OF KANKAKEE, 17-2265 -- Jury Trial (4/30/19)

1      A     Yes.

2      Q     And what did you do at that time?

3      A     I promoted Paul Berge.

4      Q     Why did you do that?

5      A     He was, he was -- he consistently finished

6  number one on the list.  He also -- he's a very good

7  police officer.  He's -- he tests well.  He does well on

8  the street.  He, he paid his price for his mistake that

9  he did, --

10     Q     At the time --

11     A     -- and we were moving on.

12     Q     At the time that you promoted Officer Berge to

13  sergeant in January of 2016, did you have any idea about

14  the automobile accident that he had been involved in and

15  misreported that it happened back in 2012?

16           MR. FLAXMAN:  Object to the leading and

17  compound.

18           THE COURT:  I'll -- sustained.  You're going to

19  have to ask that question a different way.

20  BY MR. MATHUES:

21     Q     When you promoted Officer Berge to sergeant in

22  January of 2016, what, if anything, did you know about

23  Officer Berge's involvement in a car crash and

24  misreporting it?

25     A     I knew nothing.

BROOKS v. CITY OF KANKAKEE, 17-2265 -- Jury Trial (4/30/19)

1    Q    What, if anything, would you have done

2  differently if you would have had that information at the

3  time you made the decision?

4         MR. FLAXMAN:  Objection.

5         THE COURT:  No.  Overruled.

6    A    A good chance he probably wouldn't have made it

7  again.

8         THE COURT:  I don't know what that means.

9         WITNESS REGNIER:  I would not have promoted

10  him, sir.

11         THE COURT:  Okay.

12  BY MR. MATHUES:

13    Q    Earlier in your testimony today, you had told

14  us that the first time you heard Officer Berge's name

15  with respect to the automobile accident being misreported

16  was in February of 2016; is that correct?

17    A    Yes.

18    Q    Once you heard that information, what did you

19  do?

20    A    I -- we, we began looking into the situation.

21  We found that it was, indeed, in 2012.  We pulled that

22  report; and I had the Internal Affairs, the City

23  Inspector, begin an investigation on that.

24    Q    Did you investigate it yourself?

25    A    No.

BROOKS v. CITY OF KANKAKEE, 17-2265 -- Jury Trial (4/30/19)

1       Q      Why did you turn it over to somebody else?

2       A      Because that's what his job is, is to do

3   internal investigations.

4       Q      What did you do when you -- strike that.

5              When you got the investigation report back

6   regarding Officer Berge and the accident, what did you do

7   next?

8       A      I, again, I suspended him for 30 more days.

9       Q      Now, did you consider at that time whether or

10  not to fire Officer Berge?

11      A      Yes, I did.

12      Q      Did you have any conversations about whether or

13  not to fire Officer Berge?

14      A      Yes.  Based on my conversations with my command

15  staff and other City officials, the time period had been

16  so long and they felt that it had been kept under wraps

17  for so long that I would have a hard time firing him for

18  that.  There was a good chance he would get his job back

19  if I did terminate him.

20      Q      Can you explain what you mean when you say

21  there was a chance he could get his job back if you moved

22  to terminate him?

23      A      If I was to terminate him, he would appeal the

24  process.  Okay?  That would then -- the appeal would then

25  be heard most likely by an arbitrator or a court hearing

1 such as this, and that's what would determine whether he

2 got his job back or not.

3     Q    Have you issued suspensions to various officers

4 for different reasons during your time as chief where the

5 officer did appeal?

6     A    Yes.

7     Q    Have there been times where the officer

8 appealed and the officer won and you -- no discipline?

9     A    Yes.

10     Q    Have there been times where all the discipline

11 stuck?

12     A    Yes.

13     Q    And have there been times where there was a

14 compromise ruling?

15     A    Yes.

16     Q    How long can that process take?

17     A    That could take up to a year, maybe more.

18     Q    In addition to the 30-day suspension with

19 respect to Officer, that you issued to Officer Berge in

20 2016 about the crash that happened back in 2014, what

21 else did you require for Officer Berge?

22     A    It was 2012.  And we did a last -- we did a

23 last-chance agreement on him at that point.

24         MR. MATHUES:  Judge, can I approach the ELMO?

25 And I'm going to show the witness what is page 2 of

BROOKS v. CITY OF KANKAKEE, 17-2265 -- Jury Trial (4/30/19)

1    previously admitted Joint Exhibit Number 4.

2            THE COURT:  Yes.

3    BY MR. MATHUES:

4        Q    Chief, there is a signature.  I'm going to

5    point to it here towards the bottom under "On the City's

6    Behalf."  Do you recognize that signature?

7        A    Yes.

8        Q    Whose signature is that?

9        A    That's mine.

10       Q    Underneath that, there's another name.  Can you

11   read that?

12       A    Yes.

13       Q    What name is that?

14       A    Paul Berge.

15       Q    And whose signature is underneath there?

16       A    Underneath?

17       Q    Underneath Paul Berge's name.

18       A    Paul Berge.

19       Q    When you heard or were told of Officer Brooks

20   making public statements about one of the officer's use

21   of drugs, did you hear Officer Brooks tell the

22   speakers -- or excuse me.  Did you hear Officer Brooks

23   say, "And that officer was suspended for 30 days"?

24           MR. FLAXMAN:  Objection, foundation.  When did

25   he hear this?

1          THE COURT:  Yeah.  I need to have more -- I'll

2    sustain that.  I need to have more found-- you jumped

3    around on me.

4          MR. MATHUES:  I apologize, Judge.  I did.  And

5    Mr. Flaxman is correct.  I did jump around.

6          THE COURT:  So, lay a foundation so I know when

7    and what, what -- I don't even know what conversation

8    you're talking about.

9          MR. MATHUES:  Let me ask the question a

10   different way.

11   BY MR. MATHUES:

12     Q    Have you ever heard Officer Brooks in his

13   public statements say, "And the officer who used drugs,

14   or used steroids, received a 30-day unpaid suspension"?

15     A    I have not.

16          THE COURT:  Mr. Mathues, before you venture off

17   into another area, it's 3:57.  This is -- would this be a

18   good time for us to stop for the night?

19          MR. MATHUES:  Judge, I was about to make a

20   transition.  I think that would be a great time to stop

21   for the night.

22          THE COURT:  All right.  Well, I saw you looking

23   at documents.  That's usually a -- the FBI would call it

24   a clue.

25          All right, Chief Regnier, you can step down for

1    now.  You'll be recalled tomorrow morning.

2          Ladies and gentlemen, we're going to take our

3    first evening break.  I'm not going to read you my whole

4    admonition again.  You remember what I read to you before

5    lunch?  Yes.  Everybody's nodding their head yes.  All

6    right.

7          So keep an open mind.  Don't talk about the

8    case.  We haven't even finished all the -- come close to

9    hearing all the evidence yet.  We're not even close.

10         So come back tomorrow morning.  Try and be in

11   the jury room at 9:10.

12         Leave the exhibits you have on the chair.  My

13   courtroom deputy will pick them up, and she's very good

14   about making sure that they match up with your notebooks

15   and so we get them all -- you will get your exhibits, and

16   you will get your notebooks back in the morning.  So just

17   leave everything there in your seat, and my courtroom

18   deputy will take care of that for you.

19         Have a good evening.  I hope it stopped

20   raining, and I hope it doesn't rain on you tomorrow

21   morning.  I'll see you in the morning.  Be in the jury

22   room about 9:10.  Thank you.

23              (Jury dismissed for the day, 3:56 p.m.)

24         THE COURT:  All right.  Be seated.

25         Everybody's out of the -- the jury's out of the

BROOKS v. CITY OF KANKAKEE, 17-2265 -- Jury Trial (4/30/19)

```
1    courtroom, I should say.
2            All right, give me some time for -- Mr.
3    Flaxman?
4            MR. FLAXMAN:  Does Your Honor have a
5    sequestration order for the witness who's just left the
6    stand?  Is he allowed to talk or not talk?
7            THE COURT:  Well, he's still Mr. Mathues'
8    witness, so they can still talk.
9            MR. FLAXMAN:  It's different with different --
10           THE COURT:  Yes, yes.  I've actually -- in my
11   earlier role as an assistant U.S. attorney, I actually
12   had to litigate that before the Court of Appeals; and
13   I've learned more about when somebody is someone's
14   witness and when they are not and when they leave and
15   when they don't, who they can talk to than I want to.
16           So if you want to talk about one of the many
17   esoteric areas of the law sometime when this trial is
18   over, I could explain it to you because I've now seen
19   judges do things and I know what they're doing is wrong,
20   at least according to what Seventh Circuit would say at
21   the time I researched the issue, which was probably about
22   12 years ago.
23           All right, --
24           MR. MATHUES:  So, I want to make sure I under--
25   one, I would appreciate the education when this case is
```

BROOKS v. CITY OF KANKAKEE, 17-2265 -- Jury Trial (4/30/19)

1   over; and, two, I want to make sure what Your Honor is

2   saying that I may or --

3           THE COURT:  The long and short of it is:  While

4   he's still your witness, you can still talk to him about

5   potential testimony.  There's some nuances there, but

6   that's the long and the short of it at this point.

7           All right.  Mr. Mathues, could you give me an

8   idea about the timing, what we're going to be doing?

9           MR. MATHUES:  Judge, I would estimate that I

10  have, probably, 20 minutes left with the chief, at most.

11          THE COURT:  And then how many witnesses do you

12  intend to call after the chief?

13          MR. MATHUES:  My -- well, technically, not

14  partner -- so my boss, Mr. Hervas, is going to call

15  Lieutenant Passwater, and I would anticipate that -- half

16  an hour, perhaps?

17          MR. HERVAS:  Yes.

18          THE COURT:  All right.

19          MR. MATHUES:  And then we have no other

20  witnesses other than those two, Your Honor.

21          THE COURT:  Do you have any rebuttal witnesses

22  you intend to call?

23          MR. FLAXMAN:  Not at this time.

24          THE COURT:  I'm asking because I need to start

25  working on the jury instructions, and my law clerk and I

BROOKS v. CITY OF KANKAKEE, 17-2265 -- Jury Trial (4/30/19)

1   have worked on them quite a bit over the last couple

2   days.  And I anticipate we're going to have a very large

3   fight between the two of you as to the -- as to,

4   probably, three instructions, including the elements

5   instruction, because they are -- it is very tricky, and

6   I'll be honest and direct with both of you as to that

7   elements instruction.  I am going to massage it and base

8   it -- I'm going to base it on the Seventh Circuit

9   instruction.  I am going to massage it, based on the

10  evidence that I hear, to make it more specific to this

11  case because I do not want to confuse the jury as to what

12  the issues are.  And both of you have done a good job so

13  far about not interjecting things that are not at issue

14  in terms of the elements instruction so far.  But I'm

15  going to take that up.

16          The reason I'm -- so timing-wise, just so you

17  can make some plans, if we end up resting after lunch

18  tomorrow, which I think is a possibility, I may --

19  emphasize the word "may" -- let the jury go and then come

20  back on Thursday morning so that I can work on the

21  instructions, have you wait here while we do that, have

22  our jury instruction conference; and then I cut you loose

23  while we make the copies and get everything ready for

24  Thursday morning.  But that's going to depend a lot upon

25  how late -- how far past noon we go.  If we don't go that

BROOKS v. CITY OF KANKAKEE, 17-2265 -- Jury Trial (4/30/19)

```
1    far past, I'm going to put myself under the gun and try
2    to get the whole thing done tomorrow.  We'll see.  That's
3    why I want to know.
4            All right, anything else on behalf of the
5    plaintiff before we break for the evening?
6            MR. FLAXMAN:  No, Your Honor.
7            THE COURT:  Mr. Mathues, anything you want to
8    raise?
9            MR. MATHUES:  Only what Your Honor ruled at the
10   sidebar as far as the notice of suspension for the
11   steroids, Your Honor.
12           THE COURT:  Yes.
13           MR. MATHUES:  I actually told Mr. Flaxman wrong
14   in the hall.  He asked me if had a copy.  I told him I
15   didn't; I'd get it to him.  I actually do have a copy.
16           THE COURT:  Of the actual suspension of Berge?
17           MR. MATHUES:  Of the suspension.
18           And I want to make sure I understand Your
19   Honor's ruling that I am -- because the door's been
20   opened, I am --
21           THE COURT:  Mr. Flaxman does not disagree that
22   he opened the door, at least that's my understanding from
23   the sidebar, so --
24           MR. FLAXMAN:  No.  I do disagree.
25           MR. MATHUES:  I think he did disagree.
```

BROOKS v. CITY OF KANKAKEE, 17-2265 -- Jury Trial (4/30/19)

1          THE COURT:  Oh, you did disagree?

2          MR. MATHUES:  He disagreed quite strongly.

3          THE COURT:  As to the opening of the door as to

4    the, as to whether or not Mr. Berge received a 30-day

5    suspension?

6          MR. FLAXMAN:  I opened the door to that because

7    I relied on the suspension notice not having been

8    produced.  If they had produced it or intimated that they

9    could produce it, I wouldn't have walked through that

10   door.  I, I walked -- I did that relying on the rules

11   of -- Rule 26.  If there's something that they're going

12   to use in their case -- and it seems sensible that if

13   they're saying a guy was suspended for 30 days, they'd

14   have a piece of paper showing that.  The fact that they

15   did not have that piece of paper led me to say, "Hey,

16   there is no piece of paper.  You're making this up about

17   the suspension."

18         Now there's a piece of paper.  I'm prejudiced

19   by that, so I would oppose it.

20         THE COURT:  Mr. Mathues.

21         MR. MATHUES:  I don't think there is a reason

22   for Your Honor to change the rulings.  I would reiterate

23   that Mr. Flaxman didn't request anything in discovery;

24   and I didn't anticipate that there would be an issue as

25   to whether or not Officer Berge, in fact, served the

BROOKS v. CITY OF KANKAKEE, 17-2265 -- Jury Trial (4/30/19)

1   30-day suspension for the steroids.

2            So I think Your Honor's right.  The door is

3   opened.  I'm not going to beat a dead horse, Your Honor.

4   I'm just going to show it to the witness, ask him to

5   identify what it is, move it into evidence, and move on.

6            THE COURT:  My ruling's going to stand.  I

7   think -- I'm not going to get into a gigantic discovery

8   fight here; but from every representation I have from

9   both of you, I don't think either one of you is

10  misleading me.  It was available.  It wasn't requested.

11  There was no attempt to withhold it.  And that's where we

12  are.

13           And, Mr. Mathues, my understanding is you're

14  not going to dwell upon it extensively.

15           And, Mr. Flaxman, if you wish to get into it,

16  I'll let you get into it; but I presume you would just as

17  soon have it come in and minimize it as much as possible.

18           MR. FLAXMAN:  I will sleep on that.

19           THE COURT:  Okay.  All right, I'll see all you

20  gentlemen here tomorrow morning at 9:10.  Have a good

21  evening.

22           (Trial adjourns, 4:03 p.m.)

23

24                * * * * * * * * * *

25

BROOKS v. CITY OF KANKAKEE, 17-2265 -- Jury Trial (4/30/19)

1

2

3

4                        REPORTER'S CERTIFICATE

5

6          I, LISA KNIGHT COSIMINI, RMR-CRR, hereby certify

7     that the foregoing is a correct transcript from the

8     record of proceedings in the above-entitled matter.

9

10         Dated this 16th day of May, 2019.

11

12

13         _____   s/Lisa Knight Cosimini_____
                    Lisa Knight Cosimini, RMR-CRR
14                  Illinois License # 084-002998

15

16

17

18

19

20

21

22

23

24

25