UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

RICHARD BROOKS,

                                    Docket No. 17-2265

            Plaintiff,

    vs.                             Urbana, Illinois
                                    May 1, 2019
                                    9:13 a.m.

CITY OF KANKAKEE, ILLINOIS,

            Defendant.


JURY TRIAL (Day 2 of 2)

BEFORE THE HONORABLE COLIN S. BRUCE
UNITED STATES DISTRICT JUDGE


A P P E A R A N C E S :

For the Plaintiff:    KENNETH N. FLAXMAN, ESQUIRE
                      Kenneth N. Flaxman, P.C.
                      200 South Michigan Avenue, Suite 201
                      Chicago, Illinois 60604
                      312-427-3200

For the Defendant:    G. DAVID MATHUES, ESQUIRE
                      CHARLES E. HERVAS, ESQUIRE
                      Hervas, Condon & Bersani, P.C.
                      333 Pierce Road, Suite 195
                      Itasca, Illinois 60143-3156
                      630-773-4774


Court Reporter:       LISA KNIGHT COSIMINI, RMR-CRR
                      U.S. District Court
                      201 South Vine, Suite 344
                      Urbana, Illinois 61802

Proceedings recorded by mechanical stenography; transcript
produced by computer.

BROOKS v. CITY OF KANKAKEE, 17-2265 -- Jury Trial (5/1/19)

I N D E X

Page

PRELIMINARY MATTERS ............................   3
     Discussion about supporting documentation
     regarding 30-day suspension of Paul Berge


EVIDENCE ON BEHALF OF THE DEFENDANT:

     LARRY REGNIER
     Continued Direct Examination by Mr. Mathues ...  12
     Cross-Examination by Mr. Flaxman ..............  24
     Redirect Examination by Mr. Mathues ...........  44

     ROBIN PASSWATER
     Direct Examination by Mr. Hervas ..............  46
     Cross-Examination by Mr. Flaxman ..............  63


PLAINTIFF'S RULE 50 MOTION ......................  70


INSTRUCTION CONFERENCE ..........................  77


JURY CHARGE By Judge Bruce ...................... 104


CLOSING ARGUMENTS:
     By Mr. Flaxman ............................... 115
     By Mr. Mathues ............................... 122
     Rebuttal by Mr. Flaxman ...................... 134


VERDICT PUBLISHED/JURY POLLED ................... 141

```
 1                  (In open court, 9:13 a.m.)

 2           THE COURT:  Okay.  We're back on the record.

 3           We had an issue that arose late yesterday,

 4    right before recess, concerning the issue of a document

 5    related to Officer Berge's 30-day suspension, so I want

 6    to put a few things on the record.

 7           Number one:  The Court first notes that the

 8    existence of this document is not a primary issue in the

 9    trial.  It's not even a collateral issue in the trial.

10    It is, perhaps, best described as an ancillary issue, and

11    that might be giving it more weight than it deserves.

12           It does not appear to the Court at this time

13    that the document is such that the defense is based upon

14    its existence.  The defense does not hinge upon the

15    existence of this document.  Thus, the document does not

16    fall within the scope of Federal Rule of Civil Procedure

17    26(a)(1).

18           Further, a review of the deposition of Mr.

19    Regnier shows that he was asked about the 30-day

20    suspension in his deposition, and he answered and

21    described the 30-day suspension.  It's docket number

22    16-4, the deposition of Mr. Regnier.  The first time he

23    was asked about it was in reference to a request by Mr.

24    Flaxman.  It appears on page 24 of the deposition.  There

25    was more discussion of Mr. Berge's 30-day suspension in
```

1    response to questions by Mr. Condon on page 70 of the

2    deposition.  There were even more questions referencing

3    the 30-day suspension in questioning by Mr. Flaxman on

4    page 72 of the deposition.  Thus, the Court finds there

5    was no surprise that Mr. Regnier would testify that Mr.

6    Berge received a 30-day suspension.

7            Furthermore, this is a document that could have

8    been provided under Rule 26(a)(3); however, it was not

9    readily foreseeable that the existence of this document

10   would be an issue.  In fact, if I was going to summarize

11   it, it's turning a molehill into a mountain.  The Court

12   could easily have envisioned that it could have been

13   provided if requested.  However, there is no indication

14   in the record that there was a request for this document.

15           For the Court, perhaps the most important

16   aspect of this ruling is, as I stated earlier, the

17   existence of this document is an ancillary issue at best.

18   We've already spent way too much time discussing this,

19   having me and my staff read through depositions, et

20   cetera, about an issue that is not even -- it's minimally

21   relevant.

22           Furthermore, my understanding was a copy was,

23   of this document, was provided to Plaintiff's counsel

24   yesterday when this entirely unexpected minimal

25   distracting issue arose.  So, therefore, the Court finds

1    that if the plaintiff suffered any prejudice

2    whatsoever -- and I doubt that -- by not being aware of

3    the existence of this document, any prejudice is *de*

4    *minimis* to the actual issues before the jury; and,

5    furthermore, it's not -- any issue regarding the

6    nondisclosure is not attributable to any action by

7    defense counsel.

8              I guess the bottom line, gentlemen, if you sift

9    through what I have just said, I don't want to get

10   distracted by an issue like this that is so minor to the

11   actual issue before the jury.  It's very easy to get

12   sidetracked in the heat of trial.  I'm telling both of

13   you now:  Move on.

14             If you want to use the document, Mr. Mathues,

15   that's fine.  If you want to cross-examine about it, Mr.

16   Flaxman, that's fine.  But, seriously, gentlemen, the

17   amount of attention we've already spent on the existence

18   of this one-page document that simply corroborates what

19   Chief Regnier said, Mr. Regnier said, about a 30-day

20   suspension is ridiculous.

21             So that's all I'm going to say about that.

22   That's all I'm going to hear about that.

23             MR. FLAXMAN:  One point, Your Honor, if I may.

24             THE COURT:  Yes, Mr. Flaxman.

25             MR. FLAXMAN:  It sounded like -- and I might

BROOKS v. CITY OF KANKAKEE, 17-2265 -- Jury Trial (5/1/19)     6

1    have misheard it -- that you were ruling that the

2    document that's been -- that was tendered to me yesterday

3    afternoon is admissible.  I had a chance to look at it

4    yesterday evening and sent an email to the defense saying

5    that we want the complete document.  We don't want one

6    unsigned page.

7           I think there's a rule about completeness that

8    requires -- I don't think it's waivable -- that requires

9    the party introducing a document, introducing part of a

10   document, on request, to introduce -- to produce the

11   entirety of the document.  And I don't think Your Honor

12   should allow one page to be admitted when there's more

13   that is referred to in that one page that hasn't been

14   produced.

15          THE COURT:  Mr. Mathues, is it a one-page

16   document a or multi-page document that --

17          MR. MATHUES:  Your Honor, it is a one-page

18   document that references an Appendix A.  I don't have a

19   copy of Appendix A.  Actually, I got this email from Mr.

20   Flaxman approximately 9:00 last night.  I asked

21   Lieutenant Passwater if he could find Appendix A, if he

22   could find that before he came down here from Kankakee.

23   He was not able to do that.

24          He's contacted someone from Kankakee Police

25   Department to see if they can find that and email it

1    here, and Your Honor's deputy clerk has been kind enough

2    to say, if she gets that email, that she'll print out a

3    copy.  That is, in the defense position, going above and

4    beyond to try and get an appendix that was never asked

5    for and not part of the document.

6              THE COURT:  Do you have any idea what Appendix

7    A consists of?

8              MR. MATHUES:  I don't, Judge.  I could

9    speculate that it has something to do with the details of

10   Officer Berge's suspension for the steroids.  That would

11   seem logical to me.  But I have never seen it before.  I

12   cannot speak with any sort of certainty as to what's

13   there.

14             For all I know, it confirms the steroid testing

15   that counsel for the plaintiff has cast doubt upon.  But

16   who knows?

17             THE COURT:  Well, so now we're going to spend

18   more time on an issue that's not really anything of

19   serious importance.

20             Did you plan on using this document this

21   morning?

22             MR. MATHUES:  Judge, I planned on asking

23   Officer -- excuse me, Former Chief Regnier fewer than

24   five questions about the document and moving on and not

25   mentioning Officer Berge -- not mentioning the document

BROOKS v. CITY OF KANKAKEE, 17-2265 -- Jury Trial (5/1/19)

1    again.  Maybe even two questions.

2            THE COURT:  Did you plan on using the document

3    this morning, Mr. Flaxman?

4            MR. FLAXMAN:  I planned on cross-examining him

5    and insisting upon strict compliance with Rule 106 of the

6    Rules of Evidence.

7            THE COURT:  Well, there is the rule of

8    completeness.

9                 (Brief pause in proceedings.)

10           THE COURT:  Do we have any idea when this --

11   Mr. Mathues, when this Appendix A to a document you

12   intended to introduce was going to be discovered or

13   provided?

14           MR. MATHUES:  I, I would be speculating, Your

15   Honor.  If -- truth be told, Your Honor, if there were an

16   agreement from the plain-- the only reason this is coming

17   in is the plaintiff's attorney's implication in

18   cross-examination that Officer Berge was never suspended

19   for the steroids.  If we could have an agreement that

20   there would be no questions to that effect as there

21   previously were, then I would not bother introducing the

22   document.

23           THE COURT:  Well, I'm not going to enter into

24   negotiations between the two of you.

25           Why don't we take a -- we'll go off the record

1  for five minutes -- take a recess, I should say, for five

2  minutes.  And the two of you can try to work something

3  else out.

4          But, gentleman, let me point out:  While the

5  two of you think this is an important issue, I can tell

6  you sitting here on the bench and watching the jury

7  during your questions on this, it's not that important.

8  You're spending way too much time on an issue that, for

9  most of us, is simply a waste of time.  But if you want

10  to get into it, we'll take a five-minute break, see if

11  you can work something out.  Otherwise, we will proceed,

12  hoping you can get Appendix A, and I'll have to make a

13  ruling from that point forward.

14          But right now, seemingly, it's not in

15  compliance with Rule 106.  I thought you were going to

16  tell me it was simply an administrative appendix with

17  some rules cited that actually has rules related to

18  Officer Berge.  We'll go off on this completely minor,

19  ridiculous waste of time not related to any issue and

20  we'll wait.

21          MR. MATHUES:  Judge, --

22          THE COURT:  So, --

23          MR. MATHUES:  Your Honor, I'm not going to

24  introduce it in my -- in light of Your Honor's

25  statements -- I don't know what's in Appendix A.  I'm not

1    going to introduce it in my direct.

2              THE COURT:  If it's just a regulation, I'm

3    not -- if it actually has matters related to this

4    ancillary issue we seem to be going off on, I'm not happy

5    about it.

6              I'm not happy about the fact, Mr. Flaxman,

7    there was -- obviously, you weren't surprised by this.

8    You can't tell me you were.  It's in the deposition, as I

9    indicated.  We scoured through and found it in the

10   deposition.  Your questions, as a matter of fact.  So you

11   can't claim you were surprised that he was going to

12   testify there was a 30-day suspension, and you could have

13   asked for any supporting documentation.

14             I'll liken it to this:  I don't doubt -- and

15   the jury doesn't doubt -- that Mr. Regnier was the chief

16   of police of Kankakee.  But if somehow during

17   cross-examination it came up when he became the chief of

18   police and there was a document that showed that

19   ancillary issue and the two of you were going to fight

20   about it and we had to stop and find the documentation

21   that said "this is the day he became the chief of

22   police," that's about where we are with this document.

23   And I know the two of you are locked on to fighting about

24   this, it seems.  It's not that important.

25             So we'll take a five-minute recess.  I'll come

BROOKS v. CITY OF KANKAKEE, 17-2265 -- Jury Trial (5/1/19)

1   back in here at 9:30, and you can tell me if you reached

2   an agreement.  If not, Mr. Mathues, I will not allow you

3   to introduce the document until you get the appendix, and

4   then we'll take it from there.

5           So we'll be in recess for about five minutes.

6           (Recess, 9:24 a.m. to 9:29 a.m.)

7           THE COURT:  Mr. Flaxman, any progress made?

8           MR. FLAXMAN:  Yes.  The defense has indicated

9   they will not use that document.

10          THE COURT:  Mr. Mathues?

11          MR. MATHUES:  That's correct, Your Honor.

12          THE COURT:  All right.  Mr. Flaxman, should we

13  bring the jury in?

14          MR. FLAXMAN:  Yes, please, Your Honor.

15          THE COURT:  Mr. Mathues?

16          MR. MATHUES:  No objection.

17          THE COURT:  All right.  Bring them in.

18          Mr. Regnier, come on up to the witness stand.

19  Go ahead and have a seat.

20          (Brief pause in proceedings.)

21          (Jury present, 9:31 a.m.)

22          THE COURT:  Good morning.

23          We were taking care of some administrative

24  matters and some other matters that were completely --

25  involving stuff on my bench that keeps getting moved

BROOKS v. CITY OF KANKAKEE, 17-2265 -- Jury Trial (5/1/19)

1    around that is driving me nuts, and some of my stuff

2    isn't working correctly.

3            So we have Mr. Regnier on the stand.  Mr.

4    Mathues, you wish to continue your examination?

5            MR. MATHUES:  Yes, I do, Your Honor.

6         CONTINUED DIRECT EXAMINATION BY MR. MATHUES:

7    Q    Good morning again, Chief.

8    A    Good morning.

9    Q    To clear up one thing from the end of your

10   testimony yesterday, assuming you were not present on

11   April 12, 2016, before the Board of Fire and Police

12   Commissioners, how would you have found out what Officer

13   Brooks said at that meeting?

14   A    I would have sent Deputy Chief Passwater to the

15   meeting, and he would have told me what happened.

16   Q    And when you wrote the written reprimand on

17   April 25, 2016, what was your understanding of what

18   Officer Brooks had said at the meeting before the Board

19   of Fire and Police Commissioners?

20           MR. FLAXMAN:  Objection, hearsay.

21           THE COURT:  No.  That's not hearsay.  It goes

22   to the root of one of the issues, so overruled.

23   A    He said the exact same things that he had said

24   on the previous two occasions that I had witnessed it:

25   that we were under consent decree; that officers were

1   allowed to use drugs, and nothing happened within the

2   police department; and there was a car crash, and nothing

3   was ever done about that.

4       Q    How long after you wrote the written reprimand

5   to Officer Brooks did it take for Officer Brooks to come

6   to you and ask, "What are the facts?  What do you mean,

7   Chief, when you say 'inaccurate facts' in this written

8   reprimand?"

9           MR. FLAXMAN:  Object to the form of the

10  question.  Assumes there was some reason for him to have

11  done that.

12          THE COURT:  I'm having trouble hearing what you

13  just said.  What was your objection?

14          MR. FLAXMAN:  The form the question.  It

15  assumes that there was some reason for Mr. Brooks to go

16  talk to the chief, that it was his responsibility to

17  debate a direct order.

18          THE COURT:  Well, I've lost track where we are

19  now, so Mr. Math-- sustained as far as -- ask the

20  question a different way and start over.  Take it step by

21  step.

22  BY MR. MATHUES:

23      Q    Chief, did Richard Brooks ever come to you

24  after you had written the written reprimand on April 25th

25  of 2016 regarding statements of inaccurate facts and ask

```
1    you why you told him his facts were wrong?

2         A    No.

3         Q    Can you summarize for the jury what it was

4    about Officer Brooks's statements that you believe were

5    disparaging and damaging to the Kankakee Police

6    Department?

7         A    He said that we were under a consent decree,

8    which is -- it's completely false.  The, it gives -- the

9    public thinks that we've done something wrong, that we've

10   got to have oversight for it.  Him saying that, that a

11   police officer used drugs and noth-- absolutely nothing

12   happened to him; and that he also crashed a car, filed a

13   false police report, and absolutely nothing happened to

14   him -- it lets the people that we protect and serve think

15   that the police department's running amok, which is not

16   what happened.

17        Q    Chief, how many people during, in addition to

18   Officer Brooks, during your time as Chief did you

19   discipline for making disparaging and inaccurate public

20   remarks?

21             MR. FLAXMAN:  Objection, relevance.

22             THE COURT:  No.  Overruled.

23        A    Two others.

24        Q    What were their names?

25        A    Richard Cox and Michael Shreffler.
```

1      Q    And what are their ethnicities?

2      A    They're both white.

3      Q    Who was Richard Cox, and what did he do?

4      A    Richard Cox was a detective.  This was back in

5  2012.  He was a detective.  We were hiring a

6  lateral-entry officer, which is a common thing that we

7  do.  We use it to pick up experienced officers; and,

8  also, we use it to hire minority officers from other

9  departments.  He's already been through school.  It's a

10 lateral entry for an officer.

11         He didn't like the fact that we were using the

12 lateral, lateral-entry program.  He did not, he did not

13 like that -- he thinks that the, Mr. Cox thought that

14 lateral entry was illegal.

15     Q    And what did Mr. Cox do or say to that effect?

16         MR. FLAXMAN:  Objection, hearsay.

17         THE COURT:  Well, we're going pretty far --

18 I'll sustain that objection.  Ask him -- don't get into

19 hearsay.  Move on.

20 BY MR. MATHUES:

21     Q    What did you believe that Mr. Cox had said or

22 done that was damaging or disparaging to the police

23 department?

24     A    He, he had a site on Facebook and on the

25 Internet, like a blog.  He encouraged officers that were

BROOKS v. CITY OF KANKAKEE, 17-2265 -- Jury Trial (5/1/19)

1    currently on the hiring list to sue the City of Kankakee

2    because he thought that the lateral-entry program was

3    illegal.

4        Q    Was Officer Cox correct in his public

5    statements --

6            MR. FLAXMAN:  Objection.

7        Q    -- that this was illegal?

8            MR. FLAXMAN:  Objection.

9            THE COURT:  On what grounds?

10           MR. FLAXMAN:  His opinion about whether the

11   statements were truthful or untruthful or correct is not

12   relevant here.

13           THE COURT:  My understanding is he's explaining

14   what, why he took an action, --

15           MR. FLAXMAN:  Well, he --

16           THE COURT:  -- so overruled.

17           MR. FLAXMAN:  -- can say --

18           THE COURT:  Overruled.

19           But, again, I don't want to get off on these

20   collateral issues, so ask another question.

21   BY MR. MATHUES:

22       Q    What did you do with respect to Richard Cox?

23       A    I wrote him a letter of reprimand.

24       Q    And what else did you do with respect to

25   Richard Cox?

BROOKS v. CITY OF KANKAKEE, 17-2265 -- Jury Trial (5/1/19)

```
 1        A    I transferred Mr. Cox from the Detective Bureau
 2   back into Patrol.
 3        Q    And can you explain to the jury why that could
 4   be perceived as discipline?
 5             MR. FLAXMAN:  Objection.
 6             THE COURT:  I'll sustain that.  The jury can
 7   make its own conclusions.
 8   BY MR. MATHUES:
 9        Q    Who was the second officer?
10        A    Michael Shreffler.
11        Q    What did Officer Shreffler do that you believe
12   was damaging to the police department?
13        A    He was on Facebook right after the 2016
14   halftime show, which was called "The Black Panther
15   Halftime Show."  He was making comments on his Facebook
16   page.  People were answering him.  He got into a
17   tit-for-tat with another individual.  He began to post
18   racially disparaging, racially intense pictures and
19   making statements that were the same.
20        Q    Why was that a problem?
21        A    Everyone knows that he is a police officer, and
22   him using that language and using racially disparaging
23   photos and language on there goes right to the police
24   department and makes the public think that, again --
25        Q    And what did you do to Officer Shreffler?
```

1      A     I issued him a letter of reprimand.

2      Q     How long did it take, when you found out what

3   Officer Shreffler, did for you to issue that reprimand?

4      A     One day.

5      Q     What did you tell Officer Shreffler would

6   happen if he continued doing what he was doing?

7            MR. FLAXMAN:  Objection.

8            THE COURT:  Overruled, but I'm not going to let

9   you go very far into this.  Go ahead.

10           MR. FLAXMAN:  Could we have a foundation?

11           THE COURT:  Lay a foundation.

12   BY MR. MATHUES:

13      Q     The written rep-- did you issue Officer

14   Shreffler a written reprimand?

15      A     Yes.

16      Q     Was it in a letter format?

17      A     Yes.

18      Q     At the end of the letter, did you warn Officer

19   Shreffler what could happen if he continued doing what he

20   was doing?

21      A     Yes.

22      Q     What did you tell Officer Shreffler in the

23   written reprimand would happen if he continued doing what

24   he was doing?

25      A     Future violations would, would -- would start

BROOKS v. CITY OF KANKAKEE, 17-2265 -- Jury Trial (5/1/19)

1   with progressive discipline up to and including his

2   termination.

3        Q     How did what you told Officer Shreffler would

4   happen compare to what you told Officer Brooks would

5   happen if Officer Brooks continued making false and

6   inaccurate statements?

7        A     The exact same thing.

8        Q     What is your regular -- what was your regular

9   practice when you were chief of police issuing discipline

10  as far as issuing that sort of warning?

11            MR. FLAXMAN:  Objection.

12            THE COURT:  Overruled.

13       A     That was the standard sentence I used in every

14  one.

15            MR. MATHUES:  Judge, may I approach the ELMO?

16            THE COURT:  You may.

17  BY MR. MATHUES:

18       Q     Chief, I'm almost done with you.  I want to ask

19  you a few questions about the letter of reprimand that

20  you have written.

21            This is Joint Exhibit Number 1, page 1, the

22  first sentence of the second full paragraph.  It reads,

23  "During these instances, you have made statements that

24  are not true and are, in fact, damaging not only to the

25  police department but to your fellow officers and

BROOKS v. CITY OF KANKAKEE, 17-2265 -- Jury Trial (5/1/19)

1  yourself."

2           Which statements are we talking about?

3           MR. FLAXMAN:  Objection.  It's been covered

4  several times.

5           MR. MATHUES:  I can ask a leading question,

6  Judge, just for --

7           THE COURT:  Okay.

8           MR. MATHUES:  Are you talking about --

9           THE COURT:  Don't argue with each other, and

10  don't argue with my rulings.

11           Overruled.  You may ask the question.

12  BY MR. MATHUES:

13      Q    Which statements were you referring to in Joint

14  Exhibit Number 1?

15      A    The same three statements he made at all the --

16  at the -- every time he spoke out publicly.

17      Q    Towards the bottom of the second full

18  paragraph, you have -- the next-to-the-last sentence

19  says, "The City did not lose the lawsuit, and certainly

20  no judgment was entered against the City."

21           What did you mean by the first part, that the

22  City did not lose the lawsuit?

23           MR. FLAXMAN:  Objection.

24           THE COURT:  Overruled.  He's describ-- it's his

25  letter.  He's describing the meaning of his letter, what

1   he thought it conveyed.  Overruled.  He may answer.

2       A    That the jury found for the City during the

3   lawsuit.

4       Q    And the second half of that phrase, when you

5   say "certainly no judgment was entered against the City,"

6   what did you mean by that?

7       A    No monetary judgment.

8       Q    I'm going to go to the second page of Joint

9   Exhibit Number 1.  Towards the bottom of the second full

10  paragraph, there's a sentence that reads, "In essence,

11  you are waging a battle against your own peers and

12  damaging the police department as a whole."

13           Do you see what I'm referring to?

14      A    Yes, sir.

15      Q    What did you mean by that?

16      A    That he, that what he's doing is, is -- he's

17  doing it to another, another officer.  And when he does

18  that to another officer, he might as well be doing it to

19  the, to the whole department because it makes everyone

20  look bad.

21      Q    I'm going to go down a little bit more, towards

22  the bottom of page number 2, the highlighted language I

23  will read, "prohibits giving false" -- there's a section

24  citation there.  Is that a citation to a Kankakee Police

25  Department policy?

BROOKS v. CITY OF KANKAKEE, 17-2265 -- Jury Trial (5/1/19)

1      A     Yes.

2      Q     And what you have written reads "prohibits

3    giving false or misleading statements or misrepresenting

4    or omitting material information to a supervisor, or any

5    other person in a position of authority."

6            Did I read that accurately?

7      A     Yes, you did.

8      Q     Why did you reference in that letter the

9    "omitting of material information to a supervisor, or any

10   other person"?

11     A     Because he's going to the Police and Fire

12   Commission, to other people, and making these false

13   statements which are misleading.  He's saying that the

14   police department was under a consent decree.  We

15   weren't.  He stated that the police department allowed a,

16   an officer to get caught doing drugs and did nothing to

17   him.  That's not true.  That's factually false.

18           That, you know, he's misrepresenting the facts

19   of what happened.

20     Q     Would it be fair to say that

21   "misrepresentation" can be by leaving out information as

22   well as giving information?

23     A     Yes.

24           MR. FLAXMAN:  Object to leading.

25           THE COURT:  Overruled.  Go ahead and answer

1  that.

2       A    Yes.

3       Q    Was Richard Brooks -- Officer Richard Brooks,

4  excuse me -- ever fired?

5       A    No.

6       Q    Was he ever suspended for writing -- was he

7  ever suspended for, after the, the written reprimand?

8       A    No.

9       Q    Chief, you have the written reprimand -- do you

10  have the written reprimand in front of you?

11       A    Yes, on the screen.

12       Q    Where in the written reprimand do you tell

13  Officer Brooks he can't file complaints with the EEOC or

14  Department of Human Rights?

15            MR. FLAXMAN:  Object to the form the question.

16  It's argumentative, assumes facts not in evidence.  And

17  we know what it says.

18            THE COURT:  Well, all right, I'll tell you

19  what:  I'll sustain as to the form of the question.  You

20  can ask the question a different way.

21  BY MR. MATHUES:

22       Q    Chief, did you tell Officer Brooks in the

23  written reprimand that he could not file complaints with

24  the Illinois Department of Human Rights or the EEOC?

25       A    No.

1       Q    Did you tell him in the written reprimand he

2   couldn't have an opinion about the discipline of another

3   officer?

4       A    No.

5       Q    Did you tell him anywhere in the written

6   reprimand that he couldn't share what his opinion was

7   about the discipline of another officer?

8       A    No.

9       Q    Did you tell him anywhere in the written

10  reprimand he couldn't have or share an opinion about what

11  he perceived to be racial discrimination?

12      A    No.

13      Q    How, Chief, would you respond to the claim that

14  your written reprimand was retaliatory against Officer

15  Brooks?

16      A    That it's not retaliation.  I was trying to

17  stop him from making false statements publicly about the

18  police department that were not true.

19           MR. MATHUES:  Judge, I don't have any more

20  questions for the chief.

21           THE COURT:  Okay.  Mr. Flaxman.

22           MR. FLAXMAN:  Thank you, Your Honor.

23             CROSS-EXAMINATION BY MR. FLAXMAN:

24      Q    In your letter of reprimand, the first incident

25  you've, you discuss occurred in, in 2014; is that right?

1      A    Yes.

2      Q    Did you write Mr. Brooks a letter of reprimand

3  the day after that happened?

4      A    No.

5      Q    Did you write a letter of reprimand the week

6  after it happened?

7      A    No.

8      Q    You waited how many -- you waited two years,

9  didn't you, sir?

10     A    I waited three incidents, sir.

11     Q    Well, and how long did it take for those three

12  incidents?  Two years, isn't that right?

13     A    That's correct.

14     Q    So you didn't say anything to Mr. Brooks in

15  2014 about the statements he made at the EEOC in Chicago

16  in 2014; is that right?

17          MR. MATHUES:  Objection.

18     A    Yes, sir.  We addressed it at that, at that

19  time.

20     Q    In 2016 --

21     A    No, sir.

22     Q    -- you said Mr. Brooks --

23          THE COURT:  Whoa, whoa.  You both can't talk at

24  the same time.

25          MR. FLAXMAN:  Okay.

BROOKS v. CITY OF KANKAKEE, 17-2265 -- Jury Trial (5/1/19)

1            THE COURT:  That's why you're getting that look

2     from my court reporter.

3            MR. FLAXMAN:  I'm sorry.  Let me --

4            THE COURT:  Ask a question.  Wait for an

5     answer.

6            MR. FLAXMAN:  I'm sorry.

7            THE COURT:  And I think, Mr. Mathues, you made

8     an objection and just got over-- everybody ran over it.

9            MR. MATHUES:  It probably wasn't worth it

10    anyway, Your Honor.

11           THE COURT:  All right.

12    BY MR. FLAXMAN:

13      Q     You told us that the police department is a

14    paramilitary organization; is that right?

15      A     That's correct.

16      Q     And does part of a paramilitary organization

17    mean that there's a chain of command?

18      A     Yes.

19      Q     And a police officer like Mr. Brooks reports to

20    a sergeant; is that right?

21      A     Yes.

22      Q     And then a sergeant reports to a lieutenant?

23      A     Yes.

24      Q     And are the sergeants supposed to be role

25    models?

BROOKS v. CITY OF KANKAKEE, 17-2265 -- Jury Trial (5/1/19)

1      A    Yes.

2      Q    Are they supposed to give guidance to younger

3  police officers or less -- or patrol officers?

4      A    Yes.

5           MR. MATHUES:  Objection to relevance.

6           THE COURT:  Overruled.  He answered the

7  question.

8           WITNESS REGNIER:  Sorry about that.

9  BY MR. FLAXMAN:

10     Q    Was promoting an officer who had used and

11  purchased illegal drugs calculated to provide a good role

12  model for patrol officers?

13     A    I --

14          MR. MATHUES:  Objection, form of the question.

15          THE COURT:  No.  Overruled.

16     A    No, it wasn't.  It's not a good role model.

17  However, he proved himself back to me.

18     Q    Did he prove himself back -- that's when you

19  promoted him in 2016; is that right?

20     A    Yes.  He was number one on the list.

21     Q    And then after you promoted him when he was

22  number one on the list, you learned about this false

23  police report he had been involved with years before; is

24  that right?

25     A    That's correct.

BROOKS v. CITY OF KANKAKEE, 17-2265 -- Jury Trial (5/1/19)

1      Q    And did you demote him from sergeant, bust him

2  down to patrol officer?

3      A    No, sir.

4      Q    You could have done that, couldn't you, sir?

5      A    I don't believe so.

6      Q    You couldn't have said, "As a condition of this

7  last-chance agreement, keeping your job, I want you to

8  resign from being a sergeant and become a patrol officer

9  because you don't have the character to lead"?

10      A    No.

11      Q    You didn't do that, did you?

12      A    No.  I did not.

13      Q    You didn't even think about doing that, did

14  you, sir?

15      A    No.

16      Q    You liked Mr. Berge, didn't you?

17      A    I did-- I never said that.

18      Q    Well, you do like him, don't you?

19           MR. MATHUES:  Objection to relevance.

20           THE COURT:  No.  Overruled.

21      A    I do like him.

22      Q    And he's white, isn't he?

23      A    He is.

24      Q    Okay.  Now, you told us, I think, on direct

25  that if you had known about that one-car accident when he

1   was drunk and under the influence of steroids, you would

2   not have promoted him to sergeant; is that right?

3          A     I never said he was drunk.

4          Q     Well, did you say he was under the influence of

5   alcohol --

6          A     Yes, sir.

7          Q     -- in that last-chance agreement, sir?

8          A     Yes, sir, it does.

9          Q     Is that different than being drunk?

10         A     I would say.

11         Q     How is it different, sir?

12         A     Nobody knows how much alcohol he had.  Did he

13  have one drink?  Three drinks?  Five drinks?  Do we know?

14         Q     Well, what did he say in the last-chance

15  agreement?  Didn't he say that he was under the influence

16  of alcohol when he had that one-car accident and ran into

17  the side of a building?

18         A     That's correct.

19         Q     Is somebody who does something like that a good

20  role model as a sergeant?

21         A     No.

22         Q     Did you reassign him from supervising people as

23  a sergeant to a desk job?

24         A     No.

25         Q     You reassigned that officer who posted that

1   stuff on Facebook, didn't you, sir?

2       A    Yes, I did.

3       Q    He's white, too, isn't he?

4       A    Yes.

5       Q    Okay.  Now, you said that -- I think you said

6   that after Mr. Brooks complained to the, at the mayor's

7   office about the failure to have investigated Officer

8   Berge, then-Officer Berge's one-car accident was a

9   cover-up, and that that's when you started to investigate

10  what had happened with that one-car accident; is that

11  right?

12      A    No.  That's the first time I ever heard the

13  name associated with the one-car accident.

14      Q    And you heard the name in 2016; is that right?

15      A    Yes.

16      Q    And the one-car accident was in 2012; is that

17  right?

18      A    That's correct.

19      Q    Could you tell the ladies and gentlemen of the

20  jury what investigation you ordered into why it took four

21  years to find out about Berge's false police report?

22      A    It took four years because we had no idea about

23  it.

24      Q    Could you answer my question, sir?

25      A    Yes, I did.

BROOKS v. CITY OF KANKAKEE, 17-2265 -- Jury Trial (5/1/19)

1      Q    What investigation did you do to find out why

2 the police department did not know for four years that

3 Berge had filed a false police report?

4      A    No.  We did not do that investigation.

5      Q    Why didn't you, sir?

6           MR. MATHUES:  Objection, asked and answered.

7           THE COURT:  Not as to why.  Overruled.

8 BY MR. FLAXMAN:

9      Q    Why didn't you initiate an investigation to

10 determine why you did not know -- did not learn about

11 this one-car accident while Berge was under the influence

12 of alcohol and unprescribed steroids for four years?

13      A    Because, quite honestly, we probably would have

14 had to investigate over half of our police department

15 because by the time we found out it was common knowledge

16 about -- throughout the whole police department this had

17 occurred.  However, no one ever came and told us.

18      Q    Well, isn't that a violation of the police

19 rules of conduct to cover up wrongdoing by another police

20 officer?

21      A    Yes.

22      Q    And isn't it important in a paramilitary

23 organization to see that police officers follow the

24 rules?

25      A    Yes.

1      Q      And you didn't want to find out which police

2  officers had not followed the rules; isn't that right,

3  sir?

4      A      As I stated, probably over half the department

5  was, would have been involved in that, including your

6  client.

7      Q      And you didn't want to find out which half had

8  violated the rules, did you, sir?

9      A      It really didn't make any difference.

10     Q      Well, isn't it -- aren't cover-ups of police

11  wrongdoing important?

12     A      Yes, they are.

13     Q      And Mr. Brooks uncovered one, told you about

14  one in 2016; isn't that right?

15     A      Yes, he did.

16     Q      Isn't it --

17     A      After he sat on it for four years.

18     Q      Excuse me?

19     A      After he sat on it for four years.

20     Q      And after he, after he told you about this

21  wrongdoing, you investigated -- you discovered that in

22  2012 Mr. Berge had filed a false police report after he

23  was under the influence of alcohol and drugs and had a

24  car accident, and that's when you disciplined Mr. Brooks;

25  is that right?

1          A    No.

2          Q    Well, that's when you wrote that letter to Mr.

3    Brooks; isn't that right, sir?

4          A    No.

5          Q    Did you ever write a letter to Mr. Brooks?

6          A    I sure did.

7          Q    And you wrote that letter on April 25, 2016; is

8    that right?

9          A    Yes.

10          Q    And when was it that Mr. Brooks mentioned that

11    Officer Berge, or then-Sergeant Berge had filed a false

12    police report in 2012?

13          A    I believe it was earlier in the month.  I

14    believe the 12th is when I --

15          Q    So --

16          A    -- first heard the name.

17          Q    Okay.  So on April 12th you heard the name, and

18    then -- and then on April 24th you wrote the letter to

19    Mr. Brooks; is that right?  April 25th you wrote the

20    letter to Mr. Brooks?

21          A    I wrote the letter after his last stand-up and

22    public announcement at the Police and Fire Commission.

23          Q    Now, you told us that you were not present at

24    the meeting at the EEOC back in 2014; is that right?

25          A    I said I'm not sure if I was present or not.

BROOKS v. CITY OF KANKAKEE, 17-2265 -- Jury Trial (5/1/19)

1      Q      Well, at your -- you remember you gave a

2    deposition in this case?

3      A      Yes.

4      Q      And you looked over your deposition before

5    testifying?

6      A      Yes.

7      Q      And did you have a recollection at your

8    deposition of whether you were at the EEOC or not?

9      A      Yes.

10      Q      And tell the ladies and gentlemen of the jury

11    what you remembered then.  What was your recollection at

12    your deposition?

13      A      At the EEOC?

14      Q      No, when you gave your deposition.

15      A      Yes.

16      Q      That was back in October of 2018; is that

17    right?

18      A      Yes.

19      Q      That -- and when you gave your deposition, you

20    had a good recollection of whether you were present at

21    that meeting at the EEOC?

22      A      Yes.

23      Q      And are you telling us now that you're not sure

24    if you were there?

25      A      It has since come to my attention that I may

1  not have been there.

2       Q    And, and did you also tell us that it's come to

3  your attention you may not have been at the Police and

4  Fire Commission hearing in 2016?

5       A    You've confused me here.  Where are you

6  talking -- where, the first set of questions you asked

7  me, where was -- where was I at there?  Or where are you

8  questioning me about being?

9       Q    Well, let's, let's go back to your, your letter

10  to Mr. Brooks.  The first incident you talked about are

11  statements that he made at an EEOC hearing in 2014.

12      A    Yes.

13      Q    And were you or were you not present during

14  those statements?

15      A    I was present.

16      Q    And you're sure you were present?

17      A    Positive.

18      Q    And then the next statements -- then you also

19  talk about statements made at a Police and Fire

20  Commission hearing.

21      A    That's correct.

22      Q    And is your testimony today and yesterday that

23  you weren't there at the Police and Fire Commission

24  hearing?

25      A    I said I'm not sure if I was there.

BROOKS v. CITY OF KANKAKEE, 17-2265 -- Jury Trial (5/1/19)

```
 1        Q    Well, were you sure when you gave your
 2   deposition back in October of 2018?
 3        A    I thought I had been.  Like I said, it has come
 4   to my attention since then that I may not have been
 5   there.
 6        Q    Well, how did it come to your attention?  Did
 7   you have -- how did it come to your attention?
 8        A    Somebody told me that I may not have been
 9   there.
10        Q    And did you believe that person?
11        A    I have no right to dispute them.
12        Q    So you don't really know if you were there or
13   not?
14        A    No, sir.
15        Q    You know that there's another person who says,
16   "I was there, Former Chief; you weren't."  Is that right?
17        A    That's correct.
18        Q    And you don't have any recollection about
19   whether he's right or he's wrong?
20        A    I do have a recollection because it's the same,
21   same thing that we've heard on other occasions.
22        Q    But as you sit here today, you're telling us
23   that -- well, let me direct your attention to your
24   deposition back on October 8th of 2018.
25             And I'm going to be directing your attention to
```

1    page 13; would be -- the line in a second.

2              Could I have the ELMO?

3              THE COURT:  Sure.

4              MR. MATHUES:  Judge, I would object to improper

5    impeachment.  There's no impeachment because the chief

6    said he wasn't sure.  It's not impeachment at this time.

7    At most, it's a refreshing of recollection.

8              THE COURT:  I think we're quibbling over

9    things.  I'm going to overrule that objection.  Whether

10   it refreshes his recollection or whether it's

11   impeachment, he can ask the questions.  You can always

12   question him on redirect.

13   BY MR. FLAXMAN:

14       Q    Let me direct your attention to line 20.  Do

15   you remember being asked that question at line 20?

16              "Do you recall Mr. Brooks making comments or

17   speaking at the public comment section at the meeting?"

18              And your answer was, "I do," line 23?

19       A    Yes.  I remember that.

20       Q    And is your recollection today different?

21       A    Than what I said at that point?  Yes.

22       Q    That's correct.

23       A    Yes.

24       Q    As you sit here today, you don't recall being

25   at that meeting; is that right?

1          MR. FLAXMAN:  Objection, cumulative, Your

2     Honor.

3          THE COURT:  Sustained.  Let's move on.  He's

4     given his answers.  You've shown the deposition.  Move

5     on.

6     BY MR. FLAXMAN:

7          Q    Now, you were asked a question about:  Did Mr.

8     Brooks come and talk to you about that letter you wrote

9     to him on April 25th of 2016?

10         A    Yes.

11         Q    Did you write that letter to start a debate

12    with Mr. Brooks?

13         A    No.

14         Q    Did you write that letter to have a discussion

15    with Mr. Brooks about what you described in the letter?

16         A    No.

17         Q    That, that order -- that letter of reprimand

18    wasn't an invitation to have a, a colloquy, a discussion,

19    was it?

20         A    No.

21         Q    It was a direct order to him to stop saying

22    things that you thought were false; is that right?

23         A    Yes.

24         Q    And as far as you know, he followed that order?

25         A    To my knowledge.

BROOKS v. CITY OF KANKAKEE, 17-2265 -- Jury Trial (5/1/19)

1      Q     And I think you said that it makes everyone on

2    the police department look bad when somebody talks about,

3    like Mr. Brooks did, about a police officer who's using

4    steroids and buying illegal -- buying steroids without a

5    prescription and getting into a one-car accident while

6    under the influence of alcohol and covering it up.

7              Is that what you said?

8              MR. MATHUES:  Objection, mischaracterizes the

9    testimony.

10             THE COURT:  Sustained.

11             MR. FLAXMAN:  Okay.

12             THE COURT:  It was not --

13   BY MR. FLAXMAN:

14     Q     You said that what Mr. Brooks was saying makes

15   everyone look bad; is that right?

16     A     False statements, yes.

17     Q     Well, was it a false statement that there was a

18   police officer working in the Narcotics Unit, the MEG

19   Unit, who was using drugs?

20             MR. MATHUES:  Objection to cumulative, Your

21   Honor.

22             THE COURT:  Sustained.  We've gone over this,

23   Mr. Flaxman, now several times.

24   BY MR. FLAXMAN:

25     Q     And in that agreed order -- do you have that in

BROOKS v. CITY OF KANKAKEE, 17-2265 -- Jury Trial (5/1/19)

1  front of you, sir?

2      A    No.

3      Q    Let me hand you a copy.

4           THE COURT:  You're referring to Joint

5  Exhibit 2?

6           MR. FLAXMAN:  That's correct, Judge.

7  BY MR. FLAXMAN:

8      Q    Could you tell us the title of that document,

9  sir?

10     A    "Joseph Baptist, Richard Brooks, Price Dumas,

11 Willie Hunt, and Lamont Upton, Plaintiffs."

12     Q    No.  That's, that's -- we lawyers call that the

13 caption.

14          The title is -- the centered, underlined title.

15     A    Agreed Judgment Order.

16     Q    And did I hear you correctly when you said you

17 didn't think it was a judgment order because it didn't

18 order the City to pay any money?

19          MR. MATHUES:  Objection, mischaracterizes the

20 testimony.

21          THE COURT:  I'll sustain that.

22          MR. FLAXMAN:  Okay.

23          THE COURT:  That's not what he said.

24 BY MR. FLAXMAN:

25     Q    Well, you thought this wasn't a judgment order;

1    is that right?

2        A    No.

3        Q    Well, that's -- did you -- do you think that

4    this is an order, a judgment?

5              MR. MATHUES:  Object, seeks a legal conclusion.

6              THE COURT:  Well, okay, overruled.  But, Mr.

7    Flaxman, ask that question a different way.

8              MR. FLAXMAN:  Okay.

9    BY MR. FLAXMAN:

10       Q    Did you tell us you didn't think this was a

11   judgment because it didn't require the payment of money

12   by the City of Kankakee?

13             MR. MATHUES:  Objection, mischaracterizes the

14   testimony.

15             THE COURT:  Sustained.

16   BY MR. FLAXMAN:

17       Q    Well, did -- why did you -- did you tell us you

18   didn't believe this was a judgment?

19             THE COURT:  There we go.

20       A    I was not referring to this.

21       Q    You weren't referring to the Agreed Judgment

22   Order?

23       A    No.

24       Q    You were referring to a consent decree that was

25   entered against the City of Kankakee?  We know there

BROOKS v. CITY OF KANKAKEE, 17-2265 -- Jury Trial (5/1/19)

1    wasn't one, sir.

2              What were you referring to?

3         A    I was referring to the jury finding the City --

4    finding for the City in the lawsuit, not -- I was not

5    referring to this.

6         Q    And after the jury found for the City, there

7    was an appeal; is that right?

8         A    I, I'm unaware of that.

9         Q    Well, were you aware that the appeal was

10   resolved by entry of Joint Exhibit 2?

11        A    I thought this was the, like, settled whatever

12   was not settled in the initial jury trial.

13        Q    And you didn't talk to the lawyer about what

14   was resolved in this Agreed Judgment Order before you

15   wrote your letter of April 25th to Mr. Brooks, did you?

16        A    No.  I did not.

17        Q    And this Agreed Judgment Order -- did you ever

18   read it before this trial?

19        A    I, I've seen it.  I've never -- I can't say

20   I've ever read it word for word.  No.

21        Q    Well, it resolves all of the claims that were

22   brought in that earlier case, including the claims that

23   the jury resolved against the plaintiffs; isn't that

24   right?

25        A    Yes.

BROOKS v. CITY OF KANKAKEE, 17-2265 -- Jury Trial (5/1/19)

1       Q     And it requires the City to pay some money to

2    the lawyer who did the case for the plaintiffs; is that

3    right?

4       A     That's correct.

5       Q     It was about $67,000; is that right?

6       A     That's correct.

7       Q     Aside from those Face-- two instances of

8    Facebook postings -- well, do you monitor all your police

9    officers' Facebook postings?

10      A     No, sir.

11      Q     You never saw any Facebook postings by Mr.

12   Brooks that you found to be disparaging, did you?

13      A     I don't, I don't monitor Facebook at all.

14            MR. FLAXMAN:  Could I have just a minute, Your

15   Honor?

16            THE COURT:  Take your time.

17               (Brief pause in proceedings.)

18   BY MR. FLAXMAN:

19      Q     Did you ever learn why Mr. Berge was using

20   unprescribed illegal steroids?

21      A     Did I -- please say that again.

22      Q     Did you ever learn why Mr. Berge was using

23   steroids?

24      A     I never heard it from his mouth.  No.  I only

25   made an assumption.

1      Q     Well, did -- and what was your assumption?

2      A     That he was using it to build up muscle.

3      Q     Did you ever notice him getting to be bigger

4  and bulkier from 2012 to 2014?

5      A     I never really noticed.

6      Q     Okay.  Did you ask him why he wanted to look

7  bigger?

8      A     No, sir.

9            MR. MATHUES:  Objection to relevance, Your

10  Honor.

11            THE COURT:  Yeah, I'll -- sustained.

12            MR. FLAXMAN:  Nothing further.

13            THE COURT:  Mr. Mathues, whenever you're ready.

14            MR. MATHUES:  Judge, I have fewer than ten

15  questions.

16            REDIRECT EXAMINATION BY MR. MATHUES:

17      Q     Chief, did you hear about, from Officer Brooks

18  about an officer being involved in a car crash without

19  being given a name?

20      A     Yes.

21      Q     When was the first time you heard from Officer

22  Brooks about an officer being involved in a car crash and

23  misreporting it without giving a name?

24      A     First -- in 2014.

25      Q     Was Mr. Brooks asked for a name?

BROOKS v. CITY OF KANKAKEE, 17-2265 -- Jury Trial (5/1/19)

1        A    I, I don't recall whether he was or not.

2        Q    At any point from the first time in 2014 that

3   you heard from Mr. Brooks about a crash without a name,

4   up until in early 2016 when you were at the meeting in

5   the mayor's conference room in February, did Mr. Brooks

6   tell you a name?

7        A    No.

8             MR. MATHUES:  Judge, I don't have any other

9   questions for the chief.

10            MR. FLAXMAN:  Nothing -- nothing based on that,

11  Your Honor.

12            THE COURT:  All right.  Mr. Regnier, you may

13  step down.

14            WITNESS REGNIER:  Thank you.

15                  (Witness Regnier excused, 10:10 a.m.)

16            THE COURT:  Mr. Mathues, you may call your next

17  witness.

18            MR. HERVAS:  Judge, our next witness is

19  Lieutenant Passwater.  This is my opportunity to put on a

20  witness.

21            THE COURT:  Oh, Mr. Hervas, all right.

22            Since we started late, ladies and gentlemen,

23  we're going to go until about, probably, 10:40, 10:45 or

24  so.  If you need a break before that, though, let me

25  know.

```
 1                    (Brief pause in proceedings.)

 2                    ROBIN PASSWATER, sworn, 10:11 a.m.,

 3                    DIRECT EXAMINATION BY MR. HERVAS:

 4         Q     Good morning, Lieutenant.  Could you please

 5   state and spell your name for the record?

 6         A     Robin Passwater; R-o-b-i-n, P-a-s-s-w-a-t-e-r.

 7         Q     And could you please tell the jury where you're

 8   currently employed?

 9         A     I'm a lieutenant with the Kankakee City Police

10   Department.

11         Q     And are you on duty right now?

12         A     Yes, I am.

13         Q     How long have you been employed by the City of

14   Kankakee Police Department?

15         A     29 years.

16         Q     You know, I'm a little hard of hearing, so I

17   need --

18         A     29 years.

19         Q     Thank you.

20               And what did you do before joining the City of

21   Kankakee Police Department?

22         A     I attended Illinois Valley Community College

23   for two years, and I attended Illinois State University

24   for two years and got a bachelor's degree in criminal

25   justice science and applied for Kankakee Police
```

1    Department and got on.

2        Q    Again, I'm going to ask you to speak a little

3    louder.

4        A    All right.

5        Q    I apologize, but I -- I'm having trouble

6    hearing.

7            And could you give the jury a short snapshot --

8    a snapshot of your career at the City of Kankakee Police

9    Department?

10       A    Yeah.  I was hired in August of 1989, went to

11   the Police Academy for -- I think it was 12 weeks; got

12   back, and I was a patrol officer for seven years.  Three

13   of those years was in the Patrol Division.  The other

14   four were as an investigator.

15           In 2007, I was promoted to the rank of

16   sergeant.  I was transferred to a Violent Crimes Task

17   Force, which investigated old, unsolved homicides.  I

18   worked there for another year.

19           I was transferred back to Patrol, was the

20   supervisor in Patrol for two more years.  And then in

21   2000, I was promoted to the rank of lieutenant.  I worked

22   the Patrol Division for -- from 2000 to 2008.

23           In 2008, I was transferred to a Project Safe

24   Neighborhood Task Force made up of our department, FBI,

25   ATF, and the U.S. Attorney's Office.  I worked there for

1  a year.  I was in there for a year.

2          And then I was appointed by Chief Kinkade, who

3  was before Chief Regnier, to be the Investigations

4  commander.  I was Investigations commander from 1989 --

5  or 2009 until 2015.

6          In 2015 I was appointed by the mayor of

7  Kankakee to be the deputy chief.  I was the deputy chief

8  until May of 2017.  At that time, Chief Regnier retired.

9  I was appointed to be the acting chief by the mayor who

10  was in office at that time.  And then the new mayor came

11  in in May.  I was appointed to be the acting chief at

12  that time.  I was the acting chief, probably, 30 or

13  45 days, and I resigned that position.  I went down to be

14  the deputy chief.  The new deputy chief was put in by the

15  new mayor.

16          And then I was the Investigations commander for

17  another year.

18          And then last year, last May, I was transferred

19  to the Patrol Division.

20      Q    Now, have you been a member of the police

21  union?

22      A    Yes, I have.  I was a member for, I think,

23  11 years.

24      Q    And have you been involved in any significant

25  activities within the police union?

BROOKS v. CITY OF KANKAKEE, 17-2265 -- Jury Trial (5/1/19)

```
 1       A      Yeah.   The last four years I was the president

 2   of the police union.

 3       Q      Could you please share with the jury how your

 4   activities as a union president benefitted you as a

 5   supervisor at the police department?

 6       A      When you're the -- I was, I was a patrolman for

 7   a while as the police president, as the president of the

 8   union, and then I became a sergeant.  And it's a deal

 9   where you have to be able to be able to negotiate between

10   the administration and the patrol officer who might be in

11   issues.  Also, you negotiate contracts on behalf of the

12   patrol officers.

13          I think this gives you appreciation of the

14   administration's point of view and their side of what, of

15   what they're required to do and what their goals are as

16   compared to what the patrol officers are.

17       Q      And how would you describe the organizational

18   structure of the Kankakee Police Department?

19       A      Similar to a military, we're paramilitary.

20   It's not as strict, but we do have a higher structure,

21   hierarchy of command, structured as clear and precise;

22   and there's certain rules and policies that are in place

23   to ensure that the department runs efficiently.  And

24   these reasons -- it's paramilitary, so there's safety

25   issues, too, which can be addressed in that manner.
```

1      Q     Now, I'm going to direct your attention to the

2    lawsuit that was filed by Officer Brooks.  Are you

3    familiar with a reprimand letter that was issued by Chief

4    Regnier to Officer Brooks dated April 25, 2016?

5      A     Yes.  Yes, I am.

6      Q     And at the time the letter was written by Chief

7    Regnier, what position did you hold at the police

8    department?

9      A     At the time, I was the deputy chief.

10     Q     And as the deputy chief in 2016, was it your

11   practice to consult with the chief on matters of

12   discipline within the department?

13     A     Yes.  It was part of my duties.

14     Q     And did you consult with the chief regarding

15   the Officer Brooks reprimand letter?

16     A     Yes, I did.

17     Q     Did you agree with the contents of the letter?

18           MR. FLAXMAN:  Objection.

19     A     Yes, I did.

20           MR. FLAXMAN:  It's not relevant whether he

21   agreed with it or not.

22           THE COURT:  Yeah, sustained.  He's already

23   answered.  Go ahead.

24   BY MR. HERVAS:

25     Q     What, if anything, caused the -- occurred that

1    caused the reprimand letter to be issued by the chief?

2              MR. FLAXMAN:  Objection.  He's testifying about

3    why the chief did something.

4              THE COURT:  Yeah.  I'll sustain that.

5              MR. HERVAS:  The --

6              THE COURT:  Ask another question.

7              MR. HERVAS:  Okay.

8    BY MR. HERVAS:

9        Q    I'm going to direct your attention to a Board

10   of Fire and Police Commission meeting on April 12th of

11   2016.  Were you present at that meeting?

12       A    Yes, I was.

13       Q    Could you just give the jury a snapshot of what

14   the Fire and Police Commissioners are for the City of

15   Kankakee?

16       A    They're a board appointed by the mayor of

17   Kankakee.  It's a three-member board.  The board oversees

18   the hiring process, the promotional process, and the

19   disciplinary process of officers -- police and fire

20   officers.

21       Q    And in your -- at your attendance at that

22   meeting, could you please explain to the jury what

23   occurred with respect to Officer Brooks?

24       A    During the meeting, like any -- it's a public

25   meeting.  There's an open comment session in the very

```
 1   beginning.  Officer Brooks stood up and made comments

 2   about problems occurring at the police department.

 3        Q    Was there any mention of a consent decree with

 4   the, before the board?

 5        A    Correct.  He stood up and said that there was,

 6   that the department was under a consent decree, and they

 7   weren't following that in relation to promotions being

 8   handled.

 9             He also stated that there -- officers had been

10   promoted that had been using drugs and were caught

11   driving drunk or DUI or involved in other activities that

12   had been against Department policy.

13        Q    Did the Board of Fire and Police Commissioners

14   address this issue in any way with you personally?

15             MR. FLAXMAN:  Objection, relevance.

16             THE COURT:  No.  Overruled.

17        A    Yes, they did.  At the end of the meeting, we

18   went in closed session to discuss this matter with me;

19   and they --

20             MR. FLAXMAN:  Objection to hearsay about what

21   they said.

22             THE COURT:  Sustained as to hearsay.

23   BY MR. HERVAS:

24        Q    If you would, just explain to the jury what you

25   told the Fire and Police Commissioners with respect to
```

1    the comments by Officer Brooks.

2              MR. FLAXMAN:  Objection, relevancy.

3              THE COURT:  Yeah, I'll sustain.  If you want to

4    ask him what actions he took as a result of this

5    conversation, that's one thing; but we're not going to

6    get into an ancillary issue with statements that are not

7    directly relevant.

8              Ask another question.

9              MR. HERVAS:  Okay.

10   BY MR. HERVAS:

11       Q    Lieutenant Passwater, you indicated that there

12   was a comment about a consent decree.  What, what was

13   your concern with respect to Officer Brooks making a

14   comment to the Fire and Police Commission about a consent

15   decree?

16             MR. FLAXMAN:  Objection.

17             THE COURT:  No.  He, he -- overruled.  He can

18   answer that question.

19       A    That there wasn't a consent decree.  I was

20   fully aware of what the agreement was reached; and the

21   department, the City of Kankakee, the police department

22   was under no consent decree by Department of Justice.

23       Q    Now, did -- were you aware of an Agreed

24   Judgment Order that was in place involving the Officer

25   Brooks lawsuit?

1        A     Yes, I was.

2        Q     And --

3        A     From 2005, yes.

4        Q     And when did that agreed order expire?

5        A     2011.

6        Q     And was the agreed order in effect at the time

7    that Officer Brooks made his comments to the Fire and

8    Police Commission?

9        A     No.  It was not.

10       Q     Now, after attending the Board of Fire and

11   Police Commissioners' meeting, did you then report to

12   Chief Regnier about the meeting?

13       A     Yes, I did.  The following morning, there was a

14   morning administrative meeting.  I spoke to him about it

15   and said that, told him that Patrolman Brooks had made

16   factually incorrect statements at the Police and Fire

17   Commission meeting; and those were some similar

18   statements that he had made at another meeting, and we

19   discussed the matter.

20       Q     And did you indicate to the chief any belief on

21   your part as to whether Officer Brooks had done anything

22   inappropriate?

23             MR. FLAXMAN:  Objection.

24             THE COURT:  Overruled.

25       A     Yeah.  Yes, I did, because I felt that -- I

1   knew that what he had said was factually incorrect and

2   that the reaction from the Police and Fire Commission

3   clearly, I felt, was damaging.  It really affected the

4   integrity of our department and what the administration

5   was trying to do with disciplinary hearings.

6              THE COURT:  Lieutenant Passwater, is it your

7   recollection the chief was not there at this meeting?

8              WITNESS PASSWATER:  He was not at the meeting.

9   That's why I was there.

10             THE COURT:  All right.

11  BY MR. HERVAS:

12       Q    And given that you've stated that the chief

13  wasn't there, you -- it was you that communicated what

14  Officer Brooks had said at the meeting; is that, is

15  that -- do I get that right?

16       A    Correct.  He couldn't go that night, so I went

17  in his place.

18       Q    Now, the reprimand letter also references a

19  discipline hearing with regard to a suspension in 2016

20  with Officer Brooks.  Do you have a recollection of being

21  present with Officer Brooks involving any meeting with,

22  regarding that suspension?

23       A    I was there when the suspension was given to

24  him.  Yes.

25       Q    Okay.  We've -- the jury has heard about a

1   meeting in the mayor's office on an appeal of a

2   suspension.  Were you at that meeting?

3        A    I was not.

4        Q    Okay.  So could you explain to the jury what

5   meeting you were at that involved that same suspension?

6             MR. FLAXMAN:  Objection.  Your pretrial rulings

7   about --

8             THE COURT:  Yeah.  Mr. Hervas, you're

9   getting -- I don't know how you're going to do this

10  without getting --

11            MR. HERVAS:  I'm not going to get into the

12  subject matter of the suspension at all, Your Honor.

13  This is where other statements were made about the car

14  crash.

15            THE COURT:  All right.  As long as we're not --

16  Mr. Flaxman has a point.  We're not going to get into,

17  edging into my pretrial order, so --

18            MR. FLAXMAN:  But my objection would be that

19  we're now talking about things that were not considered

20  or relied on or mentioned in the letter of reprimand.

21            THE COURT:  I don't know that that's what the

22  testimony's going to be, but I will watch to make sure we

23  don't get into the orders I entered.

24            So go ahead and ask your question.

25

BROOKS v. CITY OF KANKAKEE, 17-2265 -- Jury Trial (5/1/19)

1    BY MR. HERVAS:

2        Q    Were you at a meeting where there was a

3    discussion with Officer Brooks where a car crash was

4    brought up?

5        A    I'm trying to think.  No, I -- no.  I was not;

6    about a car crash, no, I was not.

7        Q    Well, the -- were you at a meeting -- let me

8    clarify that -- where Officer Brooks was responding to

9    you and the chief, saying that there was misconduct of

10   other officers involved at the suspension that you were

11   at?

12       A    Yes.  I was at that meeting.

13       Q    And could you tell the jury what Officer Brooks

14   said about the other misconduct?

15            MR. FLAXMAN:  Could we have more foundation and

16   relevancy?

17            MR. HERVAS:  I was trying to do that.

18            THE COURT:  Please don't bicker with each

19   other.

20            The objection's overruled.  Go ahead and

21   answer -- ask the question again.

22   BY MR. HERVAS:

23       Q    What did Officer Brooks say at this meeting

24   that you were present at about the misconduct of other

25   police officers?

BROOKS v. CITY OF KANKAKEE, 17-2265 -- Jury Trial (5/1/19)

1      A      He said that there was other misconduct going

2  on in the department and that there had been no

3  disciplinary action taken against them.

4      Q      And what, if anything, did you say in response

5  to that?

6      A      I told him directly that, if he knew about

7  misconduct, the only way that the administration would

8  know about it is if somebody told us and that he needed

9  to tell us what he knew about it; and not only did he

10 need to tell us, but we have orders -- rules and

11 regulations which require officers to report misconduct

12 to the administration and that he needed to tell us about

13 that in order for it to be addressed.

14     Q      And did, did you -- did Officer Brooks ever

15 share that information with you about the misconduct at

16 that particular meeting?

17     A      No.  He would not.

18            THE COURT:  Okay.  Wait.  Just so I get this

19 clear, this is -- this is not the meeting in the mayor's

20 office; you were not present at the meeting in the

21 mayor's office, correct?

22            WITNESS PASSWATER:  Correct.  I was not at that

23 meeting.

24            THE COURT:  This is a meeting prior to the

25 meeting in the mayor's office?

BROOKS v. CITY OF KANKAKEE, 17-2265 -- Jury Trial (5/1/19)

```
1            WITNESS PASSWATER:  Yes.

2            THE COURT:  Okay.

3    BY MR. HERVAS:

4       Q    Could you explain to the jury when the police

5    administration learned about the 2012 Officer Berge car

6    crash?

7            MR. FLAXMAN:  Objection.

8            THE COURT:  No.

9            MR. FLAXMAN:  There's no foundation that he

10   knows about when the administration learned about

11   something, and we know what's in the letters.

12           THE COURT:  We, we -- I'll sustain as to "the

13   administration" as opposed to what he knows.

14   BY MR. HERVAS:

15      Q    Could you tell -- then I'll rephrase.

16           Could you explain to the jury when you learned

17   about the 2012 Officer Berge car crash?

18           MR. FLAXMAN:  Objection, relevance.

19           THE COURT:  No.  Overruled.

20      A    When Chief Regnier came back from the meeting

21   in the mayor's office, he brought back the issue that

22   Officer Brooks was complaining that nothing was done

23   about a car crash involving Officer Berge.  That's when I

24   learned about it.

25      Q    Now, the reprimand letter also makes reference
```

BROOKS v. CITY OF KANKAKEE, 17-2265 -- Jury Trial (5/1/19)

```
1    to an EEOC hearing in 2014.  Were you present for an EEOC
2    hearing involving Officer Brooks and the City of
3    Kankakee?
4         A    Yes, I was.
5         Q    Did you hear Officer Brooks make any inaccurate
6    statements to the EEOC during the hearing?
7              MR. FLAXMAN:  Objection.  We need more
8    foundation, and "inaccurate" is objectionable.
9              THE COURT:  I will sustain as to the need for
10   foundation.
11             The EEOC -- yeah, I'm getting confused, Mr.
12   Hervas.  I'm trying to make sure my notes are correct
13   here.  So we've -- you've asked him questions about a
14   meeting prior to the meeting at the mayor's.
15             When was the meeting in the mayor's office?
16   What year?
17             MR. HERVAS:  That would have been --
18             THE COURT:  I'm asking the witness.
19             When was the meeting in the mayor's office?
20             WITNESS PASSWATER:  Um --
21             THE COURT:  Just give me a year.
22             WITNESS PASSWATER:  '16.
23             THE COURT:  All right.  So the meet-- all
24   right.  The EEOC meeting, though, was in 2014, correct?
25             WITNESS PASSWATER:  I -- there's been several
```

1    EEOC meetings, so -- I think so.  I think so.  I would

2    have to look at that, but I don't know for sure.

3    BY MR. HERVAS:

4        Q    I'm directing your attention to the actual EEOC

5    meeting in 2014 that is noted in the reprimand letter,

6    that --

7        A    Yes.

8        Q    -- that particular meeting.  Does that help --

9        A    Yes.

10       Q    -- to -- okay.

11            THE COURT:  All right.

12       Q    So at that particular meeting, were you

13   present?

14       A    Yes, I was.

15       Q    And did Officer Brooks make any comments about

16   a consent decree at that meeting?

17       A    Yes, he did.  To the, it's like an arbitrator

18   up there -- or mediator, I guess -- that there was the

19   City --

20            MR. FLAXMAN:  Objection to what the mediator

21   said.

22       A    No.  I'm, I'm --

23            THE COURT:  Hold on.

24            Overruled.  I believe he's testifying as to

25   what Mr. Brooks said.

```
 1              WITNESS PASSWATER:  Yes.

 2              THE COURT:  Go ahead and answer.

 3      A    He said that there was -- the Department was

 4  under a consent decree, and we weren't following that for

 5  promotional testing.

 6      Q    Is that a similar comment that Officer Brooks

 7  had made before the Fire and Police Commissioners?

 8      A    Yes, it was.

 9      Q    Now, was there any clarification at the EEOC

10  meeting about the City's position that there was no

11  consent decree at this 2014 meeting?

12      A    The City attorney explained it in there, that

13  there was no consent decree.  There was an agreement

14  reached between both parties that there would be a Blue

15  Ribbon Committee, but that there was no consent decree on

16  behalf of the Department from the Department of Justice,

17  or whatever.

18      Q    Now, was Officer Brooks present when the City

19  explained that there was no consent decree?

20      A    Yes.

21      Q    Now, Lieutenant Passwater, you're familiar with

22  the charge of -- the complaint of Officer Brooks

23  regarding the reprimand letter, and do you have an

24  opinion as to whether there was any retaliation in the

25  issuance of that letter?
```

```
 1              MR. FLAXMAN:  Objection.

 2              THE COURT:  Overruled.

 3      A    Yeah.  I mean, I was there throughout the whole

 4   process.  I know why it was written.  It was written as

 5   disciplinary because he was putting out false statements

 6   that affected the integrity of the department, and it --

 7   I think it challenged the community's trust in us that

 8   those statements were made, and continued to be made,

 9   about the department that were factually wrong.

10              I mean, he's entitled to his own opinion, but

11   to make false statements against the police department

12   about -- and accusations that aren't true really does

13   violate our trust in the community.

14              MR. HERVAS:  Thank you, Lieutenant.  I have no

15   further questions.

16              THE COURT:  Mr. Flaxman, whenever you're ready.

17   Take your time.

18              MR. FLAXMAN:  Thank you, Your Honor.

19                CROSS-EXAMINATION BY MR. FLAXMAN:

20      Q    Do you know Sergeant Berge?

21      A    Yes, I -- do I know him?

22      Q    Right.

23      A    Yes.  I do know him.  Yes.

24      Q    And do you like him?

25      A    Yes.
```

BROOKS v. CITY OF KANKAKEE, 17-2265 -- Jury Trial (5/1/19)

1      Q     And do you respect him?

2      A     Yes.

3            MR. HERVAS:  Objection as to relevancy, Judge.

4            THE COURT:  Overruled.

5   BY MR. FLAXMAN:

6      Q     When did you first learn that then-Officer

7   Berge was buying and using illegal drugs?

8      A     I learned that -- I was Investigations

9   commander, so that would have been sometime after 2009.

10  I learned it after there was a discussion with him and

11  the chief of police.

12     Q     You have to speak louder because I have Mr.

13  Hervas's hearing problem.

14     A     I learned it after the process had already been

15  in place.  There had already been a discussion meeting

16  with him, and the process was in place, and I was

17  informed of that later on during a meeting.

18     Q     Did you learn what efforts were made to get

19  Officer Berge to tell you -- tell the police who he was

20  buying his illegal drugs from?

21     A     I, I don't know.  I don't know any -- I don't

22  know of anything other than what I was told that --

23     Q     Well, were you told that Officer Berge had been

24  using and buying those illegal steroids for more than --

25  for about two years or more?

BROOKS v. CITY OF KANKAKEE, 17-2265 -- Jury Trial (5/1/19)

```
 1        A    I didn't know the time length.  I just knew

 2   that he had been using steroids.  Yes.

 3        Q    And did you know that Officer Berge was working

 4   in the Metropolitan Enforcement Group?

 5        A    Yes.

 6        Q    And that one focus of the MEG group was to be

 7   part of the war on drugs; is that right?

 8        A    Exactly.

 9        Q    And Officer Berge was fighting the war on drugs

10   as a user, wasn't he?

11        A    Yeah.  I'll go along with that.  Yes.

12        Q    Did you think that it would violate the

13   community's trust in the Kankakee Police Department for,

14   when it learned that an officer assigned to the Narcotics

15   Enforcement Unit was buying and using illegal drugs

16   himself?

17        A    It violated community trust, and it violated

18   the trust he had with us and administration and the whole

19   department in general.

20        Q    Okay.

21        A    It made, it made us all look bad.

22        Q    And did it make you all look bad when Officer

23   Berge was promoted to sergeant and then acknowledged that

24   he had made a false police report about a one-car

25   accident when he had been using drugs and was under the
```

1    influence of alcohol?

2        A     Yeah.  I would say yes.

3        Q     And that, that violated the community trust; is

4    that right?

5        A     Yes.

6        Q     Now, you told us at that Police and Fire

7    Commission meeting that you were at and the chief wasn't

8    at Officer Brooks spoke up; is that right?

9        A     Yes.

10       Q     And he talked about the consent -- what you say

11   was a consent decree; is that right?

12       A     Yes.

13       Q     And he also talked about an officer who had

14   been using drugs and was promoted to sergeant; isn't that

15   right?

16       A     That's correct.

17       Q     And there was, in fact, an officer who had been

18   using drugs who was promoted to sergeant; is that right?

19       A     Well, it was -- the way he said it was like it

20   was currently going on.  He made it, he made the

21   accusation that it was currently occurring; it was

22   happening at that time in the police department, and

23   nothing was being done about it.

24             He didn't --

25       Q     Well, --

1        A    Officer Brooks did not make it clear that this

2    happened in the past.

3        Q    Well, --

4        A    He made it -- his statement -- and I was in

5    there -- was clearly to say, "Hey, this is going on right

6    now, and nothing's being done about it."

7        Q    Does the Kankakee Police Department require its

8    officers to submit to random drug testing?

9        A    It's a contractual issue, and they are -- they

10   can be submitted to random drug testing.  Yes.

11       Q    The --

12       A    In the drug unit, it's different, but the --

13   yes.

14       Q    Well, back in 2014, could the City of Kankakee

15   require police officers to submit to random drug testing?

16       A    It's not -- it's a contractual thing, so it's

17   kind of complicated.  If they -- it's like a random

18   drawing, so not everybody would submit -- all the names

19   would be put in a hat.  A couple names would be pulled

20   out, and that's how the drug testing would occur.

21       Q    Was, was Officer or then-Sergeant Berge

22   subjected to random drug testing in 2016?

23       A    I don't know.  He was in the Metropolitan

24   Enforcement Group, which is a drug unit, and I know they

25   have their own drug-testing policies.

1      Q    But he was kicked out of the drug unit in 2014,

2   wasn't he?

3      A    Yes.

4      Q    And then he came back to work for Kankakee as a

5   patrol officer; is that right?

6      A    Yes.

7      Q    And then he got promoted to sergeant; is that

8   right?

9      A    Yes.

10     Q    And after he got promoted to sergeant, he

11  acknowledged that he had made a false police report about

12  a one-car accident where he had been under the influence

13  of alcohol and illegal drugs; is that right?

14     A    That's correct.

15     Q    And he wasn't demoted from sergeant to officer,

16  was he?

17     A    No.  He was not.

18     Q    He wasn't reassigned from street duties, was

19  he?

20     A    No.  He was not.

21     Q    So he's still out there supervising the arrests

22  of people who were using illegal drugs; is that right?

23     A    That, that is correct.

24     Q    And did that violate the community's trust?

25     A    I think, I think it did.  I agree with that.

BROOKS v. CITY OF KANKAKEE, 17-2265 -- Jury Trial (5/1/19)

1              MR. FLAXMAN:  Thank you.  Nothing further.

2              MR. HERVAS:  No redirect.

3              THE COURT:  You may step down.

4                  (Witness Passwater excused, 10:36 a.m.)

5              THE COURT:  You may call your next witness.

6              MR. MATHUES:  Judge, at this time, the defense

7    is going to -- I was getting the look, Your Honor.

8              At this time, we have no further witnesses.

9    The defense rests.

10             THE COURT:  All right.  Do you have any

11   witnesses you wish to call in rebuttal, Mr. Flaxman?

12             MR. FLAXMAN:  No, Your Honor.

13             THE COURT:  All right.  Well, the timing is

14   good, ladies and gentlemen.  It's 10:37.  We'll take our

15   break.  I'm going to make it a little bit longer so that

16   I can discuss some matters with the attorneys, so it will

17   probably be about 15 minutes.  All right?  I'll get you

18   back in here in roughly 15 minutes.

19             Remember my admonition.

20                  (Jury absent, 10:37 a.m.)

21             THE COURT:  Be seated.

22             All right.  The only exhibits that I have as

23   being admitted are the four joint exhibits.  Is that

24   correct, Mr. Flaxman?

25             MR. FLAXMAN:  That's my understanding, Your

1    Honor.

2            THE COURT:  Mr. Mathues?

3            MR. MATHUES:  That's correct, Judge.

4            THE COURT:  All right.  So that's --

5            MR. FLAXMAN:  I have a motion that I --

6            THE COURT:  -- straightforward.

7            All right, any motions?

8            MR. FLAXMAN:  Yes.  We have a motion for

9    judgment as a matter of law, which I haven't e-filed

10   because it wasn't ripe, but I'll hand up a paper copy.

11           THE COURT:  Mr. Mathues.

12           Do you wish to argue on this, Mr. Flaxman?

13           MR. FLAXMAN:  I'll stand on the written

14   submission, Your Honor.

15               (Brief pause in proceedings.)

16           MR. MATHUES:  Judge, very briefly, the motion

17   is based ultimately on a credibility judgment.

18   Credibility is a matter for the jury.  As Your Honor

19   ruled at summary judgment and also in the motion in

20   limine rulings, there are a number of very disputed

21   facts, including facts about what Mr. Brooks knew and

22   what his intent was.  And that's for the jury to decide;

23   and for that reason, we would ask you to deny the motion

24   for judgment as a matter of law.

25           THE COURT:  While I'm at it, do you have your

1   own motion you'd like to renew?

2          MR. MATHUES:  Not at this time.

3          THE COURT:  All right.  The plaintiff's motion

4   for judgment of -- judgment as a matter of law is denied.

5          Certainly, viewing the light -- evidence in the

6   light most favorable to the defense, the jury could, in

7   fact, find that the plaintiff was reprimanded for making

8   statements that were designed to -- that were either not

9   protected and/or were false statements; in short, that he

10  could not meet the burden of the elements he needs to

11  sustain his claim.

12         To paraphrase what Mr. Mathues said, since he

13  kind of stole some of the words straight off my notes

14  here in front of me, I have down:  This is going to be a

15  credibility fight.  This comes down to credibility

16  decisions.

17         This is exactly why we have jury trials.  The

18  jury's going to have to decide -- well, a number of

19  issues related to credibility, intent, motive -- all of

20  those issues -- which is not for the Court to decide at

21  this time, certainly not when so many things are in

22  dispute.  The motion, therefore, is denied.

23         All right.  Next on my agenda is jury

24  instructions.  They're all done -- do you have copies

25  yet?

1          LAW CLERK BARDELL:  Not yet.

2          THE COURT:  So we're -- here's what I propose

3    doing:  I'll bring the jury back in after the break.

4    It's going to be around -- it will be a little before

5    11:00.  I think I would prefer at this time to have them

6    go to an early lunch.

7          While they're doing that, I can work with my

8    law clerk.  We can finish the Court's instructions.

9    We'll get copies of them for all counsel.  We can have

10   our jury instruction conference.  I anticipate there

11   being a knockdown, drag-out fight about the elements and

12   a couple of definitional instructions related to the

13   elements.  The rest of the instructions from both sides

14   are essentially the same.  We're only going to, probably,

15   have a fight about three or four instructions; and I

16   anticipate it being a fight.

17          I will tell you -- I'll give you a chance to

18   read these after we hand them out -- I think we can

19   probably grab a quick lunch and then come back and talk

20   about the instructions.

21          I'm going to preface the distribution of the

22   instructions, Court's instructions, which will happen

23   sometime in the next, hopefully, 45 minutes or so, with

24   the following caveat to both sides:  I know I'm doing a

25   good job if I make both sides unhappy; and these

1    instructions, both of you have taken extreme positions.

2    I'm trying to follow the law and the cases and come up

3    with the appropriate instruction based on the evidence in

4    this case that's not slanted towards one side or the

5    other.

6              So, I want you to bear that in mind.  I'm

7    trying to be like Solomon, split the baby sort of thing.

8    I'm trying to come up with something that's legally

9    accurate and also consistent with the case law, and --

10   that's all I'll say at this time.  I just want to put

11   that out there so both sides can be thinking about that

12   instead of saying, you know, "Our way or no way."  If we

13   do that, then that's not going to be productive and

14   helpful to me.  I would like it, instead, if you actually

15   helped me with the instructions instead of simply

16   fighting about them.

17             Of course, I also wish I weighed 50 pounds

18   less, but I don't think those two things are going to

19   happen anytime soon.

20             All right, let's take a break for about ten

21   minutes.  I'll come back in here and give you an update

22   about the jury instructions, and then we'll see what we

23   do with the jury.

24             Take a break.

25             (Recess, 10:43 a.m. to 11:01 a.m.)

```
 1              THE COURT:  All right.  We're all back -- back
 2      on the record.  Everybody is present.
 3              To give you an update of what we're doing now,
 4      I think I have successfully worked to craft the Court's
 5      instructions consistent with the evidence that's been
 6      presented.  My law clerk is currently making the changes.
 7      I'm going to proofread them again.
 8              As I'm speaking, it just occurred to me:
 9      There's a stipulation instruction; but neither one,
10      neither side asked me to read any stipulations, so I need
11      to take that instruction out.  That just occurred to me.
12              But we need to put them in the correct order,
13      including moving that instruction, and get them to you.
14      So I'm going to bring the jury back in, tell them to take
15      a two-hour lunch, come back here at 1:00.  In the
16      meantime, I'll get you a copy of the Court's instructions
17      by 11:30, hopefully.  You can take them with you to
18      lunch.  We can come back at 12:15, have what I hope will
19      be helpful but will likely be a knockdown fight, and then
20      get the instructions finalized and make copies from,
21      before 1:00.  And that way, when the jury comes back, we
22      can start closing arguments.
23              Mr. Flaxman, does that sound doable?
24              MR. FLAXMAN:  That sounds fine.
25              MR. MATHUES:  I think that's an excellent plan.
```

```
 1              THE COURT:  Well, --

 2              MR. FLAXMAN:  And I think you're using reverse

 3    psychology on us with saying there's going to be a

 4    knockdown, drag-out fight.  I'm sure we'll agree to

 5    everything.

 6              MR. MATHUES:  I can't promise that, but I'm

 7    happy we will give this to the jury today and not

 8    tomorrow.

 9              THE COURT:  Yeah.  I'll stick with my knockdown

10    drag-out; just like I said, I'd like to lose 50 pounds,

11    but I don't think -- yeah.

12              All right, let's bring the jury back in, and I

13    can cut them loose until 1:00 for lunch.

14                   (Brief pause in proceedings.)

15                   (Jury present, 11:05 a.m.)

16              THE COURT:  All right.  Everybody be seated.

17              Part of my philosophy about absolutely not

18    wasting your time is I also like to let you know what

19    we're doing so you're not just in the jury room in the

20    dark thinking, "What are they doing out there?"

21              I just got through looking at my draft of the

22    jury instructions over the break because both sides have

23    rested now.  I have to finalize those now, make copies,

24    get them to the attorneys.  Then we have to have a jury

25    instruction conference and talk about the instructions,
```

1    make any changes that are necessary, make more copies --

2    all of which, frankly, takes time.

3            I am not going to have you simply sit back

4    there in the jury room while we're doing that.  I'd

5    rather free you from the jury room and have you take a

6    long lunch while we do all that and then bring you back

7    here and be ready to do closing arguments at 1:00.

8            So I'm going to let you go to lunch now, and

9    just be back in the jury room about 12:50, and we'll try

10   to bring you in here at 1:00.  I know it's a great day

11   outside, sunny, bright.  It's a great day to take a walk.

12           Remember my admonition.  You've heard the

13   evidence, but you haven't heard any instructions, and you

14   haven't heard the arguments of the attorneys.  So keep an

15   open mind.  Don't make any decisions.  Don't talk about

16   the case with anybody.

17           Enjoy the wonderful weather outside and -- no,

18   but seriously:  Have a good lunch.  Come back in a couple

19   hours, and we'll be ready to go.  So come back here, like

20   I said, 12:50.

21               (Jury absent, 11:06 a.m.)

22           THE COURT:  All right.  So, gentlemen, just be

23   at ease for about 20, 25 minutes.  We're going to make

24   the copies.  I'll get you the copies at 11:30.  I might

25   even come on the bench.  If I don't, I'll make sure my

```
 1   courtroom deputy gives you the copies, or my law clerk;

 2   and then if you come back here at 12:15, we'll have the

 3   jury instruction conference.  All right?

 4             MR. FLAXMAN:  Thank you.

 5             THE COURT:  I'll see you then.

 6                 (Recess, 11:07 a.m. to 12:21 p.m.)

 7             THE COURT:  Okay.

 8             MR. FLAXMAN:  Mr. Brooks is not back, but we

 9   can start.

10             THE COURT:  All right.  We're back on the

11   record for the jury instruction conference.

12             Mr. Flaxman, you received the rough draft copy

13   of the Court's proposed instructions?

14             MR. FLAXMAN:  Yes, we did, Your Honor.

15             THE COURT:  Mr. Mathues, likewise?

16             MR. MATHUES:  Yes, Your Honor.

17             THE COURT:  All right.  As I go through the

18   Court's instructions, if you don't have an objection,

19   just say "no objection."

20             All right, Mr. Flaxman, let's start.  Court's

21   1.

22             MR. FLAXMAN:  No objection.

23             MR. MATHUES:  No objection.

24             THE COURT:  Given.

25             Court's 2.
```

BROOKS v. CITY OF KANKAKEE, 17-2265 -- Jury Trial (5/1/19)

1           MR. FLAXMAN:  No objection.

2           MR. MATHUES:  No objection.

3           THE COURT:  Given.

4           Court's 3.

5           MR. FLAXMAN:  No objection.

6           MR. MATHUES:  No objection.

7           THE COURT:  Given.

8           Court's 4.

9           MR. FLAXMAN:  No objection.

10          MR. MATHUES:  No objection.

11          THE COURT:  Given.

12          Court's 5.

13          MR. FLAXMAN:  No objection.

14          MR. MATHUES:  No objection.

15          THE COURT:  Given.

16          I left -- I was going to take out Court's 6,

17   but I left it in there because I don't know if I

18   officially cautioned or warned anybody.  I don't think I

19   did; but just in case, I thought I'd leave Court's 6 in.

20   So, Mr. Flaxman, any objection?

21          MR. FLAXMAN:  No objection.

22          MR. MATHUES:  No objection.

23          THE COURT:  Given.

24          Court's 7.

25          MR. FLAXMAN:  No objection.

```
 1              MR. MATHUES:  No objection.

 2              THE COURT:  Given.

 3              Court's 8.

 4              MR. FLAXMAN:  No objection.

 5              MR. MATHUES:  No objection.

 6              THE COURT:  Given.

 7              Okay.  Court's 9 is out.  I don't recall using

 8   any evidence for a limited purpose.  Do you agree, Mr.

 9   Flaxman?

10              MR. FLAXMAN:  Yes, Your Honor.

11              THE COURT:  Mr. Mathues?

12              MR. MATHUES:  Yes, Your Honor.

13              THE COURT:  Okay.  That's with-- Court's 9 on

14   page 10 is withdrawn.

15              Court's 10.

16              MR. FLAXMAN:  No objection.

17              THE COURT:  Mr. Mathues.

18              MR. MATHUES:  No objection.  Sorry, Judge.

19              THE COURT:  Given.

20              Court's 11.

21              MR. FLAXMAN:  No objection.

22              MR. MATHUES:  No objection.

23              THE COURT:  Given.

24              Court's 12.

25              MR. FLAXMAN:  No objection.
```

```
1              MR. MATHUES:  No objection.

2              THE COURT:  Given.

3              Court's 13.

4              MR. FLAXMAN:  Do we have any prior

5    inconsistencies?

6              THE COURT:  Depositions.

7              MR. FLAXMAN:  All right, no objection.

8              MR. MATHUES:  No objection.

9              THE COURT:  Given.

10             Court's 14, I think, is out.  Nobody talked

11   about doing any pretrial prepping of witnesses.  Do you

12   agree, Mr. --

13             MR. FLAXMAN:  I agree.

14             MR. MATHUES:  I think we should just give it

15   anyway.  That would be my, my position.  I think it's

16   harmless if it's given.

17             THE COURT:  All right.  Do you have any

18   objection to that, Mr. Flaxman?

19             MR. FLAXMAN:  No objection.

20             THE COURT:  Okay.  We're going to take out the

21   part, obviously, in brackets that says "if it comes up."

22   We'll remove that.  The rest is Pattern Instruction 1.16.

23   It will be given with that correction.

24             Court's 15.

25             MR. FLAXMAN:  We had two witnesses against one.
```

1   I don't know if it really makes sense, but no objection.

2           MR. MATHUES:  No objection, Your Honor.

3           THE COURT:  Yeah.  It's just a standard

4   instruction, so I thought I'd give it.  Given.

5           Court's 16.

6           MR. FLAXMAN:  No objection.

7           MR. MATHUES:  No objection.

8           THE COURT:  Given.

9           Court's 17.

10          MR. FLAXMAN:  No objection.

11          MR. MATHUES:  No objection.

12          THE COURT:  Given.

13          All right, so I left in the Plaintiff's

14  proposed instruction, which is page 19 and 20, and the

15  defendant's instruction, which is 21, just for us to look

16  at.  So if you look at what I have done, it begins on

17  page 22.  That's the Court's instruction.  It's based on

18  Seventh Circuit Pattern 3.02.  You'll notice Instruction

19  3.01 is not there because we're not presenting a

20  discrimination to the jury; this is retaliation only.

21  And like I said in the footnote there on page 23, it's

22  functionally -- the language I have there is functionally

23  equivalent to 3.02.

24          Gentlemen, this is -- are we going to fight

25  about this, or are you going to accept the Court's

1   instruction?  Mr. Flaxman?

2           MR. FLAXMAN:  I will accept the Court's

3   instruction, but I believe there's a clerical error in

4   the third line.

5           THE COURT:  Tell me.

6           MR. FLAXMAN:  "And his statement," I think it

7   should be "or his statement."

8           And later on, you use "or" to describe the --

9   in Court's -- I think there's another instruction that

10  uses "or."

11          THE COURT:  Yeah.  I followed the "charging in

12  the conjunctive and proving in the disjunctive."  That's

13  why it says "and statements" later on.  I don't have a

14  problem changing it to "or."

15          MR. FLAXMAN:  I think it --

16          THE COURT:  Do you agree, Mr. Mathues?

17          MR. MATHUES:  I don't agree, Your Honor.

18          THE COURT:  You want it to be "and."

19          MR. MATHUES:  I do.  And the other "or's" -- I

20  would like to make an argument.  Based on the evidence in

21  this case, the "or's" in the 1 and 2 should be "ands."

22          But it sounds like Mr. Flaxman isn't done, so I

23  don't want to step on his toes.

24          THE COURT:  All right.  So just so I understand

25  this, Mr. Flaxman, you're not objecting to Court's 18,

1   and we're going to talk about whether we should use "or"

2   or "and"; is that correct?

3          MR. FLAXMAN:  That's correct.

4          THE COURT:  Mr. Mathues, is that where we are?

5          MR. MATHUES:  Judge, as far as the Court's 18,

6   I'm going to adopt my arguments in my, previously written

7   as far as the defendant's instruction --

8          THE COURT:  Okay.

9          MR. MATHUES:  -- and say nothing else about

10  them because you've already heard them.

11         THE COURT:  Yes.

12         MR. MATHUES:  As to the Court's instruction, if

13  that's our model, I would submit to the Court that the

14  evidence in this case is that the disciplinary letter was

15  issued after all three statements and because of all

16  three statements; and as it reads now in 1 and 2, the

17  plaintiff only has to prove that one out of the three

18  times he was -- he had a good-faith reasonable belief in

19  his statements.  And then the two other two times he

20  could not have a good-faith and reasonable belief in his

21  statements; and, yet, as the instruction reads, the jury

22  could find for him.

23         I don't think that's consistent with the

24  testimony here about why the letter was sent; and so

25  that's why it's my position that the "or" in the first

1    two lines of what you had listed as 1 and the "or" in the

2    third and fourth lines of what you'd listed as 2 should

3    read as "and."

4            THE COURT:  Mr. Flaxman.

5            MR. FLAXMAN:  I don't think that's the law; and

6    I think, consistent with Your Honor's summary judgment

7    ruling, it's -- any one of those three could be a

8    retaliatory act.

9            THE COURT:  Just a second.

10           (Brief pause in proceedings.)

11           THE COURT:  Just a moment, gentlemen.  I'm

12   going to look at something.

13           (Brief pause in proceedings.)

14           THE COURT:  All right.  So I'm working my way

15   through this.

16           Let me ask you first, Mr. Flaxman -- same thing

17   to Mr. Mathues -- if you look at the second element on

18   page 22, it's pretty clear from all the testimony, all

19   the evidence in the record, that the disciplinary letter

20   was issued after all three of the incidents.  It was all

21   three incidents that triggered the writing of the

22   disciplinary letter.

23           So my question to you, Mr. Flaxman, first is:

24   Is that even an element we need to give to the jury?  Is

25   that even in dispute, or should I take that whole section

1  out?

2          MR. FLAXMAN:  I don't think paragraph 2 is in

3  dispute, but I, I didn't want to challenge the Court's

4  instruction.

5          THE COURT:  No.

6          MR. FLAXMAN:  But I think there's no question

7  about paragraph 2.

8          THE COURT:  Mr. Mathues, what's your opinion?

9          MR. MATHUES:  Just a second.

10          (Brief pause in proceedings.)

11          MR. MATHUES:  I don't feel strongly, Judge.  I

12  would -- I have a slight preference for leaving it there

13  because I like that everything else has been the same

14  language, but it's not something that I have a strong

15  opinion or believe matters a lot.  So if the Court

16  decides to take it out, I'm not going to argue that.

17          THE COURT:  All right.  Let me go to the second

18  part of the question then.

19          Let's assume the second element is not there,

20  because I think the evidence in the record would show

21  that it was only after all three incidents occurred that

22  the reprimand -- the disciplinary letter was sent.

23          So if you turn back to the first element --

24  hold on.

25          (Brief pause in proceedings.)

1          THE COURT:  Well, I'll put it to you first, Mr.

2    Flaxman, then I'll again turn it to Mr. Mathues.

3          If the jury believes that Mr. Brooks had a

4    good-faith belief as to, say, his statements in two of

5    the incidents but not a third -- or flip it around.

6    Let's say the jury believes that only on one of the three

7    occasions did he have a good-faith basis.  Do you believe

8    your client prevails --

9          MR. FLAXMAN:  Okay.

10          THE COURT:  -- or not prevails?

11          MR. FLAXMAN:  Yes, Your Honor.

12          THE COURT:  All right.  Mr. Mathues?

13          MR. MATHUES:  Absolutely he does not prevail

14    because he has a causation problem.  He has not proven

15    that his statements caused the letter; that -- I would

16    contend that the testimony was unequivocally clear that

17    it was only after the statements were made on three

18    separate occasions that the written reprimand was issued.

19          (Brief pause in proceedings.)

20          THE COURT:  Okay.  We'll table that for a

21    moment.  I'm going to have to do some more research on

22    that, so we're going to table 22 while I go back and look

23    at some more cases.  It's helped me; now I've even more

24    narrowly defined the issue.

25          The instruction on page 24 is out.  I just put

1    that in there in case that came up.  It's out.

2            All right, Court's 19, I did find a grammatical

3    error that's going to be corrected.  It should -- there's

4    a "whether" that should be put in there.

5            So it should read, in Court's 19, "In deciding

6    Plaintiff's claim, you should not concern yourselves with

7    whether Defendant's actions were wise, reasonable, or

8    fair.  Rather, your concern is only whether Plaintiff has

9    proved Defendant issued a disciplinary letter to

10   Plaintiff because of his statements to the EEOC in 2014

11   or his statements in the mayor's office in February 2016

12   or his statements at the Police and Fire Commission

13   meeting in Spring 2016, and "whether" those statements

14   were based on a reasonable, good-faith belief that Paul

15   Berge was treated better because of his race or that the

16   KPD was violating a court order related to employment

17   practices."

18           We're going to table the "and" versus "or"

19   discussion.  Do you have any problem with me changing

20   that to "whether" as I read the instruction?

21           If you read along, you'll see it says "the

22   Police and Fire Commission meeting in Spring 2016,

23   and" -- it should read "whether those statements" -- to

24   be grammatically correct.  It's a simple grammatical

25   change.

BROOKS v. CITY OF KANKAKEE, 17-2265 -- Jury Trial (5/1/19)

1              MR. FLAXMAN:  No objection to that.

2              THE COURT:  All right.

3              MR. MATHUES:  No objection to that or anything

4    else with the instruction.

5              THE COURT:  Okay.  Well, I'm going to take

6    that, also, because that might affect what else we do.

7              All right.  Let's -- so we'll come back to

8    those other instructions in a minute.

9              Court's 20, any objection?

10             MR. FLAXMAN:  No objection.

11             MR. MATHUES:  No, Your Honor.

12             THE COURT:  Given.

13             Court's 21.

14             MR. FLAXMAN:  No objection.

15             MR. MATHUES:  No objection.

16             THE COURT:  Given.

17             Court's 22.

18             MR. FLAXMAN:  No objection.

19             MR. MATHUES:  No objection.

20             THE COURT:  Given.

21             Court's 23.

22             MR. FLAXMAN:  No objection.

23             MR. MATHUES:  No objection.

24             THE COURT:  Given.

25             Court's 24.

BROOKS v. CITY OF KANKAKEE, 17-2265 -- Jury Trial (5/1/19)

1        MR. FLAXMAN:  No objection.

2        MR. MATHUES:  No objection.

3        THE COURT:  Given.

4        Court's 25.

5        MR. FLAXMAN:  No objection.

6        MR. MATHUES:  No objection.

7        THE COURT:  Given.

8        26 is a mistake.  That shouldn't be in there.

9  That's going to be withdrawn.  I don't know how that

10  slipped in there.

11        And the verdict form, we pulled up a verdict

12  form for a different case; so, actually, in this one,

13  it's the one, the form that would apply in this case.

14  It's just the form.  Let me read it to you so you can

15  follow along.

16        Under where it says "Compensatory Damages," we

17  only have one plaintiff and one defendant, so it just

18  says -- it will just read, "If you find in favor of

19  Plaintiff, you must determine what damages, if any,

20  Plaintiff suffered.  If you find in favor of Defendant,

21  you will not award damages."

22        That's just the standard format we use with a

23  single defendant and single plaintiff.  It's a

24  municipality, so it got triggered as the plural.  So it's

25  not.

```
 1              Any objection to that correction?
 2              MR. FLAXMAN:  No objection to the correction.
 3              We don't believe that the "Compensatory
 4    Damages" has any meaning and should be omitted.
 5              THE COURT:  That's just on the form.  That
 6    doesn't bother me.  If you want it taken out -- do you
 7    have any preference, Mr. Mathues?
 8              MR. MATHUES:  Even I won't fight over that one,
 9    Your Honor.
10              THE COURT:  All right.  Mr. Flaxman, you want
11    "Compensatory Damages" out?  We'll take that out.
12              MR. FLAXMAN:  Yes.
13              THE COURT:  All right.  That's just part of the
14    form.
15              All right.  We're going to take another break
16    while I go back.  I'm going to look at a couple more
17    cases regarding Court's 18 and Court's 19.  So let's take
18    a break.
19              (Recess, 12:41 p.m. to 12:59 p.m.)
20              THE COURT:  All right, we're back.
21              The Court did some research, and let me make a
22    blanket statement:  The cases underlying the Court's
23    decision regarding this instruction, I looked at a number
24    of the -- a number of sections within the cases that are
25    cited in the summary judgment order.  So rather than cite
```

1    each individual one of those cases, at this time the

2    Court incorporates those cases that are cited and relied

3    upon in the summary judgment order at this time.

4              Let me just cut to the chase.  As far as the

5    first element -- and I'm referring specifically to

6    page 22, Court's Instruction 18 -- I've decided we're

7    going to change those to "and."  So it's going to read,

8    "His statements to the EEOC in 2014 and his statements in

9    the mayor's office in February 2014 and his statements at

10   the Police and Fire Commission meeting in spring 2016

11   were based on a reasonable, good-faith belief that Paul

12   Berge was treated better because of his race or that" --

13   Berge [correcting pronunciation] -- "or that the KPD was

14   violating a court order related to employment practices."

15             Let me explain my reasoning for the record.  As

16   I thought this through, it -- and we looked at the cases

17   dealing with retaliation.  If -- I'll go to a

18   semi-hypothetical.  If someone made, say, ten statements

19   and he or she had a good-faith basis for six of those but

20   for four of those there was not a good-faith basis, then

21   it would be appropriate for a disciplinary letter to be,

22   or a reprimand of some kind in a retaliation case to

23   occur.

24             In other words, one good-faith -- my reading of

25   the cases -- one good-faith basis for one set of false

BROOKS v. CITY OF KANKAKEE, 17-2265 -- Jury Trial (5/1/19)

1   statements -- or, actually, in the cases, it's

2   "inappropriate conduct" -- one good-faith basis for

3   conduct deemed inappropriate by supervisors cannot

4   justify, then, a retaliation claim for, based on that

5   plus other inappropriate conduct that was, in fact,

6   inappropriate.

7          And in case that was as clear as mud, let me

8   say it again.  If the jury were to find, for example,

9   that the EEOC statements in 2014, there was a good-faith

10  basis for Mr. Brooks's statements there, but the jury

11  were then to find he had no good-faith basis for his

12  comments in the mayor's office and no good-faith basis

13  for the statements at the Police and Fire Commission

14  meeting in 2016, it would then be appropriate -- and the

15  jury could so find -- that a reprimand letter be issued.

16  So, that results in number 1 being changed to "and."

17         Now, now, as far as number 2 goes, we heard the

18  testimony of Chief Regnier that he only issued this after

19  all three events had occurred.  But, gentlemen, the jury

20  doesn't have to agree with that.  The jury could easily

21  think -- and it would not be unreasonable for them to

22  conclude -- that regardless of Chief Regnier's testimony,

23  they could disregard part of it and think he's not being

24  truthful as to some aspect of it and say Paul Berge was

25  being treated better than Mr. Brooks and that, as a

1    result of that, the chief was going to issue the letter,

2    or had one in the works in 2014, or had one in the works

3    in February 2016 after the meeting at the mayor's office.

4    Or they could believe his testimony wholly and say it had

5    to be all three is what triggered it.

6            If we change number 2 to "ands," we're then

7    dictating to the jury that believing the witnesses'

8    testimony -- especially Chief Regnier -- is all or

9    nothing.  That's inappropriate.  That's also in conflict

10   with the other instructions the Court's going to give.

11   So I'm going to leave 2 as "or"; 1 has to become "and."

12           That then leads over to Court's 19 on page 25.

13   To make it consistent, it also has to be "and."  Because

14   if any one of those three statements, the jury were to

15   find, were not based on a reasonable good-faith belief,

16   the jury could find, reasonably find, that the letter of

17   reprimand, the disciplinary letter, was appropriate.

18           On the other hand, if they find that all three

19   of those were made in a reasonable, good-faith belief,

20   they could, they could then find for the plaintiff and

21   find that the reprimand was inappropriate.

22           And, frankly, one of my concerns was, yeah,

23   being consistent with these instructions with all of the

24   other instructions in terms of advising the jury what

25   they had to find.  So that's my ruling on, on those --

```
1                    (Brief pause in proceedings; the Court and
2                    law clerk are conferring privately.)
3              THE COURT:  Just a second.
4                    (Brief pause in proceedings.)
5              THE COURT:  Okay, just double-checking then.
6   So on Court's 19 -- did I say "ands"?
7              Do we want to keep it as "or's".
8              LAW CLERK BARDELL:  Correct.
9              THE COURT:  Okay.  Court's 19, they have to be
10  kept as "or's" to be consistent.  My law clerk just said
11  I misspoke and said "ands."  They have to be "or's" to be
12  consistent.  So we're going to keep Court's 19 as it is
13  with, with the one exception of changing one of the
14  words, "that" to "whether."
15             If I misspoke, I apologize.
16                   (Brief pause in proceedings; the Court and
17                   law clerk are conferring privately.
18             THE COURT:  Because then it's consistent with
19  the second element in Court's 18.  All right, that's the
20  Court's ruling on those.
21             I think I addressed all the other proposed
22  instructions, and that's it.
23             Anything further?
24             MR. FLAXMAN:  No.  Are you going to instruct
25  the jury before closings?
```

1          THE COURT:  Yes.  And I do not give you time

2    limits.

3          Mr. Mathues, anything?

4          MR. MATHUES:  Judge, I was going to ask if it

5    was possible for, to get a clean copy of Court's Number

6    18 and --

7          THE COURT:  You're going to get clean copies

8    of -- all right, let me, let me just tell you the

9    procedure we're going to do.

10          You're both experienced attorneys.  Lately,

11    just as an aside to lighten the mood a little bit, we get

12    law students in here lots of times doing civil rights

13    cases.  They're from the U of I Civil Rights Clinic.  And

14    the last couple of times I have not imposed time limits

15    on the law students.  The word I would take to describe

16    that, the last trial, would be "mistake."

17          So, but you're both -- you know, you're

18    experienced practitioners, and you know how long to talk.

19          The last -- what should have been, in my

20    estimation, roughly a 10-minute closing -- even

21    inexperienced, maybe a 15-minute closing -- after we

22    passed the 40-minute mark and I saw jurors literally

23    looking at their watches, you know, I wanted to signal

24    them.  You know the adage:  You can talk yourself out of

25    winning a case.  But, you know, I can't tell the students

1    that.  It's a real trial, so it's not practice.

2            Anyway, I don't impose time limits.  What I'll

3    do is we'll make these corrections now.  You'll all

4    receive a clean copy of them, and the jurors will have a

5    clean copy.  And then I instruct the jury; and then, at

6    that point, you're able to either put them on the ELMO if

7    you choose, or you could ask them to turn to the page, or

8    turn to the instruction if you choose.

9            I guess the only piece of advice I'd give you

10   along those lines:  It seems to me if you use the ELMO

11   it's better because that way some of the jurors aren't

12   flipping through the pages trying to find what you're

13   talking about.

14           But you're free to use the instructions.

15   You'll have clean copies, and I'm not going to impose

16   time limits.  I know you gentlemen -- you know what

17   you're doing.

18           All right, we're a few minutes late.  We've got

19   to make these corrections and make some copies.  So

20   anything further, Mr. Flaxman?

21           MR. FLAXMAN:  No, Your Honor.

22           THE COURT:  Anything, Mr. Mathues?

23           MR. MATHUES:  No, Your Honor.

24           THE COURT:  All right, we'll be in recess until

25   the copies are made.  Just make sure you're in a place

BROOKS v. CITY OF KANKAKEE, 17-2265 -- Jury Trial (5/1/19)

```
 1   where my courtroom deputy can find you once everything is
 2   done.
 3                (Recess, 1:09 p.m. to 1:53 p.m.)
 4                THE COURT:  All right.  We are back on the
 5   record.
 6                Mr. Flaxman, you have a copy of the
 7   instructions we went through prior to our break?
 8                MR. FLAXMAN:  I do.  I think -- I'm unsure
 9   about something.  If I could just have a --
10                THE COURT:  Take your time.
11                MR. FLAXMAN:  I thought -- maybe I misheard
12   you, but the second paragraph, the number 2 on page 18 --
13   that you had told us you weren't going to give; there's
14   no dispute about it.  There can't be a dispute about
15   that.
16                THE COURT:  No.  I decided to leave that in
17   there.  When I came back after doing the research, I said
18   we'll have to leave that in there because --
19                MR. FLAXMAN:  Okay.
20                THE COURT:  I mean, let me get a reason on the
21   record in case somebody appeals.
22                The first paragraph now reads the way it does
23   because -- as I probably inartfully tried to explain
24   before we took our break -- it cannot be that someone
25   could make two bad-faith statements, one good-faith
```

1    statement, and then the good-faith statement would shield

2    them from any type of discipline.  So that's why I used

3    that in the conjunctive.

4            However, as to number 2, as I was thinking

5    about what the evidence has been, they are -- the jury is

6    free to weigh the evidence, and they could decide that

7    the statement -- any one of the three statements by

8    themselves were going to be the reason why the

9    disciplinary letter was issued, and basically disregard

10   or not give as much weight to the statements of Chief

11   Regnier and Lieutenant Passwater.  Essentially, I didn't

12   want to substitute our judgment for the jury's judgment,

13   so that's why number 2 I left in.

14           MR. FLAXMAN:  Well, okay.  Going back to

15   number -- then I'm confused because the, the last

16   sentence of the first paragraph says you must prove two

17   things by a preponderance of the evidence.  The number 1

18   has two things, that good-faith belief that he was

19   treated better because of the race and that they were

20   violating a court order.

21           And then the -- then there's number 2.

22           I think that's confusing, and I also think --

23           THE COURT:  Wait, wait.  Stop, stop.  Give me

24   one at a time.  What are you saying now?

25           MR. FLAXMAN:  The "to succeed on his claim, you

1    must prove two things," are those two things -- the jury

2    might be confused.  Are those two things number 1 and

3    number 2?  Or are those the two things that are in number

4    1?

5              THE COURT:  It's number 1 and number 2.  I

6    mean, those are the two elements.

7              MR. FLAXMAN:  Well, I understand that, but

8    number 1 has two things:  that he was treated better

9    because of his race and that the KPD was violating a

10   court order relating to employment practices.  That seems

11   to be two things.

12             THE COURT:  I guess I just don't see the

13   confusion there.

14             MR. FLAXMAN:  All right.  The other, the other

15   point is that:  What if the jury finds that in 2014 Mr.

16   Brooks said KPD was violating a Court order relating to

17   employment practices but didn't say anything about Mr.

18   Berge or another officer?  Then, under these

19   instructions, they have to find for the defense, --

20             THE COURT:  Well, --

21             MR. FLAXMAN:  -- which I don't think is what

22   you intended.

23             THE COURT:  Okay.  You've hit the heart of one

24   of the things we were discussing back in chambers

25   regarding these instructions.  Number one, we have two

BROOKS v. CITY OF KANKAKEE, 17-2265 -- Jury Trial (5/1/19)

```
 1   facts that we relied upon.  Number one:  The pleadings
 2   are the way you pled them, and we could not rewrite the
 3   pleadings such that each incident was a separate cause
 4   for -- was either protected activity or a separate cause
 5   for disciplinary action.  We have to take the pleadings
 6   as they are drafted by the plaintiff, so I couldn't
 7   rewrite the pleadings to make them more easily
 8   transferable into jury instructions.
 9            Number two:  Unfortunately, also, in terms of
10   ease of jury instructions, the letter itself encompasses
11   all three acts.  If the, if there would have been one
12   separate letter for each act, then obviously that would
13   have made easier jury instructions as well.  It is a
14   variation on the adage that pleadings and facts
15   oftentimes do not translate well to jury instructions.
16   This would probably be one of the best examples of that.
17            We contemplated back in chambers the idea that
18   there could be a mismatch.  They might believe there were
19   misstatements at one occurrence -- let me be more
20   precise.  There could have been bad-faith -- statements
21   not made in good faith at one occurrence, and then a
22   different occurrence is what triggered the letter, a
23   mismatch.  The only thing that saved us was we have one
24   unified letter, one unified reprimand that, that -- the
25   disciplinary letter in itself encompasses all three
```

BROOKS v. CITY OF KANKAKEE, 17-2265 -- Jury Trial (5/1/19)

1    events.  So that's the best compromise we could come up

2    with that also incorporates the appropriate elements in

3    the Seventh Circuit pattern instruction.

4         So I think it accurately reflects the law.  I

5    appreciate what you're saying.  I don't think there's

6    going to be confusion by the jury as to number 1 and

7    number 2.

8         Mr. Mathues, do you have any -- do you wish to

9    make comment on that?

10        MR. MATHUES:  No, Your Honor.

11        THE COURT:  Okay.

12        MR. FLAXMAN:  Just to preserve the record in

13   case --

14        THE COURT:  Sure.

15        MR. FLAXMAN:  -- somebody else looks at it, --

16        THE COURT:  Yeah.

17        MR. FLAXMAN:  -- we would ask that the Court

18   give an instruction -- or give, give the instruction

19   using the "or" rather than the "and" in the number 1.

20   And Your Honor's ruled on that, but I wanted it to be

21   clear.

22        THE COURT:  Right.  I mean, this is a -- that's

23   an example of what you're talking about, on a different

24   level, but -- what we're talking about.  For example, if

25   the jury was to believe that the statements about Paul

1    Berge were made in good faith and during the same

2    conversation there were statements about, made about the

3    KPD that were not in good faith, they could then find

4    properly that this was not protected activity.

5            They'd, of course, also have to find that --

6    the plaintiff doesn't have to show that what he believed

7    was correct, but they could -- if the jury found that

8    there was one statement made in good faith and one

9    statement not made in good faith, that would be

10   sufficient to, to translate to the activity not being

11   protected activity.  That's the difficulty.

12           I mean, I understand what you're saying, Mr.

13   Flaxman, but I'll say again:  Number one, I'm stuck with

14   the pleadings the way they were drafted, the way you

15   presented them.  And number two, the fact that the

16   letter -- the disciplinary letter encompasses all three

17   events in one letter.  It's a -- to use a shortcut term,

18   it's a unified disciplinary letter.  So if there would

19   have been three separate letters, it would have been very

20   easy for me to break it down into three separate counts.

21   If you pled it as three separate counts and there would

22   have been three separate letters, it would have been

23   extremely easy.  That's not what we have.

24           So this is the best way I can convey the

25   appropriate elements and the burden of proof to the jury,

1  and it's consistent with what I believe is both the

2  Seventh Circuit cases that I reference in my summary

3  judgment order that I looked at again, as well as the

4  elements instruction, the pattern instruction.

5           But I think your record, your record is made.

6           Mr. Mathues, anything you'd like to throw in

7  for the good of the order?

8           MR. MATHUES:  No, Your Honor.  Your

9  articulation of what they could find in terms of one good

10 faith/one bad, that's our position.

11          THE COURT:  I mean, this was quite the, quite

12 the legal puzzle; and I'm sure, even though I'm trying to

13 do the best I can with the facts as they are -- if I

14 could rewrite the facts or rewrite the way it was pled or

15 rewrite the letter, the disciplinary letter, we could

16 have a much easier set of instructions.  But we're doing

17 the best we can.

18          All right.  Any reason not to bring the jury

19 in?

20          MR. FLAXMAN:  No.

21          MR. MATHUES:  No, Your Honor.

22          THE COURT:  All right.  Let's bring them in.

23          (Brief pause in proceedings.)

24          (Jury present, 2:03 p.m.)

25          THE COURT:  Please be seated.

BROOKS v. CITY OF KANKAKEE, 17-2265 -- Jury Trial (5/1/19)

1          Sorry.  We're an hour behind schedule, so sorry

2    about that.  We were not having a good time.  We were

3    actually working very hard to get the instructions done,

4    copied.  We ended up having to do more work than I

5    thought to get them hammered out in the correct fashion.

6    So -- and then there were more corrections, then

7    typographical errors, then more corrections; and then

8    before I knew it, it was 2:00 instead of 1:05 when I

9    thought we were going to walk in here.

10          In any event, at this time let's hand out the

11   copies of the instructions.

12               (Brief pause in proceedings.)

13          THE COURT:  All right.  All the members of the

14   jury have a copy of the instructions.

15          Ladies and gentlemen, I'm going to read you

16   these instructions.  These are my instructions.  You do

17   not have to read along with me.  If you want to, you can

18   just simply listen as I read them to you.  You will be

19   allowed to take these back to the jury room with you.  If

20   you wish to read along, you may do that as well.

21          Members of the jury, you have seen and heard

22   all the evidence and will hear the arguments of the

23   attorneys.  Now I will instruct you on the law.

24          You have two duties as a jury.  Your first duty

25   is to decide the facts from the evidence in the case.

1    This is your job and yours alone.

2              Your second duty is to apply the law that I

3    give you to the facts.  You must follow these

4    instructions, even if you disagree with them.  Each of

5    the instructions is important, and you must follow all of

6    them.

7              Perform these duties fairly and impartially.

8    Do not allow sympathy or prejudice to influence you.  You

9    should not be influenced by any person's race, color,

10   religion, national ancestry, or sex.

11             Nothing I say now, and nothing I said or did

12   during the trial, is meant to indicate any opinion on my

13   part about what the facts are or about what your verdict

14   should be.

15             During this trial, I have asked witnesses

16   questions myself.  Do not assume that because I asked

17   questions I hold any opinion on the matters I asked about

18   or any opinion on what the outcome of the case should be.

19             The Defendant City of Kankakee is a municipal

20   corporation.  All parties are equal before the law.  A

21   municipal corporation is entitled to the same fair

22   consideration that you would give any individual person.

23             The evidence consists of the testimony of the

24   witnesses and the exhibits admitted in evidence.

25             Certain things are not to be considered as

BROOKS v. CITY OF KANKAKEE, 17-2265 -- Jury Trial (5/1/19)

1    evidence.  I will list them for you.

2              First, if I told you to disregard any testimony

3    or exhibits or struck any testimony or exhibits from the

4    record, such testimony or exhibits are not evidence and

5    must not be considered.

6              Second, anything that you may have seen or

7    heard outside the courtroom is not evidence and must be

8    entirely disregarded.

9              Third, questions and objections or comments by

10   the lawyers are not evidence.  Lawyers have a duty to

11   object when they believe a question is improper.  You

12   should not be influenced by any objection, and you should

13   not infer from my rulings that I have any view as to how

14   you should decide the case.

15             Fourth, the lawyers' opening statements and

16   closing arguments to you are not evidence.  Their purpose

17   is to discuss the issues and the evidence.  If the

18   evidence as you remember it differs from what the lawyers

19   said, your memory is what counts.

20             I have a duty to caution or warn an attorney

21   who does something that I believe is not in keeping with

22   the Rules of Evidence or procedure.  You are not to draw

23   any inference against the side whom I may caution or warn

24   during the trial.

25             Any notes you have taken during this trial are

BROOKS v. CITY OF KANKAKEE, 17-2265 -- Jury Trial (5/1/19)

1    only aids to your memory.  The notes are not evidence.

2    If you have not taken notes, you should rely on your

3    independent recollection of the evidence and not be

4    unduly influenced by the notes of other jurors.  Notes

5    are not entitled to any greater weight than the

6    recollections or impressions of each juror about the

7    testimony.

8            In determining whether any fact has been

9    proved, you should consider all of the evidence bearing

10   on the question regardless of who introduced it.

11           You should use common sense in weighing the

12   evidence and consider the evidence in light of your own

13   observations of life.

14           In our lives, we often look at one fact and

15   conclude from it that another fact exists.  In law, we

16   call this "inference."  A jury is allowed to make

17   reasonable inferences.  Any inference you make must be

18   reasonable and must be based on the evidence in the case.

19           You may have heard the phrases "direct

20   evidence" and "circumstantial evidence."  Direct evidence

21   is proof that does not require an inference, such as the

22   testimony of someone who claims to have personal

23   knowledge of a fact.  Circumstantial evidence is proof of

24   a fact, or a series of facts, that tends to show that

25   some other fact is true.

BROOKS v. CITY OF KANKAKEE, 17-2265 -- Jury Trial (5/1/19)

1          As an example, direct evidence that it is

2    raining is testimony from a witness who says, "I was

3    outside a minute ago, and I saw it raining."

4    Circumstantial evidence that it is raining is the

5    observation of someone entering a room carrying a wet

6    umbrella.

7          The law makes no distinction between the weight

8    to be given to either direct or circumstantial evidence.

9    You should decide how much weight to give to any

10   evidence.  In reaching your verdict, you should consider

11   all the evidence in the case, including the

12   circumstantial evidence.

13         You must decide whether the testimony of each

14   of the witnesses is truthful and accurate in part, in

15   whole, or not at all.  You also must decide what weight,

16   if any, you give to the testimony of each witness.

17         In evaluating the testimony of any witness,

18   including any party to the case, you may consider, among

19   other things:  the ability and opportunity the witness

20   had to see, hear, or know the things that the witness

21   testified about; the witness's memory; any interest,

22   bias, or prejudice the witness may have; the witness's

23   intelligence; the manner of the witness while testifying;

24   the witness's age; and the reasonableness of the

25   witness's testimony in light of all the evidence in the

1  case.

2         You may consider statements given by a party,

3  or a witness under oath, before trial as evidence of the

4  truth of what he or she said in the earlier statements,

5  as well as in deciding what weight to give his or her

6  testimony.

7         With respect to other witnesses, the law is

8  different.  If you decide that, before the trial, one of

9  these witnesses made a statement not under oath or acted

10 in a manner that is inconsistent with his or her

11 testimony here in court, you may consider the earlier

12 statement or conduct only in deciding whether his or her

13 testimony here in court was true and what weight to give

14 to his or her testimony here in court.

15        In considering a prior inconsistent statement

16 or conduct, you should consider whether it was simply an

17 innocent error or an intentional falsehood and whether it

18 concerns an important fact or an unimportant detail.

19        It is proper for a lawyer to meet with any

20 witness in preparation for trial.

21        You may find the testimony of one witness or a

22 few witnesses more persuasive than the testimony of a

23 larger number.  You need not accept the testimony of the

24 larger number of witnesses.

25        The law does not require any party to call as a

1    witness every person who might have knowledge of the

2    facts related to this trial.  Similarly, the law does not

3    require any party to present as exhibits all papers and

4    things mentioned during this trial.

5            When I say that a party must prove something by

6    a "preponderance of the evidence," or when I use the

7    expression "if you find" or "if you decide," this is

8    what I mean:  When you have considered all the evidence

9    in the case, you must be persuaded that it is more

10   probably true than not true.

11           Plaintiff claims that he was issued a

12   disciplinary letter by Defendant because of his

13   statements to the EEOC in 2014, his statements in the

14   mayor's office in February 2016, and his statements at

15   the Police and Fire Commission meeting in spring 2016.

16   To succeed on this claim, Plaintiff must prove two things

17   by a preponderance of the evidence:

18           (1) His statements to the EEOC in 2014 and his

19   statements in the mayor's office in February 2016 and his

20   statements at the Police and Fire Commission meeting in

21   spring 2016 were based on a reasonable, good-faith belief

22   that Paul Berge was treated better because of his race

23   and that the KPD was violating a court order related to

24   employment practices.  This does not, however, require

25   Plaintiff to show that what he believed was correct.

BROOKS v. CITY OF KANKAKEE, 17-2265 -- Jury Trial (5/1/19)

1          (2) Defendant would not have issued the

2   disciplinary letter to Plaintiff if he had not made the

3   statements to the EEOC in 2014 or made the statements in

4   the mayor's office in February of 2016 or made the

5   statements at the Police and Fire Commission meeting in

6   spring of 2016, but everything else had been the same.

7          In deciding Plaintiff's claim, you should not

8   concern yourself with whether Defendant's actions were

9   wise, reasonable, or fair.  Rather, your concern is only

10  whether Plaintiff has proved Defendant issued a

11  disciplinary letter to Plaintiff because of his

12  statements to the EEOC in 2014 or his statements in the

13  mayor's office in February 2016 or his statements at the

14  Police and Fire Commission meeting in spring 2016, and

15  whether those statements were based on a reasonable,

16  good-faith belief that Paul Berge was treated better

17  because of his race and that the KPD was violating a

18  Court order related to employment practices.

19         If you find that Plaintiff has proved his

20  claim, then you must determine what amount of damages, if

21  any, Plaintiff is entitled to recover.  Plaintiff must

22  prove his damages by a preponderance of the evidence.

23         If you find that Plaintiff has failed to prove

24  his claim, then you will not consider the question of

25  damages.

BROOKS v. CITY OF KANKAKEE, 17-2265 -- Jury Trial (5/1/19)

1          You may award compensatory damages only for

2    injuries that Plaintiff has proved by a preponderance of

3    the evidence were caused by Defendant's wrongful conduct.

4          Your award must be based on evidence and not

5    speculation or guesswork.  This does not mean, however,

6    that compensatory damages are restricted to the actual

7    loss of money; they include both the physical and mental

8    aspects of injury, even if they are not easy to measure.

9          In calculating damages, you should consider the

10   following type of compensatory damages and no others:

11   the physical and mental and emotional pain and suffering

12   and loss of normal life that Plaintiff has experienced

13   and is reasonably certain to experience in the future.

14   No evidence of the dollar value of physical or mental and

15   emotional pain and suffering or loss of a normal life has

16   been, or needs to be, introduced.  There is no exact

17   standard for setting the damages to be awarded on account

18   of these factors.  You are to determine an amount that

19   will fairly compensate the plaintiff for the injury he

20   has sustained.

21         Upon retiring to the jury room, you must select

22   a presiding juror.  The presiding juror will preside over

23   your deliberations and will be your representative here

24   in court.

25         A verdict form has been prepared for you.  Take

BROOKS v. CITY OF KANKAKEE, 17-2265 -- Jury Trial (5/1/19)

1    this verdict form to the jury room; and when you have

2    reached unanimous agreement on the verdict, your

3    presiding juror will fill in and date the form, and all

4    of you will sign it.

5          I do not anticipate that you will need to

6    communicate with me.  If you do need to communicate with

7    me, the only proper way is in writing.  The writing must

8    be signed by the presiding juror or, if he or she is

9    unwilling to do so, by some other juror.

10          The writing should be given to the marshal, who

11    will give it to me.  I will respond either in writing or

12    by having you return to the courtroom so that I can

13    respond orally.

14          If you do communicate with me, you should not

15    indicate in your note what your numerical division is, if

16    any.

17          During your deliberations, you must not

18    communicate with or provide information to anyone by any

19    means about this case.  You may not use any electronic

20    device or media -- such as a smartphone, iPhone, or

21    computer, or the Internet, or any social media -- to

22    communicate to anyone any information about this case or

23    to conduct any research about this case until I accept

24    your verdict.

25          The verdict must represent the considered

BROOKS v. CITY OF KANKAKEE, 17-2265 -- Jury Trial (5/1/19)

1    judgment of each juror.  Your verdict, whether for or

2    against the parties, must be unanimous.

3         You should make every reasonable effort to

4    reach a verdict.  In doing so, you should consult with

5    one another, express your own views, and listen to the

6    opinions of your fellow jurors.  Discuss your differences

7    with an open mind.  Do not hesitate to reexamine your own

8    view and change your opinion if you come to believe it is

9    wrong.  But you should not surrender your honest beliefs

10   about the weight or effect of evidence solely because of

11   the opinions of other jurors or for the purpose of

12   returning a unanimous verdict.

13        All of you should give fair and equal

14   consideration to all the evidence and deliberate with the

15   goal of reaching an agreement that is consistent with the

16   individual judgment of each juror.  You are impartial

17   judges of the facts.

18        The verdict form reads as follows.

19        It has the caption of the case at the top.  In

20   the middle it says "Jury Verdict," underlined.  "On

21   Plaintiff's retaliation claim against Defendant, we, the

22   jury, find in favor of:  (Check one) Plaintiff," with a

23   line, "Defendant," with a line.  You'll put an X or some

24   mark on whichever represents your verdict.

25        "If you find in favor of Plaintiff, you must

1   determine what damages, if any, Plaintiff suffered.  If

2   you find in favor of Defendant, you will not award

3   damages."

4        The next line says, "We find Plaintiff's

5   compensatory damages to be" dollar sign with a line; and

6   if you determine that damages are appropriate, you can

7   put a dollar amount in there.

8        "Fill in the date, and each juror must sign the

9   form."  It has a date -- the word "date" with a line and

10   then eight signature lines with the presiding juror being

11   indicated with the words "Presiding Juror" under their

12   line.

13        One more thing.  I do not need eight signed

14   copies.  So whoever is the presiding juror, use their

15   verdict form.  I say that because -- let's just say in

16   the past it hasn't been clear.  I only need one form, not

17   eight forms.  All right?

18        With that being said, we turn to the closing

19   arguments on behalf of the plaintiff.  Mr. Flaxman,

20   whenever you're ready.

21        MR. FLAXMAN:  Thank you, Your Honor.

22        Your Honor, ladies and gentlemen of the jury,

23   it's traditional for lawyers to start off by thanking you

24   for your attention here.  And I think I speak for

25   everybody in the courtroom:  Thank you.

BROOKS v. CITY OF KANKAKEE, 17-2265 -- Jury Trial (5/1/19)

1           Yesterday, I made you a promise that I was
2    scared I would not be able to fulfill, but we're, we're
3    done today.  The case, when we finish our closing
4    arguments, will be in your hands to deliberate.  And the
5    judge told you what the instructions are.  You heard the
6    evidence.  I believe you'll have a chance -- well, you
7    have the exhibits with you, and I think the facts are not
8    really that confusing or in dispute.
9           Back in 2003, Mr. Brooks and four other African
10   American police officers filed a lawsuit.  That lawsuit,
11   you heard, was tried to -- part of it was tried to a
12   jury, and the jury found against the police officers.
13   There was another part that was going to be tried.
14   Before that trial took place and while an appeal was
15   pending, there was an Agreed Judgment Order.  That's
16   Joint Exhibit 2.
17          And the testimony at the trial was that in 2014
18   and 2016, Mr. Brooks referred to the Agreed Judgment
19   Order as a consent decree.  The chief said, "Well, when I
20   heard the word 'consent decree,' it meant to me that the
21   Department of Justice had sued us and had made us have a
22   monitor, and it had all sorts of provisions."  Nobody
23   said that Mr. Brooks said anything about that, that he
24   said anything about the Department of Justice or
25   monitoring or reform-- Mr. Brooks said it was a consent

 1   decree or an agreed judg-- agreed order from my lawsuit.

 2          You also heard testimony that the agreed order

 3   expired in 2011; and when you look at it, you'll see,

 4   yeah, parts of it did expire.  The agreed order starts

 5   out with two paragraphs that you'll see on page 1.  The

 6   first paragraph is that Kankakee agrees that it is the

 7   goal and desire of the City of Kankakee and, further,

 8   that it will use reasonable efforts to recruit, hire, and

 9   promote qualified African American, Hispanic, female, and

10   other minority candidates as police patrol officers and

11   supervisors.  And it continues with other words.

12          And then paragraph 2 talks about what we're

13   going to do to ensure that that happens.

14          Then there are other provisions about testing

15   and notice and hiring somebody to make up a test.  Those

16   expired in 2011.

17          But I don't think anybody's going to tell you

18   that the City of Kankakee's agreement that it's its goal

19   and desire to have a diverse police department expired in

20   2011.  That's the goal of -- since there's been a civil

21   rights law, that's been the requirement of public

22   employers, that they try to have a diverse work force,

23   that they not discriminate.

24          And Mr. Brooks was saying that there was this

25   agreed order, this consent decree.  He wasn't talking

1   about these little provisions about hiring somebody to

2   make up a test, about posting the results of the test.

3   He was talking about the promise that they weren't going

4   to discriminate, that they were going to aim for a

5   diverse work force.

6           And then in 2014, there were proceedings.  You

7   heard from some witnesses that was the EEOC.  Mr. Brooks

8   told you it was at the Illinois Department of Human

9   Rights.  It doesn't matter.  There was a, a proceeding

10  about employment discrimination, and Mr. Brooks said

11  there was an agreed order or a consent decree back in

12  2005.  And there was.

13          In 2016, you heard testimony -- and there's no

14  dispute -- that Mr. Brooks spoke up about Officer and

15  then-Sergeant Berge.  And we know that Sergeant Berge

16  was -- I guess you'd call him a dirty cop.  He was out

17  there working in the Narcotics Unit, arresting people who

18  were buying, selling, and using illegal drugs; and he was

19  buying and using illegal drugs.  And he did that for

20  about two years before he got caught.

21          And then when he got caught, he wasn't fired.

22  He wasn't prosecuted.  He was given another chance to do

23  well.  The chief said he was suspended for 30 days, and

24  he was in treatment, and then he came back to work.  And

25  then in January 2016 the chief said, "I'm gonna promote

1    this guy, Mr. Berge.  He's done penance for his sins, and

2    I'm going to make him sergeant.  I'm going to make him a

3    role model for police officers, a supervisor for police

4    officers in this paramilitary organization."

5            And after that happened, at the Police and Fire

6    Commission and at the mayor's office, Mr. Brooks spoke up

7    and said, "There's this guy who got promoted to sergeant

8    who was involved in making false police reports, who was

9    involved in this one-car accident when he was drunk and,"

10   as the violator acknowledged, "using steroids, and tot--

11   wrecked his car.  And there's been a cover-up about that;

12   and instead of doing anything about the cover-up, the

13   police department just brushed it under the rug and then

14   promoted the guy to sergeant."

15           After -- the chief told you that, after Mr.

16   Brooks mentioned that in 2016 at the mayor's office, they

17   did an investigation; and lo and behold, the police

18   department discovered, yeah, there has been a cover-up of

19   what Mr., Officer, Sergeant -- then-Sergeant Berge did in

20   2012; and we're going to, you know, make him promise not

21   to do it again, sign a last-chance agreement.  We're not

22   going to demote him from sergeant.  We're not going to

23   take him off street duty.  We're going to let him go out

24   and continue to arrest people who do stuff that he did.

25           We don't care about the, violating the

1  community trust.  We're not going to have a training

2  program for people -- for officers about the code of

3  silence, about turning people in who, officers in who get

4  into one-car accidents while they're under the influence

5  of alcohol.  We're gonna -- you know, he promised not to

6  do it again, so we're not gonna do anything.

7          And Mr. Brooks spoke out about that.  He spoke

8  out about that at the mayor's meeting.  He spoke out

9  about that at the Police and Fire Commission.  And

10  instead of some kind of reform in the police department,

11  some kind of action to stop this from happening again or

12  some kind of investigation about "Why was there a

13  cover-up in 2012, when that one-car accident took place,

14  to 2016?", the chief writes this letter to Mr. Brooks,

15  saying "Don't do it again.  Don't talk.  Don't make

16  complaints.  Don't speak out.  If I think you're being

17  untruthful in any of the statements you're making, you're

18  going to be disciplined, up and to discharge."

19          The judge read you the instruction.  You'll get

20  a chance to read the instruction.  I think when you read

21  the instruction and review the evidence, you'll agree

22  that the plaintiff -- and Mr. Brooks is the plaintiff --

23  has proved his case by a preponderance of the evidence.

24          And then you'll turn to the question of

25  damages.  How much money is Mr. Brooks -- should you

1    award Mr. Brooks?  It has to be -- it should be enough

2    to, to, to make it plain to Mr. Brooks that what he did

3    was right, that he shouldn't be having trouble sleeping

4    or, at night or concentrating because speaking up about

5    unfair treatment would -- you know, as favorable

6    treatment to, to a white officer, a white sergeant, is

7    something that, you know, is going to place him at risk

8    of getting fired.

9            So, it's more than a dollar, and it's less than

10   a million dollars.  It's probably less than 100,000.  But

11   it's up to you to decide what it is.  I'm not going to

12   give you a number.  You have your collective judgment and

13   the judge told you -- read you the instruction, and you

14   can read it again.

15           You'll now get a chance to hear from the

16   defense, which probably has a different view of the

17   evidence and the verdict; and then I'll get a chance to

18   address you in rebuttal, and then the case is yours.

19           Once again, thank you.

20           THE COURT:  Thank you, Mr. Flaxman.

21           Mr. Mathues.

22           MR. MATHUES:  Thank you, Your Honor.

23           THE COURT:  Take your time.  Whenever you're

24   ready.

25           MR. MATHUES:  Why are we here?  I don't mean:

1  Why are you, the ladies and gentlemen of the jury, here?

2  You are all here because were you summoned; and, like

3  good citizens, you got summoned and you came and you

4  served.  And for that, we appreciate it.

5         I mean, why is this case here?  You heard and

6  saw and you'll take back to your jury room that Officer

7  Brooks, a week after getting the written reprimand, went

8  to the Illinois Department of Human Rights.  He had a

9  hearing.  He was able to speak.  You heard him say it

10  wasn't his first time there.  And as you saw and as you

11  will see when you take an exhibit back with you, the

12  Department of Human Rights -- who is a state agency whose

13  job is to answer, to hear hearings like this -- they

14  investigated and found no substantial evidence that

15  Officer Brooks was retaliated against.

16         You also heard from Officer Brooks in terms of

17  damages, which Plaintiff's attorney mentioned, maybe, a

18  minute's worth.  He wasn't fired.  He wasn't suspended.

19  For whatever mental distress he allegedly experienced, he

20  didn't seek any treatment for it.  No one issued him a

21  30-day suspension.  So why are we here?

22         We're here for the same reason I told you at

23  the beginning.  We're here because Officer Brooks isn't

24  content to have his own opinion.  He wants his own facts.

25  And as I also told you at the beginning of the case of

1    what could happen, it shifted from Officer Brooks

2    claiming "what I said was true" to "I thought I was

3    telling the truth"; "I meant well; that's what I thought

4    was the case."

5              Officer Brooks, and even the plaintiff's

6    initial argument, isn't even trying to convince you

7    anymore that he was right.  In fact, Officer Brooks sat

8    right there in that chair and said, "That's new

9    information to me; I didn't know."

10             And I think it's interesting, and something you

11   can consider when you have watched his testimony, how

12   many times Officer Brooks didn't want to give a straight

13   answer to a simple question, how many times he evaded,

14   how many times -- in contrast to Chief Regnier and

15   Lieutenant Passwater.  Even when asked things that, you

16   know, may not have been as favorable as they wanted, they

17   gave you straight answers.  Mr. Brooks, I would submit to

18   you, didn't do that, and you can consider that as part of

19   your weighing of credibility in this case.

20             But notwithstanding as obstinate as he was on

21   the stand, even he would tell you, and admitted, that

22   there was new information, that he got his facts wrong.

23   So now his claim is he really thought that was true.  The

24   language that you saw in the jury instructions is this:

25   "reasonable and good-faith belief that all of his

1   statements were true."  That's what he's going to try and

2   convince you of.  And I'm telling you:  Do not go back

3   into the jury room and fall for it.

4           MR. FLAXMAN:  Objection.  That's arguing --

5           MR. MATHUES:  Do not --

6           MR. FLAXMAN:  -- with the Court's instruction.

7           THE COURT:  No.  He may argue.

8           MR. MATHUES:  Do not fall for what Officer

9   Brooks wants you to believe, that he had a reasonable and

10  good-faith basis that his statements to the EEOC in 2014

11  and his statements to the mayor's office in 2016 and his

12  statements to the Police and Fire Commission in 2016,

13  with reference to the consent decree and with reference

14  to Officer Berge, were correct.

15          I'm going to give you seven reasons -- rapid

16  fire -- why Officer Brooks did not have a reasonable and

17  good-faith basis for what he said.

18          Number one:  Officer Brooks never said a word

19  to the Kankakee County State's Attorney.  He said that on

20  the stand.  He never went to the State's Attorney.  And

21  for all the attempt from the plaintiff to talk about

22  Officer Berge and try to put Officer Berge on trial, it's

23  interesting that Officer Brooks never thought it was

24  worth going to the Kankakee County State's Attorney.

25  That may seem like a small thing.  It was only one

1   question amongst all the others.  But if you've ever

2   played poker, you've heard maybe of a "poker tell."  It's

3   a small thing.  You know, a guy or a gal gets a bad hand

4   and they take a drink; or they get a good hand, and their

5   eyes blink.  Something of that nature that an experienced

6   player -- which is not me; I can tell you that -- looks

7   at and says, "It's a small thing, but it tells me a lot."

8            I submit to you that Officer Brooks's not going

9   to the State's Attorney's Office -- you didn't hear

10  anything about him going to the FBI or anyone else --

11  should tell you a lot.

12           Number two:  Officer Brooks was clearly

13  impeached on the stand about the effect of the agreed

14  order in his own case.  You saw it right in front of you.

15  You heard him, I would submit to you, try to avoid it.

16  But, eventually, he had to read it to you.  He said in

17  his deposition:  The agreed order didn't benefit him.  He

18  didn't benefit from it.  And he said the opposite on the

19  stand, that he was satisfied with it.

20           I submit to you:  That is not a small thing.

21  It's not an ancillary issue, like forgetting which -- you

22  know, getting your dates turned around, which can happen

23  to a lot of us.  This is Richard Brooks's lawsuit.  His

24  name is on the caption.  He brought it.  And he wants you

25  to believe that it's an accident; that he changed his

1   position, or a small thing, about whether he benefitted

2   from the settlement?  Don't fall for it.  It's the second

3   reason he did not have a good-faith, reasonable and

4   good-faith basis for his statements.

5              Number three:  When he got the letter, Officer

6   Brooks did not try to find out what the facts actually

7   were.  He didn't go to the chief or anyone else to try to

8   find it out.  I submit to you:  If he was genuinely

9   concerned about wanting to look out for the best of the

10  department, and if he was generally concerned about

11  "Well, Paul Berge is making us look bad," and he gets the

12  letter finding out "inaccurate facts," "false facts,"

13  "inaccurate statements" -- if he's really concerned about

14  it, why not at least try to get your facts right before

15  you go opening your mouth again?  He didn't do that.

16  Reason number three you can conclude he didn't have a

17  reasonable and good-faith basis.

18             Reason number four:  His statements about the

19  agreed order and not even mentioning that it was expired.

20  Now, you can read for yourself the statement in the

21  agreed order that says "this order shall expire" and

22  decide for yourself whether that plain language squares

23  with the arguments you've heard from the plaintiff's

24  attorney.

25             But it is undisputed that Richard Brooks --

1    Officer Brooks, excuse me -- said nothing about the order

2    being expired.  Nothing.  That is undisputed.

3             It is also -- you heard from Chief Regnier and

4    you heard from Lieutenant Passwater that the other times

5    he brought that up he said nothing about it being

6    expired.  Again, does it make any sense that in his own

7    case that he brought he doesn't know what the order says?

8    If he didn't know the facts, it's because he didn't want

9    to know them.

10            Reason Number five that Officer Brooks did not

11   have a good-faith, reasonable and good-faith basis for

12   his statements:  You heard testimony that repeatedly

13   Officer Brooks made statements to the effect of "nothing

14   was done as far as Sergeant Berge."  And, yet, you also

15   heard from the chief -- and it was, this part of it

16   wasn't disputed -- at the time Officer Berge was

17   suspended for the steroids, he was number one on the

18   sergeant list.  Everyone could see it because it's

19   publicly posted.

20            You heard from the chief -- and it's

21   undisputed -- that at that time, Chief Regnier skipped

22   Officer Berge.  He skipped the guy, number 2, and he

23   promoted an African American officer.  That's no dispute

24   either.  If Richard Brooks didn't know that, he was

25   walking around with his eyes closed.  His statements do

1   not have a reasonable and good-faith basis.

2          Number six:  Officer Brooks kept saying the

3   same thing, after he was told he was wrong, without

4   getting more evidence.  You heard that the statements he

5   made in 2014 were very similar -- with one exception that

6   I will get to -- to the statements he made in

7   February 2016 and in April 2016.

8          He kept saying the same thing after he was told

9   he was wrong; and as you heard, he didn't come forward

10  with more evidence to back up his claims.  From that, you

11  may conclude that he did not ever have a good-faith basis

12  for his statements.  And if he had a good-faith basis in

13  2014, that evaporated when he was told he had facts wrong

14  and he kept saying the same thing without giving or

15  providing more evidence.  So, therefore, the plaintiff

16  would not have met their burden.

17         And number seven:  Officer Brooks sat on what

18  he knew about Paul Berge until it was a time convenient

19  for him.  You heard a question asked on the plaintiff's

20  arguments.  "Well how come there -- why was there a

21  cover-up?  Why didn't they investigate and do a cover-up

22  about what happened to Officer Berge in 2-- what he did

23  in 2012, coming out in 2016?"  Ladies and gentlemen, if

24  Officer Brooks wants to know the answer to that question,

25  he can look in the mirror.

BROOKS v. CITY OF KANKAKEE, 17-2265 -- Jury Trial (5/1/19)

1          You heard it said very clearly from both

2     Lieutenant Passwater and Chief Regnier -- there was no

3     real dispute about that -- that Officer Brooks made

4     general statements about knowing about misconduct or

5     referencing a car crash, but he wouldn't give a name.  He

6     wouldn't say.  He didn't provide the information.  Why

7     didn't they know?  Well, there was a lot of reasons, but

8     one of them was Richard Brooks sat on this information

9     until a time beneficial to him.  That is what happened.

10    And from that, you may conclude that he never had a

11    reasonable and good-faith basis for his statements

12    because that kind of selective releasing of information

13    is not reasonable or in good faith.

14          At the beginning of the case, I gave you three

15    themes.  One of them was a difference between genuine

16    confusion and deliberate deception.  I think I've covered

17    that.

18          I've given you seven reasons why Richard Brooks

19    wasn't genuinely confused.  He didn't have a good-faith

20    basis.  He never went to the State's Attorney's Office.

21    He was impeached on a major matter.  He didn't try to

22    correct the facts.  He never mentioned that the agreed

23    order was expired.  He saw that Paul Berge was passed

24    over, and an African American officer was promoted

25    instead.

1          And by the way, you can consider motive in this

2    case.  Think about something.  Officer Brooks told you

3    that two of the other plaintiffs in his original lawsuit,

4    who are also African American, at one time or another

5    served as acting chief.  You've heard that Officer Brooks

6    admit he wasn't -- he was disappointed in the jury

7    verdict, and the chief testified against the side that

8    Officer Brooks took.

9          So Officer Brooks sees two other officers are

10   promoted.  The chief skips Paul Berge, white, to promote

11   a different African American officer.  But Officer

12   Brooks, while a good patrolman, was still a good

13   patrolman.  What other motive might he have for the

14   statements that you heard him make?

15         And lastly, as I said, Officer Brooks sat on

16   the information promoting Paul Berge.

17         The second theme I told you about was the

18   contrast between inaccurate statements of fact and claims

19   about discrimination, or an opinion about discrimination.

20   Ladies and gentlemen, the facts simply are the facts.

21   It's a fact whether or not there's a consent decree

22   issued.  It's not a claim of discrimination.  It's not --

23   it's true or not true.

24         It is a fact, one way or the other, that as

25   Officer Brooks stood up and said nothing was being done

1   about what Berge did -- either it's a fact that nothing

2   happened, or it's a fact that he got a 30-day suspension

3   and other consequences that came along with it.

4            If you look at the letter that you saw and

5   have -- I'm not going to belabor the point; you can read

6   for yourself -- nowhere does it say that Officer Brooks

7   can't complain about discrimination or go to the various

8   bodies as he has, indeed, done and been suspended for.

9   It tells him he cannot make inaccurate statements.

10           And the last thing I told you that would be a

11   theme in this case is the contrast between looking out

12   for one's self and looking out for the department.  You

13   heard the testimony about how the police department has a

14   paramilitary structure.  There's a need for unified

15   focus.  There's a need for discipline.  And you heard the

16   other testimony.

17           And in light of all that, ask yourself:  Given

18   what Richard Brooks -- Officer Brooks said and what he

19   didn't say and when he said it; and given how you heard

20   that, when the chief found out about the steroids, he did

21   something; when he found out about racially insensitive

22   Facebook posts from another officer, the next day he did

23   something; when he finally heard about Officer Berge's

24   name relating to the car crash, he did something -- who

25   is it that's looking out for himself, and who is it

1  looking out for the Department?

2          I mean, you've heard a lot on this count; and,

3  really, the plaintiffs have tried -- even though the man

4  is not here -- tried to turn this into -- put Paul Berge

5  on trial because I submit to you:  If you follow that

6  issue, you won't be focused nearly as much on what

7  Officer Brooks actually said and whether he had a

8  good-faith basis for it.

9          But, you know, maybe you'll go back into the

10  jury room and you'll look at Paul Berge, and you have an

11  opinion about it.  Maybe it's on one end of the spectrum.

12  You know, maybe you say, "Steroids?  That's not a big

13  deal.  You know, ball players get caught with it.  That's

14  up to someone.  I wouldn't have given him 30 days for

15  that."  You can have that opinion if that's what you want

16  to think.  It doesn't matter to the outcome of the case.

17          Or maybe you go back and you're on the other

18  end of the spectrum.  Maybe you look at Officer Berge's

19  behavior and you say, "Well, that's not -- you know,

20  there's no evidence that he's otherwise doing things that

21  he shouldn't have been doing with respect to his work on

22  the police force."  But you say, "Given everything that

23  we know that he did, you know, if I was in the chief's

24  shoes, I would just fire that guy."

25          Maybe you're sitting there thinking, you know,

BROOKS v. CITY OF KANKAKEE, 17-2265 -- Jury Trial (5/1/19)

1    "I heard what the chief said.  I heard him explain that

2    discipline can be appealed.  It might take a year.  They

3    might win; they might lose.  And I heard the explanation

4    that, you know, it was better to take the sure thing and

5    suspend Officer Berge for 30 days and give him the

6    last-chance agreement because that was a sure thing

7    rather than an unsure of firing him."

8           Maybe you think, "Hey, you know what?  I just

9    would have tried to fire the guy and let the chips fall

10   where they are."  You know, you could go back there and

11   you could have that opinion, and it has absolutely zero

12   relevance to the outcome of his case.  Officer Brooks can

13   have that opinion -- and so can anyone else -- because

14   that's not what this case is about.

15          This case is fundamentally about Richard

16   Brooks's attempt to have his own facts.  It's about him

17   standing up in front of the Board of the Police and Fire

18   Commission and not saying that Officer Berge wasn't

19   disciplined severely enough, not saying that African

20   American officers had done the same thing and they got

21   fired.  That wasn't the claim.  The claim was "nothing

22   was done"; and, yet, at that very moment, Officer Berge

23   is serving a 30-day suspension pursuant to a last-chance

24   agreement.  That kind of statement is what this case is

25   about.

BROOKS v. CITY OF KANKAKEE, 17-2265 -- Jury Trial (5/1/19)

1          It's about Officer Brooks repeatedly saying,

2     "There's a consent decree; there's a consent decree,"

3     hanging this albatross around the neck of the police

4     department, when he has no good-faith basis to make it.

5          For those reasons, Plaintiff, regardless of

6     what they say in rebuttal, have not proven their case.

7     And that is why, when you go back into the jury room and

8     you get the instructions, we'll ask you to come back and

9     to rule and to tell Officer Brooks that, notwithstanding

10    his rights to have an opinion, notwithstanding the fact

11    that maybe you don't agree with everything the police

12    department did; but to tell him -- to make very clear --

13    that while people are entitled to their opinion, they're

14    not entitled to their own facts.  That's what this case

15    is about.  That's why the correct verdict is a verdict

16    for the defendant, the City of Kankakee.

17              THE COURT:  Thank you, Mr. Mathues.

18              Mr. Flaxman.

19              MR. FLAXMAN:  Thank you, Your Honor.

20         Why are we here?  Well, you're here because you

21    were summoned, but we're here -- this lawsuit is in court

22    because there's a statute that Congress passed saying:

23    If you believe you've been the subject of retaliation in

24    employment, you can file a lawsuit; and you can come to

25    court, and you can have eight people decide your case,

BROOKS v. CITY OF KANKAKEE, 17-2265 -- Jury Trial (5/1/19)

1    and decide the case after hearing the witnesses who have

2    been cross-examined, decide the case after listening and

3    reading the judge's instructions.

4            You don't get any of that with the Illinois

5    Department of Human Rights.  You get a discussion in a

6    conference room.  And you get a finding that:  Well, the

7    rules of the police department allowed discipline if the

8    chief wants it and the chief thinks it's against the

9    rules, so you can be disciplined.  That's not -- you're

10   not bound by that Illinois Department of Human Rights

11   finding.  You're bound by what you heard in court today

12   and yesterday.

13           We're told that Mr. Brooks has his own facts.

14   Does he have his own facts that there was an agreed order

15   entered in 2005 in which the City agreed to make efforts

16   to have a diverse work force?  That's, that's everybody's

17   fact.

18           Did Mr. Brooks have his own facts that in 20--

19   when he spoke in 2014, that there was an officer who was

20   working in Narcotics who was buying and using illegal

21   steroids?

22           And there was a suggestion made, "Well, that's

23   no big deal to use illegal steroids."  That's the kind of

24   response that somebody who comes forward and complains

25   about a police cover-up gets.  He gets excellent lawyers

BROOKS v. CITY OF KANKAKEE, 17-2265 -- Jury Trial (5/1/19)

1    coming into court, tearing him apart, saying:  He has

2    alternate facts.  He's imagining this.  He's saying that

3    everybody covered up this one-car accident and the false

4    police report -- they covered it up, and he's just using

5    it for his own benefit.  He's not coming forward because,

6    as even the chief agrees, he's a good cop.  He's a

7    hard-working, honest cop.  He's not coming forward

8    because there's something rotten in the City of Kankakee

9    when an officer who does bad things, who does awful

10   things, doesn't get fired, gets suspended in secret.

11           The chief didn't tell anyone, "I'm suspending

12   this guy for 30 days.  We're going to have training about

13   using steroids because it's illegal, and it's not healthy

14   to use steroids."  He doesn't -- the chief doesn't tell

15   everybody that, "Well, Officer Berge, who I promoted to

16   sergeant, has signed a last-chance agreement, and he's

17   agreed to be suspended for 30 days."

18           That's a secret.  The chief even writes in his

19   letter -- and, again, it's Exhibit 1 -- that "the

20   discipline administered by the Department to another

21   officer is, quite frankly, none of your business."

22   Nobody knew that Berge had been suspended for 30 days or

23   that he'd signed the last-chance agreement.

24           People knew that he was a sergeant.  People

25   knew that he wasn't bumped down -- busted down from being

1    a sergeant, that he wasn't assigned to work at a desk.

2            Mr. Brooks spoke out about bad things that were

3    happening in the police department; and what he gets is a

4    lawyer coming in, looking you in the eye, with a little

5    smile, a little poker tell, and telling you Mr. Brooks

6    has his own facts.  He's imagining all this stuff about

7    an agreed order and a promise not to discriminate.  He's

8    imagining all this stuff about a cop buying and using

9    illegal drugs.  He's imagining all this stuff about a

10   cover-up with a cop making a false police report after he

11   wrecks his car in a, in an accident where he admits he

12   was -- acknowledges that he was under the influence of

13   drugs and alcohol.

14           The verdict should not be what you saw on the

15   wall.  It should be -- that Plaintiff box should be

16   checked, and you should award an appropriate amount of

17   damages.

18           Thank you.

19           THE COURT:  Thank you, Mr. Flaxman.

20           At this time, I'd ask my courtroom deputy to

21   swear in the court security officer.

22               (Court security officer sworn, 2:51 p.m.)

23           THE COURT:  All right.  Ladies and gentlemen,

24   at this time, you may begin your deliberations.

25               (Deliberations begin, 2:51 p.m.)

```
 1              THE COURT:  All right.  Be seated.  The jurors
 2   have left the courtroom.
 3              The -- we only had four exhibits admitted.
 4   They're all four joint exhibits.  Rather than go through
 5   each exhibit one at a time, I presume you'd like all four
 6   of them to go back to the jury?
 7              MR. FLAXMAN:  I think they took their jury --
 8              THE COURT:  Yeah, and they have their own
 9   copies anyway, with their jury books.  So any objection
10   to the actual exhibits going back?
11              MR. FLAXMAN:  I have no objection.
12              MR. MATHUES:  No, Your Honor.
13              THE COURT:  All right.  So we'll make sure the
14   actual four exhibits go back.
15              Keep in touch with my courtroom deputy.  Make
16   sure she can find you if there's a jury question.
17              My usual speech is:  I will wait a reasonable
18   time for you to return, based upon the nature of the
19   question.  If it's something simple, such as "We need a
20   smoke break" -- although I don't think anybody smokes --
21   or "We want to stay late; can we get dinner?", I'll take
22   care of that.  I don't need your input on that.
23              If it's something else that's going to require
24   your input, I'll need you to get back to the courtroom as
25   soon as possible.
```

BROOKS v. CITY OF KANKAKEE, 17-2265 -- Jury Trial (5/1/19)

1          So anything else on behalf of the plaintiff?

2          MR. FLAXMAN:  Can we ask what your estimate is

3     of when we'll hear from them?

4          THE COURT:  I have -- I used to have estimates

5     about how long the jury would be out.  I have since given

6     that up since any rule I try to make is usually proven

7     false within one or two trials.  So now I, I -- sometimes

8     I think they'll be out for days, and they come back in

9     minutes.  Other times, I think a trial is

10    straightforward; and the next thing I know, I get a

11    series of questions, including asking for a copy of the

12    Constitution.

13         That actually happened, so -- and I didn't give

14    it to them.  And they were out for way longer than I

15    thought they were going to do.  Evidently, they were

16    going to do original research.  My instructions meant

17    nothing.

18         So no, Mr. Flaxman, I can't give you an

19    estimate.

20         All right, so just make sure my courtroom

21    deputy can get ahold of you, and we'll be in recess until

22    we get a verdict.

23         MR. MATHUES:  Thank you, Your Honor.

24         MR. FLAXMAN:  Thank you, Your Honor.

25              (Recess, 2:54 p.m. to 4:37 p.m.)

BROOKS v. CITY OF KANKAKEE, 17-2265 -- Jury Trial (5/1/19)

```
 1              THE COURT:  All right.  We're back on the
 2   record.  All parties and counsel are present.
 3              When were you advised the jury reached a
 4   verdict?
 5              CSO AL JOHNSTON:  4:24.
 6              THE COURT:  At 4:24, the jury reached a
 7   verdict.
 8              Any reason not to find out what the verdict is,
 9   Mr. Flaxman?
10              MR. FLAXMAN:  No, Your Honor.
11              MR. MATHUES:  No, Your Honor.
12              THE COURT:  All right, let's bring them in.
13                  (Brief pause in proceedings.)
14                  (Jury present, 4:39 p.m.)
15              THE COURT:  All right, be seated.
16              One of you is being very careful to conceal the
17   papers.  That's usually the way I tell who the foreperson
18   is.
19              Who's the foreperson?
20              Ah, this is Juror Number 4; you are the
21   foreperson.  Has the jury reached a unanimous verdict?
22              JUROR NUMBER 4:  Yes, Your Honor.
23              THE COURT:  All right.  Please pass the verdict
24   form over to my court security officer.
25                  (Brief pause in proceedings.)
```

BROOKS v. CITY OF KANKAKEE, 17-2265 -- Jury Trial (5/1/19)

```
1              THE COURT:  All right.  The verdict form reads
2    as follows:  "On Plaintiff's retaliation claim against
3    Defendant, we, the jury, find in favor of" -- the box for
4    "Defendant" is checked.
5              It is dated with today's date and appears to
6    have the signature of all eight jurors.
7              At this time, I'd ask that the jury be polled.
8              COURTROOM DEPUTY:  Juror Number 35, was this
9    and is this now your verdict?
10             JUROR NUMBER 35:  Yes.
11             COURTROOM DEPUTY:  Juror Number 29, was this
12   and is this now your verdict?
13             JUROR NUMBER 29:  Yes.
14             COURTROOM DEPUTY:  Juror Number 17, was this
15   and is this now your verdict?
16             JUROR NUMBER 17:  Yes.
17             COURTROOM DEPUTY:  Juror Number 12, was this
18   and is this now your verdict?
19             JUROR NUMBER 12:  Yes.
20             COURTROOM DEPUTY:  Juror Number 55, was this
21   and is this now your verdict?
22             JUROR NUMBER 55:  Yes.
23             COURTROOM DEPUTY:  Juror Number 26, was this
24   and is this now your verdict?
25             JUROR NUMBER 26:  Yes.
```

BROOKS v. CITY OF KANKAKEE, 17-2265 -- Jury Trial (5/1/19)

```
 1            COURTROOM DEPUTY:  Juror Number 4, was this and
 2   is this now your verdict?
 3            JUROR NUMBER 4:  Yes.
 4            COURTROOM DEPUTY:  Juror Number 57, was this
 5   and is this now your verdict?
 6            JUROR NUMBER 57:  Yes.
 7            THE COURT:  All right.  Ladies and gentlemen,
 8   at this time I direct that the judgment be entered on the
 9   verdict.
10            I heard from higher authorities that you're
11   done, so thank you for your jury service.  You're now
12   completely free.  You don't have to call and check back
13   in.
14            UNIDENTIFIED JUROR:  We don't?
15            THE COURT:  Nope.  She has spoken.
16            So -- I lost my train of thought.  Well,
17   basically, thank you on behalf of all the judges and all
18   the citizens of the Central District.
19            I hope you found serving meaningful.  It was a
20   good opportunity to see how a jury trial really works
21   without being here for weeks; and I hope I, I -- you
22   thought I used your time wisely and didn't waste your
23   time, because I hate wasting people's time.  And I hope
24   you learned some things.
25            You're free to discuss the case with anybody
```

BROOKS v. CITY OF KANKAKEE, 17-2265 -- Jury Trial (5/1/19)

1    you want to talk to about it.  Snapchat, Facebook -- do

2    whatever you want to do now; you're free.

3              And enjoy your evening, so thank you very much.

4              (Jury dismissed from service, 4:41 p.m.)

5              THE COURT:  All right.  Be seated.  The jury's

6    left the courtroom.

7              Mr. Flaxman, anything further on behalf of the

8    plaintiff?

9              MR. FLAXMAN:  Not today, Your Honor.

10             THE COURT:  Mr. Mathues?

11             MR. MATHUES:  No, Your Honor.

12             THE COURT:  All right.  That will be all for

13   the record, then.  We'll be in recess.  Thank you,

14   gentlemen.

15             (Trial concludes, 4:42 p.m.)

16

17             *  *  *  *  *  *  *  *  *  *

18

19                  REPORTER'S CERTIFICATE

20        I, LISA KNIGHT COSIMINI, RMR-CRR, hereby certify
     that the foregoing is a correct transcript from the
21   record of proceedings in the above-entitled matter.

22        Dated this 15th day of May, 2019.

23
                   _____s/Lisa Knight Cosimini_____
24                  Lisa Knight Cosimini, RMR-CRR
                    Illinois License # 084-002998
25